1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5                     Plaintiff,        )
                                        )
6                                       )  No. 13-10048-FDS
     vs.                                )
7                                       )
     KING BELIN,                        )
8                     Defendant.        )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12                  HEARING ON MOTION TO SUPPRESS

13

14

15          John Joseph Moakley United States Courthouse
                          Courtroom No. 2
16                      One Courthouse Way
                        Boston, MA 02210
17

18                      December 5, 2013
                          9:21 a.m.
19

20

21

22

23                     Valerie A. O'Hara
                      Official Court Reporter
24        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3204
25                    Boston, MA 02210
                  E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by JOHN A. WORTMANN, JR.,
     ESQ., 1 Courthouse Way, Suite 9200, Boston, Massachusetts
4    02110;

5    For the Defendant:

6         Federal Public Defender's Office by IAN GOLD, ESQ. and
     JENNIFER PUCCI, ATTORNEY, 51 Sleeper Street, Boston,
7    Massachusetts 02210.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2    Testimony of:           Direct  Cross  Redirect  Recross

3    PHILIP BISSONNETTE
       by Mr. Wortmann        5                69
4      by Mr. Gold                    38

5


6                         E X H I B I T S

7    No.      Description                          In Evd.

8
     1        Map                                  10
9
     2        Incident Report                      12
10
     3        Reports regarding firearms-related   13
11            incidents

12   4        Photograph                           18

13   5        Incident report from 2009            36

14   6        Photograph from 2012                 37

15   8        CD                                   42

16   9        Three FIOs                           58

17   10       Photograph                           70

18   11       Documents from the Suffolk County    71
              Sheriff's Department
19
     No.      Description              For Identification
20
     7        Ruger P95DC Firearm                  37
21

22

23

24

25

|   |   |
|---|---|
| 1 | PROCEEDINGS |
| 2 | THE CLERK:  All rise.  Thank you please be seated. |
| 3 | Court is in session in the matter of King Belin.  This is |
| 4 | Case Number 13-cr-10048.  Counsel, please note your appearances |
| 5 | for the record. |
| 6 | MR. WORTMANN:  Your Honor, John Wortmann for the |
| 7 | United States, good morning. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. GOLD:  Good morning, your Honor, Ian Gold on |
| 09:24AM 10 | behalf of the defendant, King Belin.  With me at counsel table |
| 11 | is an attorney from our office, Jennifer Pucci. |
| 12 | MS. PUCCI:  Good morning, your Honor. |
| 13 | THE COURT:  Good morning.  Let the record reflect the |
| 14 | defendant is here.  This is a hearing on defendant's motion to |
| 15 | suppress.  My understanding was that it was a warrantless |
| 16 | search and seizure, and, therefore, the government has the |
| 17 | obligation to go forward. |
| 18 | MR. WORTMANN:  Correct, your Honor.  Your Honor, just |
| 19 | one preliminary matter.  Mr. Gold and I spoke, and we're in |
| 09:24AM 20 | agreement that your Honor can consider anything that's attached |
| 21 | to either of the motions. |
| 22 | THE COURT:  All right. |
| 23 | MR. WORTMANN:  And I do have six paper exhibits.  I've |
| 24 | provided you and Mr. Gold with a premarked set. |
| 25 | THE COURT:  Okay.  Does this include what was attached |

1    to the motions?

2    MR. WORTMANN:  Your Honor, a couple of them, otherwise

3    it would have disrupted the flow to keep referring back to the

4    exhibits.

5    THE COURT:  I didn't print that out.  I have the

6    memos, which I've read.  I didn't print those out.

7    MR. WORTMANN:  If we actually get into a discussion

8    about anything, I'll be happy to hand up a copy.

9    THE COURT:  I assume that's acceptable, Mr. Gold?

09:25AM 10    MR. GOLD:  Yes, your Honor.

11    THE COURT:  I don't think I need anything by way of an

12    opening unless you want to give one.

13    MR. WORTMANN:  No, you don't.  I call Officer Phil

14    Bissonnette to the stand, your Honor.

15    PHILIP BISSONNETTE, having been duly sworn by the

16    Clerk, testified as follows:

17    THE CLERK:  State your name for the record spelling

18    your last name.

19    THE WITNESS:  Officer Phil Bissonnette,

09:25AM 20    B-i-s-s-o-n-n-e-t-t-e.

21                    DIRECT EXAMINATION

22    Q.   Good morning, Mr. Bissonnette.  Can you tell us where you

23    work, please?

24    A.   Good morning.  I work for the Boston Police Department.

25    Q.   And for how long?

1    A.    Six years.

2    Q.    So, you graduated from the academy in approximately 2007?

3    A.    Yes.

4    Q.    And what was your first posting following your graduation?

5    A.    Following graduation, I was assigned to a walking beat

6    down the Back Bay for several months.

7    Q.    How long did you do that?

8    A.    Just about two months.

9    Q.    And then where were you assigned to?

09:26AM 10    A.    Then I was transferred to District 3.

11    Q.    Where is District 3, what portion of the city?

12    A.    Dorchester, Mattapan.

13    Q.    How long were you in District 3?

14    A.    Approximately five years.

15    Q.    During the five years you were in District 3, did your

16    responsibilities change over time?

17    A.    They did.

18    Q.    Could you describe that to the Court?  What did you do

19    when you first were assigned to District 3?

09:26AM 20    A.    When I was first assigned to District 3, I worked as a

21    uniform patrol officer in a marked car responding to 9-1-1

22    calls, calls of a crime nature and that sorts.

23    Q.    Over time, did you acquire new and different

24    responsibilities?

25    A.    I did.

1  Q.   Tell us about them, please.

2  A.   I was assigned to the anti-crime car, which is an unmarked

3  car.  We work in plain clothes.

4  Q.   Could you tell us a little bit about what the difference

5  between standard patrol is and working a K car?

6  A.   Sure.  Working the K car, it's more of a proactive type of

7  patrol, less responding to radio calls.  Our main objectives,

8  gather intelligence.

9  Q.   With respect to what?

09:27AM 10  A.   Primarily gangs, guns and drugs.

11  Q.   Okay.  And you indicated that you worked in plain clothes?

12  A.   Yes.

13  Q.   Do you always wear a badge on the outside of your

14  clothing?

15  A.   I do, yes.

16  Q.   And what kind of vehicle do you customarily use when

17  working on the K car?

18  A.   We use an unmarked Crown Victoria.  It has subdued lights

19  and antennas.

09:27AM 20  Q.   Based on your experience, sir, is that a car that's

21  immediately recognizable on the streets as a Boston police car?

22  A.   Yes.

23  Q.   Okay.  Now, in addition to the patrol work that you did in

24  the K car, did you also begin to attend meetings with respect

25  to activity in your district and gang intelligence?

A.   Yes.

Q.   What kind of meetings were those?

A.   Once a month, the captain has a meeting down the Mildred Ave. School, and it's pretty much an update about what's going on in the district.

Q.   Did you also have -- are you given information on a daily basis at roll call?

A.   Yes.

Q.   And do you have certain reading material available to you on a daily basis regarding both developments in the district and gang intelligence?

A.   Yes.

Q.   What's that?

A.   That's the BRIC, it's the Boston Regional Intelligence Center daily post.

Q.   Do you read that regularly?

A.   Yes.

Q.   What I'd like to do is focus you in on September 17th, 2012 and ask the first obvious question.  Were you working that day?

A.   Yes, I was.

Q.   What shift?

A.   I was working the first half shift which runs from 4 p.m. till 11:45 p.m.

Q.   And at that point in time, was that your standard shift?

1    A.   Yes.

2    Q.   And were you assigned to the K car on that particular

3    evening?

4    A.   I was.

5    Q.   So, plain clothes, correct?

6    A.   Yes.

7    Q.   Badge around your neck?

8    A.   Yes.

9    Q.   Unmarked Crown Victoria?

09:29AM 10   A.   Yes.

11   Q.   And did you have a partner?

12   A.   I did, Officer Tom Finn.

13          THE COURT:  I'm sorry, Tom?

14          THE WITNESS:  Thomas Finn, F-i-n-n.

15   Q.   Let's focus you in on about 6:45.  Do you recall where you

16   were?

17   A.   At that time, we were on Norfolk Street.

18   Q.   And I'm going to put on the document camera a map, which

19   is two pages from Mapquest, your Honor, which is of the area at

09:29AM 20   issue, and do you recognize the area on that map?

21   A.   Yes.

22   Q.   And what's the big green thing in the middle?

23   A.   That's Norfolk Park.

24   Q.   And could you indicate on the map just by drawing a line

25   on the screen in front of you where Norfolk Street is?

1    A.    Sure.  Here's Norfolk Street.

2    Q.    Okay.

3          THE COURT:  I take it there's no objection to use of

4    this exhibit, Mr. Gold?

5          MR. GOLD:  No, your Honor.

6          THE COURT:  All right.  It's admitted, Exhibit 1.

7          (Map was admitted into evidence as Exhibit No. 1.)

8          MR. WORTMANN:  Thank you, your Honor, my apologies.

9    Q.    And Mildred Avenue that we're going to be talking about,

09:30AM 10   where is that?

11   A.    That's right here.

12   Q.    Okay.  Now, where on Norfolk Ave. were you at

13   approximately 6:45?

14   A.    We were on Norfolk Street just by Morin Street, which is

15   just out of the map's view.

16   Q.    So above, actually inbound towards the city?

17   A.    Yes.

18   Q.    And were you responding to a call?

19   A.    We were, yes.

09:30AM 20   Q.    What was the nature of that call, if you recall?

21   A.    The nature of that call was a removal on Walk Hill Street.

22   Q.    And while you were -- you were in the car with

23   Officer Finn?

24   A.    Yes.

25   Q.    Who was driving?

1    A.    I was driving.

2    Q.    And did you receive another call that caught your

3    attention?

4    A.    Yes.

5    Q.    And what's your recollection of what that call was all

6    about?

7    A.    We heard a broadcast for group fighting at Norfolk and

8    Fessenden Street.

9    Q.    Now, were you immediately familiar with that address?

09:31AM 10   A.    Yes.

11   Q.    And that is in fact the area that you have just shown us

12   on Exhibit 1?

13   A.    Yes.

14   Q.    Now, as of September 17th, 2012, was that an area of

15   concern to you as an officer assigned to doing K car work,

16   proactive police work in District B-3?

17   A.    Yes.

18   Q.    Why?

19   A.    This is an area that has seen recent gun violence, firearm

09:31AM 20   arrests and all types of gun-related incidents.

21   Q.    And have you, yourself, responded to this area for

22   firearm-related offenses?

23   A.    Yes, on numerous occasions.

24   Q.    And in the report that you wrote that night, did you make

25   clear that this was an area that you considered to be an area

1      of concern or high crime area for firearm and firearm-related

2      violence?

3      A.    Yes, we listed a few incident reports on the report --

4      Q.    Okay.

5      A.    -- related to those kind of incidents.

6      Q.    I'm going to put on the document camera and offer into

7      evidence, your Honor, first Exhibit 2, which is a copy of the

8      incident report, and specifically direct your attention to page

9      4 of the report.

09:32AM 10            THE COURT:  Is there any objection to admitting this?

11            MR. GOLD:  To this exhibit, no objection.

12            THE COURT:  It's admitted, Exhibit 2, incident report.

13            (Incident report was admitted into evidence as Exhibit

14      No. 2.)

15      Q.    Is there an area in this report where you specified the

16      high crime nature of this area and backed it up with certain

17      information?

18      A.    Yes.

19      Q.    Could you point that out to the Court, please?

09:33AM 20      A.    Sure, it's this paragraph here.

21      Q.    And the last sentence of that says that you, having

22      patrolled the area on Norfolk Park were very familiar with that

23      area, that it had been plagued with incidents of firearm

24      violence to include homicides, persons shot, persons assaulted

25      by firearms, shots fired, firearm arrests and firearm

1    recoveries, and then there's a parenthetical that said,

2    "incidents to include but limited to certain CC numbers."

3    What's a CC number?

4    A.   That's a Boston Police number that is used to keep track

5    of the incidents.

6    Q.   And so each one of those 8 or 9 digit numbers that

7    follows, what do they refer to?

8    A.   They refer to a police report that's written on a specific

9    incident.

09:33AM 10    Q.   And did that constitute every report that you were aware

11    of firearm-related violence in and around Norfolk Park?

12    A.   No, that is by no means a limited list.

13    Q.   Now, let me show you what's been marked as Exhibit 3, and,

14    your Honor, I'd offer this into evidence as well.

15              THE COURT:  Any objection?

16              MR. GOLD:  Your Honor, we do object to this as

17    evidence.  We don't object to the incident report reflecting

18    even the references to them, but entering these I think is

19    unnecessary.  We accept for the purposes of this hearing that

09:34AM 20    there were firearms-related incidents of which the officer was

21    aware that he made reference to when he wrote his report, but

22    entering these into evidence in this hearing we'd object to.

23              THE COURT:  All right.  I think it's marginally

24    relevant, but I'll admit it for what it's worth, Exhibit 3.

25              (Reports regarding firearms-related incidents were

1    admitted into evidence as Exhibit No. 3.)

2    Q.   And did you review these reports?

3    A.   Yes, I did.

4    Q.   Do you believe the summary to be accurate?

5    A.   Yes, it is.

6    Q.   Did you help me in tracking the location of these

7    incidents in relation to Norfolk Park?

8    A.   Yes, I did.

9    Q.   And showing you the second page of Exhibit 3, those are

09:35AM 10   the locations of all of the incidents that are summarized on

11   the first page?

12   A.   Yes.

13   Q.   And there's also a reference here to the 2009 arrest.

14   What does that refer to?

15   A.   That refers to an arrest I made in 2009 of the defendant.

16   Q.   For?

17   A.   For unlawful possession of a firearm.

18   Q.   And that's approximately the location where the car was

19   ultimately stopped and the firearm recovered?

09:35AM 20   A.   Yes.

