```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS


    * * * * * * * * * * * * * *
    *UNITED STATES OF AMERICA   *
                                *    CRIMINAL ACTION
                 v.             *    No. 13-10048-FDS-1
    *                           *
    KING BELIN                  *
                                *
    * * * * * * * * * * * * * *



           BEFORE THE HONORABLE F. DENNIS SAYLOR, IV
                 UNITED STATES DISTRICT JUDGE
         HEARING Re: RULINGS OF LAW ON MOTION TO SUPPRESS
                        January 2, 2014


    APPEARANCES:

           UNITED STATES ATTORNEY'S OFFICE, (By AUSA John A.
    Wortmann, Jr.), 1 Courthouse Way, Suite 9000,  Boston,
    Massachusetts  02210, on behalf of the United States of
    America

           FEDERAL PUBLIC DEFENDER OFFICE, DISTRICT OF
    MASSACHUSETTS, (By Ian Gold, Esq.), 51 Sleeper Street,
    5th Floor, Boston, Massachusetts  02210, on behalf of
    the Defendant




                                    Courtroom No. 2
                                    1 Courthouse Way
                                    Boston, Massachusetts 02210


                    James P. Gibbons, RPR, RMR
                      Official Court Reporter
                   1 Courthouse Way, Suite 7205
                   Boston, Massachusetts  02210
                        jmsgibbons@yahoo.com
```

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  All rise.
 3      Court is open.  You may be seated.
 4      This is Case No. 13-cr-10048, United States of America
 5  versus King Belin.
 6      Counsel, please note your appearances for the record.
 7          MR. WORTMANN:  Your Honor, good morning.  John
 8  Wortmann for the United States.
 9          MR. GOLD:  Good morning, your Honor.  Ian Gold on
10  behalf of King Belin.
11          THE COURT:  All right.  Good morning, all, and let
12  the record reflect the defendant is present.
13      This conference is for the purpose of my rendering my
14  decision on the defendant's motion to suppress and the
15  reasons for that decision.
16      Defendant has moved to suppress evidence seized, as he
17  contends, in violation of the Fourth Amendment.
18      I am going to deny the motion, and I will explain my
19  reasons for that denial.
20      There are essentially two questions:  The legality of
21  the initial stop in the case and the legality of the
22  subsequent pat frisk or search for weapons.
23      The law is relatively clear, and I do not think in
24  dispute.  A Terry stop is lawful.  Under certain
25  circumstances, an officer may conduct a brief investigatory
```

stop when he or she has a reasonable or articulable suspicion that criminal activity is afoot, and a subsequent frisk for weapons is permissible where the officer is justified in believing that the person is armed and dangerous to the officer or others.  The officer must have a particularized objective basis for his or her suspicion.  Sometimes it's framed as a "reasonable suspicion" that a person is armed and dangerous.

In assessing the officer's conduct, the Court must consider the totality of the circumstances.  That includes, for the frisk, the circumstances originally warranting the stop and as informed by what occurred afterwards and what the officer learned as the stop progressed.  It is, of course, not proof beyond a reasonable doubt, nor is it a probable-cause standard, but it is a standard.  The officer is obviously not free simply to stop or frisk citizens upon hunches or mere suspicions.

Among the factors that the officer may consider in making a Terry stop are: -- and these are not the only factors, but certainly they are factors that the courts have considered are appropriate -- the area in which it occurs, in particular whether it is a high-crime area, the officer's personal knowledge of the individual in question, including past criminal conduct or proclivity to carry a firearm, and the defendant's movement or nervousness during the course of

```
 1     the stop.
 2          The facts in this case are not disputed to a great
 3     degree.  The defendant did not testify.  The stop in
 4     question occurred on September 17, 2012, at approximately
 5     6:45 p.m.  There was a radio call that either kids or girls
 6     were fighting at the intersection of Norfolk and Fessenden
 7     Street in Mattapan near Norfolk Park.
 8          Norfolk Park has been the site of multiple recent
 9     firearms arrests or firearm incidents and is a "focal point"
10     for the Norfolk Street Bulls gang.
11          The temperature at the time, according to weather
12     reports, the maximum that day was 70 degrees.  The mean
13     temperature was 62 degrees.  According to Exhibit 12, the
14     temperature on September 17 normally peaks at about 6 or 7
15     p.m. in the evening.  And I think it's a fair conclusion
16     here that the temperature was approximately 70 degrees,
17     possibly a degree or two cooler, but approximately 70
18     degrees.
