1

1                       UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2

3

4       UNITED STATES OF AMERICA,          )
                                           )
5                          Plaintiff,      )
                                           )
6                                          )  No. 13-10048-FDS
        vs.                                )
7                                          )
        KING BELIN,                        )
8                          Defendant.      )

9

10      BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12                         STATUS CONFERENCE

13

14

15             John Joseph Moakley United States Courthouse
                            Courtroom No. 2
16                         One Courthouse Way
                           Boston, MA 02210
17

18                           April 7, 2014
                              2:00 p.m.
19

20

21

22

23                        Valerie A. O'Hara
                         Official Court Reporter
24        John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3204
25                       Boston, MA 02210
                     E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by JOHN A. WORTMANN, JR.,
     ESQ., 1 Courthouse Way, Suite 9200, Boston, Massachusetts
4    02110;

5    For the Defendant:

6        Ian Gold, Attorney at Law, 2 Clock Tower Place,
     Suite 260 EF, Maynard, Massachusetts 01754.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Thank you.  Please be seated.
Court is now in session in the matter of United States vs.
King Belin.  This is Case Number 13-cr-10048.

Counsel, please note your appearances for the record.

MR. WORTMANN:  Your Honor, good afternoon,
John Wortmann for the United States.

THE COURT:  Good afternoon.

MR. GOLD:  Good afternoon, Ian Gold on behalf of the
defendant, King Belin.

THE COURT:  Good afternoon.  This is a status
conference in the case.  I have pending defendant's motion for
reconsideration of the denial of the motion to suppress.  That
was filed on March 31st, I guess.  Is that one week ago?  Yes,
one week ago.  Mr. Wortmann, does the government expect to file
an opposition?

MR. WORTMANN:  Well, your Honor, my recollection is
that one of the issues that we were going to discuss today was
whether or not the Court wanted me to file an opposition.  I do
not believe that an opposition is warranted.  I'm happy to
explain to you why I believe that.

THE COURT:  Why don't we handle it this way.  I've
read the motion, and I'm not going to deny it on the grounds
that it's a motion for reconsideration, I'm going to take it on
the merits.  I'll let Mr. Gold speak, and then if you're

1    prepared to address it orally, we can handle it that way.

2         MR. WORTMANN:  Yes.

3         THE COURT:  And if there's any issue --

4         MR. WORTMANN:  If you want me to file something, I'm

5    happy to do it, your Honor.

6         THE COURT:  Mr. Gold, why don't I hear from you first.

7         MR. GOLD:  Well, your Honor, I think I can respond to

8    questioning, or apart from the papers, the way we put the

9    motion for reconsideration forward is, respectfully, an error

02:08PM 10   in the analysis as to when the stop actually took place from

11   which we think the better analysis flows.

12        When you locate the stop at the moment that Mr. Belin

13   is compelled to turn around, at that moment, in practical

14   terms, as we say, you remove the nervousness, so that is a

15   factor which is removed from the analysis.

16        We also urge upon the Court a reframing, I guess I'll

17   call it, of the scene and the different factors that are there.

18   What I'm calling the reframing I think we expressed as looking

19   back at the cases and attempting to make meaningful analogies

02:09PM 20   from the previous cases that we have from the First Circuit and

21   elsewhere that there isn't this organic -- I think everyone

22   would agree that this isn't simply a tally of factors or a

23   checklist, that there's got to be this meaningful relationship

24   between the purpose of the stop and kind of defining the scope

25   and extent of what's permissible, what's reasonable under the

1    circumstances, and the factors that were marshalled by the

2    government, although they are marshalled in prior cases here,

3    do not fit in the same way as the argument that we're making

4    when in fact what we have a stop for a particular purpose, we

5    have questioning, and it's simply the breaking from the group

6    that appears to draw the police officer's attention, then he

7    recognizes him.

8           And the rule which emerges from the sequence in

9    allowing the material to come into evidence not being

02:10PM 10   suppressed is one that is simply based on failure to comply

11   with questioning, if you're known to police gives this kind of

12   general warrant.  That in sum is the essence of our argument in

13   reconsideration, your Honor.

