1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

2

3

   UNITED STATES OF AMERICA,       )
4                           )
                Plaintiff,   )  Criminal Action
5                           )
                         )  No. 13-10048-FDS
6   vs.                    )
                         )
7   KING BELIN,                )
                Defendant.   )

8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

10

11

                   DAY 1 - JURY IMPANELMENT

12

13

14

        John Joseph Moakley United States Courthouse
15                   Courtroom No. 2
                   1 Courthouse Way
16                   Boston, MA 02210

17

                 December 22, 2014
18                   8:29 a.m.

19

20

21

22

23                 Valerie A. O'Hara
               Official Court Reporter
24    John Joseph Moakley United States Courthouse
          1 Courthouse Way, Room 3204
25            Boston, MA 02210
         E-mail: vaohara@gmail.com

1   APPEARANCES:

2   For The United States:

3      United States Attorney's Office, by JOHN A. WORTMANN, JR.,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
4   Boston, Massachusetts  02110;

5   For the Defendant:

6      PAUL J. GARRITY, ESQ., 14 Londonderry Road,
Londonderry, New Hampshire 03053.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1
2          THE CLERK:  All rise.  Thank you.  You may be seated.
3    Court is now in session in the matter of United States vs.
4    King Belin, Criminal Matter Number 13-10048.
5          Counsel, please identify yourself for the record.
6          MR. GARRITY:  Good afternoon, your Honor, Paul Garrity
7    for King Belin.
8          THE COURT:  Good morning.  Mr. Wortmann is not here.
9    Is the defendant here?
10         THE MARSHAL:  I'm sorry.
11         THE COURT:  Is the defendant here?
12         THE MARSHAL:  Yes.
13         THE COURT:  Why don't we bring him in.  Lisa, why
14   don't you see if you can find Mr. Wortmann.
15         THE MARSHAL:  I'm just waiting on a second person.
16         THE CLERK:  Mr. Wortmann, can you identify yourself
17   for the record.
18         MR. WORTMANN:  Yes, forgive me, your Honor,
19   John Wortmann for the United States.
20         THE COURT:  Good morning.  All right.  We'll bring the
21   defendant out in a moment.  We'll wait for him before we take
22   anything up.
23         MR. WORTMANN:  Your Honor, do you need a copy of the
24   witness list?
25         THE COURT:  I guess I'll double check against the one

1    I have.  I have four witnesses from the defense.  Are they all

2    from Boston?

3              MR. GARRITY:  Yes, your Honor.

4              THE COURT:  While we're waiting, I did receive

5    Mr. Garrity's message about *Florida v. Nixon,* which I've looked

6    at, and I want to give you a chance to talk about that.

7              MR. GARRITY:  Thank you.

8              THE COURT:  And talk about whether there's anything

9    else we need to take up before the jury comes up.

10             MR. WORTMANN:  Your Honor, forgive me for asking a

11   question that I already asked and you already answered, but

12   Number 1 is the front row?

13             THE COURT:  Yes.  There's something screwed up about

14   the seating here.  We have a chair missing.

15             MR. GARRITY:  Your Honor, if I could?

16             THE COURT:  Yes.

17             MR. GARRITY:  I provided a tie for Mr. Belin.  I don't

18   think he knows how to do the tie.  Can I have a moment before

19   the jury comes in to put the tie on?

20             THE COURT:  Yes.  I'm questioning why there isn't a

21   second person.

22             MR. WORTMANN:  Your Honor, just for the record, I've

23   included the 12 witnesses out of an abundance of caution.  I

24   don't believe I'll be calling all of them.

25             THE COURT:  I expected as much.  It matched what I

1    have.  What I tell the jurors is that counsel is giving me a

2    list of people who are potential witnesses or whose names may

3    come up at the trial.

4              MR. WORTMANN:  Thank you.

5              THE COURT:  Sometimes that list is 100 people long,

6    you know, six wind up being called.  You know, it's just the

7    way it is.

8              THE COURT:  What is going on?

9              THE MARSHAL:  I have no idea.  My first call was 9:00,

10   I just called again.

11             THE COURT:  All right.  The defendant is present.

12   It's now 9:18.  I am going to ask the marshal service, I want

13   the defendant here on time every day, all right.  I don't want

14   to waste 20 minutes of my time and the attorneys' time or, you

15   know, once the trial starts, the jury's time.  I understand

16   sometimes things go wrong, but I want the defendant here on

17   time.

18             THE MARSHAL:  Understood, your Honor.

19             THE COURT:  With that, let's begin.  As I indicated, I

20   did receive Mr. Garrity's e-mail concerning *Florida v. Nixon*,

21   which I have read.

22             Mr. Garrity, do you want to be heard on that?

23             MR. GARRITY:  Yes, your Honor.  This case was pointed

24   out to me by a colleague.  I was not aware of this when we

25   addressed this issue last week or the week before, and although

1    it's not on all fours, I think one critical paragraph is the

2    paragraph beginning with Section 2 of the Court's opinion.

3            THE COURT:  Yes.

4            MR. GARRITY:  Which outlines what a defense attorney's

5    obligations are in contrast to a client's wishes.  I believe

6    that paragraph outlines and supports the proposition I put

7    forward before that the defense attorney has strategic control,

8    has to consult with the client, but the defense attorney to

9    fulfill its obligations has control to put forward what he

10   thinks is the best strategy even if it conflicts with a

11   client's wishes.

12           THE COURT:  All right.

13           MR. GARRITY:  I think that fulfills the client's Sixth

14   Amendment right to counsel, Sixth Amendment right to put

15   forward a defense, a Sixth Amendment right to compulsory

16   process and a Sixth Amendment right to consult and

17   cross-examine.

18           THE COURT:  Mr. Wortmann, do you want to respond?

19           MR. WORTMANN:  Your Honor, again, I'm somewhat in the

20   dark because I don't have the factual basis for it, but I think

21   the Supreme Court made clear distinctions between sort of

22   ordinary tactical decisions, important decisions, including

23   questions of overarching defense strategy and then recognizing

24   that the defendant has ultimate authority.  As to the

25   overarching, it said they have to consult on issues of whether

1    to plead guilty, waive a jury, testify on his own behalf or

2    take an appeal that the defendant really does have the

3    exclusive authority, and, of course, this case dealt with a

4    situation where the defendant took no position one way or the

5    other on the question of whether or not the lawyer was going to

6    effectively admit guilt in a guilt phase in anticipation of the

7    penalty phase, so I just don't know how it cuts, but I guess

8    what troubles me here is, first, as the one thing I'm aware of,

9    the issue of whether or not there's a defense of a plant of a

10   gun, we know there's no evidence to support it because

11   Mr. Belin said it didn't happen.

12       And the other thing is if there's -- if the issue is

13   you have a -- if the defendant doesn't have the ultimate

14   authority over tactical decisions, then why haven't we filed a

15   stipulation when everybody but the defendant agrees that it's

16   in his best interest?

17       THE COURT:  All right.  Let me, I guess, cut to the

18   quick here.  I did read *Florida v. Nixon*.  The question there

19   is the obligation of the attorney to consult with the client

20   and obtain his consent before making certain decisions, and the

21   Supreme Court made clear that consultation and consent are

22   different things.

23       The defendant has ultimate authority as to whether to

24   plead guilty, waive a jury, testify or take an appeal, and the

25   attorney must both consult with the client and obtain the

1   client's consent, and the attorney does not require the

2   client's consent to every tactical decision.

3        In that case, the strategy was explained and the

4   client was silent.  It seems to me this is perhaps an inverse

5   situation, what happens when an attorney consults with the

6   client, as he's obligated to do, and the client says I don't

7   want to do that, I don't want to follow your strategy or

8   tactical decision, what right or authority does the client have

9   to make at least relatively large scale strategic decisions?

10       I don't see how the client's wishes can be overridden

11  after consultation and an informed waiver.  It seems to me that

12  has to be wrong.  The client is the one on trial.  It's not the

13  attorney's right or the attorney's prerogative that's at issue,

14  it's the client's.

15       The client plainly has a right to be consulted about a

16  decision such as this, but what does consultation mean if it

17  does not involve the right to weigh in and affect the decision

18  or to make that decision if that decision is informed and

19  intelligent.

20       Again, the client can waive trial altogether and plead

21  guilty as long as he receives appropriate legal advice and

22  makes a knowing and voluntary waiver.  It would be bizarre if

23  the client could waive that fundamental right but not a defense

24  strategy, particularly one that may have no basis on the

25  evidence.

1         And I think it's also important to note that this is a

2    factual issue or a set of factual issues, it's not something

3    where legal training or expertise necessarily comes to bear

4    directly on the question, such as a lawyer's decision how to

5    frame a question or whether something is admissible under the

6    rules of evidence.

7         So I don't see that it changes the decisions, and to

8    the extent that the defendant is renewing his obligation or

9    motion to withdraw, it's overruled.

10        The second topic I want to take up is *Old Chief*, which

11   I reread over the weekend.  The language of the Court and the

12   tenor of Justice Souter's opinion goes I guess farther than I

13   remembered, and it has led me to question Mr. Wortmann whether

14   or not it would be more prudent to redact the offense of

15   conviction from the conviction papers here.

16        It's not clear to me whether that's right or wrong or

17   required by law.  No one has directed a case to my attention

18   directly on point, but certainly there is a lot of language in

19   the appeal about to the effect that it doesn't matter what the

20   offense of conviction is, it's just the fact of conviction.

21        This isn't a circumstance where the jury needs to hear

22   the whole story to understand what's going on, all the

23   government needs to do is prove the fact of conviction.

24        What is the government's reaction to that?

25        MR. WORTMANN:  You know, your Honor, there are a

1    couple of cases that I also cited in the opposition to the

2    motion which talks about when there's significant gaps in the

3    evidence like, for example, if there's bifurcation, that that

4    can really lead to jury confusion and the jury not having any

5    idea.

6          I mean, the whole point of the opinion in *Old Chief*

7    was, you know, there are all these issues, and that's why we're

8    going to take the stipulation, and we can, you know.

9          THE COURT:  I clearly understand that piece of it, I'm

10   just talking about the language and tenor of the opinion.

11         MR. WORTMANN:  All of those things are what justifies

12   the rule of law, which says "Thou shall stipulate if the

13   defendant says," but why should he have both ends of the

14   bargain?

15         I mean, it creates awkwardness, it creates potential

16   for error if something slips out, and all he has to do is

17   execute the stipulation.  As I've said four or five times in

18   this case, I'm happy to do it, but if he's going to say no,

19   then the jury is entitled to hear the story, not necessarily

20   until the facts, but at least to know what the conviction is

21   and know that that conviction is a felony, otherwise, you know,

22   you're asking them to make assessments based on without the

23   evidence needed to do it.

24         THE COURT:  Mr. Garrity.

25         MR. GARRITY:  Well, your Honor, I think *Old Chief* does

1    speak in a particular sentence.  I think I argued to the Court

2    before about the extremely prejudicial nature of introducing a

3    similar type of offense, and here this is almost on all fours.

4    It's possession of a firearm unlawfully and possession of

5    ammunition.  That would, I submit, be extremely prejudicial.

6         I know the government has the right to prove their

7    case, has the right to present a felony, but they have other

8    avenues other than presenting this particular conviction to the

9    jury.

10        MR. WORTMANN:  Your Honor, it's unfair for the

11   defendant to be able to tell the government how to do their

12   case.  I think it's also important to think of sort of the

13   historical development that led up to *Old Chief* because if you

14   look at the older decisions, there would be five or six or

15   seven or eight, and there was an unfairness in that, and the

16   Supreme Court said let's level the playing field, but the way

17   you level the playing field is by saying to the defendant the

18   ball is in your court, you can rid yourself of this.

19        He shouldn't have the right to say, you know, go prove

20   your case, but keep your hands behind your back.

21        THE COURT:  All right.  Let me do this.  Let me go

22   back and look at the cases you cited, which I didn't -- well, I

23   didn't think to read it over the weekend, let's put it that

24   way.  We have a couple weeks before the trial starts, if I do

25   plan to revisit this issue, I would let counsel know.  If I go

1    down this path, it would be the bare minimum redaction

2    necessary to eliminate the nature of the prior offense, but I

3    also need to look at your exhibits as well and see if this

4    makes sense.

5             MR. WORTMANN:  You do have a copy.

6             THE COURT:  Yes, I do.

7             All right.  It's 9:30 or so now.  I think the jury

8    will be up in about 15 minutes.  Is there anything anyone else

9    wants to take up while I have you here?  We have 52 people

10   apparently downstairs.  They brought in too many.  I told them

11   42.  We'll have 10 in reserve in case we need them.

12   Mr. Garrity.

13            MR. GARRITY:  Judge, just to make sure I covered

14   everything with respect to the counsel issue, I understand the

15   Court's ruling but object again on Sixth Amendment right to

16   counsel, Sixth Amendment right to present all proofs favorable

17   to defense, Sixth Amendment right to compulsory process, Sixth

18   Amendment right to confront cross-examiner and Fifth Amendment

19   right due process and a fair trial.

20            I understand what Mr. Belin wishes to see happen, but

21   I'm just telling the Court that it's my strategic review of the

22   evidence that his only defense is the one I wish to put

23   forward.  I think to prohibit me violates those rights that I

24   just listed.

25            THE COURT:  Again, just to be clear, I'm not

1    prohibiting anything, but the objection is overruled.  Anything

2    else?

3          MR. WORTMANN:  I don't believe so, thank you, your

4    Honor.

5          THE COURT:  Mr. Garrity.

6          MR. GARRITY:  No, your Honor.

7          THE COURT:  All right.  Mr. Belin is in street

8    clothes.  I'm sorry, Mr. Belin, I'm embarrassed to ask you

9    this.  Am I pronouncing your name correctly, is it Belin?

10         THE DEFENDANT:  Yes, it's Belin.

11         THE COURT:  Your name was pronounced different ways,

12    and I had suddenly blanked on whether I was pronouncing it

13    correctly.

14         Why don't we take a recess.  Again, I expect we'll

15    have about 42 people in here, and we'll start the impanelment

16    process.

17         THE CLERK:  All rise.

18         (A recess was taken.)

19         THE CLERK:  All rise.  Court is now in session in the

20    matter of the United States vs. King Belin, Criminal Matter

21    Number 13-10048, the Honorable Dennis Saylor now presiding.

22    You may be seated.

23         THE COURT:  Will counsel please identify themselves

24    for the record.

25         MR. WORTMANN:  Your Honor, good morning, John Wortmann

1   for the United States.

2          MR. GARRITY:  Good morning, ladies and gentlemen, my

3   name is Paul Garrity.  I represent King Belin, and he's right

4   here.  Good morning.

5          THE COURT:  Good morning, ladies and gentlemen.  My

6   name is Dennis Saylor.  I'm the Judge assigned to preside over

7   this session of the United States District Court for the

8   District of Massachusetts.  It's a pleasure to welcome you on

9   behalf of the Court as potential members of the jury.

10          I understand that you've seen a video this morning

11   that explains something of the process that we're going to go

12   through in selecting a jury and what's expected of you if

13   you're selected to serve.  I'm going to add some words of

14   explanation of my own, and I apologize if I repeat some things

15   that may have been on the video or that you may already know.

16          Let me start off by telling you what kind of a case

17   this is because many of you may be curious about that.  This is

18   a criminal case.  There's one defendant, King Belin, who's here

19   in the courtroom with his counsel.  He's charged with illegal

20   possession of a firearm and ammunition.  Those of you who are

21   chosen as jurors will be told later what the exact charge is

22   and what the government has to prove beyond a reasonable doubt

23   in order for you to convict the defendant.

24          Now, I think you've been told this, but I'll assure

25   you anyway, we are impaneling today for a case that's going to

1    start on January 5th.  The trial is not going to occur this

2    week or next.  That's highly unusual.  We're doing it for two

3    reasons.  We don't want to try the case this week or next

4    obviously because of the Christmas and New Years holiday, and

5    we don't want to pick the jury on January 5th because that's

6    the same day that jury selection will begin in United States

7    vs. Tsarnaev, which is the marathon bombing case, and we're

8    going to bring in more than a 1,000 potential jurors that

9    morning, and I didn't want to have you tangled up in that case

10   because everything would have been much more difficult to do.

11        So we're doing this unusual thing where we're going to

12   impanel the jury today, and we're not going to start for two

13   weeks until January 5th.  We're doing that to make this process

14   easier for all of us and all of you, and I appreciate your

15   patience in understanding doing that.

16        The lawyers expect that this case will probably take

17   three days to try.  It may be less, conceivably it could be

18   more.  I'm going to do my best to hold them to that.  Sometimes

19   things wind up being a little different than we expect, but I

20   expect that the jury will begin hearing the evidence on Monday,

21   January 5th, and that they'll begin deliberating by about

22   Wednesday, January 7th.

23        Our trial will be from nine in the morning to one in

24   the morning with two very short breaks, and I'll explain to

25   those of you who are picked why we do that and what we expect

1    from you.

2         Now, you've already heard probably quite a bit about

3    the importance of jury service, but I want to add a few

4    thoughts of my own.  Our jury system goes back at least 800

5    years to the time of England in the Middle Ages.  Although much

6    has changed since then, the idea is essentially the same.  No

7    person can be convicted of a serious crime except upon the

8    unanimous vote of a jury made up of ordinary citizens.