21   Q.   We'll talk about that more then later.  Thank you.  So

22   you're on your way to Walk Hill Street, and you hear something

23   about a fight in the area of Mildred Avenue and Norfolk Street,

24   correct?

25   A.   Yes.

1    Q.    What did you do?

2    A.    At that time we respond to that area to assist the

3    officers that were also responding.

4    Q.    Now, you were already on your way to one call, and you

5    abandon that and go to another call.  Why?

6    A.    In our opinion, this was a more high priority call just

7    because of the area it was in because it was a group fighting.

8    Q.    Now, I've listened to the turret tape, and at some point

9    you can hear a reference to girls.  Do you recall hearing that

09:36AM 10   as you were driving on Norfolk that day?

11   A.    No.

12   Q.    So, if I put Exhibit 1 back on the document camera, could

13   you tell us how you -- could you tell us how you came into the

14   area of Norfolk Street?

15   A.    Sure.  We were traveling on Norfolk Street in this

16   direction here.

17   Q.    And, tell us, as you pulled in, where did you pull your

18   unmarked cruiser to?

19   A.    We pulled it onto Mildred Avenue and stopped it just at

09:37AM 20   the corner --

21   Q.    Okay.

22   A.    -- close to Norfolk Street there.

23         THE COURT:  You were traveling southwest, I guess it

24   is, on Norfolk Street?

25         THE WITNESS:  Yes, southbound.

1    Q.    So you'd be driving away from the city?

2    A.    Yes.

3          THE COURT:  And, I'm sorry, is that Blue Hill Avenue

4    on the left?

5          MR. WORTMANN:  I'm sorry, your Honor.

6          THE COURT:  I want to orient myself.  On the far left

7    of the map, is that Blue Hill Avenue?

8          THE WITNESS:  This here is Fessenden Street.  Blue

9    Hill would be probably more over here.

09:37AM 10          THE COURT:  Okay.  Thank you.  Go ahead.

11   Q.    And the second page of Exhibit 1, do you recognize that?

12   A.    Yes, this is the same intersection at Mildred Avenue and

13   Norfolk Street.

14   Q.    Okay.  Could you describe what we're looking at, please?

15   A.    Sure.  This is a view of Norfolk Park.  In the background

16   here, you can see various playground equipment, then you can

17   see this street here is Mildred Avenue.  This is Norfolk Street

18   here.

19   Q.    So there's a child's playground, tot lot?

09:38AM 20   A.    There's the tot lot there.

21   Q.    And behind that, if we go back to Exhibit 1, we can see

22   some ball fields, and it looks like basketball and tennis

23   courts?

24   A.    Yes.

25   Q.    Now, do you recall what the weather was like that day and

1    at that particular time?

2    A.    At that time it was a warm September evening.

3    Q.    How do you remember that?

4    A.    I was wearing shorts and a T-shirt.

5    Q.    And as you pulled in, do you recall whether there was

6    activity going on in the park?

7    A.    There were children and adults playing in the playground,

8    yes.

9    Q.    So right adjacent to the intersection of Mildred and

09:39AM 10   Norfolk?

11   A.    Yes, right up in that tot lot.

12   Q.    And when you pulled in, you said you took a left onto

13   Mildred and stopped your car right there?

14   A.    Correct.

15   Q.    And showing you what's been marked as Exhibit 4, do you

16   recognize that picture?

17   A.    Yes, this is a picture of my cruiser where we stopped that

18   evening.

19         THE COURT:  Is that picture actually taken that

09:39AM 20   evening?

21         THE WITNESS:  Yes, that was taken -- the cruiser had

22   not moved since we stopped it originally.

23         MR. WORTMANN:  Mr. Clerk, I'm wondering if you could

24   help me.  I'm sorry, I'm having trouble getting these off.

25         THE COURT:  While we're doing that, any objection to

1   Exhibit 4?

2         MR. GOLD:  No, your Honor.

3         THE COURT:  It may be admitted, Exhibit 4.

4         (Photograph was admitted into evidence as Exhibit

5   No. 4.)

6   Q.  So --

7         THE COURT:  I'm sorry, the cruiser is parked on

8   Mildred Street?

9         THE WITNESS:  Yes, on Mildred Avenue, yes.

09:40AM 10   Q.  As you drive into the area apart from the activity in the

11   park, did you see something else that caught your attention?

12   A.  We did see five males walking on Norfolk Street towards

13   us.

14   Q.  So they're walking on the sidewalk on Norfolk Street

15   towards Norfolk Park?

16   A.  Yes.

17   Q.  And did you and Officer Finn make a decision as to what

18   you were going to do?

19   A.  We made a decision to speak to those individuals.

09:40AM 20   Q.  Who was closest to those individuals when you pulled your

21   car and stopped it at the position that's shown in Exhibit 4?

22   A.  Officer Finn.

23   Q.  And what did he do?

24   A.  He approached the group.

25   Q.  And while that was happening, I take it you're getting out

1    of the car?

2    A.    Yes.

3    Q.    And as you look up and see what he's doing, does something

4    else catch your attention?

5    A.    Yes.

6    Q.    Tell us.

7    A.    As I exit the cruiser, I observed that one of the males

8    broke from the group and continued walking on the sidewalk down

9    by where my cruiser was on Mildred Ave.

09:41AM 10   Q.    So essentially did he walk right on the sidewalk sort of

11   right past you except you were on the other side of the car?

12   A.    Yes.

13             THE COURT:  I'm sorry, you were driving?

14             THE WITNESS:  I was driving, yes.

15   Q.    Did you notice anything about the way this person was

16   dressed?

17   A.    I did observe that he had a heavy black hoodie on.

18   Q.    And was that of concern to you?

19   A.    It was.

09:41AM 20   Q.    Tell us why.

21   A.    I've been trained before in certain characteristics, this

22   certain characteristic of somebody wearing a heavy baggie

23   clothing, unsuitable for the weather was concerning to me

24   because they could be trying to hide something under the

25   clothes.

1    Q.    Is that something that apart from your training you've

2    also seen out on the street in making stops and making arrests?

3    A.    Yes.

4    Q.    Was there anything as he walked passed, anything about his

5    mannerisms that were unusual?

6    A.    It appeared he was in a hurry.  He kept his head down.

7    Q.    Did he make eye contact?

8    A.    No.

9    Q.    Was that something else that was of concern?

09:42AM 10    A.    It was.  In my opinion, he was trying to avoid contact

11    with us.

12    Q.    People do that all the time, right?

13    A.    Yes.

14    Q.    But as this individual went past, did you recognize him?

15    A.    I did.

16    Q.    And who did you recognize him to be?

17    A.    I recognized him to be King Belin.

18    Q.    First, do you see the person you recognize to be

19    King Belin in the courtroom today?

09:42AM 20    A.    Yes, I do.

21    Q.    Could you point him out and indicate for the record what

22    he's wearing?

23    A.    Sure, he's right here sitting at the desk wearing a green

24    jumpsuit.

25          MR. WORTMANN:  Your Honor, if the record could reflect

1    that Officer Bissonnette has indicated to the defendant,

2    King Belin?

3             THE COURT:  Yes.

4    Q.   Now, you were familiar with Mr. Belin?

5    A.   Yes, I was.

6    Q.   And from interactions on the street?

7    A.   Yes.

8    Q.   Was there one interaction on the street that stands out?

9    A.   Yes.

09:42AM 10   Q.   And what was that?

11   A.   That was the 2009 arrest of Mr. Belin for unlawful

12   possession of a firearm.

13   Q.   All right.  And were you the arresting officer in that

14   case?

15   A.   Yes, I was.

16   Q.   Now, first off, going back to Exhibit Number 1, can you

17   tell us where that incident -- how did it start out?

18   A.   That started out --

19            THE COURT:  This is the 2009 incident?

09:43AM 20           MR. GOLD:  Yes, sir.

21   A.   I observed the vehicle on Norfolk Street here almost by

22   Blue Hill Ave.

23   Q.   Would you put an X on it.

24   A.   Sure.  Can you actually move it up a little bit?

25   Q.   I can.  I'm afraid I may have cut off.

1   A.   Oh, okay.  It's kind of down here, right at the corner of

2   Norfolk and Blue Ave.

3   Q.   And you ultimately affected a traffic stop?

4   A.   Yes.

5   Q.   And what was recovered?

6   A.   A firearm was recovered from under the driver's seat of

7   that vehicle.

8   Q.   And where did the actual stop take place?

9   A.   The stop took place on Ormond Street.

09:44AM 10   Q.   Showing you page 2 of Exhibit 3, Ormond Street is right

11   where I have my pen?

12   A.   Yes.

13   Q.   How far from Norfolk Park?

14   A.   I would say less than a half a mile.

15   Q.   Okay.  Mr. Belin was arrested for that offense?

16   A.   Yes.

17   Q.   And in the course of charging him on that particular day,

18   did you learn anything about his criminal history?

19   A.   I remember that he had a conviction for carrying a

09:44AM 20   dangerous weapon.

21   Q.   And that affected your charging decision?

22   A.   Yes.

23   Q.   Did you review his criminal history that day?

24   A.   Yes, I did.

25   Q.   Do you remember -- and as of this date, did you recall

1    anything else about it specific?

2    A.    Not specifically other than that it was lengthy.

3    Q.    Okay.  Now, were you also familiar at all with Mr. Belin

4    with respect to his gang involvement?

5    A.    Yes.

6    Q.    And did you believe him to be associated with any gang in

7    District B-3 as of September 17th, 2012?

8    A.    Yes, the Boston Regional Intelligence Center had

9    identified him as a member of the Norfolk Street Bulls.

09:45AM 10   Q.    And is that consistent with what you observed him out on

11   the street and what you learned at your meetings?

12   A.    Yes.

13   Q.    And the Norfolk Street Bulls, would you describe them as

14   an active gang in District B-3?

15   A.    Yes, they have been very active.

16   Q.    Involved, and were they active in 2012?

17   A.    Yes.

18   Q.    Involved in firearm and firearm-related activity?

19   A.    Yes.

09:45AM 20   Q.    Okay.  So, you're at the car, you see Mr. Belin break away

21   and start walking, and I'll put Exhibit 4 back on the box so we

22   can get the -- and he's walking down across the sidewalk

23   towards the tot lot, sort of that sign "caution," and there's

24   an electrical box right there?

25   A.    Yes.

1    Q.    And once you recognize him --

2          THE COURT:  I'm sorry, is he on -- that question

3    confused me.  As we're looking at Exhibit 4, is he on the

4    sidewalk on the right side, the sidewalk on the left side, the

5    street, the crossing?

6          THE WITNESS:  He's on the right side of the cruiser.

7    His direction was almost towards Mildred Ave. in front of my

8    cruiser.  Towards that, if you can see the upper left brown,

9    it's an electrical box.  He's walking in this direction here.

09:46AM 10        THE COURT:  Going across the street?

11         THE WITNESS:  Yes.

12         THE COURT:  Go ahead.

13   Q.    Can you give an estimate of how far it is from your car to

14   the other side of where that light pole is, where the sign pole

15   is?

16   A.    Maybe about 10 to 20 feet.

17   Q.    Okay.  So you see him walking past.  Do you make a

18   decision?

19   A.    Yes.

09:47AM 20   Q.    What do you decide to do?

21   A.    At that point I wanted to talk to him.

22   Q.    And what did you do in order to affect that decision?

23   A.    I just asked him what was up.

24   Q.    Tell us exactly what the words were.  Use the tone of

25   voice that you used that day.

1    A.    I said, "Yo, King, what's going on?"

2    Q.    How far was he from you when you said this?

3    A.    I would say about 10 feet.

4    Q.    And just so it's clear, at the end of that sentence, if

5    you were writing it, would you have put a question mark or an

6    exclamation point?

7    A.    Question mark.

8    Q.    Did Mr. Belin stop?

9    A.    No.

09:47AM 10    Q.    Did he acknowledge you in any other way?

11    A.    He did look at me and give me sort of a half smile.

12    Q.    And continued walking?

13    A.    Yes.

14    Q.    So what did you do?

15    A.    At that point I just kind of hurried my pace up a little

16    bit and caught up to him.

17    A.    Okay.

18    Q.    And as you got towards the other side of the street here,

19    did you close the gap?

09:48AM 20    A.    Yes.

21    Q.    And at that point did he do something?

22    A.    At that point he stopped.

23    Q.    And what did he do?

24    A.    He turned in my direction.

25    Q.    All right.  So at this point how far away are you from

1  him?

2  A.   At this point, about an arm's length.

3  Q.   At that point had you said anything other to him --

4  anything to him other than what's going on or what's up, King?

5  A.   No.

6  Q.   Had you placed a hand on him?

7  A.   No.

8  Q.   Were there any other officers in your immediate area?

9  A.   No.

09:48AM 10  Q.   Where was your firearm?

11  A.   It was in my holster.

12  Q.   Did you have any equipment, a night stick, a flashlight,

13  anything else in your hand?

14  A.   No, I did not.

15       THE COURT:  Were you wearing the holster?

16       THE WITNESS:  Yes, on my hip I wear a holster.

17  Q.   And when he turned around, did you ask him something?

18  A.   When he turned around, I asked him if he had anything on

19  him.

09:48AM 20  Q.   First, Officer Bissonnette, let me ask you, is that

21  something that you ask individuals that you're talking to on

22  the street on a regular basis?

23  A.   Yes.

24  Q.   All the time?

25  A.   Yes.

1    Q.   And would you tell the Court why it is that you ask that

2    question so frequently?

3    A.   Sure.  First off, I want to know if he does have something

4    on that's going to hurt me; secondly, it's to look for a

5    reaction from him.

6    Q.   And were there specific reasons that you were looking for

7    a reaction from King Belin on that day at that point in time

8    when you asked him that question?

9    A.   Yes.

09:49AM 10   Q.   Tell us.

11   A.   At that point I thought he possibly could be in possession

12   of something, so I wanted to ask him to see what his reaction

13   was.