19          Officer Bissonnette was wearing a T-shirt and shorts.
20     There is a girl in a photograph taken at the time who was
21     wearing a coat, like a light parka, and there is also a
22     woman in one of the photographs wearing a T-shirt.  It
23     certainly was not a hot day, but neither was it a cold day.
24          Officers Bissonnette and Quinn arrived at the scene by
25     automobile.  They saw a group of five men walking on Norfolk
```

1  Street near Mildred Avenue.  As they stopped the car and got
2  out, one member peeled away and hurried past Officer
3  Bissonnette down Mildred Avenue.
4      The officer, that is Bissonnette, recognize him as King
5  Belin -- he had personally arrested him in 2009 for
6  illegally carrying a firearm about half-a-mile away -- and
7  believed that he was associated with the Norfolk Street
8  Bulls.
9      The defendant's clothing was described by the officer
10  as a heavy or baggy sweatshirt.  There is some dispute about
11  this, but certainly it is the type of clothing that can be
12  used to hide a weapon or other contraband.  It's certainly
13  not tight-fitting.
14      There was a playground nearby with children playing, as
15  depicted in the photographs.
16      Bissonnette followed the defendant for a short while
17  and said to him -- asked him, "Yo, King, what's going on?"
18      He said that the defendant looked at him and smiled and
19  continued to walk away.
20      Officer Bissonnette then asked if he had anything on
21  him.  According to Bissonnette, his demeanor and facial
22  expression changed at that point.  He became quite nervous,
23  took a deep breath, and then followed that with quick and
24  shallow breathing.
25      He also reported that the defendant looked around, in

```
 1    his words, "as if searching for a means of escape."
 2         At that point Bissonnette decided to frisk him for
 3    weapons.  He took hold of his arm.  He said nothing at that
 4    point, apparently, and there is no evidence that the
 5    defendant said anything.
 6         The defendant reached to his waist with both hands.
 7    Bissonnette then grabbed both his hands, held them to his
 8    chest, told Belin to relax.  Belin resisted the moved.  The
 9    other officers came to help, and the defendant was taken to
10    the ground still resisting.  He was handcuffed, and on his
11    person were discovered a gun, marijuana, and five rounds of
12    ammunition.
13         It's unclear here whether a Terry stop occurred before
14    the decision to pat frisk.  They seem to be collapsed into
15    one moment, or certainly they occurred closely, one after
16    another.
17         Although the officer asked two questions, the
18    defendant's movement was not restrained at that point.
19         I'm not certain this it matters here because, clearly,
20    the officer's conduct has to be justified in terms of the
21    higher standard for a pat and frisk and not the lower
22    standard of a Terry stop.
23         I turn then to the factors cited by the officer and
24    outlined in the hearing and raised by the government in
25    defense of the stop and frisk.
```

1           The first is that it occurred in a high-crime area,
2    particularly an area in which there has been substantial
3    firearm violence or firearm offenses.
4           That factor, of course, is not enough by itself.  Large
5    parts of the city would qualify, but it is a legitimate
6    factor, according to court decisions, that the officer may
7    take into account in making his decision in the field.
8           The second factor is that the defendant was personally
9    known to the officer and personally known to have a history,
10   not simply a criminal history, but a history of illegally
11   carrying a firearm in which Bissonnette was the arresting
12   officer as well as suspected gang involvement.
13          I think that is a significant factor under the
14   circumstances that substantially tips the balance.  In other
15   words, he was not simply stopping a random black citizen who
16   looked suspicious.  It was someone who the officer
17   personally knew and who had a specific history as to a
18   specific crime.
19          The next factor was the defendant's clothing.  He was
20   wearing what the officer described as a heavy or baggy
21   sweatshirt, heavy and baggy.  A sweatshirt, obviously, is
22   something that makes it easier to conceal a weapon.
23          The first question is:  Was the sweatshirt suspicious
24   because of the temperature?
25          The police officer thought so.  Again, the temperature

1   was about 70 degrees.  He was wearing a T-shirt.  There was
2   a woman in the background wearing a T-shirt.  Certainly it
3   would have been very suspicious if the temperature had been
4   90 degrees, and not suspicious at all, perhaps -- or very
5   little weight would be given to the fact if it were
6   50 degrees.  But it was sufficiently warm that the wearing
7   of a sweatshirt was part of the mix of information that the
8   officer took into account in assessing the situation, and I
9   think under the circumstances that is both reasonable and
10  articulable.