14          THE COURT:  All right.  Mr. Wortmann.

15          MR. WORTMANN:  Your Honor, so the fallacy in

16   Mr. Gold's argument came out when he used the word, "compel."

17   He says that Mr. Belin was compelled to stop, and it's not true

18   on the facts, and it's an incorrect statement of the law.  You

19   know, his suggestion is that because a police officer calls out

02:11PM 20   to somebody and follows him, that that's enough to constitute a

21   seizure, and he's just wrong.

22          The one case that he cites for the proposition is

23   United States vs. Camacho, and if you look at Camacho, what

24   Camacho involved was three officers cutting off somebody's

25   travel path, demanding, making accusatory accusations and

1    bending him over the hood of a car, and to suggest that that

2    case is analogous to what we have here just makes no sense, and

3    it's also important because of all the cases and really the

4    settled case law that Mr. Gold completely ignores.

5         All right.  Consider first where it all starts, which

6    is *Mendenhall*, and *Mendenhall* talks about, and here's what it

7    said at 446 U.S. 554, "Relevant circumstances as to whether a

8    seizure takes place include the threatening presence of several

9    officers, the display of a weapon by an officer, some physical

02:12PM 10  touching of the person of the citizen or the use or language or

11   tone indicating that compliance with the officer's request

12   might be compelled."

13        Okay.  Mr. Belin goes O for 4 on that, your Honor,

14   O for 4.  There's nothing in *Mendenhall* that even suggests that

15   this was a seizure in this case, and, more importantly, so he

16   ignores a really substantial statement in *United States vs.*

17   *Smith* when he talks about because really the notion is, oh,

18   God, I see a police officer approaching me, that means I have

19   to stop because it makes me nervous, because it makes me upset,

02:12PM 20  and in *Smith*, and I'm going to read this for a little bit

21   because I think it's so on point and so clear.

22        I'm at 422 Fd. 3d 28.  "Since most tend to feel some

23   degree of compulsion when confronted by law enforcement

24   officers asking questions, such discomfort cannot be a measure

25   of Fourth Amendment seizure.  If it were, officers would

1    effectively be barred from approaching citizens at all absent

2    full blown probable cause."

3          In *Mendenhall*, the Supreme Court made clear that

4    "Characterizing every street encounter between a citizen and

5    the police is a seizure would impose wholly unrealistic

6    restrictions upon a wide variety of legitimate law enforcement

7    practices without the authority to approach and briefly

8    question a citizen, those who were innocent might be falsely

9    accused, those who are guilty, might wholly escape prosecution,

02:13PM 10    and many crimes would go unresolved.  In short, the security of

11    all would be diminished."

12          Then in order to avoid such an unsatisfactory result,

13    the Court has made clear that "Only when a citizen's freedom is

14    objectively restrained is there any foundation for invoking

15    constitutional safeguards.  No seizure occurs when an officer

16    approaches a citizen to ask a question unless it was

17    objectively reasonable for that person to believe that he was

18    compelled and stay to answer the question."

19          And if you look at all the cases we cited in the

02:13PM 20    original motion, your Honor, there is no compulsion here.

21    Mr. Belin had a choice.  He could have stopped walking, he

22    could have kept walking, he could have said, no, sorry, I'm

23    busy or I've got to go, and at that point, he would have put

24    the issue in focus, and this net would have had a choice,

25    either to say stop or to say, okay, I'll talk to him next time,

1   but he didn't do that.  He made that choice to just turn around

2   and say, "Okay, what do you want?"

3          There was nothing about the events leading up to it,

4   which are not in dispute, and there's nobody saying that there

5   are other police officers around, that Bissonnette commanded

6   him to stop, that up until the second question was asked that

7   there was any physical contact with him, there's just nothing

8   to support the notion that the stop took place, and until

9   Bissonnette put his hand on him and started the pat frisk that

02:14PM 10   there was anything that could even remotely constitute a

11  seizure.

12         Now, there are other flaws in the argument, and the

13  next one that I'll talk about is a broad conceptual one, which

14  is ironic because Mr. Gold says he's not doing it, and that is

15  to look at each individual factor and say, well, that's not

16  enough and forget that what we're looking at is the totality of

17  the circumstances that appear to the officers.