9         The founders of our nation believed that the right to

10   a jury was so important that they put it in the United States

11   Constitution in the Bill of Rights.  Juries have always been

12   composed of ordinary citizens taken from all walks of life,

13   each of whom brings their own individual experience and life

14   experience to the table.

15        You don't have to have any particular education.  What

16   is truly important is that you take your responsibilities

17   seriously and that you exercise your authority to the best of

18   your ability.  The quality of justice in the United States

19   depends on the good judgment and common sense of ordinary

20   citizens.  It is a great system.  It is not a perfect system.

21   Nothing created by human beings will ever be perfect, but it is

22   a great system, nonetheless.

23        A trial by jury is not necessarily the most efficient

24   way to decide whether someone should be convicted of a crime,

25   and there are things about it that are old fashioned, but there

1   are things that are more important than efficiency, and

2   protection of our rights is one of those things.

3         We all enjoy a great many rights and freedoms in this

4   country.  Probably all of us take them for granted from time to

5   time.  Sometimes we have to be reminded of what those rights

6   are and why they're important.  The jury is one of the most

7   basic protectors of our freedom.  It's fundamental to our

8   system of justice, and it's both an obligation of citizenship

9   and an honor and a privilege to serve.

10        If you are selected to serve, I hope that you will

11  exercise your duties solemnly and responsibly and in accordance

12  with the law, but you should not assume that your service will

13  be burdensome.  Many jurors find that it is one of the most

14  interesting and rewarding experiencing of their lives.

15        All right.  Let me talk next about how we're going to

16  select a jury.  The parties in this case have a right to a jury

17  that is fair and impartial, one that is not biased or

18  prejudiced one way or the other.  In order to try to obtain a

19  fair jury, we have a selection process that we go through.  The

20  process begins with me introducing the case, introducing the

21  lawyers and the defendant.  That's to see if you know about

22  them or have a connection with them.

23        I'll list the potential witnesses, again, to see if

24  any of you know them, and then I'll ask some other questions on

25  other topics.  The purposes of those questions is to determine

1    whether or not any of you should be excused for what we call

2    cause.  Once we've gone through that whole process and have

3    eliminated people who cannot or should not serve on the jury

4    for one reason or another, we'll call a group of people up into

5    the jury box.

6         By law, the lawyers will have an opportunity to

7    challenge a small number of those prospective jurors.  Those

8    are what we call peremptory challenges.  That's where the

9    lawyers don't have to give a reason, and when the lawyers are

10   both satisfied with the jury or they've run out of challenges,

11   the people who are left will be the jury.

12        Even though the trial is short, we're going to impanel

13   14 jurors, 2 will serve as alternates.  That way if something

14   happens to one or two of the jurors, we won't have to start the

15   trial all over again.  Only 12 jurors will deliberate and vote,

16   and that means if we have not lost anyone, we'll have to take

17   two of you off the jury.  The extra two jurors will not be

18   taken off until the end of the trial when the time has come to

19   deliberate.

20        If you're not chosen to sit on this jury, you should

21   not think that it reflects upon you personally or your ability

22   to be a good juror or a good citizen.  This is not a scientific

23   process, it's not a merit selection process, and you should not

24   be at all concerned if for some reason you're not chosen.

25        All right.  Now, I'm going to start by asking you some

1    questions.  Your answers must be under oath.  In other words,

2    you must swear that your answers are true.  It's very important

3    that you give truthful answers, so I will ask the deputy clerk

4    to please swear in the jury pool.

5             THE CLERK:  Will you all please stand and raise your

6    right hand.

7             (Prospective Jurors were sworn.)

8             THE CLERK:  Thank you.  Please be seated.

9             THE COURT:  All right.  When I ask a question, if your

10   answer is yes or you think your answer might be yes, please

11   raise your hand so I can see you.  If you raise your hand, I'm

12   going to ask you to come over here to the sidebar where I'm

13   going to follow up with you one-by-one.  The lawyers will be

14   here and each individual member of the jury panel one-by-one.

15            I'll try to find out what the issue is, maybe explore

16   it a little bit with you.  I might excuse you or I might not.

17   For some of my questions, more than one of you are going to

18   raise your hand.  When that happens, I'd like you to line up

19   here to the entrance to the enclosure, and I'll take you one at

20   a time.

21            Please do not be shy.  Don't hesitate to raise your

22   hand if you're not sure what to do.  The time to ask questions

23   or to raise issues is now, not partway through the trial, and I

24   will not be upset with you if you raise your hand because you

25   aren't sure or weren't sure what to do.

1          All right.  Again, the case on which you've been

2    called to sit is a criminal case.  There is one defendant,

3    King Belin.  Again, he is charged with possession of a firearm

4    and ammunition and doing so illegally, possessing a firearm and

5    ammunition after a previous conviction for a crime punishable

6    by imprisonment for a term of more than one year.

7          I would ask counsel now to reintroduce themselves,

8    Mr. Wortmann.

9          MR. WORTMANN:  Thank you, your Honor.  Ladies and

10   gentlemen, good morning.  My name is John Wortmann.  I'm an

11   Assistant United States Attorney, and I practice here in

12   Boston.

13         THE COURT:  All right.  Mr. Garrity.

14         MR. GARRITY:  Good morning, again.  My name is

15   Paul Garrity.  Again, I represent King Belin, who's hopefully

16   going to stand up and look around.

17         (Defendant standing)

18         THE COURT:  Thank you.  All right.  Again,

19   John Wortmann is the Assistant United States Attorney, the

20   prosecutor in this case, he represents the government.

21   Paul Garrity is the defense attorney.  He represents Mr. Belin.

22         Do any of you know or are any of you related to or

23   acquainted with Mr. Belin?  I see no hands.

24         To your knowledge, does any member of your family or

25   any close friend know Mr. Belin?  I see no hands.

1          Do any of you know or are you related to or are

2    acquainted with any of the lawyers in this case?  I see no

3    hands.

4          To your knowledge, does any member of your family or

5    any close friend know any of the lawyers in this case?  I see

6    no hands.

7          Have you or any member of your family or any of your

8    close friends ever worked for the United States Attorney Office

9    or had any dealings with them?  I see a hand.  All right.  I'll

10   see you at sidebar.

11          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12          THE COURT:  I'm going to ask you to stand at sidebar

13   like this so I can hear you, the lawyers can hear you and the

14   stenographer can hear you, and the first thing I'm going to ask

15   is your name and if you know your jury number.

16          THE JUROR:  Amy Spurling.  29 maybe.

17          THE COURT:  Yes.  Why did you raise your hand?

18          THE JUROR:  My friend works for the United States

19   District Court.  She's one of the attorneys.

20          THE COURT:  What's her name?

21          THE JUROR:  Amanda Strachan.

22          THE COURT:  Is she in the U.S. Attorney's Office?

23          MR. WORTMANN:  I believe she is.

24          THE COURT:  And she's a friend of yours?

25          THE JUROR:  Yes.

1           THE COURT:  Is she a close friend?

2           THE JUROR:  I went to law school with her, and we see

3     each other socially frequently.

4           THE COURT:  And would that affect your ability to be a

5     fair and impartial juror in the trial of this case?

6           THE JUROR:  I don't think so.

7           THE COURT:  I would need you to be completely

8     confident about that.

9           THE JUROR:  I am.

10          THE COURT:  And are you confident that you could

11    decide the case on the evidence and be fair to both sides?

12          THE JUROR:  Yes.

13          THE COURT:  Defense as well as the government?

14          THE JUROR:  Yes.

15          THE COURT:  What kind of a lawyer is, I'm sorry, your

16    spouse?

17          THE JUROR:  She's a corporate and real estate.

18          THE COURT:  Where does she work?

19          THE JUROR:  The Drew Company up the street.

20          THE COURT:  Any follow-up from counsel?

21          MR. GARRITY:  Could I have one second, your Honor?

22          THE COURT:  Yes.

23          MR. GARRITY:  No, your Honor, thank you.

24          (SIDEBAR CONFERENCE WAS CONCLUDED.)

25          THE COURT:  Thank you.  All right.  Have you or any

1   member of your family or any of your close friends ever worked

2   for Mr. Garrity or had any dealings with him?  I see no hands.

3           All right.  I'm going to read a list of people who may

4   be called as witnesses in this case.  Not all of these people I

5   expect will actually be called, but I've asked the lawyers to

6   give me a list of all the potential witnesses or people whose

7   names may come up in the trial, and please listen carefully

8   because I'm going to ask you whether you know any of these

9   people.

10          The first is a list of Boston police officers.  All of

11  these people work in some capacity or another with the Boston

12  Police Department:  Philip Bissonnette, David Bridges,

13  Thomas Finn, Jeff Driscoll, Martin Velez, V-e-l-e-z,

14  Kevin Magoon, M-a-g-o-o-n, Nina Jefferson, Tyrone Camper,

15  Thomas Taylor, Maryellen Shea or Debra Dobrydney,

16  D-o-b-r-y-d-n-e-y.  Again, all of those are Boston police

17  officers of one kind or another.

18          Brandon McClellan who's, a probation officer in

19  Plymouth County; Mathieu Kelsch, K-e-l-s-c-h, who's with the

20  Federal Bureau of Alcohol, Tobacco, Firearms and Explosives;

21  Derek Kirkland of Boston; Damon Carpenter of Boston;

22  Calvin White of Boston and Rafael Wallace of Boston.

23          Do any of you know or are you related to or acquainted

24  with any of those people?  All right.  I see no hands.

25          To your knowledge, does any member of your family know

1    or is any member of your family related to or acquainted with

2    any of those people?  I see no hands.

3         Do any of you have any special disability or physical

4    problem that would make serving as a member of the jury

5    difficult or impossible or might interfere with your service as

6    a juror?  Okay.  I'll see you.

7         THE COURT:  Hi.  What's your name?

8         THE JUROR:  Donna Gradie.

9         THE COURT:  Yes.

10        THE JUROR:  I went for a routine chest X-ray in

11   November, and they found a nodule on my bottom right lung, went

12   for a CAT scan.  They found three more nodules.  I have a

13   appointment on Monday, the 29th.  I don't know what's going to

14   happen after that.  So, you know, I'd rather be here at this

15   rate, so I don't know what's going to happen.

16        THE COURT:  Can I do this, can I get you to step away

17   and let me talk to the lawyers.

18        What do you want me to do?

19        MR. WORTMANN:  I'm inclined to excuse her.

20        THE COURT:  Let her go?

21        MR. GARRITY:  Yes.

22        THE COURT:  Ms. Gradie.

23        THE JUROR:  I have a letter from my doctor, too.  I

24   don't know if you need that.

25        THE COURT:  I don't think you're lying to me.  I'm

1   going to let you go.  I think that's the safest thing to do.

2   　　　　　THE JUROR:  It's Dr. Bordeaux at Beth Israel.

3   　　　　　THE COURT:  I just hope you're all right.  Have a good

4   holiday.

5   　　　　　THE JUROR:  Thank you.  Can I just go?

6   　　　　　THE COURT:  Yes, you can go.  I'm sorry, I didn't

7   realize there were other people.  I'm sorry, come back.

8   　　　　　THE JUROR:  Bernard Hogarty.

9   　　　　　THE COURT:  Number 26, yes, sir.

10   　　　　　THE JUROR:  I have difficulty hearing.  People talk

11   very softly.  I have a tough time hearing.

12   　　　　　THE COURT:  Were you having trouble hearing my

13   instructions?

14   　　　　　THE JUROR:  I had trouble hearing her.  So, of course,

15   if I'd be a little closer, it might make a difference, but I

16   figured I'd let you in on that.

17   　　　　　THE COURT:  That's fine.

18   　　　　　THE JUROR:  I think my 30 years in a machine shop.

19   　　　　　THE COURT:  We have, I think, headphones we can use

20   for people who are hearing impaired.  Would that work do you

21   think?

22   　　　　　THE JUROR:  Yes, that works.

23   　　　　　THE COURT:  If you can't hear my questions or anything

24   else that's going on, raise your hand.

25   　　　　　THE JUROR:  I can hear you very good.  You speak with

1    a little more volume.

2         THE COURT:  And if you wind up sitting on the jury and

3    you have any problem at all, let us know right away, we'll deal

4    with it as best we can.

5         THE COURT:  Any follow-up?

6         MR. WORTMANN:  No, thank you.

7         THE COURT:  Next.  What's your name?

8         THE JUROR:  I'm not sure I should come up.

9         THE COURT:  That's all right.  What's your name?

10         THE JUROR:  Jennifer Scalese.

11         THE COURT:  Number 32.

12         THE JUROR:  I was diagnosed with moderate anxiety, and

13    the day the trial is happening, I think it would increase

14    anxiety, as my hands are already sweating.

15         THE COURT:  All right.  Can I get you to step away

16    just for a minute?

17         THE JUROR:  Sure.

18         THE COURT:  Do you want me to pursue this, counsel, or

19    let her go?

20         MR. WORTMANN:  I think you should let her go.

21         THE COURT:  Ms. Scalese.  All right.  I think the safe

22    thing to do is to just let you go and have a good holiday.

23         THE JUROR:  Thank you.

24         THE COURT:  Ladies and gentlemen, as I said, this case

25    will begin on Monday, January 5th.  Our trial day will be from

1    9:00 to 1:00.  I expect that the case will take about three

2    days to try, it could be two or four but about four days.  Once

3    the jury begins to deliberate, if necessary, it will meet for

4    full days to 5:00, if necessary, until it reaches a verdict.

5    Obviously, anyone who serves on the jury is going to be

6    inconvenienced to some extent, but do any of you have unusual

7    hardship caused by the daily schedule or the length of the

8    trial?  All right.  I'll see you.

9          THE JUROR:  Hi, Bridget Garabedian.

10         THE COURT:  Hold on.

11         MR. WORTMANN:  14, your Honor.

12         THE COURT:  14, thanks.  Bridget Garabedian.

13         THE JUROR:  No.

14         MR. WORTMANN:  I'm sorry.

15         THE JUROR:  I was the last person.

16         THE COURT:  Number 42.  Yes, sir.

17         THE JUROR:  I run a small business that's generally

18   I'm the only employee besides another person, so I work

19   basically from 5:30 in the morning to 7:00 every day seven days

20   a week.

21         THE COURT:  This is the Sunoco in Wayland?

22         THE JUROR:  Yes, sir.

23         THE COURT:  Where is that, Cochituate Road?

24         THE JUROR:  Route 20 and Cochituate, yes.

25         THE COURT:  Who's running the station now?

1        THE JUROR:  My wife is currently there right now.

2        THE COURT:  All right.  Here's what I'm inclined to

3   do.  You're last on the list, which makes it pretty unlikely

4   we'll get to you.

5        THE JUROR:  Sure.

6        THE COURT:  What I'm going to do is keep you for the

7   time being, and if we get to that point, we'll revisit that

8   issue, so listen to the rest of my questions, and we'll see how

9   it goes.  We only need 14 people, and you are Number 42, so we

10  may not get to you.

11       Next.  Hi, what's your name?

12       THE JUROR:  Stephanie Smykal.

13       THE COURT:  Number 36.  Yes.

14       THE JUROR:  My biggest issue is childcare.  My son's

15  full time childcare provider on Tuesdays and Thursdays, I

16  talked to his daycare today, and they said they're full for

17  Tuesday and Thursdays, otherwise I would send him, but we don't

18  have family within 100 miles or all my friends work full time.

19       THE COURT:  That's on Tuesday and Thursday?

20       THE JUROR:  Yeah.  I work Mondays and Wednesdays.

21       THE COURT:  So you have other care for him?

22       THE JUROR:  Yes.

23       THE COURT:  What's your care on Monday and Wednesday?

24       THE JUROR:  He goes to a childcare facility.

25       THE COURT:  To a childcare facility.  Okay.  Let me

1    talk to the lawyers for a second.

2            With someone like this, I could either let her go, I

3    could leave her on because she's Number 36 and wait and see.

4    Do counsel have a view?  What do you want me to do or I could

5    pursue it further?

6            MR. GARRITY:  Wait and see, Judge, I think.

7            THE COURT:  One thing that I do sometimes is I drop

8    people to the end of the list, which, you know, means it would

9    makes it very unlikely they're going to be called.  Sometimes

10   it's a borderline case.  I think I'll leave her in place for

11   the time being, but if we come up with these other people.

12           All right, Ms. Smykal.  Here's what I'm going to do

13   for the time being.  You're Number 36, which is almost at the

14   end of the list, so I'm going to leave you on for now just, you

15   know, to revisit it if it looks like we may need you, I'll

16   bring you back up here and we'll talk a little more.  I might

17   let you go.

18           THE JUROR:  Okay.

19           THE COURT:  It's unlikely you'll be called anyway, and

20   I want to make sure we won't run out of people, so I'll keep

21   you on for now and listen to the rest of my questions, and

22   we'll see how it goes.

23           Next.

24           THE JUROR:  Johannah Oh.

25           THE COURT:  Number 24.  Yes.  What's your situation?

1          THE JUROR:  Starting from January 6th, I'll be the

2     host family for three foreign students for Andover Public

3     School.  I have to provide them with the transportation before

4     school and after school.