14   Q.   You said earlier that he smiled at you?

15   A.   Yeah, half smile, yes.

16   Q.   Was he smiling at you after you asked the question of him,

17   "Do you have anything on you"?

18   A.   No, as soon as he heard that question, facial expression

19   kind of dropped.

09:49AM 20   Q.   I want you to explain to the Judge in as much detail as

21   you can what your observations of Mr. Belin's reaction was.

22   A.   Sure.  As soon as he heard the question, he had kind of --

23   sort of a quick wide-eyed look and took a deep breath in and

24   then he continued to try to gain his composure and kind of took

25   short breaths, short, quick breaths.

|    |    |    |
|----|----|----|
| 1 | Q. | Would you characterize it as a nervous reaction? |
| 2 | A. | Yes, in my opinion, uncontrollably nervous. |
| 3 | Q. | Unusually so? |
| 4 | A. | Yes. |
| 5 | Q. | Of concern to you? |
| 6 | A. | Yes. |
| 7 | Q. | And at that point, did you make an investigative decision? |

8   A.   It wasn't until he kind of -- after I asked the question,

9   he made the facial expression, he went to turn, looked over his

09:50AM 10   shoulder.

|    |    |    |
|----|----|----|
| 11 | Q. | Was that of concern to you? |
| 12 | A. | Yes. |
| 13 | Q. | What did you think he was doing? |
| 14 | A. | At that point, I thought he was going to try to escape. |
| 15 | Q. | Did he make any movements? |
| 16 | A. | He started moving away from me. |
| 17 | Q. | So what did you do? |
| 18 | A. | At that point, I reached out and grabbed his arm. |
| 19 | Q. | Now, for what purpose? |
| 09:50AM 20 | A. | To conduct the pat frisk. |
| 21 | Q. | Could you tell us what was going through your mind as to |

22   why you thought both stopping him and doing the pat frisk was

23   appropriate at that moment?

24   A.   Sure.  Originally when we pulled up, he was with a group

25   of males.  He was the one that broke off.  I observed that he

1    had the heavy hoodie on.  Like I said before, it was a warm

2    night, it's somebody I had known from the past who have carried

3    firearms, his nervous look, all these things led me to believe

4    that he might be armed.  I made the decision to stop and frisk

5    him.

6    Q.   Was the location important?

7    A.   Yes.

8    Q.   Not only the firearm but the history of --

9         MR. GOLD:  Objection, your Honor.

09:51AM 10        THE COURT:  Well, it's certainly leading.  Why don't

11   you ask him why it was important to him.

12        MR. WORTMANN:  Sure.

13   Q.   Was there anything else about his criminal history that

14   was important to you?

15        MR. GOLD:  Objection.

16        THE COURT:  I'll hear the answer.  Go ahead.

17   A.   I did know him to have previously been convicted of

18   carrying a firearm.

19   Q.   Now, when you grabbed -- describe exactly what motions you

09:51AM 20   made when you first made contact with Mr. Belin.

21   A.   I just reached out with my left hand, went to grab him,

22   almost simultaneously going towards the waistband to frisk that

23   area.

24   Q.   And what did he do in response?

25        THE COURT:  Before we get there, you reached out with

1    your left hand to grab him?

2         THE WITNESS:  Yes, I stopped him with my left arm,

3    grabbed one of his arms, and at the same time --

4         THE COURT:  On his left arm, he was facing you or

5    behind?

6         THE WITNESS:  He was facing me.

7         THE COURT:  So your left arm grabbed his right arm?

8         THE WITNESS:  Yes, my left arm grabbed his right arm.

9    My right hand went towards his waistband to frisk that area.

09:52AM 10   Q.   Did you make it to his waistband?

11   A.   No.

12   Q.   What happened?

13   A.   As I went to frisk his waistband, he dropped both arms

14   towards his waistband.

15   Q.   Now, let me ask you something.  Him going to his

16   waistband, in those circumstances, was that a motion of concern

17   for you?

18   A.   Yes, very much so.

19   Q.   And could you tell the Court why?

09:52AM 20   A.   Sure.  At that point based on all my observations and his

21   reaction when I frisked, I believe he was reaching for a

22   firearm.

23   Q.   And so what did you do in response to his motions and his

24   movement towards the waistband?

25   A.   In response to that, I grabbed both of his hands and

1   brought all of our hands up to our chests.

2   Q.   Did you have some conversation while this was going on?

3   A.   Yes, I just kept telling him to relax.  I told him, "You

4   know me, if you don't have anything on you, you have nothing to

5   worry about."

6   Q.   Did that relax Mr. Belin?

7   A.   No, his resistance actually increased.

8   Q.   And can you describe his actions once you got his hands up

9   here, and could you describe his resistance from that point

09:53AM 10   going forward?

11   A.   Sure.  It was kind of almost like a standoff.  Both of our

12   arms were up here, and I was just telling him to relax and all

13   this, and eventually Officer Bridges, which was another

14   responding officer, came over to assist me.

15   Q.   And when Officer Bridges came over, did Mr. Belin make

16   another lunge towards his waist?

17   A.   Yes.

18        MR. GOLD:  Objection, your Honor.

19   Q.   When Officer Bridges came over, what did Mr. Belin do?

09:54AM 20   A.   Sure.  Officer Bridges came over to assist me on getting

21   control of Mr. Belin's arms.  As soon as he went up to touch

22   him, Mr. Belin bent over, brought his hands right to his waist,

23   became even more resistant.

24   Q.   Ultimately how many officers did it take to secure

25   King Belin on that particular evening?

1    A.    It took four.

2         THE COURT:  I'm sorry, where did the other officers

3    come from?

4         THE WITNESS:  There were two original.  It was me and

5    my partner and two other officers that had the call originally,

6    so during my interaction with King Belin, they showed up on

7    scene.  As they did, Officer Bridges saw me in sort of a

8    struggle with Mr. Belin.  That's when he came over to assist

9    me.

09:54AM 10         THE COURT:  Okay.  Your partner is Finn.  He's

11   off-duty?

12        THE WITNESS:  Yes, he was with the other four guys.

13   His back was, I assume, towards me.  He didn't see what was

14   going on.

15        THE COURT:  Okay.  Go ahead.

16   Q.   If we take a look at Exhibit 4, can you describe how it

17   was that you were actually able to bring him to the ground and

18   secure him?

19   A.   Sure.  Kind of like right where this arrow is is where I

09:55AM 20   was standing with Mr. Belin with our hands up to our chest.

21   Officer Bridges came over.  He started becoming more resistant.

22   We actually pushed him up against this box here, and during the

23   whole time, he was still kind of bent over at the waist

24   reaching for his waistband.  At that point, the other two

25   officers on team came over.  We were able to take him to the

1    ground, just in this area, place him into handcuffs.

2    Q.   And prior to actually getting him into handcuffs, how many

3    times did he lunge for his waist?

4         MR. GOLD:  Objection, your Honor.

5         THE COURT:  It's leading.  Why don't you rephrase.

6    Q.   Could you describe -- you indicated earlier that he had

7    gone to his waist?

8    A.   Yes.

9    Q.   Can you describe those motions as they --

09:55AM 10   A.   Sure.  As we pushed him up against the box, he was bent

11   over at the waist at this point, almost bent over like this.

12   His hands were pressed against his waist.  Me and Officer

13   Bridges were trying to control his hands.  The whole time he

14   was bent over like this.  Even when we took him to the ground,

15   his hands were still under him.  At this point, it was still a

16   fight for all four of us to get his arms.

17   Q.   Did you continue talking to him as this went on?

18   A.   Yes, we just kept telling him to stop resisting.

19   Q.   Did it have any effect?

09:56AM 20   A.   No, he was resisting the whole time.

21   Q.   So, once you got him to the ground, were you able to

22   secure him?

23   A.   Yes.

24   Q.   Tell us what you did.

25   A.   We placed him in the handcuffs behind his back.  As I

1  rolled him over to conduct the frisk finally, his hoodie came

2  up revealing that there was a firearm in his waist.  At that

3  point, I took the firearm and secured it.

4  Q.   Is that the first time you saw the gun?

5  A.   Yes.

6  Q.   Now, let me ask you, when you -- when Mr. Belin first

7  stopped and you approached him, how far were you from him?

8  A.   About 10 feet, then I made the distance, and I was an

9  arm's length when I started talking to him.

09:56AM 10  Q.   Even when you were an arm's length, were you able to see

11  any bulges?

12  A.   No.

13  Q.   Why not?

14  A.   He had that baggie hoodie on.  There was nothing to see

15  under it.

16  Q.   From the time that you first saw -- from the time that you

17  stopped your car and you got out and you first saw Mr. Belin

18  walking away from the group until the time that he was secured,

19  rolled over and you recovered the gun, approximately how much

09:57AM 20  time went by?

21  A.   I would say anywhere between -- no more than 3 to 4

22  minutes.

23  Q.   What did you charge him with that night?

24  A.   That night he was charged with unlawful possession of a

25  firearm, carrying a loaded firearm, possession of a firearm

1    with an obliterated serial number, possession of a Class D

2    marijuana with intent to distribute.

3    Q.    Anything else?

4    A.    We also charged him with possession of Class D with intent

5    to distribute in a school zone -- park zone.

6    Q.    Were there some drugs found on him as well?

7    A.    Yes.

8    Q.    Did you consider charging him with any other offenses?

9    A.    No.

09:57AM 10    Q.    Did you consider charging him with assault or assault and

11    battery on a police officer?

12           MR. GOLD:  Asked and answered, your Honor.

13           THE COURT:  I'll allow it.

14    A.    I didn't consider it at the time, no.

15    Q.    Why not?

16    A.    There was no injuries from our struggle, so it's not

17    something I usually charge.

18    Q.    Did you consider -- did you believe that you had probable

19    cause to charge him with that had you chosen to?

09:58AM 20           MR. GOLD:  Objection.

21           THE COURT:  Overruled.

22    A.    If I wanted to, I could have, yes.

23    Q.    On what basis?

24    A.    On the basis of the menacing move of him reaching for his

25    waistband, I thought there was a gun there, so in my opinion, I

1    thought that was an assault on me.

2    Q.   And his resistance as well?

3    A.   Yes.

4         MR. WORTMANN:  Your Honor, if I could just have a

5    moment.

6    Q.   I'm going to put in front of you two documents.  Do you

7    recognize Exhibit 5 to be the incident report from the 2009

8    arrest?

9    A.   Yes.

09:58AM 10        MR. WORTMANN:  And I offer that as Exhibit 5, your

11   Honor.

12        MR. GOLD:  This is the 2009?

13        MR. WORTMANN:  Yes.

14        MR. GOLD:  No objection, your Honor.

15        THE COURT:  It may be admitted, Exhibit 5.

16        (Incident report from 2009 was admitted in evidence as

17   Exhibit No. 5.)

18   Q.   Lastly, showing you what's been marked as Exhibit 6, do

19   you recognize -- what do you recognize that photograph to be?

09:59AM 20   A.   That's a photograph of the firearm, the magazine that was

21   in the firearm.  We also recovered a Newport box in his pocket

22   that had this plastic baggy with five additional rounds of

23   ammunition.

24   Q.   And obviously the marijuana is not included in that?

25   A.   No.

1        THE COURT:  I'm sorry, Exhibit 6 is from the 2012?

2        MR. WORTMANN:  2012, your Honor, my apologies for not

3  making that clear.

4        THE COURT:  Any objection to the admission of the

5  photograph?

6        MR. GOLD:  No, no objection, your Honor.

7        THE COURT:  That may be admitted.

8        (Photograph from 2012 was marked Exhibit No. 6 and

9  admitted into evidence.)

09:59AM 10        MR. WORTMANN:  Lastly, your Honor, may I approach the

11  witness for a moment?

12        THE COURT:  Yes.

13  Q.   Sir, I'm showing you a Ruger P95DC firearm, and would you

14  take a look at it, please.

15  A.   Yes.

16  Q.   And do you recognize that to be the firearm that you

17  pulled from the waistband of King Belin on September 17th?

18  A.   Yes, I do.

19        MR. WORTMANN:  Your Honor, I'd rather not put this

10:00AM 20  into the evidence record, if we just mark it for I.D., and if

21  your Honor wants to take a look at it.

22        THE COURT:  That's fine.  Exhibit 7 for

23  identification.  I don't need to see it.

24        MR. WORTMANN:  Thank you.

25        (Ruger P95DC Firearm was marked Exhibit No. 7 for

```
  1    identification.)

  2              MR. WORTMANN:  That's all I have at this time.  Thank

  3    you, your Honor.

  4              THE COURT:  Cross-examination.

  5              MR. GOLD:  Thank you, your Honor.

  6              If I could request that the Court's clerk switch the

  7    screens to this.  Thank you.

  8                          CROSS-EXAMINATION

  9    BY MR. GOLD:

10:00AM 10   Q.   Good morning, Officer Bissonnette.

 11    A.   Good morning, counsel.

 12    Q.   What is your position right now with the Boston Police

 13    Department?

 14    A.   Right now I'm assigned to the Youth Violence Strike Force.

 15    Q.   And you testified you've been a police officer now for

 16    about six years?

 17    A.   Approximately, yes.

 18    Q.   Approximately six years.  And that is your role, and your

 19    title is still police officer?

10:01AM 20   A.   Yes.

 21    Q.   And what area do you patrol right now?

 22    A.   Right now we're a city-wide unit.

 23    Q.   City wide?

 24    A.   Yes.

 25    Q.   And the Youth Violence Strike Task Force, do they patrol
```

1   high crime areas?

2   A.   Yes.

3   Q.   And is that their function primarily?

4   A.   Primarily our focus is on areas that have seen an increase

5   in youth violence.  We concentrate on those areas in an event

6   to try to prevent certain, you know, gun-related incidences and

7   so forth.

8   Q.   Would you characterize this area around what we've been

9   calling the Norfolk Park or Norfolk Street Park one of these

10:02AM 10  areas?