11       There is a second piece of this, and that is a
12  sweatshirt or hoodie is fashionable, particularly in the
13  urban community or African-American community, and a concern
14  has been expressed that this would give officers a license
15  to stop everyone wearing a hoodie or a sweatshirt.
16       Again, if that factor were the only factor, that would
17  not be sufficient to justify the stop.  But the fact remains
18  that whether it's fashionable or not, it's what the
19  defendant chose to wear, chose to wear on that day.  It
20  does, again, make it easier to conceal a weapon, which is
21  part of the mix.  If he were wearing a tight, clingy
22  T-shirt, the officer would have had dramatically less reason
23  to suspect the presence of a firearm or any other
24  contraband.
25       I made the analogy during the hearing, and I think it

remains a fair one, that while dressing in a sexually suggestive manner is not enough to provide a reasonable suspicion of prostitution -- it's fashionable, and many women or girls do dress that way -- nonetheless, it would be part of an officer's reasonably articulable suspicion that a woman was engaged in prostitution if she were dressed in that manner.

Again, means of dress might not be enough standing alone, but taken in combination with other circumstances is a factor on which an officer could rely.

The next factor is the fact that the defendant peeled off. Again, he had no obligation to stay. That factor standing alone is not enough, but the fact remains that four men stayed on course and one peeled off, and that is part of the mix of information the officer was entitled to consider.

The next factor is the defendant's nervousness. Again, I think this is a significant factor, and what makes it significant is not mere nervousness in the presence of a police officer, that's a common response -- that would, nonetheless, be a factor but a minor one -- but here Bissonnette said there was a sudden change of demeanor, not the normal nervousness that accompanies being spoken to by a police officer, but it also occurred in response to a direct question as to whether he had anything on him. The officer described it as a "strong reaction." A reasonable

1  implication under the circumstances was that the defendant
2  was suddenly nervous because he did have something on him,
3  and I think that factor, again, was legitimately considered
4  by the officer.
5       There are at least a couple of other factors that are
6  relatively minor but part of the mix.  One is the
7  defendant's conduct and demeanor.  The officer interpreted
8  it as looking for an escape route, looking around.  Again, a
9  minor factor but part of the mix.
10      And, finally, the fact that there were children playing
11 nearby on a playground.  The officer is entitled to evaluate
12 the safety of the situation from all aspects, and under the
13 circumstances here:  He had a known gun offender wearing
14 clothing that permits concealment, expressing strong
15 nervousness in response to a direct question that implicated
16 the possibility of gun possession, in the presence of nearby
17 children, and that factor, again, was appropriate for the
18 officer to consider.
19      Taking all those factors together, again, as we must,
20 collectively, not singling out any one or relying too much
21 on any one factor, I conclude that with respect to the Terry
22 stop portion of the analysis that the officer had a
23 reasonable articulable suspicion that criminal activity was
24 afoot.  And as to the frisk, the officer had a
25 particularized objective basis for his suspicion that Belin

1  was armed and dangerous.

2      I therefore conclude that the stop and the search did
3  not violate the Constitution, in particular, were not
4  illegal under the Fourth Amendment or unreasonable within
5  the meaning of the Fourth Amendment and, therefore, the
6  motion to suppress will be and is denied.

7      All right. With that, what is our next step?

8      I am sure the defendant needs to digest this
9  information.

10     Mr. Gold, what do you want to do from this point?

11         MR. GOLD: Thank you, Judge.

12     We were talking, Mr. Wortmann and I, before your Honor
13 took the bench. I think what we'd like to do is request
14 that the Court schedule a pretrial conference for us in
15 about three weeks, which will allow us to digest the
16 decision and decide what we would like to do.

17         THE COURT: A pretrial conference in which we're --
18 I would interpret that to mean I want to know how long you
19 expect the trial to be and schedule a trial or a status
20 conference, which would normally be shorter and require less
21 preparation, so to speak.

22         MR. GOLD: Well, a status conference prior to
23 trial.

24     I think one of the things we'd like to do, one of the
25 things we typically explore here, is to negotiate whether a

1  conditional plea is possible.  I would need to talk about
2  the ins and outs of that with Mr. Belin.  And, if we were to
3  try the case, to really put on our trial cap and think about
4  what that would look like.