18         He said that at the last page, he says, well, of

19  course, I wouldn't do that, but then every time that he looks

02:15PM 20   at something, the neighborhood, well, that's not enough, the

21  gang, that's not enough, his nervousness, that's not enough,

22  but, of course, looking at the totality, which is exactly what

23  your Honor recognized when you decided the case from the bench

24  in the first place, and it was correct.  There's no grounds.

25  You know, the notion that the fact that either A,

1   Officer Bissonnette, as he says in his motion for

2   reconsideration several times candidly said, "Yeah, I was

3   probably going to stop him regardless."

4        His subjective intentions, the law makes clear again

5   and again and again have nothing to do, and Bissonnette had the

6   right, and it's good police work to do what he did, no matter

7   what he was ultimately planning on, he let the scene develop,

8   he let things happen, and the more things happened, the more

9   Mr. Belin piled on the justification for the stop and for the

02:16PM 10   seizure.

11        I think, you know, in view of all those circumstances,

12   your Honor, you know, the point about the hoodie is not just

13   that it was improper for the weather but also that it was

14   sufficiently baggy to allow, and as your Honor said in the

15   findings that you made, if he had been wearing a tight T-shirt,

16   that would have been a very different factor.

17        The idea that there wasn't sufficient evidence of a

18   high crime neighborhood is belied both by Officer Bissonnette's

19   testimony and by the documents that were attached from the

02:16PM 20   Boston Regional Intelligence Center showing the prevalence of

21   firearm and firearm-related pretenses in the area of Norfolk

22   Park, and although Mr. Gold's repeatedly, at least once or

23   twice, said how candid Officer Bissonnette, he says, "Well, he

24   must have been lying about the gang because it doesn't appear

25   in the report."

1     None of that makes any sense, your Honor.  You have

2   the opportunity to assess the credibility of this officer.  You

3   have the opportunity to look at the totality of the

4   circumstances, and what do we want our police officers to do in

5   that situation?  I suggest exactly what Officer Bissonnette

6   did, which is, be patient, wait, make sure that he was right,

7   and then take appropriate actions to protect himself and the

8   other people in the area.

9     Both the stop and the frisk were justified, and I ask

02:17PM 10   that your Honor deny the motion for reconsideration without any

11   further briefing.

12     THE COURT:  All right.  Mr. Gold.

13     MR. GOLD:  Thank you, your Honor.  I think this was

14   helpful, Mr. Wortmann's response was helpful.  I think we're

15   making a factual argument about the stop, which is a little bit

16   different, I guess, than he's implying we are.  You know, we

17   cited some social science research.  I wanted to let the Court

18   know that we had ordered the textbook that we cite in the

19   papers, and it's available at the First Circuit Library through

02:18PM 20   inter-library loan.

21     The notion is, and this is Mr. Wortmann's own

22   question.  He said, "So you followed him?"  Remember, and

23   during the hearing, it emerged that when Mr. Belin politely

24   nodded and said I decline to engage with you and continued on

25   his way with the intention to stop him, he followed him

1    aggressively closing the distance until he was on top of him,

2    within an arm's distance, and we argue compelling him to turn

3    around because that's the natural human reaction when a police

4    officer is within your personal space, you have the option to

5    run, but you don't have the option to continue to walk like a

6    normal person.

7         The police officer is commanding you by his physical

8    presence entering your physical space, and I don't think we

9    need social science to buttress that, we just need a little bit

02:19PM 10   of imagination to think about how that would look, how long

11   could they walk an arm's length or 18 inches from each other

12   toward the park if he really wanted to decline, to decline to

13   submit to questioning.

14        It's simply untenable.  It doesn't make sense, and it

15   leads to a distorted view of the sequence of what occurred.

16   That is what it leads to, and, in fact, in the Court's opinion,

17   these things are sort of discussed together and separates them

18   out is helpful, I think leads to the correct analysis.  Once

19   the stop occurs, he stopped, then there's a question, then

02:20PM 20   there's a frisk.