5          THE COURT:  So how old are these people?

6          THE JUROR:  Seventh, eighth and nine grade.

7          THE COURT:  And they are coming from?

8          THE JUROR:  Korea.

9          THE COURT:  Are they going to school here?

10         THE JUROR:  Andover Public School.

11         THE COURT:  Andover Public School.  They arrive on the

12    6th; is that right?

13         THE JUROR:  I have to pick them up the 6th at Andover

14    High.  They're staying for one month.

15         THE COURT:  And is there anybody who could cover for

16    you for what looks like will probably be a day, I think

17    probably, right, if you pick them up or maybe two days, your

18    husband or someone else at the school?

19         THE JUROR:  Because they pay me to do it, so I signed

20    a contract and everything.  I didn't know the trial would be

21    the 5th so I already signed a contract for them.

22         THE COURT:  I guess my question is a little different,

23    and that's whether anybody could cover you.

24         THE JUROR:  I don't have anyone right now.  I have my

25    own daughter who's in middle school because I was doing it at

1   the same time that I drop her off and pick her up.

2           THE COURT:  All right.  Let me talk to the lawyers for

3   a moment if you would step away.  Counsel, any follow-up?  What

4   do you suggest I do?

5           MR. WORTMANN:  I'd be inclined to hold her, again,

6   maybe drop her to the bottom, your Honor.

7           THE COURT:  Mr. Garrity.

8           MR. GARRITY:  I'm not disinclined to hold her, but it

9   appears that she's not going to resolve the issue.

10          THE COURT:  Well, should I drop her to the bottom of

11  the list as opposed to letting her go?

12          MR. GARRITY:  Sure, that would make sense.

13          THE COURT:  Ms. Oh.  What I'm going to do, I'm not

14  going to let you go, but I'm going to drop you to the bottom of

15  the list which makes it much less likely that you'll be picked,

16  and then I'll re-evaluate it at that point.  I'll see how you

17  compare with other people's hardships if we get that far, so

18  there will be a good chance you won't be called.  You'll have

19  to listen to the rest of my questions.  We'll see how it goes.

20          Next.

21          THE JUROR:  Good morning.

22          THE COURT:  Hi.  What's your name?

23          THE JUROR:  Sara Taylor.

24          THE COURT:  Number 20.  Why did you raise your hand?

25          THE JUROR:  I am self-employed, and I am flying out of

1    Boston on January 6th for a job at 8:30 a.m.

2            THE COURT:  Okay.  Where are you going?

3            THE JUROR:  Florida.

4            THE COURT:  For work?

5            THE JUROR:  Yes.

6            THE COURT:  What's it for?  You're a realtor; is that

7    right?

8            THE JUROR:  Yes.  So, actually, one of my

9    investigators is a professional race time, and they hired me to

10   do logistics coordination for a race in Sebring, Florida, and

11   they've hired me the 6th through the 11th.

12           THE COURT:  And is there anyone who could cover you if

13   you were stuck in Boston?

14           THE JUROR:  I'm covering for the person that normally

15   works for them, which I professionally work with them in real

16   estate, but they like what I am doing for work, so I am their

17   backup.

18           THE COURT:  Can I get you to step away?

19           THE JUROR:  Sure.

20           THE COURT:  Counsel.

21           MR. WORTMANN:  I'd let her go, your Honor.

22           MR. GARRITY:  I would, too.

23           THE COURT:  Ms. Taylor, I'm going to let you go, so

24   thank you and have a good holiday.

25           THE JUROR:  Thank you, you, too.

1           THE COURT:  Next.  Hi, what's your name?

2           THE JUROR:  Barbara Todd.

3           THE COURT:  You are Number 37.  Why did you raise your

4    hand?

5           THE JUROR:  My husband has cancer, he's got pancreatic

6    cancer, and in January, he's going to be starting radiation.

7           THE COURT:  When does he start radiation?

8           THE JUROR:  January 3rd, and right now he's going to

9    chemo.

10          THE COURT:  Who's taking care of him today?

11          THE JUROR:  He's home with his sister.

12          THE COURT:  And could his sister cover if you wound up

13   on jury duty, could his sister?

14          THE JUROR:  She could, yes.

15          THE COURT:  Here's what I'm going to do with you.  You

16   are Number 37, which is pretty far down the list.

17          THE JUROR:  Okay.

18          THE COURT:  So I think it's probably not likely you're

19   going to be called.  What I'm going to do if we get that far,

20   I'll revisit the issue, maybe call you back and explore it a

21   little bit more.

22          THE JUROR:  Okay.

23          THE COURT:  In the meantime, I'm going to leave you

24   on.  I think you're pretty far down the list, so I think you'll

25   probably be all right.  I'll ask you to take a seat and listen

 1    to the rest of my questions, and we'll take it from there.

 2    Okay.

 3              Next.

 4              THE JUROR:  I'm Sara Levy.

 5              THE COURT:  All right.  You're Number 2.

 6              THE JUROR:  I don't know if this is considered a

 7    hardship, but I have an anxiety disorder, and I've had a

 8    horrible divorce for the last two and a half years, finally got

 9    divorced, but it is still ongoing, and so even being in this

10    room makes me very uneasy.  My husband is very abusive and

11    harassed me on a daily basis.  I have two lawyers, and it's

12    just ramping up a lot, you know, I get very panicked.  I just

13    got some new anti-anxiety medicine, but I haven't noticed

14    anything from it yet.

15              THE COURT:  So you're taking medication for anxiety?

16              THE JUROR:  I'm starting new stuff tomorrow.

17              THE COURT:  All right.  Let me talk to the lawyers for

18    a moment.

19              MR. WORTMANN:  I would let her go.

20              MR. GARRITY:  I would, too.

21              THE COURT:  Ms. Levy, I'm going to let you go.  Okay.

22              THE JUROR:  Thank you and have a good holiday.

23              (SIDEBAR CONFERENCE WAS CONCLUDED.)

24              THE COURT:  All right.  Ladies and gentlemen, I'm

25    going to ask you a series of questions that ask whether you

1    have some connection to law enforcement officers or the law

2    enforcement system.  I expect that more than one of you are

3    going to raise your hand, and if you do, what I'm going to ask

4    as a follow-up the nature of whatever relationship you have and

5    whether that relationship would interfere with your ability to

6    be a fair and impartial juror in this case.

7            Again, what matters most is whether you can be fair to

8    both sides.  What I'm concerned about here is prejudice or

9    bias.  Sometimes people have strong feelings about law

10   enforcement that might affect their ability to be fair to both

11   sides.

12           An individual police officer might or might not tell

13   the truth in a particular case.  That's for the jury to decide,

14   but some people might generally favor police officers.  They

15   might have trouble believing that a police officer might lie.

16   Others might generally dislike police officers and have trouble

17   believing a police officer is telling the truth.

18           In other words, that would affect their view of the

19   evidence of listening carefully and evaluating the case on its

20   own merits.  It would be unfair or wrong if any of the jurors

21   who decide this case were prejudiced either in favor of law

22   enforcement or against law enforcement.  This case might be

23   decided according to the evidence and according to the law and

24   not because the jurors are prejudiced one way or the other.

25           So with that as an introduction, let me ask the

1    following questions:  Have you or any member of your immediate

2    family or any close friends ever been employed by the Boston

3    Police Department?

4             All right.  Let me see you.

5             (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

6             THE COURT:  Yes.

7             THE JUROR:  Good morning.

8             THE COURT:  What's your name?

9             THE JUROR:  Matt Duggan.

10            THE COURT:  Number 28.  Yes, sir, why did you raise

11   your hand?

12            THE JUROR:  I have some friends that are currently on

13   the Boston Police Department, and I work with the MBTA Police

14   in the revenue department, so I work with a lot of MBTA also.

15            THE COURT:  Okay.  And are these close friends?

16            THE JUROR:  Yeah.

17            THE COURT:  All right.  And is there anything about

18   that friendship or those relationships that would make it or

19   that would interfere or affect your ability to be a fair and

20   impartial juror in the trial of this case?

21            THE JUROR:  I don't think so.

22            THE COURT:  I need to be completely confident that

23   you'll be fair to both sides.  You didn't raise your hand that

24   you recognized any of those people, so I assume none of the

25   witnesses are going to be your friends, right?

1           THE JUROR:  No, I didn't know any of the names.

2           THE COURT:  And, again, are you confident you can be

3     fair to both sides, listen to the evidence and decide?

4           THE JUROR:  To the best of my ability, absolutely.

5           THE COURT:  And decide it on the basis, again,

6     according to the evidence and according to the law?

7           THE JUROR:  Yes, sir.

8           THE COURT:  Any follow-up, Mr. Wortmann?

9           MR. WORTMANN:  No, thank you.

10          MR. GARRITY:  Can I have one second, your Honor?

11          THE COURT:  Yes.

12          MR. GARRITY:  No, thank you.

13          THE COURT:  You can be seated.

14          Next.  Hi, what's your name?

15          THE JUROR:  Karin Sullivan.

16          THE COURT:  Number 41.  Why did you raise your hand?

17          THE JUROR:  My father-in-law was the superintendent of

18    the Boston Police, but that was back in the '80s, my

19    brother-in-law retired from the Boston Police.

20          THE COURT:  Okay.  So is your father-in-law your

21    husband's father?

22          THE JUROR:  My husband's father.  He's deceased.

23          THE COURT:  And you had a brother-in-law?

24          THE JUROR:  Right, my husband's father and brother.

25          THE COURT:  Okay.  Is there anything about those

1   relationships that would affect your ability to be a fair and

2   impartial juror in the trial of this case?

3            THE JUROR:  No.

4            THE COURT:  Okay.  Are you confident you can be fair

5   to both sides?  Again, we expect Boston police officers as

6   witnesses.  Are you confident you can be fair to both sides?

7            THE JUROR:  Yes, yes.  I don't see that brother-in-law

8   that often.

9            THE COURT:  Any follow-up questions?

10           MR. WORTMANN:  No, thank you.

11           THE COURT:  Mr. Garrity.

12           MR. GARRITY:  One second again, your Honor.  I think

13   we're all set, your Honor.

14           THE COURT:  Next.

15           THE JUROR:  Hi, I'm Bridget Garabedian.

16           THE COURT:  We have two Garabedians.

17           THE CLERK:  14.

18           THE COURT:  14.

19           THE JUROR:  My husband's cousin is a police officer in

20   Boston.

21           THE COURT:  Are you close to him?

22           THE JUROR:  We've seen him a few times a year, yes.

23           THE COURT:  Is there anything about that connection or

24   relationship that would interfere with your ability to be a

25   fair juror?

1          THE JUROR:  I think I could be impartial.

2          THE COURT:  I need you to be confident that you can be

3    fair to both sides.

4          THE JUROR:  Yes, I could be.

5          THE COURT:  Any follow-up questions?

6          MR. WORTMANN:  No, thank you, your Honor.

7          MR. GARRITY:  No, thanks.

8          THE COURT:  Thank you.

9          THE JUROR:  Thank you.

10         THE COURT:  Next.

11         Hi, what's your name?

12         THE JUROR:  Brian Hogan.

13         THE COURT:  Number 22.  Why did you raise your hand?

14         THE JUROR:  I have two very good friends that are

15   currently Boston police officers, and I have one friend who is

16   out on disability being shot on the job over 20 years ago.

17         THE COURT:  Is there anything about those

18   relationships or connections that would make it difficult or

19   interfere with your ability to be a fair and impartial juror in

20   this case?

21         THE JUROR:  I don't think so.

22         THE COURT:  I need to be completely confident.

23         THE JUROR:  No.

24         THE COURT:  We're going to have Boston police officers

25   testify in this case, I expect.  The case is about firearms or

1    a firearm, and we need to make sure everybody is fair to both

2    sides.  Are you confident you can do so?

3              THE JUROR:  Yes.

4              THE COURT:  Even though you have very good friends on

5    the police force?

6              THE JUROR:  They're not involved in this from the

7    names you read.

8              THE COURT:  Mr. Wortmann.

9              MR. WORTMANN:  Nothing, thank you.

10             MR. GARRITY:  Just a few questions.

11             THE COURT:  Go ahead.

12             MR. GARRITY:  Do your friends talk about their work at

13   all?

14             THE JUROR:  Not to me.  I mean, it's just, I mean,

15   they're just friends of mine that I've known for over 40 years.

16   I don't see them regularly now.

17             MR. GARRITY:  Given your friendship with your two

18   friends, would you tend to believe a police officer simply

19   because he's an officer?

20             THE JUROR:  No.

21             MR. WORTMANN:  If I can have a follow-up, would you

22   tend not to believe them simply because they're police

23   officers?

24             THE JUROR:  No.

25             THE COURT:  I'm going to ask that question of the

1     whole panel.

2          MR. GARRITY:  Thank you.

3          THE COURT:  Thank you.

4          (SIDEBAR CONFERENCE WAS CONCLUDED.)

5          THE COURT:  Ladies and gentlemen, I asked whether any

6     of you or any immediate family members or close friends were

7     ever employed by the Boston Police Department.  Let me expand

8     that.  Have you or any member of your immediate family or any

9     close friends ever been employed by the Federal Bureau of

10    Alcohol, Tobacco, Firearms and Explosives or ATF or any federal

11    law enforcement agency, state law enforcement agency, like the

12    Massachusetts State Police or city police department?  Might

13    pick the Massachusetts slip or the city law department?

14    All right.  I'll see you one-by-one.

15         THE JUROR:  Again, Stephanie Smykal.  My Brother works

16    for the San Diego sheriff's department, but it shouldn't

17    matter.

18         THE COURT:  What kind of work does he do?

19         THE JUROR:  He's director of dispatch.

20         THE COURT:  And, again, is there anything about that

21    relationship or connection that would affect your ability to be

22    a fair and impartial juror in the trial of this case?

23         THE JUROR:  No.

24         THE COURT:  Are you confident of that?

25         THE JUROR:  Uh-hum.

```
 1              THE COURT:  You have to answer yes.

 2              THE JUROR:  Yes.

 3              THE COURT:  Mr. Wortmann.

 4              MR. WORTMANN:  No, thank you, your Honor.

 5              MR. GARRITY:  No, thank you, your Honor.

 6              THE COURT:  Next.  Hi, what's your name?

 7              THE JUROR:  Maria Elena Wilson.

 8              THE COURT:  Number 12.  Why did you raise your hand?

 9              THE JUROR:  My brother-in-law is a lieutenant in the

10   Cambridge Police force.

11              THE COURT:  Okay.  What kind of work does he do?

12              THE JUROR:  I can't exactly answer it.

13              THE COURT:  Because you're not sure?

14              THE JUROR:  I'm not sure.

15              THE COURT:  And brother-in-law meaning your husband's

16   brother?

17              THE JUROR:  My husband's brother.

18              THE COURT:  Are you close to him?

19              THE JUROR:  Yes.

20              THE COURT:  That is, close to your brother-in-law.  I

21   hope you're close to your husband.

22              THE JUROR:  Yes, absolutely.

23              THE COURT:  Is there anything about that relationship

24   or connection that would affect your ability to be a fair and

25   impartial juror in the trial of this case?
```

1           THE JUROR:  Not with this relationship, no.

2           THE COURT:  Is there any other reason?

3           THE JUROR:  I do have other acquaintances that are in

4      law enforcement.

5           THE COURT:  Why don't we deal with it now.  Who else

6      do you know?

7           THE JUROR:  My daughter's basketball coach is a state

8      police prosecutor in Wrentham.

9           THE COURT:  Okay.

10          THE JUROR:  And then my neighbor, he's employed by the

11     IRS, but I think it has something to do with the DEA, and is

12     that the ATF?

13          THE COURT:  Okay.  It sounds like you're not quite

14     sure.

15          THE JUROR:  No, I don't know what he does, so I'm kind

16     of glad that I don't, but I have been interviewed by government

17     officials in relationship to his character.

18          THE COURT:  As part of a background check?

19          THE JUROR:  Correct.

20          THE COURT:  I've been through that several times.

21     It's kind of unnerving to have the people walking around asking

22     what they think of you, but, in any event, is there anything

23     about those relationships or connections that would affect your

24     ability to be a fair and impartial in the trial of this case?

25          THE JUROR:  No, but there is my husband was arrested a

1    couple years ago.

2         THE COURT:  Okay.

3         THE JUROR:  In Franklin.

4         THE COURT:  For?

5         THE JUROR:  For assault and battery.  The case was

6    dismissed.

7         THE COURT:  Do you feel he was treated fairly by the

8    law enforcement system?

9         THE JUROR:  No, I don't.

10        THE COURT:  Obviously, that case has nothing to do

11   with this case.

12        THE JUROR:  Correct.

13        THE COURT:  But the question, again, is there anything

14   about that experience that would affect your ability to be a

15   fair and impartial juror in this case?

16        THE JUROR:  I don't think so.  I think I'm more

17   cautious and skeptical, to answer your question.

18        THE COURT:  But the bottom line question is can you be

19   fair, in other words, decide this case not because of what

20   happened to your husband in Franklin but because of what the

21   witnesses say and the laws as I instruct you and the other

22   evidence in the case?