11   A.   Yes.

12   Q.   But it's not the only area of this nature in the city,

13   correct?

14   A.   No.

15   Q.   Would it be fair to say that there are several areas that

16   would fit that description in the City of Boston?

17   A.   Sure.

18   Q.   And some of those areas are in Mattapan?

19   A.   Yes.

10:02AM 20  Q.   And in Dorchester?

21   A.   Yes.

22   Q.   And in Roxbury?

23   A.   Yes.

24   Q.   Now, it's a true statement, I think, or would you agree

25   with the statement that a lot of these neighborhoods are

         1    primary minority neighborhoods?
         2              MR. WORTMANN:  Objection, your Honor.
         3              THE COURT:  I'll allow it for what it's worth.  Go
         4    ahead.
         5    A.    Yes.
         6    Q.    And, in fact, these areas are predominantly Hispanic or
         7    African-American?  When I say minority, that's what I
         8    understand the term to be.  Do you understand it that way?
         9              MR. WORTMANN:  Objection, your Honor.
10:03AM 10              THE COURT:  Again, I'll allow it.
        11    A.    Yes.
        12    Q.    Now, you were with the Youth Violence Strike Task Force on
        13    the night of September 17th, 2012?
        14    A.    No.
        15    Q.    But you were in what they call a K car?
        16    A.    Yes.
        17    Q.    And that is sort of like being a different -- that's a
        18    different type of position than being a patrolman, right?
        19    A.    Correct.
10:03AM 20    Q.    One of the things you do, you're assisting, you're doing
        21    proactive investigations, right?
        22    A.    Yes.
        23    Q.    But you're not doing proactive investigations all the
        24    time, right?
        25    A.    Correct.

1    Q.   Sometimes you're just assisting with calls that come in

2    through 9-1-1, right?

3    A.   Right.

4    Q.   Like patrolman, correct?

5    A.   Yes.

6    Q.   And I guess this story that we're telling here starts when

7    you are responding to a call for a disturbance on Walk Hill

8    Street, right?

9    A.   Right.

10:04AM 10    Q.   And the setting is in you're car with Officer Finn, right,

11    and you're driving?

12    A.   Yes.

13    Q.   Where were you going right before you heard the call for

14    Walk Hill Street, anywhere in particular?

15    A.   Not in particular.  We just happened to be on Norfolk

16    Street at that time.

17    Q.   And that's why you were free to respond to a call, right?

18    A.   Correct.

19    Q.   And so you started to go down Norfolk Street to respond to

10:04AM 20    the Walk Hill call when another call came in?

21    A.   Yes.

22    Q.   And these are calls that are recorded and that you can

23    listen to while you're inside your vehicle, right?

24    A.   Yes.

25    Q.   And have you had the occasion to review the tape of the --

1    the turret tape of the recordings that you were listening to

2    that evening?

3    A.   Yes.

4    Q.   And if I played a fragment of it, do you think you might

5    be able to recognize it?

6    A.   Yes.

7         MR. GOLD:  Your Honor, if I may, and, for the record,

8    I am going to play a section of the turret tape from that

9    evening.  We have agreed or stipulated that it's already been

10:05AM 10   submitted to the Court as an attachment to our papers, so I

11   think I can either -- I have a copy to submit it formally here,

12   or we can simply make reference to it.

13        THE COURT:  You have a copy of the transcript or the

14   actual disk or a thumb drive?

15        MR. GOLD:  I have it burned to a CD, which is how we

16   originally submitted it to the Court, but I also have another

17   CD here if the Court would prefer.  I can also formally enter

18   it as an exhibit in this hearing or just refer back to the

19   recording that I think we're all agreed.

10:05AM 20        THE COURT:  Why don't we designate the CD, and I guess

21   it might as well be the one that's already been submitted as

22   Exhibit 8?

23        MR. WORTMANN:  Yes.

24        THE COURT:  All right.

25        (CD was admitted in evidence as Exhibit No. 8.)

1         THE COURT:  And it's admitted.

2         (Audiotape played)

3    Q.    Now, for the record, this is from about the two-minute and

4    fifty-four second mark of the tape that is in evidence, but do

5    you recognize that person who's speaking as a dispatcher?

6    A.    Yes.

7    Q.    And is the reference that she's making to a disturbance at

8    a group home at Walk Hill Street the call that we've been

9    talking about?

10:07AM 10   A.    This is the original call that I was responding to.

11   Q.    This is the call that took you in a certain direction

12   taking you to Norfolk Street initially, right?

13   A.    Initially.

14        (Audiotape played)

15   Q.    And do you hear someone identifying himself as 682 stating

16   that he's at the front desk talking about a group of kids

17   fighting in that segment that we just listened to?

18   A.    Yes.

19   Q.    Is this the call that you decided was more important and

10:07AM 20   you were going to respond to instead?

21   A.    Yes.

22   Q.    So, Norfolk and Fessenden is an intersection which is

23   quite near the intersection of Norfolk and Mildred Avenue,

24   right?

25   A.    It's just across the street, yes.

1            (Audiotape played)

2    Q.   So, this, again, is the dispatcher responding to someone

3    calling in from somewhere, a front desk.  Do you know who 682

4    was?

5    A.   I don't know, it sounds like Eric Bradshaw, but I can't be

6    sure.

7    Q.   Do you know what kind of post Eric Bradshaw had at that

8    moment?

9    A.   682 is commonly a walking beat post.

10:08AM 10   Q.   A patrolman, someone who's just responding to things that

11   happen on the street?

12   A.   Yes.  Actually if I could back that up a minute.

13   Q.   Sure.

14   A.   Patrol officers are more of like just for visibility.

15   They don't necessarily respond to calls.  They're just out

16   there on bikes, bright orange clothes, just as like kind of

17   visibility, talking to shop owners.

18   Q.   And so you think, although we're not sure, but for

19   purposes of this hearing, I think that's fine that this is

10:09AM 20   Eric Bradshaw, a patrol officer, calling in something he may

21   have observed?

22   A.   Yes.

23            (Audiotape played.)

24   Q.   Now, it seems that 682 says here that there's a group of

25   girls getting together trying to fight each other at Norfolk

1    and Fessenden, and that's the same individual who called in the

2    first fight, right?

3    A.    Yes.

4    Q.    And you are in your vehicle listening both to the

5    dispatcher and also other people calling in on their channel,

6    right?

7    A.    Yes.

8    Q.    So you were exposed to this information, although I

9    understand your testimony now is that you were not aware of it;

10:09AM 10   is that right?

11   A.    Right.

12   Q.    And so you -- but the call that brought you there said

13   that there was a group of girls trying to fight each other at

14   this intersection, right?

15   A.    Yes.

16   Q.    You decided to respond to this incident rather than

17   Walk Hill, right?

18   A.    Correct.

19   Q.    And then you approached the park, Norfolk Park, right?

10:10AM 20   A.    Yes.

21   Q.    Now, you passed by Norfolk Park, and Mildred Avenue is the

22   first turn after Norfolk Park in the direction that you're

23   traveling, right?

24   A.    Yes.

25   Q.    And coming up Norfolk Street, you see a group of five

males, right?

A.   Correct.

Q.   And you decide to question those males, right?

A.   We wanted to speak with them, yes.

Q.   Now, as a police officer, if I could just take us forward in time a little bit just to get clear on certain things. After this incident was done and Mr. Belin was arrested, a police report was drafted, right?

A.   Correct.

Q.   And Officer Finn is the one who actually drafted the police report that we have in evidence, right?

A.   Right.

Q.   But he did it in consultation with you, right?

A.   Yes.

Q.   And, in fact, you testified here today that he didn't see anything about the interaction between you and Mr. Belin in your opinion, right?

A.   In my opinion, right.

Q.   So the information about the interaction between yourself and Mr. Belin comes from you, right?

A.   Yes.

Q.   Not from Mr. Belin, right?

A.   Right, from me.

Q.   And not from any other witness?

A.   Right.

1   Q.   And the police report -- I suppose as part of your

2   training, and we've made reference to your training, it's

3   important that police reports are accurate and complete, right?

4   A.   Yes.

5   Q.   Because you know that they're going to be the subject

6   potentially of litigation, right?

7   A.   Right.

8   Q.   And this police report would you characterize as thorough?

9   A.   Yes.

10:12AM 10   Q.   And, in fact, this police report even contains citations

11   to other police reports, right?

12   A.   Right.

13   Q.   Almost like citations to cases in case law, right?

14   A.   Correct.

15   Q.   And also part of your training is being aware of what the

16   Fourth Amendment requires before a police officer can interfere

17   with someone's movement, right?

18   A.   Right.

19   Q.   You know about Terry stops, right?

10:12AM 20   A.   Correct.

21   Q.   You've been trained about vehicle stops, right?

22   A.   Right.

23   Q.   And so you know that there is a certain amount of -- you

24   need to have articuable reasons before you stop someone on the

25   street, right?

A.   Right.

Q.   And your police report -- actually part of its intention,
I think, will you agree with me, is to lay out what those
reasons are for the stop of Mr. Belin?

A.   Yes, I agree.

Q.   And, in fact, you stated that it's a high crime area, this
is one of your reasons, and you provide support for that by
citing other police reports that have occurred in the area,
right?

10:13AM A.   Right.

Q.   Now, you also testified, this does not always happen, but
you also testified in a grand jury proceeding in this building,
right?

A.   Yes, I did.

Q.   Because Mr. Belin's case was federalized, right?

A.   Right.

Q.   And it went from your hands to Mr. Wortmann and the
United States Attorney's Office, right?

A.   Yes.

10:13AM Q.   And so you testified in support of the government seeking
an indictment of Mr. Belin for possession of a firearm, right?

A.   Right.

Q.   Now, and that was several months after the police report
was drafted, right?

A.   Yes.

1   Q.   And there, of course, just like now, you're under oath and

2   you're testifying truthfully and as accurately as you're able,

3   right?

4   A.   Yes.

5   Q.   And one of the things -- well, when you saw this group of

6   five individuals, did you think they were involved -- they

7   weren't girls obviously, right?

8   A.   Right, they weren't girls, no.

9   Q.   Did you think they were involved with the fight?

10:14AM 10   A.   At that point, we weren't sure.  They could have been

11   witnesses, they could have been involved, they could have saw

12   something.  These are the reasons we wanted to talk to them.

13   Q.   So, they weren't -- they could have been involved, they

14   could have been witnesses, right?

15   A.   Right.

16   Q.   Is it the case that you stated at the grand jury that you

17   thought -- you thought they had no involvement in the fight,

18   you just wanted to talk to them to see if they were witnesses?

19   A.   At that point -- at that point we weren't sure, we didn't

10:15AM 20   see them fighting.

21   Q.   Do you recall testifying at the grand jury in response to

22   a question by Mr. Wortmann that you did not think they were in

23   the fighting?

24   A.   If you say so, yes, that's what I testified to.

25        MR. WORTMANN:  Objection.  Motion to strike.

1        MR. GOLD:  I'm just setting it up, your Honor.  May I

2   approach?

3        THE COURT:  Yes, go ahead.

4        MR. WORTMANN:  Page, please.

5        MR. GOLD:  Page 15 of the grand jury testimony.

6   Q.   For the record, I'm handing you your grand jury testimony

7   dated February 27th of this year, and if I could just direct

8   your attention to lines 13 through 17.

9   A.   Right.  So right here I said based on the fact that they

10  were in the area of the fight, whether they were in the fight

11  or not, whether they were in the fight, saw something, I just

12  wanted to talk to them.

13  Q.   But it's true -- Mr. Wortmann asked you a direct question.

14       THE COURT:  Could we just read the question and answer

15  the answer.

16       MR. GOLD:  Sure.

17  A.   The question was:  "And it was because you thought that

18  they had been involved in the fight?"  My answer was:  "No,

19  just based on the fact that they were in the area of the fight,

20  whether they were in the fight, saw something, just wanted to

21  talk to them."

22  Q.   Now, you pull over in front of the two -- in front of the

23  group of individuals, right?

24  A.   Yes.

25  Q.   And at this point you've testified today that you don't

1    recognize King Belin, right?

2    A.   I recognize him now or when we first spoke?

3    Q.   No, at this point in the sequence.  So you're driving, and

4    you pull over in front of a group of five individuals.  Are

5    they at the corner of Norfolk and Mildred at that point?

6    A.   Yes.

7    Q.   And your partner, Officer Finn, gets out and steps out in

8    front of these five individuals, right?

9    A.   Correct.

10:17AM 10    Q.   And are these five African-American individuals, do you

11    recall, or do you know?

12    A.   I believe so.  I don't recall.  The only one I really had

13    the interaction with was Mr. Belin.

14    Q.   Do you remember what they were wearing or how they were

15    dressed?

16    A.   No, I never really even seen them.

17    Q.   So, you noticed -- you're getting out of the passenger's

18    side.  You notice that one of the individuals continues to

19    walk, right?

10:17AM 20    A.   Yeah, I actually got out of the driver's side and observed

21    one of the individuals break from the group, yes.

22    Q.   And so you didn't observe the group, you didn't see what

23    they were wearing, but are you sure that Mr. Belin as you sit

24    here now was with the group?

25    A.   Yes.

1    Q.   What makes you positive?

2    A.   When we pulled up, the group was walking together.  The

3    fact that he broke from the group, my attention was immediately

4    drawn to him, and that's the only one I was observing, that's

5    why I can't tell you what the other guys were wearing at that

6    point.

7    Q.   Right.  But what makes you positive that he was a member

8    of the group as opposed to simply being simultaneously on the

9    sidewalk and going about his business?

10:18AM 10   A.   When we were coming down Norfolk Street, we saw the group,

11   they were all walking together.  It's safe to assume that he

12   was with that group.

13   Q.   What makes it safe to assume?

14   A.   I would assume that if somebody is walking with a group,

15   most likely they're with that group.

16   Q.   So how long did you have to observe the group as you were

17   approaching them before you pulled in in front of them?