5      So I think, just to allow us to have a better idea of
6  where we're going -- we'll certainly try, your Honor, by
7  that date to know whether or not this is going to be a plea
8  or a trial.
9          THE COURT:  All right.
10     Let's do this.  Let's set it for a conference Friday,
11 January 24 at 9 a.m.
12     Does that work?
13         MR. GOLD:  Yes.
14         MR. WORTMANN:  And, your Honor, I would request
15 that the time between today and the 24th be excluded under
16 the Speedy Trial Act.
17         THE COURT:  All right.
18     I think we had our hearing on this on December 5th.
19 So I've had it under advisement, I think, for under 30 days.
20 It took longer than I thought with the holidays and weather
21 and so forth.  But I think that time is all excludable.
22 And then I would propose to exclude the time between today,
23 January 2, and January 24 in the interest of justice to
24 permit the parties to potentially negotiate a non-trial
25 resolution or otherwise to prepare for trial.

1        Is there any objection to that, Mr. Gold?
2            (Whereupon, the defendant and his counsel conferred.)
3            MR. GOLD:  Can I have a moment?
4            THE COURT:  Yes, go ahead.
5            (Whereupon, the defendant and his counsel conferred.)
6            MR. GOLD:  We object, your Honor.  The defendant
7   objects.  I haven't had a lot of time to confer with him.  I
8   think this is a decision that -- that's his, so I've
9   expressed an interest in what I want to do, but I think I
10  would just note an objection to the exclusion of the time
11  until the 24th.
12           MR. WORTMANN:  Your Honor, on that account, I would
13  ask if we can move it up then, because I just don't want us
14  to see, if there is going to be -- and it's perfectly within
15  Mr. Belin's rights.  If he's really interested in moving
16  this case along, I don't want to see us get jammed on the
17  70-day period.
18           MR. GOLD:  And I wouldn't object to moving it up.
19           THE COURT:  Let's see if we can come up with
20  something earlier then.
21           THE CLERK:  We have time the week of January 6 and
22  the week of January 13th.
23           THE COURT:  A week from today?
24           THE CLERK:  Yes.  We can do it at 11:30.
25           THE COURT:  January 9 at 11:30?

1          MR. WORTMANN:  Yes.  That would be fine.  Thank
2     you, your Honor.  We appreciate it very much.
3          THE COURT:  And I will exclude the time between
4     today and January 9 in the interest of justice.  The
5     defendant does not have to consent, obviously.  I can,
6     nonetheless, exclude the time.  I think, given the
7     circumstances here, some time has to be permitted to digest
8     the information, to talk about where the case goes from
9     here, and prepare for trial.
10         I will alert the parties that if we are going to be on
11    a fast track, I am starting a major trial, the O'Brien
12    trial, which is the probation case, on, I think,
13    February 24, and that's going to take me into April.  And if
14    we're going to try it before, then we're going to have to
15    make some significant arrangements here to move things.
16         MR. WORTMANN:  Your Honor, just to make matters
17    more complicated, I have a trial February 3rd and another
18    one March 3rd, so --
19         THE COURT:  We will see where we are.  Let's talk
20    about this when we reconvene January 9.
21         The defendant has a constitutional and statutory right
22    to a speedy trial, and we will do the best we can.  If I
23    have to transfer this to another judge to make it happen, I
24    will do that.  We will figure out something.
25         But, just for planning purposes, we ought to talk about

```
 1    that.  I'm guessing that this is a trial that probably is
 2    two or three days, but you know better than I.
 3              MR. WORTMANN:  That would be my guess, your Honor.
 4              THE COURT:  All right.  Let's see where we are next
 5    week, and we'll take it from there.
 6              MR. GOLD:  Thank you, Judge.
 7              MR. WORTMANN:  Thank you, your Honor.
 8              THE COURT:  Thank you.
 9         Let me make the formal finding.
10         I am excluding the time between January 2nd and
11    January 9 in the interest of justice, and I find that the
12    exclusion of the time outweighs the interests of the parties
13    and the public in a speedy trial and will enter a written
14    order to that effect.
15              MR. WORTMANN:  Thank you, your Honor.
16              MR. GOLD:  And note our exception for the record.
17              THE COURT:  Yes.
18              THE CLERK:  All rise.
19         (Proceedings adjourned.)
20
21
22
23
24
25
```

## **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                          January 14, 2014
_____
James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com