21        The other point we make, and, again, this is based of

22   the reading of the cases, we've been interacting with the

23   cases, is that some of the factors that are cited may more

24   meaningfully be connected to the decision to frisk than they

25   are to the initial decision as to whether there's reasonable

1   suspicion that criminal activity is afoot based on a read of

2   the circumstances.

3          We can't just ignore context and throw out that they

4   heard a fight for girls, they stopped, they wanted to question

5   these guys, somebody walks off, I'm going to follow that guy,

6   and there Mr. Wortmann talks about subjective intention because

7   it says so in a case, and we all know from *Whren* it is not

8   relevant, but it is pertinent because what the Court needs to

9   do is get to the right result, a read of what happened, and we

02:20PM 10   learned in the hearing that the distances involved, we have

11   this police officer closing the distance within seconds.  He

12   says by his own account, "I'm within an arm's length when the

13   guy spins around."

14          I will say Mr. Wortmann I believe misremembers the

15   *Camacho* case.  In the *Camacho* case, there are two individuals,

16   there are two police officers.  The cop, almost identically,

17   the police officer almost identically to our situation, they

18   just pull the car in front of them.  That's a display of

19   official authority, of course, and there the officer orders

02:21PM 20   Camacho's companion to put his hands on the vehicle.  While

21   Camacho is not ordered to stop, it's simply that the stop

22   occurs at that point, according to the First Circuit.  That is

23   less than what we have here.

24          Arguably, if Mr. Belin had stopped with the other

25   group of four, and I note that they were all, I'm not sure what

1   the reasons were in those individual cases, but they were all

2   without the walking away, without all that, they were all

3   frisked, or three of them were, and I'm not sure if those

4   searches were supported by reasonable suspicion or reason to

5   believe that they were armed and currently dangerous.

6       The dividing conquer strategy, that's true, I just --

7   I don't -- I guess the answer to that is when Mr. Wortmann says

8   we're guilty of what the cases identify as a problem, just kind

9   of isolating out factors, I'm striving not to do that.  I will

02:22PM 10   say that what that leads to is that any search with two factors

11   can lead to a totality.

12       The only way to kind of analytically build up a

13   challenge to a search is to look at the factors discretely,

14   even if you put them back together in the end, and what we have

15   here, again, we're saying is that the factors weren't

16   organically related to the context.  They were there.  They

17   certainly are factors that have been identified in other cases

18   as supporting reasonable suspicion in those cases.

19       Take gang involvement.  There was a call relating to

02:23PM 20   gang involvement.  There's gang involvement in the Am case

21   where it's kind of intrinsically related to the reason for the

22   stop.

23       Again, a lot of these factors simply can be blanket

24   inner city factors.  If you are suspected of being in a gang,

25   can you be searched?  If you are wearing a hoodie, can you be

1    searched without more?  If a police officer can marshal three

2    factors in any instance, will that justify, will that make

3    reasonable suspicion?  Those are the stakes, your Honor, and we

4    would argue that in this circumstance, we don't have a call

5    bringing them because there's a suspicion of gang activity, we

6    simply have a late afternoon or early evening, full sunlight

7    out and some individuals walking down the street when they are

8    confronted by police officers in an unrelated, for an unrelated

9    call.

02:24PM 10    So, again, I think I've mentioned this already, but I

11    see in my notes that it's at the end.  The subjective

12    intention, we're not arguing that it's independently relevant,

13    but for the right factual read, it helps to understand because

14    the body language is important, and it gives us a sense of what

15    the body language was, and it's Mr. Wortmann's own words at the

16    grand jury when he was questioning Mr. Belin that kind of

17    sealed the deal from our perspective that when he said, "So it

18    became clear that he wasn't going to be able to get away from

19    you, right, you walked after him until it became clear?"

02:25PM 20    That is a very telling comment, and I think it gives

21    us a sense of what was happening.  He commanded him to turn

22    around as if he had grabbed his arm, which he probably would

23    have done if Mr. Belin had not in fact turned around as a

24    submission to that assertion of authority.

25    THE COURT:  All right.  Anything further,

1    Mr. Wortmann?

2         MR. WORTMANN:  Well, just that, you know, Mr. Gold

3    continues to use these words like "command" that have no

4    bearing on what happened, have no bearing on the evidence that

5    you heard, your Honor, and it's just he's wrong on the facts

6    and he's wrong on the law.