23        THE JUROR:  Yes.

24        THE COURT:  You don't have to erase your life

25   experience, I want to make that clear, you are who you are and

1    you experienced what you experienced, and you can bring it to

2    the table, but you have to decide this case on its own facts,

3    not because you're mad at the Franklin Police Department or

4    anything else.  Do you understand that?

5                THE JUROR:  Absolutely.

6                THE COURT:  You're confident with all of this you can

7    be fair --

8                THE JUROR:  Yes.

9                THE COURT:  -- to both sides?  Any follow-up?

10               MR. WORTMANN:  Do you think you would be more

11   skeptical of a police officer witness than a citizen witness?

12               THE JUROR:  No.

13               THE COURT:  You'll treat everybody the same?

14               THE JUROR:  Uh-hum.

15               THE COURT:  You have to answer yes for the record.

16               THE JUROR:  Yes.

17               MR. GARRITY:  I have no questions, thank you.

18               THE COURT:  You can be seated.

19               Next.  Hi, what's your name?

20               THE JUROR:  Dana Raines.

21               THE COURT:  Number 13.  Yes, sir.  Why did you raise

22   your hand?

23               THE JUROR:  School police.

24               THE COURT:  You are a school policeman?

25               THE JUROR:  Yes.

1           THE COURT:  Where do you work?

2           THE JUROR:  West Roxbury High School.

3           THE COURT:  How long have you been doing that?

4           THE JUROR:  Eighteen years.

5           THE COURT:  You must work sometimes with the Boston

6     PD?

7           THE JUROR:  Yes.

8           THE COURT:  Is there anything about your experience or

9     your occupation or your connection with the Boston PD that

10    would make it difficult for you to be a fair and impartial

11    juror in the trial of this case?

12          THE JUROR:  No.

13          THE COURT:  You're confident you can be fair to both

14    sides?

15          THE JUROR:  Yes.

16          THE COURT:  Mr. Wortmann, any follow-up?

17          THE JUROR:  No, thank you, your Honor.

18          THE COURT:  Mr. Garrity.

19          MR. GARRITY:  Do you commonly interact with the Boston

20    Police Department?

21          THE JUROR:  Yes.

22          THE COURT:  Given your interaction with them, would

23    you tend to believe a police officer?

24          THE JUROR:  Well, I'd go by the judgment.

25          MR. GARRITY:  Thank you.

 1              THE COURT:  Okay.  Thank you.

 2          Next.  Hi.  What's your name?

 3              THE JUROR:  Donald Kosterman.  I'm sorry.

 4              THE COURT:  Number 1.  Yes, sir.  Why did you raise

 5      your hand?

 6              THE JUROR:  My brother-in-law was a police officer in

 7      Gardner.

 8              THE COURT:  Okay.  Is he retired?

 9              THE JUROR:  Yes.

10              THE COURT:  And is that your wife's brother?

11              THE JUROR:  It's my sister's husband.

12              THE COURT:  Okay.  And are you close to him, your

13      brother-in-law?

14              THE JUROR:  Fairly.

15              THE COURT:  Is there anything about that relationship

16      or connection that would interfere with your ability to be a

17      fair and impartial juror in the trial of this case?

18              THE JUROR:  No.

19              THE COURT:  You're confident you can be fair to both

20      sides?

21              THE JUROR:  Yes.

22              THE COURT:  Any follow-up, Mr. Wortmann?

23              MR. WORTMANN:  No.

24              MR. GARRITY:  No, thank you.

25              THE COURT:  Okay.

1          Next.  What's your name?

2          THE JUROR:  Danielle Williams.

3          THE COURT:  Number 3.  Yes, why did you raise your

4    hand?

5          THE JUROR:  A close family friend of my next door

6    neighbor is a detective for the City of Fall River.

7          THE COURT:  Okay.  Is this someone that you personally

8    are close to?

9          THE JUROR:  Yes, I've been growing up my entire life,

10   so he was like primary like caretaker after school for most of

11   my life.

12         THE COURT:  Okay.  And is there anything in that

13   relationship or connection that would interfere with your

14   ability to be a fair and impartial juror in this case?

15         THE JUROR:  I can't say with complete confidence, you

16   know what I mean, I tend to favor toward the police.

17         THE COURT:  Okay.  I think I'm not going to try to

18   talk you out of that.  It seems to me probably this isn't the

19   right case for you to sit on, so why don't I let you go and

20   maybe we'll get you on some different kind of case.  Have a

21   good holiday.

22         THE JUROR:  Thank you.

23         THE COURT:  All right.  Next.

24         THE JUROR:  Hi.

25         THE COURT:  What's your name?

```
 1              THE JUROR:  Linda Araujo.

 2              THE COURT:  16.  There you are.

 3              THE JUROR:  My late husband was a police officer.

 4              THE COURT:  Whereabouts?

 5              THE JUROR:  Westport, Mass.

 6              THE COURT:  Okay.  How long ago did he pass away?

 7              THE JUROR:  Thirteen years.

 8              THE COURT:  And how long was he on the force?

 9              THE JUROR:  I think it was over 20 years.

10              THE COURT:  Okay.  Was he a patrolman?

11              THE JUROR:  Yes.

12              THE COURT:  That was Westport?

13              THE JUROR:  Uh-hum.

14              THE COURT:  Is there anything about that fact or that

15    connection that would make it difficult for you to be a fair

16    and impartial juror in the trial of this case or that might

17    interfere with your ability to be fair?

18              THE JUROR:  No.

19              THE COURT:  You're confident you can be fair to both

20    sides?

21              THE JUROR:  Yes.

22              THE COURT:  Any follow-up?

23              MR. WORTMANN:  No, thank you, your Honor.

24              THE COURT:  Mr. Garrity.

25              MR. GARRITY:  No, thank you, your Honor.
```

```
 1              THE COURT:  Okay.  Thank you.  Next.  Hi.  What's your
 2    name?
 3              THE JUROR:  Carol Garneau.
 4              THE COURT:  Number 23.  Okay.  Why did you raise your
 5    hand?
 6              THE JUROR:  My brother-in-law is a retired police
 7    officer.
 8              THE COURT:  Where did he retire from?
 9              THE JUROR:  What city, I believe Hyde Park.  I think
10    that's where he is.
11              THE COURT:  Hyde Park meaning --
12              THE JUROR:  -- part of Boston.
13              THE COURT:  So he was in the Boston PD?
14              THE JUROR:  (Nodding)
15              THE COURT:  Yes?
16              THE JUROR:  Yes.
17              THE COURT:  Sorry, she was taking it down, we can't
18    get nods.  Your brother-in-law, so is that your sister's
19    husband?
20              THE JUROR:  My husband's brother.
21              THE COURT:  When did he retire, ballpark?
22              THE JUROR:  Eight years ago, ten years ago.
23              THE COURT:  Are you close to him?
24              THE JUROR:  Not really.
25              THE COURT:  Is there anything about that connection or
```

1    relationship that would affect your ability to be a fair and

2    impartial juror in the trial of this case?

3              THE JUROR:  No.

4              THE COURT:  Are you confident you can be fair to both

5    sides?

6              THE JUROR:  Uh-hum.

7              THE COURT:  You have to answer yes.

8              THE JUROR:  Yes.

9              THE COURT:  Mr. Wortmann.

10             MR. WORTMANN:  No questions, thank you.

11             THE COURT:  Mr. Garrity.

12             MR. GARRITY:  I have no questions, thank you.

13             THE COURT:  Okay.  Thank you.

14             Next.  Hi.

15             THE JUROR:  I got to apologize.  I know that before

16   was you guys called for, you know, if you have any like medical

17   issues.

18             THE COURT:  Let me get your name.

19             THE JUROR:  Luis A. Soto, Jr.  My issue is that I have

20   sciatic pain, and if I sit for a long period of time, you know,

21   that pain, it just bothers me, and sometimes I take like a

22   medication, a muscle relaxer, and sometimes it gets me all,

23   tired and I can't think sometimes straight, so like right now I

24   was wondering if I could get Advil or something like that that

25   would help me.  It's just starting to acting up.

```
1              THE COURT:  The longest we would sit is an hour and a

2      half.  We go from 9:00 to 10:30, take a short break, go to

3      noon, take a short break and go to one.  Is that too much for

4      you?  Could you get through that without being bothered or

5      needing pain medication?

6              THE JUROR:  Well, with medication, I'll be fine or if

7      I could stand up from time to time.

8              THE COURT:  What if I --

9              THE JUROR:  Just sitting too much.

10             THE COURT:  If I let you stand up and stretch, if you

11     needed to, would that be enough?  I'm just trying to explore.

12             THE JUROR:  Anything, I'll work around anything.

13     That's one of my issues, and sometimes I take that medication

14     and it just gets me tired, you know, extend the time.

15             THE COURT:  We would need you to be alert if you wound

16     up on the jury.  I wouldn't want you to take something that

17     would make it hard for you to concentrate.

18             THE JUROR:  If I could take some Advil, whatever,

19     before, I would be fine, I just don't want it to start acting

20     up and then having to take that medication.

21             THE COURT:  Any follow-up questions?

22             MR. WORTMANN:  Well, I think what the Judge is saying,

23     any time you need to stand up and stretch, you could just do

24     it, and you think that would solve the problem?

25             THE JUROR:  For the most part, yes.
```

1          MR. GARRITY:  With the Advil it won't cause you any

2     confusion or anything like that?

3          THE JUROR:  No, I take that other muscle relaxer.

4          THE COURT:  That could be a problem but not Advil?

5          THE JUROR:  No, not Advil.  I take it from time to

6     time, so, you know, it's been acting up lately, so I take that

7     medication at home, and sometimes I take it when I go to sleep

8     and throughout the day, like one of my side effects that I've

9     had with that pill is, you know, I'm just tired all day and

10    can't concentrate as much.

11         MR. WORTMANN:  Mr. Soto, I wonder do you take it

12    during work?

13         THE JUROR:  No, when I do take it, I have to excuse

14    myself from work due to that because I can't, you know, think,

15    I'm always tired.  It keeps me tired for a long time.

16         MR. WORTMANN:  When is the last time you took

17    something?

18         THE JUROR:  I took it about three months ago it's when

19    it starts acting up or when I sit for a long time, you know, I

20    go home, go to bed, the next morning all tight.

21         THE COURT:  Those hard wooden benches are bad.  Jurors

22    have at least a padding.

23         THE JUROR:  That's why I stand up because of that.

24         THE COURT:  Here's what I'm going to do:  I'm going to

25    leave you on for now, but if you wind up on the jury, don't

1  suffer in silence, if you're feeling uncomfortable, you need to

2  stretch, you need to take an Advil, let me know, and if you

3  feel you need to take a muscle relaxer, let me know, we'll work

4  through it.  The important thing is make sure you're talking to

5  me if you have a medical problem, promise me that?

6        THE JUROR:  I'll promise.

7        THE COURT:  Okay.  Thank you.

8        Sir.

9        THE JUROR:  Bernard Hogarty.

10       THE COURT:  Yes.

11       THE JUROR:  I have a nephew who just joined the Bourne

12  Police Department, just graduated.  His name is.

13  Alan Florentine.

14       THE COURT:  Okay.  Are you close to him?

15       THE JUROR:  Yeah, pretty much.

16       THE COURT:  And he's a rookie more or less, he just

17  joined?

18       THE JUROR:  Yes.

19       THE COURT:  Is there anything about that connection,

20  relationship that would make it difficult for you to be a fair

21  and impartial juror?

22       THE JUROR:  No, other than that I'm compelled to tell

23  you if I'm related.

24       THE COURT:  That's fine.

25       THE JUROR:  That's the only issue.

1          THE COURT:  Any follow-up?

2          MR. WORTMANN:  No, thank you.

3          MR. GARRITY:  No.

4          THE COURT:  Thank you.

5          THE JUROR:  Thank you.

6          THE COURT:  Next.

7          THE JUROR:  Hi, Karin Sullivan.

8          THE COURT:  You're Number 41.

9          THE JUROR:  I have another brother-in-law who was

10   pretty high up at the Capital Police force, but he has retired

11   about six years ago.

12         THE COURT:  Is this one that used to be separate

13   Capital Police in Boston?

14         THE JUROR:  No, in Washington.

15         THE COURT:  The same question, is there anything about

16   that connection or relationship that would make it --

17         THE JUROR:  No.

18         THE COURT:  -- difficult for you to be a fair and

19   impartial juror in this case?

20         THE JUROR:  No, no.

21         THE COURT:  Okay.  Thank you.  You might as well stay

22   here.

23         MR. WORTMANN:  Are you going to ask a question about

24   he's favorable or unfavorable at the police department?

25         THE COURT:  That's coming.  I'm not done with my

 1    questions yet.

 2           MR. WORTMANN:  Sorry.

 3           (SIDEBAR CONFERENCE WAS CONCLUDED.)

 4           THE COURT:  Ladies and gentlemen, thank you for your

 5    patience.  Have you or any member of your immediate family or

 6    any close friend ever been employed by a prosecutor's office or

 7    a public defender's office, a court, a probation office or a

 8    prison or are any of you or any of those people currently

 9    applying or do you plan to apply to such an office or to a law

10    enforcement agency?  Okay.  I'll see you.

11           (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12           Hi.  What's your name?

13           THE JUROR:  Sarah Glick.

14           THE COURT:  Number 34.  Yes.

15           THE JUROR:  My father was a public defender back

16    before I was born.

17           THE COURT:  He was, but he's not anymore?

18           THE JUROR:  No.

19           THE COURT:  What does he do now?

20           THE JUROR:  He's a lawyer.

21           THE COURT:  What kind of lawyer?

22           THE JUROR:  He works with elder law.

23           THE COURT:  Okay.  And is there anything about that

24    connection or relationship that would affect your ability to be

25    a fair and impartial juror in the trial of this case?

```
 1          THE JUROR:  No.

 2          THE COURT:  You're confident you could be fair to both

 3    sides?

 4          THE JUROR:  Yes.

 5          THE COURT:  Any follow-up, Mr. Wortmann?

 6          MR. WORTMANN:  No, thank you.

 7          MR. GARRITY:  No.

 8          THE COURT:  Thank you.

 9          Next.

10          THE JUROR:  29.

11          THE COURT:  Amy Spurling.

12          THE JUROR:  Yes.  My cousin works for the Plymouth

13    County Department of Corrections.

14          THE COURT:  I'm sorry, who?

15          THE JUROR:  My wife's cousin, and we are close.

16          THE COURT:  Plymouth House of Correction?

17          THE JUROR:  Yeah.

18          THE COURT:  And, again, is there anything about that

19    connection or relationship that would affect your ability to be

20    a fair and impartial juror in the trial of this case?

21          THE JUROR:  No.

22          THE COURT:  Are you confident you can be fair to both

23    sides?

24          THE JUROR:  Yes.

25          THE COURT:  Any follow-up?
```

1          MR. WORTMANN:  No.

2          MR. GARRITY:  If I could, just a few.  You said your

3     wife's cousin works for the Plymouth House of Correction.  Is

4     that a he or a she?

5          THE JUROR:  It's a woman.

6          THE COURT:  Does she talk about her work at all?

7          THE JUROR:  No.

8          THE COURT:  Thank you.

9          Next.  Number 12; is that right, Ms. Wilson?

10          THE JUROR:  Yes.  My daughter's basketball coach is a

11     prosecutor for the Massachusetts State Police.

12          THE COURT:  I think we asked about that last time.

13          THE JUROR:  Yes.  I thought I'd come up.

14          THE COURT:  Any reason you couldn't be fair to both

15     sides based on that relationship?

16          THE JUROR:  No.

17          (SIDEBAR CONFERENCE WAS CONCLUDED.)

18          THE COURT:  Thank you.  Ladies and gentlemen, if I

19     asked a question and you came up and talked about a topic and

20     the topic was covered by another question, you don't have to

21     come up and repeat it.  In other words, if we've touched on it

22     once, you don't need to come up and say the same thing again.

23          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

24          Next.

25          THE JUROR:  Hi, Rebecca Fagan, F-a-g-a-n.

1            THE COURT:  30.  Yes.

2            THE JUROR:  My sister in law's fiance' is an ADA on

3    the gun court somewhere in the city in the district court.

4            THE COURT:  Sister-in-law's fiance' is a prosecutor on

5    the gun court?

6            THE JUROR:  Yes.

7            THE COURT:  Is this your brother's wife?

8            THE JUROR:  It's my husband's sister's fiance'.

9            THE COURT:  Are you close to this person?

10           THE JUROR:  I am.

11           THE COURT:  That is not just your sister-in-law but

12   the fiance'?

13           THE JUROR:  Uh-hum.

14           THE COURT:  You have to answer yes for the record.

15           THE JUROR:  I'm sorry, yes.

16           THE COURT:  Is there anything about that connection or

17   relationship that would affect your ability to be a fair and

18   impartial juror in this case?

19           THE JUROR:  No, I don't think so.

20           THE COURT:  Are you confident you can be fair to both

21   sides?

22           THE JUROR:  Yes.

23           THE COURT:  This case involves guns or a gun, I think.

24   Obviously it has to be decided on its own merits, but, you

25   know, whatever happens in those cases doesn't really have

1    anything to do with, you know, what happened here.  Are you

2    confident you can be fair?

3              THE JUROR:  Yes.

4              THE COURT:  Can I ask what kind of -- you're an

5    attorney?