18   A.   Not very long.

19   Q.   But enough time to determine that Mr. Belin was with the

10:18AM 20   group and had broken away?

21   A.   Sure.

22   Q.   But what factors made him seem like he was a part of the

23   group and not simply on the street at the same time?

24           MR. WORTMANN:  Asked and answered, your Honor.

25           THE COURT:  I'll allow it.

1    A.   I'm sorry, can you ask that question again?

2    Q.   What factors made it appear that he was a part of the

3    group and not simply walking on the street at the same time?

4    A.   It was just an opinionated observation.  I saw a group of

5    five people walking.  He was next to them, so I assumed that he

6    was with them.

7    Q.   But they weren't standing and having a discussion, it was

8    five individuals walking in the direction of the park, right?

9    A.   Yes.

10:19AM 10   Q.   So you get out, and you see Mr. Belin who you don't know

11   is Mr. Belin right away, right?

12   A.   Right.

13   Q.   And so what you see is an individual who was part of a

14   group continuing to walk in what you've called a hurried

15   manner, right?

16   A.   Right.

17   Q.   You also say that he avoided eye contact with you, right?

18   A.   Right.

19   Q.   What makes you say that?

10:19AM 20   A.   He didn't look at me.

21   Q.   Where was he looking?

22   A.   He was looking down at the ground.

23   Q.   And how long did that walking hurried looking down at the

24   ground last?

25   A.   Just a few seconds.

1    Q.   Even less than a few seconds?

2    A.   No, it was a few seconds.

3    Q.   A few seconds.  So he was walking hurriedly, it looks like

4    from the photo that we've seen, in the direction of the park,

5    right?

6    A.   Right.

7    Q.   And, for the record, I've put up on the screen so we can

8    look at it Exhibit 4, and this is the photograph we were

9    looking at before.  Is there an entrance to the park along this

10:21AM 10   stretch of Mildred Avenue?

11   A.   Yes.

12   Q.   And so he is walking in the direction of the street signs

13   that you see on the pole there?

14   A.   Correct.

15   Q.   Now, at the time that he walks off from the group, how

16   hurried is he, would you say?

17   A.   It is a quick walking pace.

18   Q.   You're able to catch up with him quite easily, right?

19   A.   Yes.

10:21AM 20   Q.   He's not running?

21   A.   No.

22   Q.   He's not jogging?

23   A.   No.

24   Q.   And, in fact, you catch up with him, the final arrest

25   here, Mr. Belin is pushed up against that brown electrical box

1    that you see?

2    A.    Yes.

3    Q.    And so the interaction that we're talking about does not

4    take -- I believe you said you estimated the distance between

5    the interaction and your car is 10 to 20 feet?

6    A.    Yes.

7    Q.    So the interaction that we're talking about with Mr. Belin

8    takes place quite close to your car, right?

9    A.    Yes.

10:22AM 10   Q.    And it also takes place quite soon after you first see

11   him, right?

12   A.    Yes.

13   Q.    Now, when you see Mr. Belin, not knowing that he's

14   Mr. Belin, you've noted two things that struck your attention

15   or caught your attention.  One is that he was wearing a

16   sweatshirt.  Do you recall that testimony?

17   A.    Yes.

18   Q.    Now, was he wearing pants or shorts?

19   A.    I believe he was wearing pants.

10:22AM 20   Q.    And you spent a lot of time in different parts of the

21   city, right?

22   A.    Yes.

23   Q.    In minority communities, right?

24   A.    Yes.

25   Q.    Among minority youth, right?

1    A.    Yes.

2    Q.    And would you agree with me that baggie clothing is a

3    style that many minorities prefer?

4          MR. WORTMANN:  Your Honor, objection to the

5    characterization.  This isn't a minority issue.

6          THE COURT:  Well, there's no allegation of race

7    discrimination, selective prosecution or selective arrest, but

8    I'll take this as going toward whether the suspicion was

9    articuable somehow whether the clothing was sufficiently unique

10:23AM 10   to be part of the officer's reasonable suspicion, so I'll allow

11   it in that vain.  Go ahead, Mr. Gold.

12   Q.    So, in your own personal observations as a police officer

13   or as a person, is it uncommon to see young African-American

14   men in baggie sweatshirts?

15   A.    No.

16   Q.    And the date we're talking about, it's not summer anymore

17   in September, right?

18   A.    Right.

19   Q.    You are wearing a T-shirt and pants, shorts, right?

10:24AM 20   A.    Shorts.

21   Q.    How many people -- what were people wearing in the park

22   that day?

23   A.    I would say people were dressed like me.  Some people may

24   have been wearing longer-sleeve shirts.  I mean, it was a

25   summer day, warm, so people could wear all sorts of things

1   depending where they were coming from, where they were going.

2   Q.   Can I draw your attention, it seems to be a bystander

3   there in Exhibit 4 next to the electrical box?

4   A.   Yes.

5   Q.   And that person, we don't see them.  I'll try to make them

6   out, but that is -- does that appear to be a coat to you?

7   A.   It does appear to be a jacket.

8   Q.   And that is someone wearing long pants, right?

9   A.   Yes.

10:24AM 10   Q.   Now, what's an FIO, Officer Bissonnette?

11   A.   Sure, it's a report that we fill out.  It's a field

12   interaction and encounter report.

13   Q.   A field interaction --

14   A.   -- and encounter report.

15   Q.   What does the O stand for?

16   A.   Observation.

17   Q.   So field interrogation and observation report.  Were FIOs

18   performed on the other individuals who were stopped to your

19   knowledge?

10:25AM 20   A.   Yes.

21   Q.   And is there a reference to those FIOs in the police

22   report that we've discussed?

23   A.   There is.

24   Q.   And do FIOs typically note the dress of individuals?

25   A.   Yes.

1    Q.   Do you recognize what I've put on the screen as an FIO?

2    A.   Yes.

3    Q.   And is this --

4         MR. GOLD:  For the record, your Honor, this is --

5    these FIOs are appended to our motion to suppress.  They were

6    the final exhibit.  There are three separate documents.

7         THE COURT:  For this purpose, I'm going to

8    collectively designate them Exhibit 9 and admit them.

9         (Three FIOs were admitted into evidence as Exhibit

10:27AM 10   No. 9.)

11   Q.   And does this appear to be one of the FIOs that was

12   collected that evening identifying one Derek Kirkland?

13   A.   Yes.

14   Q.   So does it describe his clothing on that evening as a gray

15   hooded sweatshirt with blue jeans and gray sneakers?

16   A.   Yes.

17   Q.   And the same question with respect to Calvin White, does

18   this appear to be an FIO from September 17, 2012?

19   A.   Yes.

10:28AM 20        THE COURT:  With modern technology, this goes slower

21   than it would.

22        MR. GOLD:  Your Honor, we're going to get there.  The

23   promise is there.  I apologize for the delay.

24   Q.   Here for Mr. White, we have a blue hoodie.  Is that what

25   that reflects?

1    A.    Yes.

2    Q.    With respect to this group of African-American males,

3    would you agree with me that wearing a hoodie was not unusual

4    with respect to this group of males?

5    A.    It appears that other members of the group were wearing

6    hoodies.

7    Q.    And we've talked about when it was.  How long have you

8    lived in New England?

9    A.    My whole life.

10:29AM 10    Q.    What do they say about New England weather?

11    A.    You never know when it's going to change.

12    Q.    You never know when it's going to change.  Do you remember

13    how many degrees it was at the time?

14    A.    No, not off the top of my head.

15    Q.    But it's evening time, right?

16    A.    Yes.

17    Q.    Sometimes when you go out in the evening, you might put on

18    a T-shirt and take a sweater with you, right?

19    A.    Yes.

10:29AM 20    Q.    Because the weather might change, right?

21    A.    (No response)

22    Q.    So, you have the hoodie, and you have the breaking away

23    from the group at the moment when you decide to follow the

24    individual who's broken away from the group and is wearing the

25    hoodie, right?

1    A.    Right, and my knowledge of the area.

2    Q.    And that you know that it's a high crime area, right?

3    A.    Yes.

4    Q.    But what's brought you there is this call that we listened

5    to for a group of girls, right?

6    A.    Right.

7    Q.    And if you have questions, they're probably going to be

8    about this fight, right?

9    A.    Right.

10:30AM 10    Q.    At that stage, you've mentioned a couple of times the

11    characteristics of the armed gunman.  Is that part of a

12    training, part of your training put on by the Bureau of

13    Alcohol, Tobbaco, Firearms and Explosives?

14    A.    Yes.

15    Q.    So they have the training about the characteristics of the

16    armed gunman?

17    A.    Yes.

18    Q.    And one of those characteristics might be clothing that

19    could plausibly conceal a gun, right?

10:31AM 20    A.    Right.

21    Q.    But there's a whole bunch of characteristics, right?

22    A.    There are.

23    Q.    And, in fact, one of the characteristics is that people

24    walk in a funny fashion because individuals who are carrying

25    illegal weapons often don't have holsters, right?

1    A.    Right.

2    Q.    And so one of the things you want to look out for is

3    obviously bulges, and you've testified there were no bulges or

4    anything here, correct?

5    A.    Correct.

6    Q.    But you want to look out for movement designed to keep the

7    gun safe, right?

8    A.    Yes.

9    Q.    And there were no observations of those types of

10:31AM 10  characteristics with respect to Mr. Belin, right?

11   A.    No.

12   Q.    And you then recognize him, right?

13   A.    Correct.

14   Q.    And don't you decide you're going to search him at that

15   point?

16   A.    Yes.

17   Q.    Because he's King Belin, right?

18   A.    Correct, that and based on the other observations I had.

19   Q.    Right, the walking away from this group, the hooded

10:32AM 20  sweatshirt and the high crime area, right?

21   A.    Yes.

22   Q.    And any others I'm missing?

23   A.    No, I don't think so.

24   Q.    So, do you just grab him?

25   A.    No.

1    Q.    You wait for him to turn around?

2    A.    Yes, I wanted to ask him, like I said before, I wanted to

3    see his reaction to the question of "Do you have anything on

4    you" was.

5    Q.    But you've already decided, I think you just testified,

6    that you're going to search him at that point, right?

7              MR. WORTMANN:  Objection, your Honor.  Relevance.

8              MR. GOLD:  Relevance?

9              MR. WORTMANN:  Relevance.  It's irrelevant what he's

10:32AM 10    thinking, it's only relevant what he does.

11              THE COURT:  I'll hear the answer.  Overruled.

12    A.    Ask the question again, please.

13    Q.    But you've already decided at that point, you've just

14    testified, that you're going to search him, right?

15    A.    Sure, based on my observations at that point, I believe

16    that he probably had a weapon on him.  The question I asked was

17    to try to get more, the question of "Do you have anything on

18    you?"  It was in my opinion at that point I did want to frisk

19    him.

10:33AM 20    Q.    And then you observed a nervousness?

21    A.    Yes.

22    Q.    And we broke down this nervousness into I think 35

23    component parts, I'm joking, but it happens very quickly,

24    right?

25    A.    It does happen quickly.

1   Q.   Then you make a decision that he might be trying to flee,

2   and you reach out with which hand?

3   A.   I believe it was my left hand.

4   Q.   Are you left-handed?

5   A.   No.

6   Q.   So you reached out for his right hand?

7   A.   I can't be sure.  The best of my recollection is my left

8   hand went to his right hand so I could search, you know, kind

9   of natural.

10:33AM 10   Q.   Left hand went to his right hand?

11   A.   Right hand to the waistband.

12   Q.   And then this struggle ensued, right?

13   A.   Right.  He reached for his waistband, that's when the

14   struggle ensued.

15   Q.   Now, we talked about the -- did you review the police

16   report that Officer Finn developed?

17   A.   Yes.

18   Q.   For accuracy, right?

19   A.   Yes.

10:34AM 20   Q.   And one of the reasons that you review it for accuracy in

21   this particular case is because most of it is about you, right?

22   A.   Correct.

23   Q.   And what you did and what your factors were for the Terry

24   stop basically, right?

25   A.   Basically, yes.

1    Q.   And we've heard today about this BRIC database, but so far

2   when we've discussed the factors, we haven't discussed that

3   factor, have we?

4   A.   Right.

5   Q.   And nowhere in the police report does any reference to

6   Norfolk Bulls occur, right?

7   A.   Right.

8   Q.   Now, part of the purpose of police reports is to provide

9   information for future investigations, you know that as a

10:34AM 10   member of the Youth Violence Strike Task Force, right?

11   A.   Right.

12   Q.   So when you do a police report, you're actually also

13   creating intelligence for future officers like yourself, right?

14   A.   Right.

15   Q.   So you include all of the information that will be useful

16   not just for these purposes but for other officers, right?

17   A.   Right.

18   Q.   And, again, there was no reference to the Norfolk Bulls in

19   this particular police report, right?

10:35AM 20   A.   No.

21        THE COURT:  I'm sorry, Norfolk Bulls like Chicago

22   Bulls?

23        THE WITNESS:  Yes.

24   Q.   So you decided to search and frisk him at the same time

25   basically, right?

1    A.   To search and frisk him at the same time?

2    Q.   Yes.

3    A.   No.  I intended frisking the area where I thought he had a

4    firearm.

5    Q.   I'm sorry, I'm making a mistake, so let me withdraw the

6    question and ask again.  You decided to stop and frisk him at

7    the same time, right?

8    A.   Yes.

9    Q.   And when you made that decision, you were an arm's length

10:36AM 10   away from him, right?

11   A.   Right.

12   Q.   You didn't grab him and turn him around with your right

13   hand to his left arm, right?

14   A.   Right.

15   Q.   You were facing him, and you grabbed his right arm with

16   your left arm and simultaneously basically started to pat --

17   A.   We were facing each other, right.

18   Q.   Started to pat in this area, his arm goes down?

19   A.   I never actually had a chance to pat that area because as

10:36AM 20   I went for it, so did he, and that's when he --

21   Q.   The arm went down.  So then I think the way I have this is

22   your arms are basically -- are you grabbing his wrists?