7         THE COURT:  All right.  I'm going to deny the motion

8    for reconsideration.  I think one of the key central issues

9    here, the nature of this initial encounter, what the officer --

02:26PM 10   well, what he was subjectively thinking, of course, is not

11   relevant, but what happened between the officer and the

12   defendant.

13        The basic problem, as I see it, is the law has framed

14   the issue sometimes in a way that really doesn't to me make a

15   lot of sense, whether a reasonable person would feel free to

16   decline the officer's request or otherwise terminate the

17   encounter.

18        Most people, as Mr. Gold points out, feel some

19   discomfort or lack of freedom in any kind of interaction with

02:26PM 20   an officer, and so the standard is phrased I think somewhat

21   poorly or awkwardly perhaps, and I think there's lots of case

22   law that puts a gloss on that.  The true subjective feeling of

23   freedom is not really what's at issue there or even an

24   objective feeling of freedom, but for the reasons I indicated,

25   I'm not making myself very articulate here, but for the reasons

1    stated in my prior denial of the motion, I continue to believe

2    that the standard, which is an objective one, has been met both

3    for a Terry stop and for a subsequent frisk, and I think there

4    is not Fourth Amendment violation for the reasons previously

5    indicated, and, again, while I'm considering the motion to

6    reconsider on its merits and without regard to whether I should

7    handle a motion for reconsideration differently, I'm going to

8    nonetheless deny it.

9         Where do we go from here?  Mr. Gold.

02:27PM 10    MR. GOLD:  Your Honor, the next I guess agenda item

11    would be to schedule a trial.  The last I've discussed the

12    issue with Mr. Belin is that's where he wanted to go.

13         THE COURT:  Okay.

14         MR. GOLD:  I was talking about this, as the Court

15    knows, as we've discussed in other cases, I'm in the process of

16    departing the Federal Defender's Office.

17         THE COURT:  Do you have a departure date?

18         MR. GOLD:  I do.  It's actually this month,

19    April 23rd, so I'm sure we can't try the case between now and

02:28PM 20    then, but I was going to just tell the Court that in

21    discussions with Ms. Conrad, it appears that I will be allowed

22    to, or to depending on the individual case, I'll be making

23    motions in some cases to remain as counsel of record pursuant

24    to the Criminal Justice Act.

25         THE COURT:  Is that -- I mean, if you're not on the

1    panel, will that work?  In other words, can you be paid for it

2    or can you do it at all?  Obviously, I don't have any question

3    about your qualifications, the question is legally if you're

4    neither a defender nor on the CJA panel, can you be appointed?

5         MR. GOLD:  Well, that's what we've looked at.

6    Apparently, you can.  There's a provision in the Criminal

7    Justice Act and in the local plan that allows, you know, to

8    preserve values on continuity of representation, conservation

9    of resources for a nonpanel attorney in certain circumstances

02:29PM 10    to be appointed.

11         THE COURT:  Okay.

12         MR. GOLD:  But we're having a meeting about which

13    cases I will do that in and which cases make sense to leave

14    with the office tomorrow afternoon.

15         THE COURT:  Okay.

16         MR. GOLD:  So what I propose, I suppose, is to the get

17    the issue of representation sorted out and then come back in a

18    week with some proposed dates.

19         THE COURT:  All right.  A week may be a little long.

02:29PM 20    Mr. Wortmann, how long do you think this case is going to take

21    to try, two or three days?

22         MR. WORTMANN:  I think that's right, your Honor.

23         THE COURT:  Do you agree with that, Mr. Gold?

24         MR. GOLD:  I don't see how it could take longer, yes.

25         THE COURT:  Let me look at the calendar and put out

1    some possible times.  We can try this relatively quickly,

2    assuming Mr. Gold stays on the case.  Well, I might have to

3    move some things around, but the week of May 12th is doable, as

4    is the week after Memorial Day, May 27th.  I'm out the

5    intervening week, May 9th.