6              THE JUROR:  Yes.

7              THE COURT:  What do you do?

8              THE JUROR:  So for almost year I was a civil

9    litigator, now I do staffing and recruiting, so I've been doing

10   that for a year.

11             THE COURT:  What kind of civil litigation did you do?

12             THE JUROR:  Personal injury and med. mal.

13             THE COURT:  Plaintiff's side?

14             THE JUROR:  Plaintiff's side.  I did some defense work

15   as well.

16             MR. WORTMANN:  I'm sorry, what are you doing now?

17             THE JUROR:  I was staffing and recruiting.

18             MR. WORTMANN:  Okay, thanks.

19             MR. GARRITY:  No questions, your Honor.

20             (SIDEBAR CONFERENCE WAS CONCLUDED.)

21             THE COURT:  Thank you.  Ladies and gentlemen, have any

22   of you ever filed a lawsuit against any police officer or other

23   law enforcement personnel?  I see no hands.

24             Have any of you had any kind of experience with the

25   Boston Police Department, whether that experience is negative

1    or positive, that might interfere with or affect your ability

2    to be a fair and impartial juror in this case?  I don't see any

3    hands.

4           Do any of you have any feelings or beliefs about law

5    enforcement officers or other government agents, again, whether

6    those are positive or negative that might interfere with or

7    affect your ability to serve as a fair and impartial juror in

8    the trial of this case?  I see no hands.

9           Do any of you believe that law enforcement officers

10   are more likely to tell the truth than other kinds of witnesses

11   just because they're law enforcement officers or they're less

12   likely to tell the truth than other witnesses, again, just

13   because they're law enforcement officers?  All right.  I see no

14   hands.

15          Have you or any member of your immediate family or any

16   close friend ever been involved in a criminal matter, either as

17   a defendant, a victim or a witness?

18          All right.  I'll see you.

19          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

20          THE JUROR:  29.  My younger brother was incarcerated

21   for five years on a ten-year term in a federal prison.

22          THE COURT:  Okay.  What was the charge?

23          THE JUROR:  Drugs, possession and distribution.

24          THE COURT:  And when was that, roughly?

25          THE JUROR:  He's been out for six years now.

```
 1            THE COURT:  And he was incarcerated for five, did you
 2   say?
 3            THE JUROR:  Yeah.
 4            THE COURT:  And do you feel he was treated fairly by
 5   the criminal justice system?
 6            THE JUROR:  No, actually.
 7            THE COURT:  Okay.  Well, that's why I'm asking.  I
 8   don't want to belabor every detail.
 9            THE JUROR:  Sure.
10            THE COURT:  Can you just give me a one-sentence answer
11   why you think it was not fair?
12            THE JUROR:  Sure.  It was a military court case, there
13   was no evidence.  It wasn't a civilian world, they had no
14   evidence and they convicted him for ten years with zero drug
15   actual paraphernalia or drugs.
16            THE COURT:  And, again, this case has nothing to do
17   with your brother's situation.
18            THE JUROR:  Correct.
19            THE COURT:  Or for that matter the military.  Are you
20   confident you can be fair to both sides?
21            THE JUROR:  I am.
22            THE COURT:  Again, you don't have to erase your life
23   experience, but you do have to consider this case on its own
24   merits or lack of merit, as the case may be.
25            THE JUROR:  Yes, understood.
```

1          MR. WORTMANN:  Did you ever visit your brother while

2    he was incarcerated?

3          THE JUROR:  I did.

4          MR. WORTMANN:  Was there any long-lasting effect on

5    you?

6          THE JUROR:  No.

7          MR. GARRITY:  No questions, thank you.

8          THE COURT:  Thank you.

9          Next.  Hi.  What's your name?

10         THE JUROR:  Donna LaGrassa.

11         THE COURT:  Number 40.  Yes.

12         THE JUROR:  My nephew, he just got out last year for

13    breaking and entering.

14         THE COURT:  Okay.  How long was he incarcerated?

15         THE JUROR:  I think it was like nine months.

16         THE COURT:  Do you feel he was treated fairly by the

17    criminal justice system?

18         THE JUROR:  I believe so, yeah.

19         THE COURT:  Were you close to your nephew?

20         THE JUROR:  Not very.

21         THE COURT:  Is there anything about that experience

22    that would affect your ability to be a fair and impartial juror

23    in the trial of this case?

24         THE JUROR:  No.

25         THE COURT:  You're confident you can be fair to both

1    sides?

2              THE JUROR:  I believe so.

3              MR. WORTMANN:  I don't mean to -- you seemed to

4    hesitate when asked if he was treated fairly.  Are there some

5    things about it that you thought were not fair?

6              THE JUROR:  No, I don't know enough about the case.

7              MR. WORTMANN:  Okay.  Thank you.

8              MR. GARRITY:  No questions.

9              THE COURT:  Next.  Hi.  What's your name?

10             THE JUROR:  Michael DiCicco.

11             THE COURT:  Number 39.

12             THE JUROR:  So my brother was robbed at gunpoint about

13   eight years back.

14             THE COURT:  And did they ever catch the person who did

15   it?

16             THE JUROR:  Yeah, he wound up testifying, I didn't.

17   My brother testified, yeah.

18             THE COURT:  Where did this happen?

19             THE JUROR:  Bentley College.

20             THE COURT:  Okay.  And how long ago was it?

21             THE JUROR:  Probably between six to eight years, I

22   would say.

23             THE COURT:  All right.  Is there anything about that

24   experience that would affect your ability to be a fair and

25   impartial juror in the trial of this case?

1          THE JUROR:  I'd say only if it's a similar situation,

2     I think.

3          THE COURT:  Well, it's not a robbery, but the case

4     does involve guns, someone who's charged with illegally

5     possessing a firearm and ammunition, and, you know, of course,

6     this case has nothing to do with your brother's case but do you

7     think it would affect you so that you'd have trouble being

8     fair?

9          THE JUROR:  I don't think.  If it wasn't a robbery, I

10    don't think so.

11         THE COURT:  You think if it was a robbery, you might

12    have some trouble?

13         THE JUROR:  Yeah.

14         THE COURT:  Any follow-up, Mr. Wortmann?

15         MR. WORTMANN:  No, thank you.

16         THE COURT:  Mr. Garrity.

17         MR. GARRITY:  Just given what happened to your

18    brother, do guns in general cause you any concern?

19         THE JUROR:  No, I don't think so, no.

20         THE COURT:  Can I get you to step aside for a second,

21    can I talk to the lawyers?

22         THE JUROR:  Sure.

23         THE COURT:  He's Number 39 on the list.  I have some

24    question here, but I'm inclined to leave him on but I might

25    later strike him depending what it looks like, but I'm inclined

1    to leave him on for now.

2              MR. GARRITY:  That's fine.

3              MR. WORTMANN:  I think he should be left on.

4              THE COURT:  I'm going to leave you on the jury.  I

5    might very well visit this.  You're pretty far down the list,

6    but if we got that far, I might bring you back up here, but why

7    don't you take a seat and listen to the rest of my questions.

8              Next.  Hi.

9              THE JUROR:  Hi.

10             THE COURT:  Number 6.  Yes.

11             THE JUROR:  2008 or 9 two of my sons were victims of

12   street violence, and the youngest one was being robbed in the

13   hallway, and when the oldest one went downstairs to help him

14   because he heard the screaming, he got stabbed in the back six

15   times and my youngest one in the leg.

16             THE COURT:  Okay.  Was a gun involved or just a knife?

17             THE JUROR:  Knife.  The two kids that did it, they

18   served time.

19             THE COURT:  Did your sons have to testify as

20   witnesses?

21             THE JUROR:  No.

22             THE COURT:  Okay.  How old were they when that

23   happened?

24             THE JUROR:  16 and 20.

25             THE COURT:  And do you feel that your sons as victims

1    were treated fairly by the law enforcement system or the

2    criminal justice system?

3            THE JUROR:  My sons were, yeah.

4            THE COURT:  Do you think the perpetrators were treated

5    fairly?

6            THE JUROR:  No.

7            THE COURT:  Why is that?

8            THE JUROR:  They only served -- one of them, the one

9    that actually did the stabbing served 18 months in prison, and

10   the other one didn't serve any time at all.

11           THE COURT:  Okay.  This case obviously has nothing to

12   do with your son's situation.  Do you think that experience

13   would affect your ability to be a fair and impartial juror in

14   the trial of this case?

15           THE JUROR:  I don't think so, no.

16           THE COURT:  I need you to be competent.  You do not

17   have to erase your life experience.  You are what you are, and

18   you've been through what you have been through, but you do have

19   to be fair and decide this case on its own merits, in other

20   words, you can't say I'm going to convict this guy because the

21   guys who stabbed my sons, you know, got off lightly, you have

22   to separate this and decide this case on its own facts.  Do you

23   understand that?

24           THE JUROR:  I understand that and I feel like I could.

25           THE COURT:  Mr. Wortmann.

1          MR. WORTMANN:  Thank you.

2          MR. GARRITY:  No questions, thank you.

3          THE JUROR:  Thanks.

4          (SIDEBAR CONFERENCE WAS CONCLUDED.)

5          THE COURT:  All right.  Ladies and gentlemen, the

6     charge in this case is possession of a firearm and ammunition

7     by someone who has previously been convicted of a certain kind

8     of crime, a crime that carries a potential punishment of a year

9     or more, more than a year.

10         The law says once you've been convicted of such a

11    crime, I'm going to call it a felony for shorthand purposes,

12    you cannot legally possess a gun or ammunition.  If you do,

13    that's a new crime.  So the government expects to prove in this

14    case that the defendant was previously convicted of a crime and

15    that afterward he possessed a gun and ammunition.

16         Now, the fact that someone committed one crime does

17    not mean that they committed another.  There is a danger that a

18    juror might not be fair knowing the fact that someone had been

19    previously convicted of a crime.  They might conclude that he's

20    a bad person, that he has a bad character and convict on that

21    basis instead of listening to that evidence and deciding the

22    case on its own merits.

23         Everyone is entitled to a fair trial, everyone, even

24    people with a prior criminal conviction, and it's improper or

25    unfair to convict someone on the grounds that he must be a bad

1    person or he wouldn't have a record.

2           With that as background, do any of you have any

3    feelings or beliefs about the crime with which the defendant is

4    charged and the fact that it involves a previous conviction

5    that in some way might affect your ability to serve as a fair

6    and impartial juror in this case?  Are you all confident you

7    can be fair to him even if you learned that he has a prior

8    conviction?  All right.  I see no hands.

9           Do any of you have strong feelings or opinions

10   regarding guns or government regulation of guns or firearms or

11   ammunition that would affect your ability to serve as a fair

12   and impartial juror in the trial of this case?  I see no hands.

13          The defendant in this case is an African-American.

14   Again, both sides are entitled to a fair trial.  Both sides are

15   entitled to jurors with open minds and who will decide the case

16   solely on the evidence and according to the law.  It's

17   particularly important, of course, that the defendant receive a

18   fair trial.  He's entitled to exactly the same degree of

19   fairness and justice as any other person, not one bit less, and

20   he must be considered as an individual and judged according to

21   what he as an individual did or did not do.

22          It's difficult sometimes in our society for people to

23   talk openly about issues such as this, to be honest and to be

24   open about whatever feelings they may have on those subjects,

25   but your duties and obligations as citizens and potential

1    jurors require you be completely honest with the Court.

2           Do any of you have any feelings of any kind that might

3    affect your ability in any way to be fair and impartial in this

4    case because of the race or color of the defendant?  I see no

5    hands.

6           If you are not completely confident, if there's any

7    doubt at all in your mind on these issues, please raise your

8    hand.  All right.  I see no hands.

9           Do any of you feel that the defendant is more likely

10   to have committed a crime because of his race or color?  I see

11   no hands.

12          Have any of you learned or heard anything about this

13   case or the defendant before you came into court today?  I see

14   no hands.

15          The defendant has a constitutional right not to

16   testify, and no inference of guilt or anything else may be

17   drawn from the fact he does not testify.  To draw such an

18   inference would be wrong.  In fact, it would violate your oath

19   as a juror.  Are there any of you who do not accept that basic

20   principle concerning the defendant's rights not to testify and

21   might hold it against him if in fact he does not testify?  I

22   see no hands.

23          The fact that the defendant has been charged with a

24   crime is not evidence that he is guilty of the crime.  He is

25   presumed innocent, and the government has the burden of proving

1    his guilt beyond a reasonable doubt.

2         Are there any of you who might have trouble accepting

3    that basic principle concerning the presumption of innocence

4    and the burden of proof?  I see no hands.

5         All of you must decide the case solely on the evidence

6    presented in this court.  Are there any of you who might have

7    trouble accepting that principle and might decide the case on

8    something other than the evidence presented in this court and

9    the laws as I instruct you?  All right.  I'll see you at

10   sidebar.

11        (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12        THE COURT:  Ms. Fagan, Number 30.

13        THE JUROR:  I was a juror earlier this year, and the

14   one challenge I had was leaving out the things I already knew

15   about evidence that weren't presented in the Court, so, for

16   example, it was a DUI trial, and I knew refusal was involved,

17   so the fact that it wasn't there, I had a hard time separating

18   out what I already knew or think I know or remember from, you

19   know, I wasn't, but it was one challenge that I had.

20        THE COURT:  And did that affect your verdict at the

21   end of the day?  In other words, did you let that affect your

22   decision?

23        THE JUROR:  In that particular case, I know that I had

24   a hard time separating out that I believed that he refused

25   based on my knowledge of those things generally, but I could do

1    my best.

2         THE COURT:  Okay.  Any question, Mr. Wortmann?

3         MR. WORTMANN:  Could you tell us a little bit more how

4    it was, whether the same thing would happen here.

5         THE JUROR:  Sure.  I don't know anything about gun

6    possession laws or anything like that.  Like I said, I mean

7    anything I know about evidence was from law school, so it's

8    almost things I think or know or what I think I remember that

9    was in that just one case I found it especially in deliberating

10   in the jury room when people were talking about the

11   breathalyzer and refusal to blow and stuff like that I didn't

12   say anything because I knew it's how the Judge instructs you.

13        THE COURT:  Obviously, in addition to considering the

14   case evidence, you also have to follow the law as I instruct

15   you, and if you think it's different or wrong, do you have any

16   trouble in that regard?

17        THE JUROR:  No.

18        THE COURT:  Mr. Garrity, any questions?

19        MR. GARRITY:  I have no questions.

20        THE COURT:  Can you step aside for a second and let me

21   talk to the lawyers.  I'm not quite sure what to do here.  We

22   may not reach her.  What do counsel think?

23        MR. WORTMANN:  It's enough of a concern, your Honor,

24   given the fact that we have plenty of numbers I think I'd

25   excuse her.

1          MR. GARRITY:  Your Honor, I don't think she said -- I

2     think she said in that particular case she had some knowledge.

3     It sounds like an OUI case.  She said she had no information

4     with respect to gun laws, so I don't think and she did say she

5     didn't interfere with the jury deliberation process.

6          THE COURT:  Right.

7          MR. GARRITY:  With her specialized knowledge so I

8     don't think it's an issue.

9          THE COURT:  Why don't we do this.  I'm going to leave

10    her on for now, and I'll revisit it if we get to it.  I'm going

11    to bring her back and talk to her right now.

12         Ms. Fagan.  All right.  I'm going to leave you on the

13    jury panel for now.  We might not reach you.  If we do reach

14    you, I might bring you back up here and follow-up on some of

15    this.

16         Let me re-emphasize, it's possible that something

17    might come up in the course of this trial that triggers

18    something that you think you remember from first year criminal

19    law or something, I don't know, and it is critically important

20    that every juror decide the case on the evidence or lack of

21    evidence presented in the case and the law as I instruct it.

22         So, for example, so let's say I exclude something and

23    you think you might know what that might have been or you think

24    you might be able to figure out what I'm doing, you can't

25    speculate about what that evidence might have been or, you

1    know, whether my ruling was right or wrong, you just have to

2    accept it.  Are you prepared to do that?

3            THE JUROR:  Yes.

4            THE COURT:  All right.  Why don't you take your seat,

5    and we will see how this plays out.  Again, you might not get

6    picked at all.

7            MR. GARRITY:  Your Honor, one question I had with the

8    racial questions going to be asked at sidebar.

9            THE COURT:  I said I would do it with the 14.

10           MR. WORTMANN:  Well, your Honor, when you do it, you

11   could follow up.  At least one of the witnesses is likely to be

12   African-American as well.

13           THE COURT:  Ladies and gentlemen, do any of you have

14   any feelings or beliefs about the government, whether those

15   feelings or beliefs are positive or negative that might affect

16   your ability to serve as a fair and impartial juror?  I see no

17   hands.

18           Do any of you have any feelings about lawyers or

19   Judges or the criminal justice system, again, whether those

20   feelings are positive or negative that might affect your

21   ability to serve as a fair and impartial juror?  I see no

22   hands.

23           Do any of you have any political or religious or

24   ethical beliefs that might interfere?  I don't know want to

25   know your politics or your religious beliefs unless those

1    beliefs could somehow interfere with your ability to follow the

2    law as I instruct you and to render a fair verdict in this

3    case?  I see no hands.