23   A.   Yes.

24   Q.   Then they immediately go up, right?

25   A.   Correct.

1    Q.    Then we've described this struggle where ultimately

2    Officer Bridges comes, you pushed him against the electrical

3    box; is that right?

4    A.    Yes.

5    Q.    And then got him down on the ground, right?

6    A.    Right.

7    Q.    Put his arms behind him, put the --

8    A.    Handcuffs.

9    Q.    Handcuffs on him, they were behind his back?

10:37AM 10  A.    Yes.

11   Q.    And then was it as a result of the frisk, or did you just

12   see the gun when his shirt --

13   A.    At that point I just observed the gun, when we rolled him

14   over, the shirt came up.

15   Q.    Right.  And then you decided to charge him the way you

16   did, right?

17   A.    Right.

18   Q.    Now, why didn't you charge him with resisting arrest?

19   A.    That's just one of those things I don't normally charge.

10:37AM 20  The other charges on this were much greater than something of

21   that sort.

22   Q.    And -- well, did you think you had enough evidence to

23   charge resisting arrest?

24   A.    I believe that once we saw the firearm, he was still

25   resisting, so we could have charged it, yes.  He was still

1    resisting until we put him in the cruiser.

2    Q.   But just so we're clear, he's not resisting an arrest

3    until -- in your view until you have probable cause because you

4    see the gun, right?

5    A.   No, the force we used was because we wanted to conduct a

6    pat frisk, not to arrest him at that point.

7    Q.   So that was the stop, right?  It's not a crime in

8    Massachusetts -- resisting arrest doesn't encompass resisting

9    detention, right?

10:38AM 10   A.   Correct.

11   Q.   And you know that, right?

12   A.   Yes.

13   Q.   So that's why you didn't charge resisting arrest for this

14   conduct that we've been describing, right?

15   A.   Right.

16   Q.   But you could have, you're just testifying now that you

17   think you could have charged resisting arrest?

18   A.   Yes, he was still resisting after he was under arrest, so

19   we could have charged it, yes.

10:39AM 20   Q.   Now, is it your testimony that it's a personal decision of

21   yours not to charge resisting arrest when you have other more

22   serious charges?

23   A.   Yes, I made that decision.  We didn't charge resisting

24   arrest or assault or any of those, and certainly they could

25   have been charged.

1      Q.    And have you ever charged them before?

2      A.    Not very frequently, no.

3      Q.    So you don't charge assault and battery on a police

4      officer when it occurs?

5      A.    It's my personal -- personally, I don't do it, no.  Unless

6      there's a serious injury to myself, it's not something I

7      normally do.

8      Q.    And with respect to resisting, isn't it common to see

9      resisting arrest on a criminal record?

10:39AM 10          MR. WORTMANN:  Your Honor, I object.

11               THE COURT:  I think that's pretty far afield.

12     Q.    Well, Mr. Belin has resisting arrest on his record, right?

13     A.    I'm not sure.

14     Q.    You're not sure.  Is it common practice of other officers

15     to charge resisting arrest?

16               MR. WORTMANN:  Objection, your Honor.

17               THE COURT:  Sustained.

18     Q.    You've testified -- well, is this the first time you've

19     had any interaction with federal personnel with regard to an

10:40AM 20     investigation that you've done?

21     A.    Yes.

22     Q.    So have you ever interacted with Mr. Wortmann before?

23     A.    Before this, no.  Actually, no, I'm sorry, if I can back

24     up, we did have a case, perhaps one case before, not with

25     Mr. Wortmann, with another Assistant U.S. Attorney, but that

1    case didn't end up being indicted federally, and that was the

2    one before.

3          MR. GOLD:  If I might have a moment, your Honor.  Your

4    Honor, we're done.

5          THE COURT:  All right.  Redirect.

6          MR. WORTMANN:  Thank you, your Honor.

7                        REDIRECT EXAMINATION

8    BY MR. WORTMANN:

9    Q.   I'm going to put Exhibit 4 back up on the document camera,

10:42AM 10   if you can make that changeover, please.  Do you know when

11   this -- was this picture taken before the gun was seized?

12   A.   No.

13   Q.   When was it taken?

14   A.   It was taken after.

15   Q.   Do you know how long after?

16   A.   I would say 45 minutes.

17   Q.   Okay.  And were there other pictures taken that day?

18   A.   There were.

19   Q.   And you've reviewed them?

10:43AM 20   A.   Yes.

21   Q.   And I'm going to put one in front of you that I would ask

22   to be marked as the next exhibit.  Do you recognize that?

23   A.   Yes.

24          THE COURT:  That's Exhibit 10.

25          MR. WORTMANN:  Thank you, your Honor.

1          THE COURT:  Any objection?

2          MR. GOLD:  No objection, your Honor.

3          THE COURT:  It may be admitted, Exhibit 10.

4          (Photograph was admitted in evidence as Exhibit

5     No. 10.)

6     Q.   We see some people in the background, a man with a T-shirt

7     on?

8     A.   Yes.

9     Q.   Another female with a T-shirt on?

10:43AM 10    A.   Yes.

11    Q.   And it looks like school-age children with a backpack on?

12    A.   Yes.

13    Q.   And where is the Mildred Avenue School?

14    A.   It's right at the end of Mildred Avenue there, within 100

15    feet from this.

16          MR. WORTMANN:  Mr. Clerk, if I could approach and ask

17    you to mark that as the next exhibit, please.

18    Q.   Showing you a series of documents from the Suffolk County

19    Sheriff's Department, the first page is a letter responding to

10:44AM 20    a subpoena on King Belin, and do you recognize this picture?

21    A.   Yes, this is Mr. Belin.

22    Q.   And does that indicate the black hoodie that you saw him

23    wearing that night?

24    A.   Yes.

25    Q.   Another picture of it right here.  Now, let me ask you a

1    question.

2              THE COURT:  Hold on, is that in evidence?

3              MR. WORTMANN:  It will be the next exhibit, your

4    Honor.  I offer it as Number 11.

5              THE COURT:  Any objection?

6              MR. GOLD:  No objection.  This is also material that's

7    been appended to the pleadings, your Honor.

8              THE COURT:  We'll call it Exhibit 11.

9              (Documents from the Suffolk County Sheriff's

10:44AM 10   Department were admitted as Exhibit No. 11.)

11   Q.   If you had noticed the fact that other members of the

12   group were also wearing hoodies, would that have heightened or

13   alleviated your suspicions about what was going on?

14             MR. WORTMANN:  Objection.

15             THE COURT:  I'll sustain it in that form.

16   Q.   Okay.  If you had noticed that all the individuals, other

17   individuals, in that group would have been wearing hoodies,

18   would that have been a concern to you?

19             MR. WORTMANN:  Objection.

10:45AM 20            THE COURT:  I'm not sure that's any better.

21   Sustained.

22             MR. WORTMANN:  Lastly, your Honor, I offer into

23   evidence the history, Weather Underground, the history for

24   Boston for September 17th, 2012, which contains an hour-by-hour

25   listing of the temperature and the humidity.

1          THE COURT:  I take it Weather Underground is a

2     radical, up to scrutiny --

3          MR. WORTMANN:  I believe that's correct, your Honor.

4          MR. GOLD:  Not anymore, your Honor.

5          THE COURT:  Is there any objection?

6          MR. GOLD:  No objection.

7          MR. WORTMANN:  I'm confident they've changed their

8     tune.

9          THE COURT:  All right.  Exhibit 12.

10:46AM 10          (History from Weather Underground for September 17th,

11     2012 was admitted in evidence as Exhibit No. 12.)

12          MR. WORTMANN:  Here we have the period from 5:54 all

13     the way to 11:54 indicating that the temperature was 68 degrees

14     at 6:54, and it got down to 61 degrees, and ultimately down to

15     55 degrees at midnight.

16          THE COURT:  I think you misspoke.  Oh, I'm sorry, the

17     temperature went up?

18          MR. WORTMANN:  Yes.

19          THE COURT:  68, all right, thank you.  Anything else,

10:47AM 20     Mr. Wortmann?

21     Q.   When Mr. Belin is walking away from you, could you see

22     where his hands were?

23     A.   No, just put down by his sides.

24          MR. WORTMANN:  Thank you.  That's all I have, your

25     Honor.

1          THE COURT:  Recross.

2                  RECROSS-EXAMINATION

3   BY MR. GOLD:

4   Q.   Down by his sides?

5   A.   Down by his sides, yes, I'm sorry.

6          MR. GOLD:  No further questions.

7          THE COURT:  You may step down.  Why don't we take

8   about a five-minute break, and then we'll resume.

9          THE CLERK:  All rise.

10:48AM 10          (A recess was taken.)

11          THE CLERK:  All rise.  Thank you.  Please be seated.

12          THE COURT:  Mr. Wortmann, is there anything further

13   from the government?

14          MR. WORTMANN:  Your Honor, if you have any questions,

15   I'm happy to answer them.  I don't want to repeat everything I

16   said.  I believe the evidence came in pretty much exactly the

17   way it was laid out in the memo.

18          THE COURT:  I'll give a chance for closing if you want

19   to do it, but let's just stick with the evidence.

10:55AM 20          MR. WORTMANN:  No, I apologize, we rest.

21          THE COURT:  Anything from the defense?

22          MR. GOLD:  No, your Honor.

23          THE COURT:  Okay.  The evidence is closed on the

24   motion to suppress.  Mr. Wortmann, you can, if you want to

25   supplement your filing, I'll hear it.

1          MR. WORTMANN:  Thanks, your Honor.  What really, I

2     guess, I want to talk about is the fallacies that affect the

3     cross-examination in this case.  In establishing reasonable

4     suspicion, the officers have to have specific and articuable

5     facts from which they could make a reasonably objective

6     judgment that contributes to reasonable suspicion, and this

7     Court and the First Circuit have repeatedly said that we give

8     substantial deference to the judgments made by an experienced

9     police officer, and Mr. Gold has succeeded in suggesting that

10:56AM 10   there may have been a number of alternative explanations that

11    were inconsistent with the conclusions that Officer Bissonnette

12    reached, but, your Honor, that's irrelevant.

13         The only question is were the facts as seen by him, as

14    observed by him, as noted by him, were the inferences that he

15    was drawing that this man was a man who there was reasonable

16    concerns that criminal activity was afoot, that he was armed

17    with a firearm, were those objective, reasonable inferences

18    made by such an experienced police officer, and I suggest, your

19    Honor, that the evidence shows overwhelmingly that it is.

10:56AM 20        We have a high crime area.  He knows it's a high crime

21    area because he said so in his report, he backed it up with

22    other reports, and you have in your Exhibit 4, which is a much

23    more detailed crime map from the Boston Regional Intelligence

24    Center showing that in 2012 alone there were six assault and

25    batteries with a dangerous weapon, firearm, 22 shots fired,

1    five firearm arrests, so when that second call came in for

2    Norfolk Park, they immediately went to it because it was a

3    higher priority item.

4         And what did they see?  They see a guy in that heavy

5    black sweatshirt peel off from the group, not look at him.

6    Now, maybe he was going to be out all night, maybe he had a

7    cold, maybe he just likes the hoodie.  All those things are

8    possibilities, but the fact of the matter is that

9    Officer Bissonnette was entitled to make the inferences that he

10:57AM 10    did that contribute to and constitute reasonable suspicion and

11    the right to frisk in this case.

12         The breaking away from the group, it's been cited in a

13    number of cases, the failure to make eye contact.  You know, I

14    mean, picture the scene, your Honor.  The cruiser pulls up,

15    turns left, the group is right in front of him, and then

16    Mr. Belin walks by with his head down not looking at anything.

17    It's not natural, it's not normal, and it's something that he's

18    entitled to infer, hey, something might be up here, and then it

19    only gets better because he sees who it is, and it's the same

10:58AM 20    guy he arrested two years before two blocks away for a firearm,

21    and in the course of that learned that he had another weapons

22    offense on his record, so this guy is a serious guy, and he

23    also knows that he's associated with the Norfolk Street Bulls.

24    He told you that.

25         The BPD gang verification is also in the documents

1       that I attached to the suppression opposition, specifically,

2       your Honor, I believe it is Exhibit 5, which shows that indeed

3       Norfolk, but it's the excellence of the policing here that

4       really makes, carries the day because by the time they started

5       to approach, Bissonnette said to you, and he's very frank about

6       it, "I thought the guy was armed, and I was going to pat frisk

7       him," but he waited, he developed more evidence, and he did it

8       in a very appropriate, a very reasonable and a certain

9       constitutional way, and that was, you know, Mr. Belin stops

10:59AM 10   because knows he's not going to able to walk away from

11      Bissonnette.

12          There's been absolutely no show of force up to that

13      point, and the record is clear, your Honor, and he says, "Do

14      you got anything on you," and why did he tell you that he said

15      that, because he wants to see the reaction, because he wants to

16      build the evidence that shows, and what does he do?  You know,

17      I think he said he was nervous beyond control, his face

18      changed, his breathing changed, his mannerisms changed, he

19      started to look over his shoulder, and he started to back away.

11:00AM 20      At that point given what he knew about King Belin,

21      given what he had seen about King Belin, given where they were

22      with King Belin, he would have been foolhardy not to do exactly

23      what he did, but, of course, it's easier than that, your Honor,

24      because King Belin did not allow the frisk to take place.  He

25      reaches for the arm, and he grabs it, and he holds it, and he

1    tries to -- and he tells you, I never got to get to his waist

2    because he grabbed me, and what does he do, he immediately goes

3    down and makes that move towards his waist, not once, not

4    twice, but several times.

5         THE COURT:  The stop has to be constitutional, doesn't

6    it, before we even get to that point?  I mean, I'm curious how

7    these two things intersect, right, you can't just begin

8    frisking people at random on the sidewalk obviously?