6            One of the problems I have being in Boston as opposed

7    to Worcester is in Worcester I could impanel a jury any time I

8    wanted to, impanel on a day other than the Monday, but it's

9    possible that we could make arrangements to begin the trial

02:31PM 10    later in the week and spill over in the week.  I'm out part of

11    the week of June 2nd.

12            MR. WORTMANN:  Your Honor, I have vacation that week.

13            THE COURT:  Which week?

14            MR. WORTMANN:  But May 12th sounds like it would be

15    just fine.

16            THE COURT:  May 12th works for me.  If you're on the

17    case, Mr. Gold, does that work for you?

18            MR. GOLD:  If I'm on the case, I could certainly do

19    that.

02:31PM 20            THE COURT:  Why don't we block off May 12th.  Why

21    don't we reconvene sort of as quickly as we possibly can.

22    Obviously, I'm quite familiar with the case at this stage, and

23    it's not complicated, but there are still things to do.

24            MR. WORTMANN:  The only hesitation, your Honor, is

25    that I need to call witnesses today just to make sure that

1       they're available, and I'll do that promptly.

2              THE COURT:  Right.  I'm not going to formally set the

3       trial date of May 12th, but I want you to block that off, and

4       let's circle back.  You're having your meeting --

5              MR. GOLD:  Tomorrow afternoon.

6              THE COURT:  Why don't we circle back, let's see, well,

7       I can do Wednesday morning or Thursday morning.

8              MR. WORTMANN:  Either one is fine with me, your Honor.

9              THE COURT:  How about Thursday morning at 10?

02:32PM 10             MR. GOLD:  Yes.

11             THE COURT:  All right.  Further status, Thursday

12      morning, April the 10th at 10:00.  I want the parties to I

13      guess first confirm that Mr. Gold is going to be counsel,

14      confirm that under the CJA Act and our local plan that I can

15      appoint him, confirm that the length of the trial is going to

16      be three days, at most, probably closer to two, I'll set a

17      timetable for pretrial filings.  I guess, Mr. Gold, if you're

18      going to go off the case, I'd like to know --

19             MR. GOLD:  What the game plan is.

02:33PM 20             THE COURT:  -- what the game plan is, and if someone

21      else in the office is going to take over.  Ms. Conrad keeps

22      telling me how flat out everyone is, and my guess is probably

23      you're going to stay on the case unless you've got prepaid

24      tickets to New Zealand or something, but, anyway, we'll see,

25      It's your office's decision, and we'll take it from there.

1          MR. WORTMANN:  I would ask for the time between today

2     and Thursday be excluded.

3          THE COURT:  Any problem with that?

4          MR. GOLD:  No objection.

5          THE COURT:  All right.  I'm going to exclude the time

6     between April 10th and today in the interests of justice in

7     order to provide for pretrial preparation and to address this

8     issue of continuity of counsel, and I find that the ends of

9     justice -- I've said this phrase 300 times in the course of my

10    career, and I'm stumbling over it now as I have to think about

11    it.  The ends of justice served by taking that action outweigh

12    the interests of the parties and the public in a speedy trial,

13    and I'll enter a written order to that effect.  It's going to

14    be tough when I get up into my 70s to remember what it is I'm

15    supposed to say, but I'm still hanging on there.

16         MR. WORTMANN:  Hopefully, we'll all work together,

17    your Honor.

18         THE COURT:  Anything further, Mr. Wortmann?

19         MR. WORTMANN:  No, thank you, your Honor.

02:35PM 20    THE COURT:  Mr. Gold?

21         MR. GOLD:  No, Judge, thank you.

22         (Whereupon, the hearing was adjourned at 2:35 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS ) ss.

5   CITY OF BOSTON )

6

7           I do hereby certify that the foregoing transcript,

8   Pages 1 through 21 inclusive, was recorded by me

9   stenographically at the time and place aforesaid in Criminal

10  Action No. 13-10048-FDS, UNITED STATES OF AMERICA vs.

11  KING BELIN and thereafter by me reduced to typewriting and is a

12  true and accurate record of the proceedings.

13          Dated this 23rd day of December, 2015.

14

15                         s/s Valerie A. O'Hara

16                    _____

17                         VALERIE A. O'HARA

18                         OFFICIAL COURT REPORTER

19

20

21

22

23

24

25