4         Are you aware of any beliefs or feelings that would

5    prevent you from completely and honestly applying the law as I

6    give it to you at the end of the case to the facts as you find

7    them?  I see no hands.

8         Do you know of any reason that has not been mentioned

9    why you cannot sit as a fair and impartial juror in the trial

10   of this case?  All right.  I'll see you.

11        Let me ask a follow-up question.  Is there anything

12   like that that I've not asked you before we go any further?

13   Sir, I'll see you.

14        (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

15        THE COURT:  What's your name?

16        THE JUROR:  Carlos Pereira.

17        THE COURT:  I'm sorry.

18        THE JUROR:  Carlos Pereira.

19        THE CLERK:  15.

20        THE COURT:  15.  Yes, sir.

21        THE JUROR:  Language is not for me.

22        THE COURT:  Is English your second language?

23        THE JUROR:  Yes.

24        THE COURT:  Is your first language Spanish or

25   Portuguese?

1          THE JUROR:  Portuguese.

2          THE COURT:  Are you having a little bit of trouble

3    following this?

4          THE JUROR:  Yes.

5          THE COURT:  I think probably we will, unless someone

6    wants to explore this further, I think probably the thing to do

7    is to let you go so you don't have to serve.

8          MR. WORTMANN:  Agree, your Honor.

9          MR. GARRITY:  That will be fine.

10         THE COURT:  I'm going to let you go.  Thank you, have

11   a good holiday.

12         THE JUROR:  Thank you, your Honor.

13         THE COURT:  Next.  Hi.  Your name?

14         THE JUROR:  Smykal.  Sorry, I was nervous the first

15   time.

16         THE COURT:  36.

17         THE JUROR:  I have two jobs, they're both per diem,

18   which means I don't accrue any sick or vacation time or get

19   paid for jury duty, so I am scheduled to work that Monday and

20   Wednesday, so if I don't go, I don't get paid even if I have

21   any personal time, which I don't.

22         THE COURT:  Where physically do you work?

23         THE JUROR:  I work two places, I work at Boston

24   Children's Hospital as a pediatric nurse, and I work at

25   St. Elizabeth's Medical Center as an adult psychiatric nurse.

1           THE COURT:  Okay.  Like I say, we'll see if we get to

2    you.  There's one advantage of quitting each day quite promptly

3    at one.  Sometimes people can work shifts or half days or do

4    things getting out at one that you might be able to trade a

5    shift.  You're an R.N.; is that right?

6           THE JUROR:  They do 12-hour shifts, so they're 7 to 6,

7    no half shifts.

8           THE COURT:  Okay.  Any follow-up?

9           MR. WORTMANN:  No.

10          MR. GARRITY:  No, thank you.

11          MR. WORTMANN:  Your Honor, for what it's worth given

12   sort of the number of things where she sits on the list, I'd be

13   inclined to let her go.

14          THE COURT:  I think we will probably get to that.

15          MR. WORTMANN:  I think you're probably right.

16          THE COURT:  Any follow-up questions on the voir dire

17   before we begin the peremptory process?

18          MR. WORTMANN:  You know, I wondered if the person who

19   had the language because that is something I was going to ask,

20   if anyone has any problems.

21          THE COURT:  I always feel like the card in the seat

22   pocket.

23          MR. WORTMANN:  I hear you.

24          THE COURT:  The card in the seat pocket, if you can't

25   read this, call a flight attendant.  Other than that,

1    Mr. Garrity?

2            MR. GARRITY:  I'm fine with that.

3            THE COURT:  What I'm going to do is let them have a

4    break, a bathroom break, and we'll start the process.

5            MR. WORTMANN:  We're going to put the first 14 on the

6    list?

7            THE COURT:  The first 14 on the list will be put in

8    the box.

9            (SIDEBAR CONFERENCE WAS CONCLUDED.)

10           THE COURT:  One follow-up question, ladies and

11   gentlemen.  Do any of you have such language problems or you

12   have fear that you have trouble following the trial?  I see no

13   hands.

14           What we're going to do now, I'm going to give you a

15   very, very quick and short break so you can use the facilities.

16   I don't want you to go anywhere other than the restroom.  Those

17   of you who smoke will be tempted to go downstairs.  You cannot

18   do that.  I don't want you to leave this floor.  I want to make

19   this as quick and orderly as possible, and we can't start until

20   100 percent of you are back in the room, so make this, again,

21   as quick and orderly as you can.  The bathrooms are down the

22   hall.  I will see you in hopefully about 5 or 10 minutes.

23           (A recess was taken.)

24           THE CLERK:  All rise.  You can be seated.

25           THE COURT:  All right.  Ladies and gentlemen, thank

1    you for your cooperation.  What we're going to do next is the

2    clerk is going to read out the names of 14 people and those

3    people will take a seat in the jury box.  The first name called

4    out will sit in seat Number 1, which is the one closest to me

5    in the front row here, and we'll go 1, 2, 3, 4, 5, 6, 7.  The

6    8th name will be behind juror Number 1, and we'll have 14

7    names, and we'll begin the process of going through the

8    peremptory challenges.

9            THE CLERK:  Juror Number 1, seat Number 1, Warren

10   Kosterman; Juror Number 4, seat Number 2, Sean Goncalves; juror

11   Number 5, seat Number 3, Lee Britton; juror Number 6, seat

12   Number 4, Rosa Montalvo; juror Number 7, seat Number 5, Alden

13   Pierce; juror Number 8, seat Number 6, Nicole Arsenault; juror

14   Number 9, seat Number 7, Elizabeth Freeto; juror Number 10,

15   seat Number 8, Mary Jacobsen; juror Number 11, seat Number 9,

16   Nancy Groden; juror Number 12, seat Number 10, Maria Elena

17   Wilson; juror Number 13, seat Number 11, Dana Raines, Sr.;

18   juror Number 14, seat 12, Bridget Garabedian; juror Number 16,

19   seat Number 13, Linda Araujo; juror Number 17, seat Number 14,

20   Luis Soto.

21           THE COURT:  All right.  I think actually, sorry,

22   before you get settled, can I get everyone to move over so that

23   8 is behind 1.  Sorry about that.  All right.  Great.

24           Ladies and gentlemen, let me ask some follow-up

25   questions.  I'm going to try to fill in some blanks on the

```
1    form.  I'm going to ask some of you whether you're married.

2    I'm not doing that to pry, because if you have a spouse, the

3    lawyers are entitled to know what your spouse does for a

4    living.

5            Let me just go down the list.  Mr. Goncalves, are you

6    married?

7            THE JUROR:  No.

8            THE COURT:  Mr. Britton, are you married?

9            THE JUROR:  Engaged.

10           THE COURT:  I'm sorry.

11           THE JUROR:  Engaged.

12           THE COURT:  Engaged.  What does your fiancee' do?

13           THE JUROR:  She works at Boston Savings.

14           THE COURT:  Ms. Montalvo, are you married?

15           THE JUROR:  No.

16           THE COURT:  Ms. Arsenault, are you married?

17           THE JUROR:  Engaged.

18           THE COURT:  What does your fiance' do?

19           THE JUROR:  Public schoolteacher.

20           THE COURT:  Ms. Jacobsen, are you presently employed?

21           THE JUROR:  No.

22           THE COURT:  Are you retired?

23           THE JUROR:  Yes.

24           THE COURT:  What did you retire from?

25           THE JUROR:  Warehouse work.
```

```
 1              THE COURT:  Your spouse is retired as well?

 2              THE JUROR:  Yes.

 3              THE COURT:  Where did he work as well?

 4              THE JUROR:  He worked warehouse work as well.

 5              THE COURT:  Mr. Raines, are you married?

 6              THE JUROR:  Yes.

 7              THE COURT:  What does your spouse do?

 8              THE JUROR:  Unemployed.

 9              THE COURT:  What was her last work?

10              THE JUROR:  She worked at Mass. Housing.

11              THE COURT:  Ms. Araujo, are you married?

12              THE JUROR:  No.

13              THE COURT:  Mr. Soto, are you married?

14              THE JUROR:  No.

15              THE COURT:  Let me ask the 14 of you, have any of you

16     ever served before on any kind of jury, civil or criminal, and,

17     if so, I'll raise your hand and I'll go one-by-one, tell me

18     quickly what kind of case it was.  Yes.

19              THE JUROR:  Murder conviction.

20              THE COURT:  I'm sorry.

21              THE JUROR:  Murder conviction.

22              THE COURT:  Yes.

23              THE JUROR:  Robbery case.

24              THE JUROR:  One civil and three criminal.

25              THE COURT:  Okay.  When was the one most recent one of
```

1    those?

2              THE JUROR:  March.

3              THE COURT:  In the back, yes?

4              THE JUROR:  Motor vehicle.

5              THE JUROR:  Two, one was rape, and another one was

6    motor vehicle.

7              THE COURT:  In the back?

8              THE JUROR:  Drunk driving.

9              THE COURT:  Okay.  Did I get everybody?  One more

10   thing I want to do, I'm going to call you up one-by-one to

11   follow up on one of my questions.  I'll just take you one at a

12   time.  Mr. Kosterman, I'll get you first.

13             (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

14             THE COURT:  All right.  Mr. Kosterman, I asked

15   everyone in open court a question about race and whether it

16   might affect their decision in any way or affect the trial in

17   any way, and I want to give everyone a chance not in front of

18   everyone to answer the same question.

19             Is there any way in which the race of the defendant or

20   any of the witnesses might affect your ability to be a fair and

21   impartial juror in this case?

22             THE JUROR:  No way it would be affected.

23             THE COURT:  Thank you.

24             THE JUROR:  Thank you.

25             THE COURT:  Mr. Gonsalves.

1          (SIDEBAR CONFERENCE WAS CONCLUDED.)

2          THE COURT:  I think it would be actually faster, you

3    might line up, it might save you a couple minutes.  Thank you.

4          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

5          THE COURT:  Mr. Goncalves, I asked everyone whether

6    race would affect their decision in any way, and I want to give

7    everyone an opportunity one-on-one to answer the same question.

8    Is there anything about the race of the defendant or any of the

9    witnesses that might affect your verdict in any way?

10         THE JUROR:  Absolutely not.

11         THE COURT:  Thank you, sir.

12         Mr. Britt, I asked everyone in open court about

13   whether race might affect their verdict in any way, and I want

14   to give everyone an individual opportunity to do that.  Is

15   there anything in any way in which the race of the defendant or

16   any of the witnesses might affect your verdict in this case in

17   any way?

18         THE JUROR:  No, your Honor.

19         THE COURT:  Thank you.  Ms. Montalvo, I asked everyone

20   in open court about race and whether it might affect the

21   verdict in any way.  I want to give everyone a chance to do

22   that, to answer that question individually.  Is there anything

23   in this case about the race of the defendant or any of the

24   witnesses that might affect your verdict in any way?

25         THE JUROR:  No.

1          THE COURT:  Thank you.

2          Mr. Pierce, I asked everyone in open court about the

3     subject of race and whether it would affect their verdict in

4     any way, and I want to give everyone an opportunity to do that

5     one-on-one.  Is there anything about the race of the defendant

6     or race of any of the witnesses that might affect your verdict

7     in this case?

8          THE JUROR:  No.

9          THE COURT:  Thank you, sir.

10         Ms. Arsenault, I asked everyone in open court whether

11    race might in any way affect their verdict in this case.  I'm

12    giving everyone a chance to answer this question one-on-one.

13    Is there anything at all about the race of the defendant or any

14    of the witnesses that might affect your verdict in this case in

15    any way?

16         THE JUROR:  No.

17         THE COURT:  Thank you.

18         Ms. Freeto, I asked everyone this question in open

19    court, and I'm giving everyone a chance to answer it

20    one-on-one.  I asked about race and whether it might affect the

21    verdict in any way.  Is there anything about the race of the

22    defendant or any of the witnesses that might affect your

23    verdict in any way?

24         THE JUROR:  No.

25         THE COURT:  Thank you.

1          THE JUROR:  Thank you.

2          THE COURT:  Ms. Jacobson, I asked everyone this

3     question in open court, and I want to give everyone a chance to

4     answer the same question one-on-one.  I asked about whether the

5     race of the defendant might in any way affect your verdict in

6     this case.  Is there anything about the race of the defendant

7     or the race of any of the witnesses that might affect your

8     verdict in any way?

9          THE JUROR:  No.

10         THE COURT:  Thank you.

11         Ms. Groden, I asked everyone this question in open

12    court, and I'm giving everyone a chance to answer the same

13    question one-on-one.  I had asked about the race of the

14    defendant and whether it might affect the verdict.  Is there

15    anything about the race of the defendant or any of the

16    witnesses that might affect your verdict in any way?

17         THE JUROR:  No.

18         THE COURT:  Okay.  Thank you.

19         Ms. Wilson, I asked everyone this question in open

20    court, and I'm going to give everyone a chance to answer the

21    same question one-on-one, and that was about the race of the

22    defendant and whether it might affect the verdict.  Is there

23    anything about the race of the defendant or the race of any of

24    the witnesses that might affect your verdict?

25         THE JUROR:  No.

1          THE COURT:  Okay.  Thank you.

2          Mr. Raines, I asked this question in open court to

3    everyone, and I'm giving everyone a chance to answer it

4    one-on-one.  The question was about race.  Is there anything

5    about the race of the defendant or the race of any of the

6    witnesses that might affect your ability to return a fair and

7    impartial verdict in this case?

8          THE JUROR:  No.

9          THE COURT:  Thank you.

10         Ms. Garabedian, I asked this question to everyone in

11   open court, and I'm giving everyone a chance one-on-one to

12   answer the same question, and that was about the race of the

13   defendant or the race of any of the witnesses with whom it

14   might affect the trial.  Is there anything about the

15   defendant's race or the race about any of the witnesses that

16   might affect your ability to be fair and impartial in this

17   case?

18         THE JUROR:  No.

19         THE COURT:  Ms. Araujo, I asked this question to

20   everyone in open court and I'm giving everyone a chance to

21   answer the same question now one-on-one.  And that was about

22   the race of the defendant.  Is there anything about the race of

23   the defendant or any of the witnesses that might affect your

24   verdict in any way?

25         THE JUROR:  No.

1          THE COURT:  Okay.  Thank you.  Mr. Soto.

2          THE JUROR:  Yes.

3          THE COURT:  I asked everyone this question in open

4    court, and I want to give them an opportunity to answer the

5    same question one-on-one, and that was about the race of the

6    defendant.  Is there anything about the defendant's race or the

7    race of any of the witnesses that might affect your verdict in

8    any way in this case?

9          THE JUROR:  (Witness nodding head.)

10          THE COURT:  You have to say yes or no.

11          THE JUROR:  No.

12          THE COURT:  Thank you, sir.

13          All right.  Let's begin the process of the peremptory

14    challenges.  I want to remind everyone, we're going to proceed

15    by rounds.  Actually, why don't you all come around here.  We

16    do it one-by-one.  The government will go first in the first

17    round, then the defendant, and the government and the

18    defendant, we'll switch, the defendant will go first in the

19    second round and so on.

20          The government gets seven peremptory challenges, the

21    defense has eleven, the last two jurors seated regardless of

22    their seat, that is, the last two impaneled will be the

23    alternates, and the 7 and 11 peremptory challenges can be used

24    without regard whether it's the last two seats or not.

25          All right.

1          MR. WORTMANN:  May I have a moment, your Honor?

2          THE COURT:  Yes.

3          MR. WORTMANN:  Your Honor, the government challenges

4   juror Wilson, that's Number 12 sitting in seat Number 10.

5          THE COURT:  Juror 12, seat 10.  All right.

6   Mr. Garrity.

7          MR. GARRITY:  We challenge juror Number 1 in seat 1.

8          THE COURT:  Juror 1 in seat 1.  The government.

9          MR. WORTMANN:  Your Honor, Garabedian, seat 12, juror

10  Number 14.

11         THE COURT:  Did you say 14, seat 12, Garabedian?

12         MR. WORTMANN:  Yes.

13         THE COURT:  Defense.

14         MR. GARRITY:  Juror Number 9 in seat 7.

15         THE COURT:  Ms. Freeto?

16         MR. GARRITY:  Yes.

17         THE COURT:  Juror 9, seat 7.  All right.  The

18  government.

19         MR. WORTMANN:  Juror Number 17 in seat 14, Mr. Soto.

20         THE COURT:  Juror 17, seat 14.  Okay.  Defense.

21         MR. GARRITY:  Juror 10 in seat 8.

22         THE COURT:  That's Ms. Jacobsen, juror 10, seat 8.

23  Okay.

24         MR. WORTMANN:  The government is content, your Honor.

25         THE COURT:  Anything more from the defense in this

1    round?

2            MR. GARRITY:  Yes, your Honor, juror Number 11.

3            THE COURT:  In seat 13, Mr. Raines?

4            MR. GARRITY:  Oh, I'm sorry, Judge, juror Number 11.

5            THE COURT:  That's juror Number 9 -- you're right,

6    juror Number 11, seat 9.

7            MR. GARRITY:  Seat 9, yes.

8            And juror 14 was stricken by the government?

9            MR. WORTMANN:  Yes.

10           MR. GARRITY:  Juror Number 16.

11           THE COURT:  In seat 13?

12           MR. GARRITY:  Yes, your Honor.

13           THE COURT:  Okay.

14           MR. GARRITY:  And other than that, we're content.

15           THE COURT:  So the government has used three, you have

16   four left.  The defense has used five, so they have six left,

17   and we'll replace those eight jurors.