9         MR. WORTMANN:  Correct.

11:01AM 10        THE COURT:  So, it's got to be a valid, you know,

11   whether it's Terry or something else, it's got to be a valid

12   stop even before you start to frisk?

13        MR. WORTMANN:  Of course, the stop was never -- he

14   never submitted to the stop because he immediately started

15   fighting, and the crimes, the assault and the assault and

16   battery of a police officer took place immediately, so they

17   sort of fold into one, but even if I agree with your Honor

18   saying that's the case, he clearly had it then because at that

19   point he had all those things that he talked about, he had his

11:01AM 20   appearance, he had the knowledge, he had the position, he had

21   his actions and, he had his response to have you got anything

22   on you, and it's really important, your Honor, to distinguish

23   that from sort of general nervousness because you ask when he

24   first said to him, when he first said, "Hey, what's up, King,"

25   Mr. Belin came up and gave him a little smile.  He kept

1  walking, of course, because he didn't want to have anything to

2  do with either Officer Bissonnette or any of the other cops,

3  especially Officer Bissonnette because he knew him, but then he

4  asked that question, and all of a sudden there's no smile, all

5  of a sudden, he's the deer caught in the headlights and all

6  those things.

7  Based on all the cases, based on those factors, that

8  amounts to reasonable suspicion and surely amounts to the right

9  to frisk given what he knew and given his actions.  Again, you

11:02AM 10  don't have to reach that far because of the assault and the

11  assault and battery that was committed, but I'd ask you to deny

12  the motion.

13  THE COURT:  All right.  Mr. Gold.

14  MR. GOLD:  Thank you, Judge.  The gun was

15  unconstitutionally obtained and should be suppressed.  That's

16  our position.  We heard testimony from Officer Bissonnette.  I

17  think he testified consistent with his own memory, most likely,

18  but I think what we have is a window into a type of police

19  practice which is impermissible and happens more often than we

11:03AM 20  might like to admit.

21  The case that I'm most instructed by when thinking

22  about this case is, or one of them, anyway, is Judge Woodlock's

23  opinion below in the *McCoy* case.  The *McCoy* case is a case

24  where there's a vehicle stop and the police conduct a frisk of

25  the defendant when he exhibits nervousness, and that case is

1    often cited for the proposition that nervousness alone, being

2    in a high crime area alone are not sufficient to make -- are

3    not sufficient, articulable reasons to justify this intrusion

4    into the Fourth Amendment rights of an individual.

5         The reason that I'm thinking about the case now is

6    because it's very helpful, an instructive case where

7    Judge Woodlock sort of thinks the issues through, and one of

8    the things that's remarkable about these Terry cases is that

9    we're always asked, Judges are asked, and the defendant is

11:04AM 10   taking the position that we must second guess the judgment of

11   an officer who was right.

12        He was right.  There was a weapon on Mr. Belin's

13   person, and so it's difficult to second guess the judgment of

14   Officer Bissonnette in those circumstances, however, what we

15   have here is if the Court were to accept this search is

16   basically a precedent for a rule which would allow police on

17   very little provocation to search people that they know have a

18   prior record.  That is the element which ties this together,

19   makes this case even colorable at all.

11:05AM 20        What we have here, again, is a shaping of the case

21   through the course of litigation.  I would submit, Judge, to

22   fit the purposes of the government here.  The evidence shows a

23   call for a fight among girls with no reference to a gun which

24   directs the two officers to a particular location.

25        Officer Bissonnette has testified in the past simply

1    that he did not think we're talking about Officer Bissonnette's

2    intuitions, that he did not think the group had anything to do

3    with it.  He testifies today he doesn't remember the girls'

4    comment which came over the radio.

5         I would suggest, again, this process of shaping the

6    case or how cases get shaped and memories get shaped to fit the

7    purposes of the government, it's not particularly credible.  It

8    was as audible as any other piece of information in that tape,

9    a group of girls getting together trying to fight each other is

11:06AM 10   the language there that brings them there, and then what we

11   have is simply a stop for questioning among what the officer

12   says is a group.  Officer Bissonnette says it's a group that is

13   walking together down the street.  They pull in front of them,

14   and one of them breaks off.

15        We have this slow motion replay effect, but speeding

16   it up is helpful.  I don't think there's sufficient evidence in

17   the case right now that Mr. Belin was doing anything other but

18   walking along the street, walking along the street and walking

19   around the police car.  The notion that this was a group,

11:07AM 20   again, that's Officer Bissonnette's intuition and that some

21   stayed and were compliant and some were not is not established.

22        When Officer Bissonnette gets out of his car, he says

23   he sees one of the individuals break away.  His factor, he says

24   I think I see a group, some of them are compliant, I'm going to

25   question this one, simply, because A, he walked away, it's a

1   high crime area, and, C, because he's wearing a hooded

2   sweatshirt.

3        Your Honor, the points that I was trying to make, I

4   think race and just reality sort of interject into this case,

5   but it's simply the fact.  This case demonstrates it, that it's

6   a common mode of dress among African-American males of a

7   certain age to wear hooded sweatshirts, so to isolate that as a

8   factor in this case or any case is inherently problematic.

9   It's been done in other cases, it's among the factors that a

11:08AM 10  Court can consider, but it is a problem that many individuals,

11  including other individuals in this case, wear this type of

12  clothing.

13       THE COURT:  The point cuts in different ways, you

14  know, what you say is true, you know, that it's the fashion and

15  particularly the fashion in the minority community.  On the

16  other hand, the fashion is to look dangerous, to look like a

17  gang member, to wear clothing that other people might find

18  frightening or menacing, and you can't stop everyone wearing a

19  hoodie, obviously, and the officer does have to take into

11:09AM 20  account that it's the fashion.

21       On the other hand, it seems to me that it's not

22  entirely irrelevant either, that when you got up that day,

23  that's what you decided to wear as opposed to something that

24  was not intended to look menacing.

25       It's a factor to which a certain amount of weight

1    needs to be assigned, but it's not entirely inculpatory, but

2    it's not entirely innocent either.

3         MR. GOLD:  Your Honor, it's as far as we could get at

4    this point.  I would say following through with this theme

5    that, you know, there's this shaping and this, you know, I

6    think inevitably or ineluctably, you know, we have this focus

7    on these factors.  It certainly doesn't cut all one way.  It's

8    not something we've seen in other cases where we have someone

9    in the middle of summer wearing a puffy coat or anything like

11:09AM 10   that or a trenchcoat.  It is the style of dress.  It does

11   communicate something, and I think that can't be denied, but

12   it's a style, you know, it is a popular style.

13        The government moves from that, the hooded sweatshirt,

14   to this --

15        THE COURT:  Just to illustrate the point with extreme,

16   making it very extreme, that the way a woman might be dressed,

17   you know, the suspicion of prostitution, wearing very

18   sexually-suggestive clothing as opposed to looking like, I

19   don't know, dressed like a nun or something.  I'm trying to

11:10AM 20   think what the opposite extreme might be.

21        It's a factor.  Again, some people dress

22   sexually-suggestive who are not prostitutes, obviously.

23   Unfortunately, that's the fashion among girls in the city as

24   well, but if you were taking into account a mix of information

25   about whether you had suspicion that someone was engaging in

1    prostitution activity, the way she's dressed would be a factor,

2    right, it would be fair to take it into account.  If that's all

3    you had, that wouldn't be enough, but it's a factor.

4         MR. GOLD:  Well, I'll submit that, Judge, that it's a

5    factor.  I mean, I was thinking along the same lines because

6    dress does communicate something, but I do think that this

7    factor is -- the danger is that we overemphasize it.

8         I was thinking, speaking of extremes, what if everyone

9    in Roxbury, African-American male between 18 and 28 started to

11:11AM 10    dress like a Mormon, right, then we'd have a dress that

11    communicated something different with the ties and the upright,

12    mean or whatever, that would communicate something very

13    different, and the reason I bring that out in that way is we

14    don't -- they don't.  They don't dress like Mormons, they dress

15    like people in popular culture, popular media, rap, where these

16    symbols are norm.

17         So, you know, it's something that I believe the police

18    have to be sensitive to.  The dress is not unusual, and I guess

19    I'll leave this point there by saying that Officer Bissonnette

11:12AM 20    is using this as a factor.  There it is.  He says it's unusual,

21    but it's not unusual, in fact, it's usual.  It's quite usual.

22         There's inordinate significance on the heat, but it's

23    not particularly hot.  It's September.  It's not August.  It's

24    evening, and even in the images that we have, samples of

25    convenience in the case, we see a woman with a coat, we see

1    women with T-shirts and some long-sleeve T-shirts and pants,

2    and so the notion that it's unusual, which is something that

3    police often, I think, rightly respond to, some unusual

4    characteristic is not present here.

5         So what we have is the walking away, the sweatshirt,

6    and then the big factor is he recognizes him, and he recognizes

7    him because he personally arrested him, and that is a big

8    factor.

9         As Officer Bissonnette acknowledged though, he

11:13AM 10   arrested him three years before, so a rule that permits this

11    search, which, you know, there's a broad variety of records.  I

12    think if we permit this search, we do give this permission for

13    the officer to say I recognize someone, I'm going to search

14    them.

15        THE COURT:  But, again, isn't that if this is the only

16    factor, it's not enough.  You can't go down the street and

17    arrest everyone who you know who has a record, obviously that's

18    impermissible, but at the same time, it's not unfair, is it,

19    for it to be part of the mix of information that the officer

11:14AM 20   has?  Again, we can question how much weight ought to be put on

21    it, it's a three-year old arrest and so on, but the fact that

22    he was someone that the officer, who at least at one point

23    carried a weapon, had been reported to be associated with a

24    gang, aren't those facts that are part of the mix of

25    information you also can take into account?

1          MR. GOLD:  Well, they have to be.  One thing my

2     frustration with trying to sort out the case law and figure out

3     a right result to propose to the Court is that we have a lot of

4     phrases.  You know, we can't look at the factors in isolation,

5     but at the same time, not every collection of factors can be

6     assembled into reasonable suspicion in every case.

7          Most of the cases that we see, we have the police less

8     of a fortuitous encounter looking for something in particular

9     that draws their attention to someone.  Here, we have sort of a

11:15AM 10     break in the action.  They're going to question a group.  One

11     individual walks away, one individual is then a known prior

12     offender, and we take issue with the lack of emphasis of the

13     gang piece as also, I'm just going to say I think we

14     can -- it's simply not present in the police report, not

15     discussed, not among the factors in his mind.

16          I think that he is much more -- I think it also is

17     sort of doing double-duty with the fact that he arrested

18     Mr. Belin before, but that that factor is, again, the shaping

19     of this case to fit our categories here, *United States vs. Am*.

11:15AM 20     I think it's a First Circuit case from 2009, where gang

21     involvement was a very important factor for justifying a Terry

22     stop and frisk, where a known gang member was walking through

23     rival territory, and the expert judgment there was, he wouldn't

24     be walking through rival territory unless he was armed.  That

25     was the expert judgment.

1          Here, what we're presenting is a fortuitous "fishing

2     expedition" isn't the right word, but there are always factors

3     that can be assembled to justify a stop like this when it

4     results in a gun or some type of seizure, and that's something

5     that I think the Courts -- it's the policing role of the Court

6     to think about and wonder about.  What we have here is he

7     recognizes --

8          THE COURT:  But it has to be, assuming we're talking

9     about a Terry stop, it has to be reasonable and articulable,

11:16AM 10   right, those are the two adjectives that control the analysis?

11          MR. GOLD:  Yes.  Well, articuable, but not -- I mean,

12     many things can be articulated, and then it's the Court's

13     judgment to determine whether to be in this position, this

14     difficult position of second-guessing the judgment of a cop.

15          THE COURT:  I don't take articuable to mean literally

16     it can be put into words but something other than, you know, I

17     had a hunch that he was up to no good.  That obviously isn't

18     good enough.  It has to be facts, observable facts that the

19     officer can articulate.

11:17AM 20          MR. GOLD:  Right.  I think criminal history can be

21     among the facts, but, on the other hand, our read of this

22     sequence is like a hunch.  The officer candidly testified that

23     he had determined that he was going to frisk Mr. Belin before

24     he turned around, that was his testimony, based on the factors

25     he had right then, and then again --

1          THE COURT:  He could be subjectively wrong, and if

2     something happens in the interim to make it objectively

3     reasonable, that's good enough, right?  In other words, suppose

4     at that point he's subjectively wrong, and then after he makes

5     a decision he's going to search him, he observes, you know, the

6     gun sticking out of his waistband.  Surely that would be enough

7     from an objective standpoint, right?

8          MR. GOLD:  If he observed the bulge, right.  Here we

9     have the nervousness playing that role.

11:18AM 10          THE COURT:  Tell me, because I'm not sure I understand

11     how this works.  I assume that just because a Terry stop is

12     permissible doesn't mean that you have the right to conduct the

13     pat-down or the frisk, right?  Is there a difference between

14     those two standards, and if so, what is it?

15          MR. GOLD:  Well, your Honor, this case is a confusing

16     presentation of those issues.  I view, and Ms. Pucci, who has

17     helped a great deal with the research and briefing in this,

18     maybe can pull my sleeve if I say something wrong.

19          THE COURT:  Better let, I could let her speak.

11:19AM 20          MR. GOLD:  Well, that would be fine, too, but I'll try

21     first, but it's to say that it's a very similar standard, but

22     it's separated in time, so you have a reasonable suspicion that

23     the individual is armed and dangerous compared to the

24     reasonable suspicion that criminal activity is afoot, right,

25     and that's something I'm going to focus my remarks on, the

1       afoot piece.

2              THE COURT:  Let's assume I were to find that there was

3       enough to do the Terry stop, that is to stop and question him,

4       and once -- that is, to stop him in the sense that he's not

5       free to leave, if at that point he makes a movement, you know,

6       if he suddenly reaches to cover something up or to reach for a

7       gun or something, even if it's a split second, that changes the

8       calculus so now there would be a reasonable suspicion of

9       dangerousness, right, justifying the frisk?