18           MR. WORTMANN:  Thank you, your Honor.

19           (SIDEBAR CONFERENCE WAS CONCLUDED.)

20           THE CLERK:  Juror 10, Mary Jacobsen, you're excused,

21   you're seat 8.  Juror Number 1, Larry Kosterman, you're

22   excused.  Juror Number 11, Nancy Groden, you're excused.  Juror

23   Number 16, Linda Araujo, you're excused.  Juror Number 12,

24   Maria Elena Wilson, you're excused.  Juror Number 14, Bridget

25   Garabedian, you're excused.  Juror Number 9, Elizabeth Freeto,

1      you're excused.  Juror Number 17, Mr. Soto, you're excused.

2            THE COURT:  All right.  The clerk will now read off

3      eight more names.

4            THE CLERK:  Juror Number 18, Brittany Ferreira, seat

5      Number 1; juror Number 19, Richard Scola, seat Number 7; juror

6      Number 21, Mark Willis, seat Number 8; directly behind

7      Number 1, juror Number 22, Brian Hogan, seat Number 9; juror

8      Number 23, Carol Garneau, seat Number 10; juror Number 25,

9      Anthony Gennaoui, seat Number 12; juror Number 26, Bernard

10     Hogarty, seat Number 13; juror Number 27, Cheryl Segreve, seat

11     Number 14.

12            THE COURT:  All right.  Let me ask the new jurors,

13     Ms. Ferreira, are you married?

14            THE JUROR:  No.

15            THE COURT:  Okay.  Mr. Scola, are you married?

16            THE JUROR:  Yes.

17            THE COURT:  What does your spouse do?

18            THE JUROR:  She's retired.

19            THE COURT:  What did she retire from?

20            THE JUROR:  Medical field.

21            THE COURT:  Okay.  What about you, what do you do?

22            THE JUROR:  I'm retired from the Boston Globe.

23            THE COURT:  Mr. Willis, are you married?

24            THE JUROR:  No.

25            THE COURT:  Ms. Garneau, is your spouse -- you're

1    married, correct?

2            THE JUROR:  I'm married, yes.

3            THE COURT:  Does your spouse work?

4            THE JUROR:  He's retired.

5            THE COURT:  What did he retire from?

6            THE JUROR:  Post office.

7            THE COURT:  All right.  Let me ask the eight new

8    jurors, have you ever served on a jury of any kind before?  Can

9    I get you to give a brief description?

10            THE JUROR:  Three civil, last one about five years

11   ago.

12            THE JUROR:  Drunk driving and firearms.

13            THE COURT:  Okay.  When was the firearm case?

14            THE JUROR:  2012.

15            THE COURT:  Okay.  Was it in state court or federal

16   court?

17            THE JUROR:  It was in Brockton.

18            THE COURT:  Brockton, okay.

19            THE JUROR:  A stabbing.

20            THE COURT:  A stabbing case.  Can I get the eight new

21   jurors to line up and beginning with Number 1, let me see you

22   at sidebar.

23            (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

24            THE COURT:  All right.  Ms. Ferreira, I asked this

25   question in open court, but I'm giving you another chance to

1    also talk about it one-on-one, and that concerns the race of

2    the defendant.  Is there anything about the defendant's race or

3    the race of the other witnesses that might affect your ability

4    to be a fair and impartial juror in this case?

5             THE JUROR:  No.

6             THE COURT:  Okay.  Thank you.  Mr. Scola.

7             THE JUROR:  Yes.

8             THE COURT:  I asked this question -- can I get you to

9    back up just a hair.  Thank you.  I asked this question in open

10   court to everyone, and I'm asking it again one-on-one, and that

11   is concerning the race of the defendant.  Is there anything

12   about the defendant's race or race of any of the witnesses that

13   might affect your ability to be a fair juror in this case?

14            THE JUROR:  No.

15            THE COURT:  Okay.  Thank you.  Mr. Willis, I asked

16   this question to everyone in open court.  I'm asking it again

17   one-on-one, and that's about the defendant's race.  Is there

18   anything about the race of the defendant, the race of any of

19   the witnesses that might affect your ability to be a fair and

20   impartial juror in this case?

21            THE JUROR:  No.

22            THE COURT:  Thank you.  Mr. Hogan, I asked this

23   question to everyone in open court, and I'm asking it again

24   one-on-one.  That concerns the race of the defendant.  Is there

25   anything about the defendant's race or the race of any of the

1    witnesses that would affect your ability to be a fair and

2    impartial juror in this case?

3              THE JUROR:  No.

4              THE COURT:  Thank you, sir.  Ms. Garneau, I asked this

5    question to everyone in open court, and I'm asking it again

6    one-on-one so people have a chance to respond, and that

7    concerns the race of the defendant.  Is there anything about

8    his race or the race of any of the witnesses that might affect

9    your ability to be a fair and impartial juror in this case?

10             THE JUROR:  Not at all.

11             THE COURT:  Okay.  Thank you.  Mr. Gennaoui, I asked

12   this question in open court.  I'm giving everyone a chance to

13   answer it one-on-one as well.  That concerns the race of the

14   defendant.  Is there anything about the defendant's race or the

15   race of any of the witnesses that might affect your ability to

16   be fair and impartial in this case?

17             THE JUROR:  No.

18             THE COURT:  Okay.  Thank you.  Mr. Hogarty, I asked

19   this question in open court to everyone, and I'm going to give

20   everyone a chance to answer it one-on-one, and that concerns

21   the defendant's race.  Is there anything about the defendant's

22   race or the race of any of the witnesses that might affect your

23   ability to be fair and impartial?

24             THE JUROR:  No.

25             THE COURT:  Thank you, sir.

1          THE JUROR:  This thing isn't working too good.  Do you

2     want it back?

3          THE COURT:  We'll try to see if we can get it to work

4     and get you a better one.

5          Ms. Segreve, I asked this question in open court to

6     everyone, and I'm giving everyone a chance to answer it

7     one-on-one.  That concerns the race of the defendant.  Is there

8     anything about the defendant's race or the race of any of the

9     witnesses that might affect your ability to be fair and

10    impartial in this case?

11         THE JUROR:  No.

12         THE COURT:  Thank you.

13         (SIDEBAR CONFERENCE WAS CONCLUDED.)

14         THE COURT:  Counsel, do you need a few moments?

15         MR. GARRITY:  Can I have a few minutes?

16         THE COURT:  Yes.  Are you ready, counsel?

17         MR. GARRITY:  Your Honor, can I have one more minute?

18         THE COURT:  Yes.

19         MR. GARRITY:  Thank you.

20         (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

21         THE COURT:  All right.  Counsel.  This is round 2.

22    The defense will go first.  Mr. Garrity.

23         MR. GARRITY:  Your Honor, we will strike juror 26.

24         THE COURT:  Seat 13, Mr. Hogarty.

25         MR. GARRITY:  Yes.  Mr. Wortmann.

1            MR. WORTMANN:  Juror 18, seat 1, Ms. Ferreira.

2            THE COURT:  Juror 18, seat 1.  Mr. Garrity.

3            MR. GARRITY:  On that, we're content, your Honor.

4            MR. WORTMANN:  The government is content, your Honor.

5            THE COURT:  All right.  That will mean that the next

6    two people will be the alternates.  We'll put Matthew Duggan

7    and Amy Spurling as 28 and 29 and see if we get to Ms. Fagan.

8    She's the one who was the lawyer.  Okay.

9            (SIDEBAR CONFERENCE WAS CONCLUDED.)

10           THE CLERK:  Juror Number 18, Ms. Ferreira, you're

11   dismissed.  Juror Number 26, Mr. Hogarty, you're dismissed.

12   Thank you.

13           THE COURT:  The clerk will read out two more names.

14           THE CLERK:  Could we have juror Number 28, Matthew

15   Duggan, seat Number 1 and juror 29, Amy Spurling, seat

16   Number 13.

17           THE COURT:  Actually, no, I'm sorry, Mr. Duggan, are

18   you married?

19           THE JUROR:  No, sir.

20           THE COURT:  And the two new jurors, have either of you

21   ever sat on a jury of any kind before?

22           THE JUROR:  Yes.

23           THE COURT:  What kind of case?

24           THE JUROR:  It was criminal, a gun charge.

25           THE COURT:  Which court?

1          THE JUROR:  State court.

2          THE COURT:  Are counsel ready?

3          (THE FOLLOWING OCCURRED AT SIDEBAR:)

4          THE COURT:  All right.  This is round 3.  The

5     government goes first.  Mr. Wortmann.

6          MR. WORTMANN:  Your Honor, are we going to bring them

7     up?

8          (SIDEBAR CONFERENCE WAS CONCLUDED.)

9          THE COURT:  I'm sorry.  Can I bring the two of you up.

10    Mr. Duggan, I've asked this question in open court, but I'm

11    also giving everyone a chance to answer it one-on-one, and that

12    concerns the race of the defendant.  Is there anything about

13    the defendant's race or the race of any of the witnesses in the

14    case that might affect your ability to be a fair and impartial

15    juror in this case?

16         THE JUROR:  Irrelevant.

17         THE COURT:  Okay.  Thank you.  Ms. Spurling, I asked

18    this question to everyone in open court, but I'm also giving

19    everyone a chance to answer it one-on-one.  That concerns the

20    defendant's race.  Is there anything about the defendant's race

21    or the race of any of the witnesses that would affect your

22    ability to be a fair and impartial juror in this case?

23         THE JUROR:  No.

24         THE COURT:  Thank you.  Do you need a moment or are

25    you ready?

1          MR. GARRITY:  One moment, Judge.

2          THE COURT:  Okay.

3          MR. GARRITY:  We're content, your Honor.

4          MR. WORTMANN:  The government challenges 29,

5   Ms. Spurling.

6          THE COURT:  The government challenges juror 29 in seat

7   13.  Any other challenges?

8          MR. WORTMANN:  No.

9          THE COURT:  That means we have to make a decision

10  about Ms. Fagan.  Do you want me to do another colloquy with

11  her?  She's the attorney who said that in her drunk driving

12  case, she had some trouble separating out what she knew about

13  breathalyzer tests, or at least I think that's a fair

14  characterization, she had some trouble.  I think at the end of

15  the day, she said she could make that separation.  Do you want

16  me to do further inquiry of her?  You both have a multitude of

17  unused peremptory challenges, or do I have to decide I have to

18  strike her for cause?  What's the government's view?

19         MR. WORTMANN:  I think she can stay on, your Honor.

20         MR. GARRITY:  I think so, too, Judge.

21         THE COURT:  All right.  Then we'll call her up.

22         THE CLERK:  Juror Number 29, Amy Spurling, you're

23  dismissed.  Juror Number 30, Rebecca Fagan.

24         THE COURT:  Actually, Ms. Fagan, why don't you come

25  right to sidebar.

1       (THE FOLLOWING OCCURRED AT SIDEBAR:)

2       THE COURT:  I asked this question in open court to

3  everyone, and I'm giving everyone a chance to answer it

4  one-on-one.  It concerns the race of the defendant.  Is there

5  anything about his race or the race of any of the witnesses

6  that would affect your ability to serve as a fair and impartial

7  juror in this case?

8       THE JUROR:  No.

9       THE COURT:  Let me ask another follow-up, which is we

10  talked about this previous case you had, the drunk driving

11  case, and how your legal training at least gave you a little

12  bit of trouble separating out some of the evidentiary issues,

13  and you've had a chance I guess to think about that a little

14  bit.  Is there anything you want to follow up or clarify?

15       THE JUROR:  No.

16       THE COURT:  Are you confident you could be fair in

17  this case and decide this case on the evidence?

18       THE JUROR:  I think so.

19       THE COURT:  Any follow-up, counsel?

20       MR. WORTMANN:  No, thank you, your Honor.

21       THE COURT:  Other than that, have you served on a

22  jury?

23       THE JUROR:  No, just that one.

24       THE COURT:  Why don't you take your seat.

25       All right.  Round 4.  So the defense would have to go

1    first.

2            MR. GARRITY:  Your Honor, we're content.

3            MR. WORTMANN:  We're content, your Honor.

4            THE COURT:  Okay.  So hold on.  So Ms. Fagan and

5    Mr. Duggan are the alternates.  I'm not going to take them off

6    or tell them until the end of the trial.  Normally, at this

7    point, I would swear the jury and discharge everyone else.

8            I've been wrestling with this and talking to other

9    Judges, and there's two schools of thought equally divided in

10   terms of what way to go.  The advantage of swearing them is

11   they know, you know, they're under oath and they have to follow

12   my instructions strictly.  The advantage of not swearing them

13   is jeopardy hasn't attached, and in the two-week gap, if

14   something were to happen, it's hard to foresee exactly how this

15   would play out but, in any event, jeopardy wouldn't have

16   attached.  What's the government's view?

17           MR. WORTMANN:  I don't think you could swear the jury

18   just because of that possibility.  I think if we suddenly had a

19   block of witnesses and something there would be manifest in any

20   way, but I think to avoid that problem.

21           THE COURT:  Mr. Garrity.

22           MR. GARRITY:  Your Honor, I would ask that you swear

23   them in because that will emphasize with them that they have to

24   follow the Court's instructions, and we do have two alternates

25   so I can't foresee a two-week delay talking about a mistrial or

1    a lack of jurors.

2          THE COURT:  It's not at all clear to me what the right

3    thing to do is, but I'm going to tip the balance by doing what

4    defense counsel asked, so we'll swear the jury.

5          (SIDEBAR CONFERENCE WAS CONCLUDED.)

6          THE COURT:  All right.  Ladies and gentlemen, I

7    declare that we have a jury indifferent, which means you're

8    going to be the jury in the case.  I need you to all stand and

9    be sworn in as the jury in this case.

10          (Jurors were sworn.)

11          THE COURT:  Thank you.  All right.  The rest of you

12   are discharged.  Thank you for your patience.  I hope you all

13   have a great holiday.  Those of you who are worried about your

14   schedule are off the hook, so thank you.  I know the benches

15   are hard and wooden.  They are that way in every courtroom, old

16   and new, I don't know why, but thank you.

17          Ladies and gentlemen, let me talk about a few things.

18   I'm going to take a few moments and talk about your duties as

19   jurors and give you some preliminary instructions, and then

20   we'll talk about logistics.

21          As I said, we're going to take two weeks off and come

22   back after the holidays, but let me start by giving you again

23   some instructions on your duties and obligations.  I'm also

24   going to give you some brief preliminary instructions on the

25   law that you're to follow.

1      At the end of the trial, I'm going to give you a

2  complete and detailed set of instructions on the law.  Those

3  instructions will be in writing.  Each of you will have your

4  own copy to read along as I give you the instructions and to

5  take with you into the jury room.

6      The reasons I'm going to give you some instruction now

7  instead of waiting to the end of the trial is to try to give

8  you a bit of the framework for considering the evidence and to

9  help you understand it.  I don't want you to think my

10  preliminary instructions are somehow more important than the

11  ones that come later.  You must apply the instructions I give

12  you at the end of the trial as a whole.

13      As the jury, it is your duty to decide from the

14  evidence what the facts are.  You and you alone are the judges

15  of the facts.  You will hear the evidence, decide what the

16  facts are and then apply those facts to the law as I give it to

17  you.  You must follow the law as I explain it whether you agree

18  with it or not.

19      Sometimes jurors are curious about what I think,

20  whether I think, for example, that the defendant is guilty or

21  not or whether I think a particular witness is believable.  My

22  opinion, if I have one, and I certainly don't have one now, is

23  not relevant.  It is your role, not mine, to decide those

24  issues, and you should not interpret anything I might say or do

25  during the trial about what I think about a witness or what I

1    think your verdict ought to be.

2          Again, this is a criminal case.  The defendant has

3    been charged with one crime, possession of a firearm and

4    ammunition by a person who has been previously convicted of a

5    crime punishable by more than a year.

6          The charge against the defendant is contained in a

7    document called an indictment.  The indictment is simply a

8    description of the charge against him.  It's not evidence of

9    anything.  Mr. Belin has pleaded not guilty to the charge.  He

10   is presumed innocent.  The government must prove his guilt

11   beyond a reasonable doubt.  The defendant does not have to

12   prove his innocence, he does not have to put on any evidence,

13   he does not have to testify.  Those are rights guaranteed by

14   the United States Constitution.

15         At the end of the trial, you'll be asked to render a

16   verdict of guilty or not guilty.  Your verdict must be

17   unanimous.  That is, you may not convict the defendant if only

18   one of you agrees that he is guilty beyond a reasonable doubt.

19         In order to help you follow the evidence, I'm going to

20   give a brief summary of the elements of the crime charged.

21   Every crime has what we call elements.  Those are things that

22   the government has to prove beyond a reasonable doubt in order

23   to find the defendant guilty of that particular crime.

24         I'll instruct on the elements of the crime later in

25   greater detail at the end of the case, and, again, the

1    instructions you get at the end of the case, which will be more

2    detailed, will govern your deliberations.