11:20AM 10       MR. GOLD:  I believe the officer's testimony is,

11       they're completely elided in this case, that the reasonable

12       suspicion he had had nothing to do with the fight, had nothing

13       to do with anything.  He's saying based on the fact that he

14       arrested him for a gun crime that the reasonable suspicion is

15       the gun crime.

16              THE COURT:  I understand the Terry argument, but up to

17       the point he grabs his wrist or arm, or whatever it is he does,

18       he's now clearly stopped him, but he hasn't frisked him yet.

19       He says in that brief second interval, he makes a movement for

11:20AM 20       something in his waistband.

21              MR. GOLD:  Well, my read of the testimony is that what

22       Officer Bissonnette says, and I think this is important, is

23       that he stops him and frisks, and goes to frisk him with the

24       free hand simultaneously.  There is simultaneous, to separate

25       them, and that Mr. Belin's movement is in reaction to what he

1    does, and then their arms come together, and they're joined in

2    what I think Mr. Wortmann's called a "Mexican standoff," but

3    they're in this back and forth which ultimately results in him

4    being handcuffed.

5            THE COURT:  Let's just call it a "standoff."

6            MR. GOLD:  "Standoff."

7            THE COURT:  Ms. Pucci, do you want to weigh in here on

8    this legal question or any other question?

9            MS. PUCCI:  I think it's important that he be armed

11:21AM 10    and dangerous at that present moment, so you're asking about --

11            THE COURT:  Well, what the standard is, is it a

12    separate standard for the Terry stop as opposed to the stop and

13    frisk?

14            MS. PUCCI:  Yeah, I think it is.

15            THE COURT:  In other words, you might have reasonable

16    articulable suspicion to stop someone but not to pat frisk

17    them, and, if so, what is that standard for frisking?  Does he

18    have to be armed and dangerous?  I mean, could he --

19            MS. PUCCI:  Right, he has to have --

11:22AM 20            THE COURT:  Presumably, it would be a suspicion of

21    something that makes a frisk valid, right, in other words, he

22    doesn't have to actually see the gun?

23            MS. PUCCI:  Right.  That's right, to have a frisk, you

24    would have to have reasonable suspicion that there is criminal

25    activity afoot for just the stop.  The frisk, the purpose

1   behind the frisk is to protect the officer or people in the

2   area, so to do the frisk, you have to have reasonable belief

3   that the person is armed and presents a danger at that time.

4          THE COURT:  But the mere fact of a Terry stop is not

5   enough to justify a frisk without more, right, you need some

6   other thing?

7          MS. PUCCI:  That's right.  I think if you had

8   reasonable suspicion that someone was armed and dangerous, that

9   could justify both because that would be a particular type of

11:22AM 10   criminal activity, but it is a distinct standard.

11          THE COURT:  Okay.

12          MR. WORTMANN:  Your Honor, if I can?

13          THE COURT:  I want to make sure Mr. Gold, anything

14   further?

15          MR. WORTMANN:  I'm sorry.

16          MR. GOLD:  I will just say I'm looking at the

17   First Circuit's opinion in *McCoy* in 2005.  It does seem,

18   there's just two standards.  They're very similar to each

19   other, justified in believing that the person is armed and

11:23AM 20   dangerous to the officer or others, and the first is reasonable

21   articuable suspicion that criminal activity is afoot.

22          One point I wanted to emphasize is the afoot piece of

23   the Terry stop where this does seem to be an opportunity to

24   accost Mr. Belin or to stop him and search him, but there is

25   no -- before this happens no suggestion that criminal activity

1    is afoot.  They're not investigating anything in particular.

2    They stop to question these individuals about a fight, an

3    incident they may have witnessed.  One person walks away.

4         THE COURT:  Suppose he had run away at full speed,

5    would that be enough to say now the officer has a suspicion

6    that he has something to hide, that he has something on his

7    body or in his body that he wants to conceal and, therefore,

8    that's suspicion?  In other words, suppose they just got out of

9    the car, and, you know, Mr. Belin takes off full tilt jumping

11:24AM 10    over fences and so forth?

11         MR. GOLD:  Well, that would be much more probative.

12         THE COURT:  Right.

13         MR. GOLD:  Right, and we are in these inquiries, I

14    think, talking about matters of degree and also how evidence is

15    shaped.  What we have here is something that happens within

16    mere seconds.  We have the testimony that he was hurried, but

17    he can't have been hurrying too much, given the parameters in

18    which the incident transpired.  He catches up with him

19    immediately.

11:25AM 20         He doesn't turn on his heel and start walking in the

21    other direction, he starts walking toward the park, and very

22    little happens, and then he is recognized, recognized as a

23    prior offender by an officer who's arrested him again --

24    arrested him in the past, then we have the decision to search,

25    and we have this description of the nervousness.

1    All of these factors together are actually not as

2    overwhelming, to say the least, as the government submits.

3    It's a very thin case which would create a rule which really --

4    or lead to the creation of a rule, which would allow much

5    broader range of searches for people with prior criminal

6    convictions who dress in a particular way than is, I think,

7    acceptable to us, even consistent with cases in the

8    First Circuit.

9    I think that concludes most of what I wanted to say.

11:26AM 10    Ms. Pucci is just reminding me, so I'll close or just talking

11    again about the presentness piece here.  Is there something

12    presently going on, and this is something that the Terry cases

13    are about that leads to this reasonable articuable suspicion.

14    What we have here is, you know, the warm weather, the

15    high crime area, walking away.  Those things alone don't give

16    Officer Bissonnette the right to search or accost Mr. Belin.

17    Acknowledge, recognizing him is not a factor that should put it

18    over as someone who has had a previous arrest.  This was a

19    three-year old, not two, it's a 2009 year-old arrest and

11:27AM 20    conviction for gun possession that was three years ago.

21    There's no suggestion here of current intelligence.

22    There's no suggestion here of suspicion directed at Mr. Belin,

23    it's all based on his past record and criteria that can -- that

24    are very prodient, very malleable that can be marshaled in

25    almost any case, high crime, sweatshirt, walking away from the

1   police.

2          As we cite in our papers, you have the right to walk

3   away from police, the police are aware of that, and the

4   nervousness at the end, as the ultimate factor, "Do you have

5   anything on you," is I guess I would argue overblown.  It's

6   simply a drawn-out kind of description of facial ticks and

7   things that really don't -- aren't supported by the majority of

8   the evidence, which really is this quick grab and this quick

9   incident.

11:28AM 10          Ms. Pucci has one more point, your Honor, and I want

11   to let her make it.

12          THE COURT:  All right, Ms. Pucci.

13          MS. PUCCI:  Apologies, your Honor, we're talking back

14   on paper.  What I was just telling Mr. Gold also in terms of,

15   does Mr. Belin presently present a danger?  He was walking from

16   the officer.  This wasn't a situation where this was an

17   aggressor, and I think this is relevant to think about because

18   the justification behind doing the frisk is not to gather

19   evidence or investigate, it's to protect the officer.

11:29AM 20          Is there something that presents a danger to the

21   officer or the community at that time, so you have to think

22   about the setup and the situation and how Mr. Belin became

23   engaged with Officer Bissonnette, and here it was after the

24   officer himself pursued Mr. Belin down the street and grabbed

25   his arm and began to talk with him.

1          THE COURT:  All right.  Let me hear from Mr. Wortmann.

2          MR. WORTMANN:  Your Honor, it's the last point first.

3     She's absolutely right, you do have to consider the

4     dangerousness to the officer and the dangerousness to the

5     community.  She said those words, and the fact this encounter

6     took place a stone's throw from where a bunch of young kids and

7     their parents were playing in a tot lot only emphasizes the

8     potential danger, but let me get back to a couple of questions

9     that you asked and back to the point, the initial point that

11:30AM 10   Mr. Gold made, which is exactly the wrong one but cuts exactly

11    the other way.

12          The first is what is the difference between the

13    standards, and we have *Ponto,* which says, officer safety must

14    be at the forefront of police work, and it follows logically

15    that a pat frisk may accompany investigative stop, whenever the

16    officer has a reason to believe that the suspect is armed and

17    dangerous.

18          And then *LeFave* says that the requisite possibility to

19    justify a frisk appears to be lower than that required to

11:30AM 20   justify a Terry stop, so the standard, at least according to

21    *LeFave*, and according to a lot of the cases is somewhat lower,

22    and, you know, again, it's that first off, let's talk about

23    *McCoy*, because *McCoy* is a number of police officers walking up

24    to a guy in a traffic stop, and they have nothing to compare

25    him to, and he's nervous, he's nervous, we all get nervous when

1    we get stopped by the police, I do, but, here, it's so clear

2    that you have the initial look, which was, you know, a little

3    smile, nothing out of the ordinary, and you have to look at

4    what prompted the nervousness.

5         What prompted the nervousness was in Mr. Belin's mind

6    exactly the wrong question, exactly the one thing he didn't

7    want to hear, have you got anything on you, and here's this guy

8    with this monster of a gun in his waist, with more, you know,

9    with a cigarette pack with more bullets, and he knows it's all

11:31AM 10   there, and, you know, as the testimony came in, he said he was

11   nervous out of control.

12        His breathing patterns changed, his facial patterns

13   changed, he started looking around for an avenue of escape, and

14   he started walking away.  And all of that comes in, all of that

15   is part of the decision to stop and the decision to frisk and

16   the fact that they fight him so hard.

17        Before they can affect the frisk, that comes in as

18   well, and there's tons of cases which talk about, you know, the

19   failure to obey officer commands once the stop begins, get your

11:32AM 20   hand out of your pocket, move your hand out of the way.  All

21   that's relevant in terms of establishing a frisk, and, your

22   Honor, of course, it's a lot of little things.  That's what

23   Terry is all about, and it's about careful police work, and

24   that's what was done here.

25        This was a careful officer, you know, knowing who he

1   was dealing with, knowing where he was dealing with him,

2   looking very carefully at the situation and making exactly the

3   kind of decisions that we wanted him to make, and you should

4   deny the motion.

5          THE COURT:  All right.  Anything further, Mr. Gold?

6          MR. GOLD:  Yes, your Honor.  I just -- Mr. Wortmann

7   made a point that he makes in his papers, which I think is

8   significant.  He says what prompted Mr. Belin's nervousness.

9   He had a gun on him, which sort of reflects the point I was

11:33AM 10   bringing before.  What we're talking about is what the officer

11   knows at the time.  He's interpreting the factor of

12   nervousness.  Nervousness, sweatshirt, I know the guy.  There's

13   simply -- those are the factors, those are the factors, and

14   what we -- and they're insufficient to allow what happened

15   here, which is simply a decision to interfere with him.  No

16   further questioning, no further interaction, just the grab, I'm

17   going to grab him and frisk him, and that's what he did.

18          The sequence itself is a back and forth.  The stop and

19   the frisk, I think we argue happened simultaneously.  There was

11:33AM 20   insufficient -- there was insufficient suspicion, reasonable

21   suspicion to justify that search.

22          THE COURT:  All right.  Thank you.  What I'm going to

23   do is take this under advisement.  Terry stops are a collection

24   of facts.  Everything is an issue of degree probably.  It's

25   true of every issue in the law, civil and criminal.  Everything

1    is a question of degree, but, in any event, I want to look at

2    the cases a little more closely and look at this.  I think what

3    I'd like to do is to set a time period where we can reconvene

4    and I can deliver the opinion from the bench.  I don't know

5    that I'm going to have time to write anything regardless, but

6    on the ordinary of two weeks or so, and you can phone in, in

7    other words, I'm just literally going to be providing an

8    opinion.

9         THE COURT:  Let's leave it this way.  I have a trial

11:35AM 10   for the week of December 16th, which may go away, and we are

11   likely to know that tomorrow.  Why don't I put that on hold for

12   the time being.  Will the defendant need to be present, I'm

13   certainly happy to bring him in here, if I'm simply rendering

14   an opinion?

15        MR. GOLD:  Let me ask his feelings and get back to

16   you.  Your Honor, I'm just conferring with Mr. Belin.  I

17   haven't actually -- if we had an opinion in writing, obviously

18   we wouldn't be present, but if the Court is inclined to read it

19   into the record, which we would appreciate, we would seek,

11:36AM 20   request to be present.

21        THE COURT:  All right.  Here's what I'm going to do

22   then.  I'm going to try to schedule this the week of

23   December 16th.  It will depend on whether that trial goes

24   forward or not.  I think the stub week before Christmas is the

25   latest I want to do this, and I'll leave it open for the time

1    being, and Mr. Cicolini will let you know, and we'll bring in

2    Mr. Belin.

3              MR. WORTMANN:  Thank you, your Honor.

4              THE COURT:  I'm trying to be realistic here.  I want

5    to make this decision quickly, and given the many things I have

6    on my plate, I think a written opinion is not likely to happen.

7              MR. WORTMANN:  Your Honor, I'm scheduled to be at the

8    re-entry, the Department of Correction re-entry for most of the

9    day on the 17th.

11:37AM 10         THE COURT:  All right.  We'll obviously take into

11   account both of your schedules.

12             MR. WORTMANN:  Thank you.

13             THE COURT:  I don't imagine this will take very long

14   whether I grant the motion or deny it.  We'll find a time that

15   works for everybody.

16             MR. WORTMANN:  Thank you.

17             THE COURT:  Thank you, all, we'll stand in recess.

18             (Whereupon, the hearing was adjourned at 11:37 a.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS ) ss.

6    CITY OF BOSTON )

7

8

9           I do hereby certify that the foregoing transcript,

10   Pages 1 through 99 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 13-10058-FDS, UNITED STATES OF AMERICA vs.

13   KING BELIN and thereafter by me reduced to typewriting and is a

14   true and accurate record of the proceedings.

15           Dated this 12th day of December.

16

17                       s/s Valerie A. O'Hara

18           _____

19              VALERIE A. O'HARA

20              OFFICIAL COURT REPORTER

21

22

23

24

25