3        The crime charged is possession of a firearm and

4    ammunition after a previous conviction for a crime punishable

5    by imprisonment for a term exceeding one year.  The elements of

6    that crime are as follows:

7        First, that the defendant was convicted in any court

8    of a crime punishable by imprisonment for a term exceeding one

9    year;

10       Second, that the defendant possessed a firearm or

11   ammunition after that conviction occurred;

12       Third, that the defendant acted knowingly; and

13       Fourth, that the firearm or ammunition moved in

14   interstate commerce after it was manufactured.

15       That is just a very preliminary outline.  At the end

16   of the trial, I'll give you a final instruction on all the

17   things you need to know, including definitions of important

18   terms, and those instructions will govern your deliberations.

19       I've talked about the word "evidence."  The evidence

20   in this case will probably include the testimony of witnesses.

21   It will include objects and things received as exhibits, it may

22   include documents and any facts upon which the parties might

23   agree.  The evidence consists of all the testimony, both on

24   direct and cross-examination and all the exhibits regardless of

25   who introduced them.

1           There are rules that control what you may consider as

2    evidence.  When a lawyer asks a question or offers something

3    into evidence, if the other lawyer on the other side thinks

4    it's not permitted by the rules, that lawyer might object.

5    Sometimes it's necessary for me to discuss the issue with the

6    lawyers outside the hearing of the jury either by having a

7    conference at the sidebar or by calling a recess.

8           The purpose of those conferences is so I can make a

9    decision on the rules of evidence.  We don't keep things from

10   you just to frustrate you, but sometimes it's important to

11   discuss things outside your earshot, and I will do what I can

12   to keep those conferences to a minimum.

13          Certain things are not evidence.  Statements and

14   arguments by the lawyers are not evidence.  The lawyers are not

15   the witnesses.  Questions by lawyers standing alone are not

16   evidence.  Again, the lawyers are not the witness, it's the

17   question and the answer taken together that are the evidence.

18          Objections are not evidence.  Lawyers have a duty to

19   their client to object if they think there's something

20   improper.  If I sustain an objection, in other words, if I

21   agree with the lawyer's objection and I keep something out, you

22   must ignore the question or ignore the exhibit, and don't

23   speculate what the answer might have been or the exhibit might

24   have said.  If I tell you to disregard something, it's not

25   evidence, and you may not consider it.  If you see or hear

1    anything outside the case, it's not evidence.

2            Sometimes evidence comes in for a limited purpose

3    only.  You can use it for one purpose and not for any other.

4    If that happens, I'll give you an instruction on the ways in

5    which you can and cannot use the evidence.

6            In deciding what the facts are, you may have to decide

7    what testimony you believe and what testimony you do not

8    believe.  You may believe everything a witness says or only

9    part of it or none of it.  It's entirely up to you.

10           Now, many people watch television shows or movies

11   about courts or lawyers about the criminal justice system, and

12   sometimes they're affected by that when they serve as jurors.

13   Television shows and movies can create false expectations about

14   real life, for example, how a trial is going to proceed or what

15   the evidence is going to look like.

16           You must decide the case on the evidence before you

17   and the law as I give it to you.  Do not decide this case even

18   in part based on something you saw on television or in a movie.

19   That's improper and unfair.

20           Now, to make sure that the trial is fair, we have

21   rules that the jury has to follow.  These rules are important.

22   I'm going to instruct you to follow these rules.  The first

23   rule is do not talk among ourselves about the case or about

24   anyone involved with it until the end of case when you go to

25   the jury room to decide on your verdict.

1           You can feel free to get to know one another.  You can

2      talk about the weather or your families or the Patriots or

3      anything other than this case.  What we don't want is for

4      people to start having side discussions with one another,

5      particularly where two people begin to talk about whether or

6      not they think the case ought to be decided in a certain way

7      outside the hearing of the others and before all the evidence

8      has come in.  So, again, don't talk about the case among

9      yourselves until it's time to do so.

10          The second rule is don't make up your mind about what

11     the verdict ought to be until you've gone to the jury room to

12     decide the case and you and your fellow jurors have discussed

13     the evidence.  The evidence has to be heard in some order.

14     Something has to go first, something has to go last, and it may

15     be that the last answer and the last question are the most

16     important things for trial.

17          Third, don't talk with anyone else about this case.

18     Now, when I say don't talk with anyone else, that includes

19     members of your family and your friends.  It's the most natural

20     thing in the world when you go home to talk to your wife or

21     husband or roommate about the case.  They'll say:  What kind of

22     case is it?  Do you think he's guilty or they'll talk about

23     some other case that they heard about or read about.  It's

24     natural for them to do that, but you should not have that

25     conversation with someone who has not heard the evidence and is

1   not part of this case and is not familiar with what that

2   evidence is or how the case ought to be decided, and you cannot

3   have that conversation.  You can tell them that I told you so,

4   you can talk about it after the case is over, but say the Judge

5   told me I can't talk about the case until it's over.

6           Next, do not mention or discuss this case in any way

7   on any social network or in any electronic forum.  This is an

8   increasing problem for the courts.  Most, a lot of people,

9   anyway, in modern life talk about things on their Facebook

10  accounts or similar things, and if you do, that's going to

11  result in a mistrial, and we're going to have to start all over

12  again.  Please don't do that.  Don't talk about the case on

13  Facebook or any other social network.  Don't send a text

14  message or an e-mail.  Don't use Twitter.  Don't discuss it in

15  any way, shape or form electronically, again, until the case is

16  over.

17          Next, don't let anyone talk to you about the case.  If

18  anyone approaches you and wants talk to you about the case,

19  please report it to me immediately.

20          Next, during the trial, don't talk to any of the

21  parties or the lawyers or the witnesses involved in the case.

22  You should not even say hello.  It's important that you give

23  the appearance of doing justice, and if someone sees you

24  talking to someone, even it's just being polite, even if you're

25  waiting for the elevator, it might arose suspicion, so don't do

1    it.  If one of the lawyers or the witnesses don't speak to you,

2    they are obeying my instructions, too.

3    Next, please don't do any research on your own.  Don't

4    consult any reference materials, don't go to the place where

5    the events supposedly took place, and please, please, please,

6    please, please do not look up things on the Internet.

7    Again, this is a huge problem for the courts.  If you

8    think some piece of information is missing, you are not allowed

9    to find that information out on your own.  You must decide the

10    case on the evidence that you've been given in this case.  If

11    you're curious about some things you can do it afterwards, but

12    you cannot do it during the case.

13    Next, please don't read any news stories or articles

14    about the case or listen to any radio or television reports

15    about the case.  I don't expect there will be any, but if there

16    are, don't read them, don't listen to them, have someone put it

17    aside if there's an article you want to read and you'll be able

18    to read it after the trial is over.

19    Next, please be respectful to the Court.  Please don't

20    bring food or drink into the courtroom, and please try to dress

21    appropriately.

22    Finally, during the course of the trial, if you have

23    any kind of problem, please raise your hand, we'll stop the

24    proceeding, and I'll try to take care of it.

25    Sometimes the lawyers get between you and the witness,

1    sometimes people mumble, if you can't hear a witness, sometimes

2    you may need a glass of water, you need a Kleenex, you need a

3    bathroom break, we will try to take one as best we can.

4         If we're not in court and you need to communicate with

5    me, please give a signed note to the Court security officer to

6    give to me.  Those rules are important.  Please follow them.

7         All right.  I'm going to permit you to take notes in

8    this case.  The clerk will distribute a notebook.  There will

9    be a number on the cover of the notebook.  That will be your

10   juror seat number.

11        I want to give you a couple cautions about taking

12   notes.  Do not allow your note-taking to distract you from

13   listening carefully to the testimony that's being presented.

14   It's important that you observe and listen to the witnesses.

15        If you want to take no notes at all, a lot of notes,

16   none at all, it's entirely up to you, but make sure you're

17   listening to the witnesses.  Please remember that not

18   everything that you write down is necessarily what was said.

19   When you return to the jury room to discuss the case, don't

20   assume simply because something is in somebody's notes that it

21   necessarily took place that way.

22        Notes are an aid to a recollection, nothing more.  The

23   fact that it's written down doesn't mean it's necessarily true.

24   One of the things sometimes people do, they write down the

25   question and not the answer.  Again, the question standing

1    alone is not the evidence, it's the question plus the answer.

2          You should take your notes with you to the jury room

3    at every recess.  You can't take your notes home or anyone else

4    outside the courtroom or the jury room.  At the end of every

5    day, the clerk places them in the vault.  They'll be returned

6    to you the next day, and no one but you will ever look at them.

7          Now, as you can see, we have a reporter who's creating

8    a record of everything that happens in this trial.  Sometimes

9    jurors think that they'll have a transcript of the trial when

10   they go back to the jury room.  That is not true.  You will not

11   be given a transcript.  There are a number of reasons for that,

12   but one of the reasons is strictly practical.  Usually there's

13   not enough time to prepare one.  The Court reporter has a

14   difficult job.  It's time consuming to take a raw record, which

15   is what she's creating, and turn it into a transcript, so you

16   will not have a transcript, and you should, therefore, listen

17   carefully to help you remember the testimony.

18         All right.  Let me next talk about the outline of the

19   trial.  On January 5th, we will begin with the opening

20   statements.  The government will go first.  It will tell in its

21   opening about the evidence.  It is not itself evidence.  Its

22   purpose is to help you understand the evidence.  After the

23   government opens, the defendant's attorney may, if he chooses,

24   make an opening at that time.  The government's evidence will

25   come next.  That will consist of the testimony of witnesses and

1    any exhibits that may be introduced.  After the government's

2    evidence, the defendant may present evidence, if he chooses.

3    Again, the defendant is not required to do so.  He's presumed

4    innocent.  He does not have to testify and does not have to put

5    on any evidence at all.

6            After you've heard all the evidence, the government

7    and the defense will be given opportunity for final or closing

8    argument.  Again, like opening statements, they're a summary of

9    the evidence but they are not themselves evidence.  I'll then

10   give you your instruction in writing about the rules of law

11   that you're to use, and I'll read them aloud to you as well.

12   After hearing everything together, you will go to deliberate to

13   make your decision.  You will never have to reveal your

14   decisions or explain your verdict to anyone.

15           Now, as I've indicated, our normal trial day is from

16   9:00 in the morning to 1:00 in the afternoon, and you might

17   wonder why we do it that way rather than go all day and get the

18   case over with sooner.

19           One of the things we've found over the years, the

20   cases don't really go much faster if we go all day.  There are

21   lots of reasons for that.  One of them is that I have other

22   work to do, sometimes on this case, and what often happens is

23   that the jurors end up sitting and waiting, and that can be

24   very frustrating.  The cases start at 9:30 or 10:00, lunch

25   tends to be two hours, and it's not any more a productive day

1    than 9 to 1.  It's also much easier on people who want to check

2    in at their office or place of work, it's much easier on

3    parents of school-age children, and lawyers and jurors get

4    tired when we go all day, and the cases tend to drag in the

5    afternoon.  People don't pay as close attention.

6          To make sure this works properly, we have to be

7    disciplined and keep you to a tight schedule.  I want to begin

8    trial every day 9:00 sharp.  That means you need to be here

9    before that to make sure we start on time.

10         I'm going to talk in a moment about what to do first

11    thing Monday morning, but we'll start at 9:00 sharp.  I will

12    take two breaks, one at about 10:30, one at noon.  They'll be

13    about five minutes long, give you time to stretch your legs and

14    go to the bathroom, that's it, and we'll go to one o'clock

15    sharp.

16         Again, when the time comes for you to deliberate,

17    you'll meet all day until you reach a decision.  It might not

18    take you that long, but you should plan for the possibility

19    that you'll be here all day.  I don't expect that to happen.  I

20    might ask for an afternoon session or ask to start a little

21    early.  I won't do that without checking with you, but if

22    something goes wrong, I'll see if we can try a different

23    schedule.

24         All right.  Two other points before I get to my final

25    instructions:  The first is it's wintertime.  We may have a

1    snow event, you never know.  What we do basically is we follow

2    what the Boston Public Schools do.  If they are off for the

3    day, we're off for the day; if they start an hour late, we

4    start an hour late.  So if you hear on the radio or see on the

5    Internet that the Boston Public Schools are closed, we're

6    closed that day, you don't have to come in, you don't have to

7    call, and we'll sort it out.

8         The next is the unusual circumstance of the Tsarnaev

9    trial starting the same day we're going to start.  It's going

10   to be crowded in the courthouse.  We're bringing in more than a

11   thousand people for that jury pool.  You should probably thank

12   your lucky stars that you're on a nice short trial instead of

13   that one, but there are some logistics involved.

14        I've been asked to see if you can't get here by 8:30

15   in the morning because of logical reasons, including the

16   elevators.  It's going to be difficult to assemble everyone or

17   more difficult than usual, but try to be here by 8:30, if you

18   can.

19        There are going to be lines to get through the medical

20   detectors, which you probably came in, but we also have one

21   over on the side by the harbor, there's a little circular park,

22   and it's likely to have much shorter lines, but try to allow

23   more time to get through that, if you can, and we'll do the

24   best we can.  I ask that you be patient.  I also ask that you

25   don't wear anything of any kind that might be intended to

1     affect that trial.  Please don't wear anything that says

2     "Boston Strong," for example, anything at all that could create

3     an issue in that case, just wear regular clothing.  I'm sure

4     you have your own views and opinions about that case, but if I

5     could just ask you to wear conventional, no badges, no

6     T-shirts, no buttons and so forth, and your juror badge is a

7     badge.  You probably don't want to wear it outside on the

8     street or outside the courthouse given, again, how crowded that

9     day will be.  So I hope it all goes well, and if there's any

10    problem at all, we'll give you a telephone number to call in to

11    try to accommodate whatever issue you may have.

12          So I have a final instruction, and that is under our

13    Constitution, all persons are equal before the law.  Everyone

14    accused of a crime, everyone is entitled to a fair trial.  You

15    should not hesitate to convict if you think the government has

16    met its burden; you should not hesitate to acquit if you think

17    it has not, but you should be completely and scrupulously

18    open-minded, honest and fair.  That is your duty as jurors, and

19    that is your duty as citizens of the United States.

20          I thank you for your patience during the impanelment

21    process.  I hope you all have a good Christmas, if you

22    celebrate, and New Year's, and I will see you in two weeks

23    Monday, January 5th at 9:00 sharp beginning with the

24    government's opening statement in this case.  The clerk will

25    show you to the jury room and give you contact information.

1    Thank you.  All rise for the Court.

2              THE CLERK:  All rise.

3              (JURORS EXITED THE COURTROOM.)

4              THE COURT:  All right.  We have the dangling issue of

5    the possible redaction of the conviction records, which I'm

6    going to at least give some further thought to.  Is there

7    anything else we ought to take up while I have you here,

8    Mr. Wortmann?

9              MR. WORTMANN:  I don't think so, your Honor.  The only

10   thing you don't have yet, I'm waiting to get some Keeper of the

11   Records certifications from the Boston Police Department and

12   possibly one from the State Police, and as soon as I get those,

13   I'll give them to counsel, and I'll send maybe a revised once

14   we have all the redactions, I'll do revised books.

15             The only thing I'd ask, your Honor, if your Honor is

16   inclined to change the issue on the redactions, I'd really

17   appreciate it if we could have a conversation about that.

18             THE COURT:  Yes.

19             MR. WORTMANN:  All right.

20             THE COURT:  I should add, I'm not going to work on the

21   24th or 25th, I'm not sure about how it's going to play out

22   between Christmas and New Year's, but I'm reachable by e-mail,

23   and we can convene court, if necessary.

24             MR. WORTMANN:  Part of it is just straight logistics

25   because I've done one set of redactions, and the other is, of

1    course, on the merits as well.

2         THE COURT:  Yes, I understand.  Mr. Garrity.

3         MR. GARRITY:  Your Honor, we have no issues from the

4    defense side other than that one hanging issue, but I do have

5    Court hearings scheduled throughout that week, but I should be

6    able to be available if the Court wishes me to make myself

7    available.

8         THE COURT:  And barring further developments, why

9    don't we plan to meet at 8:30 Monday morning just to -- I want

10   to do that every morning of the trial, if not earlier, to see

11   if there's any issues we might want to take up.  My advice,

12   please allow enough time to get in, and, again, if you know

13   anyone is going to be attending the trial or in the building,

14   please again caution them about wearing "Boston Strong" or

15   other type of clothing or badges or signs.  All right.  If

16   there's nothing else, then have a good holiday, all.

17        MR. WORTMANN:  Your Honor, I assume but American flags

18   worn on the lapel?

19        THE COURT:  I would think not but everyone should

20   exercise prudence.

21        MR. WORTMANN:  Sure, I just wanted to be careful.

22        THE COURT:  Thank you.

23        (Whereupon, the hearing was adjourned at

24   12:45 p.m.)

25

1              C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7

8              I do hereby certify that the foregoing transcript,

9    Pages 1 through 117 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Criminal

11   Action No. 13-10048-FDS, UNITED STATES OF AMERICA vs.

12   KING BELIN and thereafter by me reduced to typewriting and is a

13   true and accurate record of the proceedings.

14             Dated this 6th day of January, 2015.

15

16                        s/s Valerie A. O'Hara

17             _____

18                     VALERIE A. O'HARA

19                     OFFICIAL COURT REPORTER

20

21

22

23

24

25