1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,         )
                                        )
5                       Plaintiff,      )  Criminal Action
                                        )
6                                       )  No. 13-10048-FDS
      vs.                               )
7                                       )
      KING BELIN,                       )
8                       Defendant.      )

9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12                      JURY TRIAL DAY 2

13

14

15          John Joseph Moakley United States Courthouse
                         Courtroom No. 2
16                       One Courthouse Way
                         Boston, MA 02210
17

18                       January 5, 2015
                          8:30 a.m.
19

20

21

22

23                     Valerie A. O'Hara
                     Official Court Reporter
24       John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3204
25                     Boston, MA 02210
              E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by JOHN A. WORTMANN, JR.,
     ESQ., 1 Courthouse Way, Suite 9200, Boston, Massachusetts
4    02110;

5    For the Defendant:

6        PAUL J. GARRITY, ESQ., 14 Londonderry Road,
     Londonderry, New Hampshire 03053.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

  OPENING STATEMENT BY MR. WORTMANN:                2-11

3
  OPENING STATEMENT BY MR. GARRITY:                 2-24
4

  Testimony of:          Direct  Cross  Redirect  Recross
5

6 PHILLIP BISSONNETTE
    by Mr. Wortmann      2-32                2-89
    by Mr. Garrity              2-61                2-92
7

8 THOMAS FINN
    by Mr. Wortmann:     2-93                2-112
9   by Mr. Garrity             2-104               2-113

10 KEVIN MAGOON
    by Mr. Wortmann:     2-116               2-132
11  by Mr. Garrity             2-125               2-132

12 BRANDON McCLELLAN
    by Mr. Wortmann:     2-132               2-143
13  by Mr. Garrity             2-142               2-144

14 MATTHEU KELSCH
    by Mr. Wortmann:     2-144
15
                          E X H I B I T S
16

17 No.     Description                        In Evd.

   No. 3                                      2-29
18
   No. 4.1                                    2-29
19
   No. 4.2                                    2-29
20
   No. 8.1                                    2-30
21
   No. 8.2                                    2-30
22
   Nos. 5.2, 5.3, 5.4, 5.5, 5.6, 5.7          2-38
23
   No. 6.1                                    2-54
24
   No. 6.2                                    2-58
25

1                    E X H I B I T S (CONTINUED)

2    No.       Description                        In Evd.

3    No. 6.3                                      2-122

4    Nos. 7.1 through 7.7                         2-123

5    No. 6.4                                      2-125

6    No. 2                                        2-135

7    No.       Description              For Identification

8    A         Map                               2-37

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1   THE CLERK:  All rise.  United States District Court

2   for the District of Massachusetts is now in session, the

3   Honorable F. Dennis Saylor presiding.  You may be seated.  This

4   is in the matter of United States vs. King Belin, Criminal

5   Matter 13-10048.

6   Counsel, would you please identify yourself for the

7   record.

8   MR. WORTMANN:  Your Honor, John Wortmann for the

9   United States, good morning.

10   THE COURT:  Good morning.

11   MR. GARRITY:  Good morning, your Honor, Paul Garrity

12   for King Belin.

13   THE COURT:  Good morning.  Welcome back.  I hope you

14   had a good holiday.  I received and read the government's

15   memorandum regarding admissibility of booking sheets and

16   fingerprint cards, and the government also supplied me with a

17   new exhibit list and exhibit booklet.

18   MR. WORTMANN:  Your Honor, for the record, Mr. Garrity

19   has the same thing.

20   THE COURT:  Okay.  All right.  Is there anything

21   requiring my attention this morning?  Yes, Mr. Garrity.

22   MR. GARRITY:  Judge, the only issue I have with

23   respect to the government's memorandum on the fingerprint card,

24   I would object on confrontation clause grounds.

1          THE COURT:  All right.  Crawford-type grounds; is that

2     the idea?

3          MR. GARRITY:  Yes, your Honor.

4          THE COURT:  All right.  I would expect to -- are you

5     going to introduce that today; is that the idea?

6          MR. WORTMANN:  I am actually planning on introducing

7     all the business records first thing, your Honor, just so that

8     they can get in.

9          THE COURT:  All right.  In that case, I'm going to

10    overrule the objection and admit the fingerprint cards,

11    assuming, of course, that they come in as the government has

12    represented, obviously.

13         MR. WORTMANN:  I provided both you and Mr. Garrity

14    with copies of the keeper of the records certifications.

15         THE COURT:  All right.

16         MR. GARRITY:  Judge, just to expand on the objection,

17    I make it based on the fact that it's asserting a fact.  It was

18    produced by the police department.  Arguably, there's an issue

19    with respect to the rules of evidence and the exception of the

20    police records, but the item is not based on that, it's based

21    on Fourth Amendment, I mean, excuse me, Sixth Amendment

22    confrontation clause grounds that a fact is being asserted that

23    I won't be able to cross-examine.

24         THE COURT:  All right.  With regard to the Sixth

25    Amendment objection, the information in question is not

1   testimonial.  Again, assuming that the government's

2   representations as to both the nature of the fingerprint cards

3   and the underlying foundational evidence is correct, they are

4   records that are created routinely upon arrest.  They don't

5   require any particular discretion or judgment or testimony.

6   There's no analysis involved.

7           They are a collection of objective information in

8   what's effectively a ministerial fashion, and assuming that the

9   appropriate foundation is laid, they are records of a regularly

10  conducted activity under Rule 803(6) and can be authenticated

11  under Rule I guess it's 902(11) as public records as well.

12          MR. WORTMANN:  Yes, your Honor.

13          THE COURT:  All right.  So I rule both the

14  constitutional objection and the evidentiary, that is, the

15  rules of evidence objection.

16          MR. GARRITY:  Thank you.

17          THE COURT:  I'm sorry, go ahead.

18          MR. WORTMANN:  I apologize, your Honor, I'm sorry.

19          THE COURT:  No, go ahead.  Mr. Wortmann, how long do

20  you expect your opening to be?

21          MR. WORTMANN:  Probably about 20 minutes, your Honor.

22          THE COURT:  Do you expect to open now?

23          MR. GARRITY:  I do, your Honor.

24          THE COURT:  And yours?

25          MR. GARRITY:  If it's five minutes, Judge, that will

1    be long.

2         MR. WORTMANN:  Your Honor, I have a feeling things

3    might go quickly today.

4         THE COURT:  Yes.

5         MR. WORTMANN:  I have six of the eight witnesses

6    coming in.  If we end up running short, I didn't want to -- I

7    have two witnesses left, fingerprint experts, and I have them

8    signed up for tomorrow.

9         THE COURT:  I never understood when I was a lawyer how

10   Judges got upset if we were ahead of schedule.  If it moves

11   faster than you think, again, I don't want to send the jury

12   home after two hours.

13        MR. WORTMANN:  No, no, and I don't think that would be

14   the case.  I just wanted to give your Honor a heads-up because

15   I obviously want to use the Court's time and the jury's time

16   efficiently.

17        THE COURT:  I understand.  The question it raises, if

18   we move very fast such that the jury would get the case

19   tomorrow, we need to have our charge conference this afternoon,

20   and we'll see where we are at the end of the day.

21        MR. WORTMANN:  And if we could do it at 8:30 tomorrow

22   morning, your Honor, because I can't imagine it would be

23   terribly -- I mean --

24        THE COURT:  That may be true, but at least I'd have a

25   preliminary conference to ascertain that there isn't much to

1    argue about.  All right.  Anything else?  The jurors are

2    trickling in at last report.  It's a little chaotic downstairs.

3            MR. WORTMANN:  There's a surprise.

4            THE COURT:  They seem to be arriving.  I heard the

5    lead story on the news today was the jury selection begins in

6    federal court, and I thought they were talking about the

7    King Belin case, but it turns out they weren't.  We already

8    selected the jury.

9            MR. GARRITY:  Likewise, your Honor, the news

10   reporters, they weren't looking at me.

11           MR. WORTMANN:  You know, your Honor, I'm perfectly

12   happy they're not.

13           THE COURT:  I'm very content to have -- I don't mean

14   to demean the case in any way but perfectly happy to have an

15   ordinary case as opposed to a difficult and extraordinary case.

16   All right.  Unless there's anything anybody else wants to

17   raise, I will be back in the robing room for the next 20

18   minutes or so, and as soon as we have all 14 people, we'll

19   bring everyone out.

20           THE COURT:  Do you know, is the defendant present?

21           MR. GARRITY:  I believe he is, Judge.  I dropped some

22   clothes off for him, and they didn't say he wasn't there, so I

23   believe he is in the building.

24           MR. WORTMANN:  Thank you, your Honor.

25           THE COURT:  I will bring the jury out and start, I'll

1    welcome them, and we'll get right into the opening statements.

2              THE CLERK:  All rise for the jury.

3              (JURORS ENTERED THE COURTROOM.)

4              THE CLERK:  Thank you.  Please be seated.  The United

5    States District Court is now in session, the honorable

6    F. Dennis Saylor presiding.  This is in the matter of the

7    United States vs. King Belin, Criminal Matter Number 13-10048.

8    Counsel, will you please identify yourself for the record.

9              MR. WORTMANN:  Your Honor, good morning, John Wortmann

10   for the United States.

11             THE COURT:  Good morning.

12             MR. GARRITY:  Good morning, your Honor, Paul Garrity

13   for King Belin.

14             THE COURT:  Good morning.  Good morning, ladies and

15   gentlemen.  Welcome back.  I hope you had a great holiday and

16   happy new year.  I hope those of who are fans watched a lot of

17   football.  My wife made some comments that perhaps I had

18   watched enough, which is not what I wanted to hear, but we are

19   going to begin today with opening statements.

20             The government is going to open first.  Mr. Garrity

21   has indicated he'll open as well for the defense.  Again, what

22   you hear in the openings is not itself evidence, it's a summary

23   of what the government or the parties expect the evidence will

24   be in the trial, and then we'll begin with the government's

25   witnesses.

1          All right.  Whenever you're ready, Mr. Wortmann.

2          MR. WORTMANN:  Thank you, your Honor.

3                    OPENING STATEMENT

4          MR. WORTMANN: Ladies and gentlemen, good morning.

5          ALL JURORS:  Good morning.

6          MR. WORTMANN:  As I've told you a couple of times, my

7  name is John Wortmann.  I'm an Assistant United States

8  Attorney, and I will have the privilege of representing the

9  United States of America in its prosecution of its claim

10  against King Belin.

11          Over the course of this trial, and it's only going to

12  last a couple or three days, as Judge Saylor has already told

13  you, the government will prove to you and prove to you beyond a

14  reasonable doubt that King Belin, the man sitting right over

15  there in the white shirt and the blue tie, on September 17th,

16  2012, Mr. Belin violated federal law, that is,

17  Section 922(g)(1), which prohibits somebody who has previously

18  been convicted of a felony, that is, a crime punishable for a

19  period in excess of one year for possessing a firearm or

20  ammunition.

21          And that, ladies and gentlemen, is exactly what

22  King Belin did on September 17th, 2012 in the area of

23  Norfolk Park in Mattapan, not just any gun but this one, a

24  Ruger P95DC semiautomatic, not just any ammunition, but this

25  ammunition, the eleven rounds that were in the gun, including

1    one round in the chamber, and these five additional rounds of

2    ammunition that were found in one of his pockets inside a

3    cigarette pack wrapped up in a plastic bag, that plastic bag,

4    this gun, this ammunition.

5         And over the course of the trial, you're going to hear

6    testimony from the individuals who were involved in this case,

7    and at the end, I'm going to ask you to come back and return a

8    verdict of guilty, a verdict of guilty because the evidence

9    will show you, I submit, that King Belin is guilty of the

10   offense charged, that is, being a felon in possession of the

11   firearm and ammunition.

12        Well, that's really easy to say, isn't it, but the

13   real question and the only question that matters for you is how

14   are we going to prove it?  Well, it won't be based on anything

15   that I say or anything that Mr. Garrity says because as you've

16   already heard from Judge Saylor, what the lawyers say isn't

17   evidence.

18        No, ladies and gentlemen, the government is going to

19   prove its case to you from one place and one place only, that

20   witness stand right there where you'll hear the testimony of

21   Officer Phillip Bissonnette and Officer Thomas Quinn, two of

22   the officers who secured Mr. Belin, you know, in the area of

23   Norfolk Park after he vigorously resisted Officer Bissonnette's

24   efforts to pat frisk him, that is, pat the outside of him, and

25   as Officer Bissonnette pulled the firearm from Mr. Belin's

1   waist and other officers pulled a package of cigarettes that

2   contained the additional five rounds of ammunition from his

3   pocket, on his person, in his waistband, in his pocket, that's

4   where this gun and firearm were.

5          That testimony will also include evidence from

6   officers at the Boston Police Firearm Section who test fired

7   the gun to make sure that it was in fact a firearm, that is in

8   the words of the statute, a weapon that's capable of expelling

9   a projectile by reason of explosive force, that's how Congress

10  defined it, who will tell you that the ammunition, all 16

11  rounds were certified.

12         You'll also hear testimony from an ATF agent who is

13  what's known as an interstate commerce expert, and one of the

14  elements of the crime that Judge Saylor is going to tell you

15  about is that the gun has to have a relationship to interstate

16  commerce, which is generally proven simply by showing that at

17  any time from the day it was manufactured to the day it was

18  recovered from his waistband in Mattapan that it crossed an

19  interstate line or an international boundary.

20         How did it prove that?  Well, Special Agent Kelsch

21  will tell you that this gun and all of this ammunition was

22  manufactured outside of Massachusetts based on stamps that are

23  required to be put on it, therefore, by necessity in order to

24  get to Massachusetts, it had to cross a state line, and,

25  finally, you'll hear testimony and see exhibits showing that in

1    fact prior to September 17th, 2012, Mr. Belin had been

2    convicted of a crime punishable for more than a year, another

3    of the elements of the crime, and you'll see the conviction.

4          You'll hear from his probation officer, you'll see the

5    booking sheet that matches up with the conviction, so what I'd

6    like to do for the next 10 minutes or so is tell you a little

7    bit more about what I anticipate all these witnesses will

8    testify to, again, not because what I say is evidence, you know

9    that it's not, but in the hopes that it will assist you in

10   understanding the case as it comes in.

11         Like every case, this case has a beginning, and the

12   beginning of the case really takes place on September 17th,

13   2012.  It was a summer day.  You'll hear from

14   Officer Bissonnette that it was warm and sufficiently warm that

15   he has specific recollection of wearing a shirt with a peace

16   sign on it and a pair of khaki shorts as he went out to work

17   the first half shift, which in the Boston Police Department

18   starts from about 4:45 and ends at 11:45 p.m., and he and his

19   partner, Officer Thomas Finn, were working out of District B-3,

20   which covers lower Dorchester and Mattapan.

21         They were working in what's known as a K car, which is

22   a plain clothes assignment, so they were not in uniform, they

23   were not driving a marked unit, and I already told you that

24   Bissonnette had a T-shirt and shorts on, Finn was in plain

25   clothes, and they drive a Crown Victoria, which has antennas on

1    it and is generally recognized as a police vehicle on the

2    street but which is not one of the blue and white units you

3    see.

4         They also always wear their badge on the outside

5    either around their neck or tucked into their belt, and the K

6    car, the plain clothes assignment is different in that they can

7    be a little more selective about the calls they respond to, and

8    their job is generally aimed at more serious potential

9    offenses, and you're going to learn that about 6:45 Bissonnette

10   and Finn were on -- excuse me, ladies and gentlemen.

11        THE COURT:  Do you all have a screen that works that

12   shows an image?  Okay.  Sometimes for no reason that anyone can

13   tell, some of the screens will go blank.  Let us know if that

14   happens, and we'll try to move you around so you all have an

15   active screen.

16        MR. WORTMANN:  Everyone working?

17        THE COURT:  You've got a blank one.  Standard computer

18   advice, reboot.

19        MR. WORTMANN:  When in doubt, reboot.

20        THE COURT:  Any luck?  Are you able to see, can you

21   move your chair and try to see the one?  Will that work?  Can

22   you see?  We can put you in different chairs, if need be.

23        MR. WORTMANN:  It's 6:45 at night, Bissonnette and

24   Finn are in this unmarked cruiser.  They're on Norfolk Street,

25   which is this road right here, but they're up out of the

1    picture.  Bissonnette's driving, and they're on their way to a

2    call for a person who's being troublesome in a group home, and

3    while they're driving, another call comes in, and that call is

4    for initially a fight at Norfolk Park, later then it's changed

5    or it morphs, it's not clear.

6           There are two groups of girls that might be fighting

7    in Norfolk Park, and Bissonnette, who's very familiar with

8    Norfolk Park, realizes that this is a higher priority item, so

9    he changes his direction and drives down and then turns into

10   Mildred Avenue, and you can see Norfolk Park, we've got some

11   basketball courts, a tennis court, there's a tot lot you'll see

12   right here in the pictures, and this is a field in which they

13   play a lot of soccer and do some other things, and this is

14   where right on Mildred, this is just past the intersection of

15   Norfolk Street and Mildred Avenue, which is where Bissonnette's

16   car comes to a stop, and that's the passenger door through

17   which Officer Finn got out.

18          As they're coming into the park that day, ladies and

19   gentlemen, they see the usual activity, there's people playing,

20   there's kids, but as they walk, they see coming towards them a

21   group of four or five guys, and they make a decision that

22   they're going to talk to these guys, not because they've seen

23   them do anything wrong, not because they think they've done

24   anything wrong but just to find out have you seen anything, did

25   you see anybody fighting, did you see some groups of girls,

1    things that police officers do every day in order to figure out

2    if, in fact, there's a problem.

3            So they pull into Mildred right on that spot, Finn

4    gets out, he gets out quickly, and he walks right over and

5    starts talking to the group.  Officer Bissonnette, who's

6    driving the car, takes a little bit longer to get out because

7    he's got to turn it off and take care of the car, and it turns

8    out he never gets over there.  The reason he never gets over

9    there is because when he stands up and gets out of the car, he

10   sees some things that concern him.

11           What were they?  What Bissonnette saw was that one

12   member of this group doesn't stay with the group when Finn

13   comes walking over.  One member of the group peels off and

14   starts walking right down Mildred heading towards the park in

15   that general direction, and it's curious because it appears

16   that that person didn't want to talk to the police, but, in

17   addition, Officer Bissonnette notices three things.

18           First, that young man who is King Belin has a big

19   black baggy hoodie on despite from Officer Bissonnette's

20   perception the relative warmth of the evening, and he'll tell

21   you that it's the kind of clothing that people wear when they

22   don't want bulges to be seen, when they may have something in

23   their waist or in their pockets that they don't want the police

24   to see.

25           Second, that Mr. Belin was walking quickly with his

1    head down not looking at anyone, even though this police car

2    had just pulled up, and the third thing that Bissonnette sees,

3    it's that it's King Belin, who he knows from the street, and,

4    in fact, who he had arrested several years earlier, which

5    arrest you'll learn resulted in the conviction of two offenses

6    for felonies, that is, crimes punishable for a period in excess

7    of one year, an element of the offense that's all it's there

8    for.

9        So, does Bissonnette go walking over to the group?

10   No, because this is more of concern to him, where it's someone

11   that obviously doesn't want to talk to the police.  He sees

12   Mr. Belin, and he calls out to him.  He says, "Yo, King, what's

13   up?"  What does Mr. Belin do?  He keeps walking.  He keeps his

14   head down.  At one point, he looks over, he smiles a little

15   bit.  Bissonnette decides to follow him.  He quickly catches

16   up.

17       As he gets closer to him, Mr. Belin actually turns

18   around and faces Bissonnette, and that's when Bissonnette asks

19   Mr. Belin the question, and the question is, "King, Do you have

20   anything on you that I should know about?"

21       Bissonnette will tell you he asks this question all

22   the time, and on that particular day, he asked for two reasons:

23   One, because sometimes people answer him and say, well, as a

24   matter of fact, I have this, but almost more importantly, he's

25   looking to see the reaction.

1          People who have something on them tend to be nervous.

2     People who are nervous react in certain, you know, definable,

3     repetitive ways, so he says, "Do you got anything on you?"  And

4     he's watching Mr. Belin, and what does he see, ladies and

5     gentlemen?  First, that smile that he saw earlier, all of a

6     sudden, his face has become lowered, it becomes crest-fallen.

7     All of a sudden, he's breathing heavily, and he's looking over

8     his shoulder, and he actually starts to back up a ways, and

9     Bissonnette thinks he's going to run.

10          So, what does he do?  He makes the decision he's going

11     to perform a pat frisk because he's concerned there might be a

12     weapon involved, and, again, the pat frisk is nothing more than

13     a patting down the outside of somebody's clothes to see if

14     there's any unusual bulges or items that could be weapons that

15     could be dangerous either to the officer or to the person who

16     has them.

17          And what happens when Bissonnette goes to perform the

18     pat frisk?  He reaches out with his hands and goes into the

19     waist, and what does Mr. Belin do?  He immediately goes for his

20     own waist.  Bissonnette will tell you that was of significant

21     concern to him.

22          Bissonnette was able to grab Mr. Belin's hands, bring

23     them up to the waist, and he's telling him, "King, relax, I

24     just want to frisk.  You know, you know me, if you don't have

25     anything, it's no problem, relax, relax your arms, and just let

1   me do this."

2           And what happens, it only increases Mr. Belin's

3   resistance as he continues to try to get his hands down by his

4   waist.  Now, by this time other officers have come onto the

5   scene, and ultimately three other officers come over to assist,

6   including Officer Finn, Officer Bissonnette's partner, and the

7   more people that come, the more resistance there is from

8   Mr. Belin, and ultimately they end up backing up right onto

9   that electrical panel that you see there.

10          By this time, Officer Finn is joined, and while

11  they're over there, and Mr. Belin is crouched down like this

12  trying to go for his waist again, ultimately all of them go

13  onto the ground, and being on the ground enables them to get

14  control of Mr. Belin's hands and arms, which is what the whole

15  thing is all about so that everybody is going to be safe.

16          They get his arms, they handcuff him, and as

17  Officer Bissonnette rolls him over, the hoodie part rolls up,

18  and what does he see?  Obviously, the magazine was in, but he

19  sees this gun tucked in his waistband.  He removes the gun, he

20  yells, "gun," Mr. Belin's placed under arrest, he's searched on

21  scene, and one of the officers whose -- two of the officers who

22  were doing, assisting in the search of Mr. Belin, Officer Velez

23  and Officer Finn, who you'll hear from, and Officer Finn will

24  tell you that he saw Officer Velez take a cigarette pack out of

25  the front pocket of Mr. Belin, and Velez hands it to Finn, and

1    Finn notices something.  It's much too heavy for cigarettes.

2    He opens it up, and what does he see but a plastic bag with

3    five more bullets.  The plastic bag, five more bullets.

4         Well, once the firearm is recovered, there are certain

5    procedures that are followed at the Boston Police Department.

6    The first one is to get detectives on scene, and it's the job

7    of the detectives to photograph the scene, photograph the gun,

8    take the gun, make it safe, and that is to make sure that

9    there's not a round in the chamber that could accidently go

10   off, and then they're responsible for going down, taking the

11   gun, and after fuming the gun, and you'll hear a little bit

12   about that.

13        And basically all fuming is, they have like a fish

14   tank down at the district, and there's a heating element in it,

15   and you put Super Glue on the heating element, and you put the

16   gun in the magazine, and you heat it up, and fumes are formed,

17   and those fumes deposit on the gun, and it helps to accentuate

18   and stabilize any fingerprints that might be on the gun, and

19   that's one of the things that Officer Kevin Magoon did that

20   night after he had made the gun safe, that is, by removing the

21   round that was in the chamber and the 10 rounds that were in

22   the magazine of the gun.

23        And he will tell you how he did all these things, he

24   prepared a box, put the gun and the magazine and the ammunition

25   into it, and it got to sent up to other groups within the

1    Boston Police Department for further evaluation.

2         One of those is, is it a real gun, and you will hear

3    from Firearms Examiner Nina Jefferson who will tell you that

4    she took this gun, she put a bullet into it, she cocked it

5    back, I believe she did it twice, and fired it into what they

6    have, which is a large tank of water, and when she pulled the

7    trigger with ammunition in it, the gun went off, meaning that

8    is in fact a firearm.

9         She also examined the ammunition, certified it that it

10   is in fact ammunition.  It was then sent to the latent print

11   unit which further processed the gun, and they were able to

12   locate two things:  First, they were able to locate a

13   fingerprint of Mr. Belin's left thumbprint on the magazine;

14   and, secondly, they were also able to find and locate and

15   identify a fingerprint that was Mr. Belin's left thumbprint off

16   of the bag that contained the five rounds of ammunition that

17   were in his pocket, so ballistics, latents.

18        And, lastly, you'll hear from Officer Kelsch, ladies

19   and gentlemen, with respect to the gun, who will tell you that,

20   as I have indicated, it was manufactured outside of

21   Massachusetts, meaning that it has the necessary nexus with

22   interstate commerce.

23        Finally, ladies and gentlemen, you'll also hear from

24   Brandon McClellan, who is a probation officer who currently

25   works in Brockton but who used to work in Suffolk County, and

1   he will tell that you in 2010, 2011, he was working in Suffolk

2   Superior Court and that he was responsible for supervising

3   King Belin while he was on probation and while he was on

4   probation for two convictions, both of which, the same two

5   convictions that Officer Bissonnette arrested him for that were

6   both crimes punishable for a period in excess of one year,

7   okay, felon in possession of a firearm and ammunition.

8           You'll hear evidence as to every one of those elements

9   from the people who did the work, from the people who recovered

10  the gun, and at the end of the case, I will come back and ask

11  you to find King Belin guilty because that I submit to you,

12  respectfully, ladies and gentlemen, is what the evidence will

13  show.

14          THE COURT:  Thank you, Mr. Wortmann.  Before we get to

15  the defendant's or defense counsel opening, let me give you a

16  caution.  The fact that the defendant may have been arrested on

17  an earlier occasion or convicted of a crime is relevant in

18  certain narrow ways and may be considered by you as evidence.

19          I'll explain to you at the appropriate time what the

20  limitations are on that evidence, but there's a danger here

21  that you might conclude that because he may have been arrested

22  before or may have been convicted of a prior crime that he must

23  be a bad person or have a bad character and, therefore, he must

24  be guilty of this crime.

25          You may not do that.  That's improper and unfair.  The

1    fact that someone committed a crime in the past or even

2    multiple crimes does not mean that a person committed the crime

3    with which he is charged.

4         This case has to be decided on its own facts, and you

5    may not consider evidence that the defendant was arrested or

6    convicted earlier as evidence that he somehow is a bad person

7    or has a bad character, because he was convicted in the past,

8    he must be guilty of this crime or that he's more likely to

9    have committed this crime.  You cannot convict the defendant on

10   that basis.  You may convict him only on the evidence in this

11   case and the law as I instruct you at the end of the case.

12        With that, Mr. Garrity.

13                         OPENING STATEMENT

14        MR. GARRITY:  Thank you.  Good morning.  I know it's

15   been a couple weeks, so I'm going to reintroduce myself.  I

16   already did that this morning when I said good morning to the

17   Judge, but I'll do it again.  My name is Paul Garrity.  I

18   represent King Belin.

19        What the prosecutor just told you is a promise of what

20   he's going to produce, but it's a promise that's unlike any

21   other promise that most of us make.  It's a promise he has to

22   keep to you beyond a reasonable doubt.

23        He's got to prove to you beyond a reasonable doubt

24   that Mr. Belin knowingly possessed a firearm and knowingly

25   possessed ammunition after having been convicted of a prior

1   offense, and I would suggest to you that the evidence you'll

2   hear during the course of this trial will show it's a promise

3   he can't keep, that there will be reasonable doubt, and that

4   doubt will come in a number of forms.  It will come from

5   evidence that wasn't obtained by the police in this case.

6          You'll hear that Officer Bissonnette and Officer Finn

7   go down Norfolk Street.  They're responding to a fight, a radio

8   call for a fight among girls on the corner of Norfolk Street

9   and Fessenden Street across the street from where they pull

10  into.  They see four individuals walking down Norfolk Street

11  and pull into not to Fessenden Street but onto Mildred Avenue

12  for some reason, they pull into Mildred Ave., cut right in

13  front of these five individuals.

14         You'll hear from Officer Bissonnette that he didn't

15  really see these people for all that long a period of time, so

16  he can't tell you whether they were all together.  In any

17  event, Mr. Belin walks in front of the cruiser.  Within

18  seconds, Officer Bissonnette is grabbing Mr. Belin and

19  searching him.

20         What they don't do, what the police don't do is they

21  do not interview the four other individuals to get a statement

22  from them in terms of what they observed.  The other officer

23  that allegedly was involved with Officer Bissonnette in

24  arresting and pushing Mr. Belin up against that brown box that

25  you may have seen in that photograph, Officer Bridges, the

1    government, for whatever reason, won't produce him, won't call

2    him to testify to you.  He did not write a report, you'll hear.

3              You'll hear that Officer Velez, the officer who

4    obtained supposedly this pack out of Mr. Belin's pocket, again

5    allegedly, they won't call him, for whatever reason.  He didn't

6    write a report.

7              You'll hear that there were other individuals in the

8    park.  There's a playground right by where Mr. Belin was

9    arrested and taken into custody.  You'll hear from

10   Officer Bissonnette and Officer Finn there were a number of

11   individuals in that park.  They do not interview them, they

12   don't get statements from them in terms of what they may

13   observed, and Officer Finn himself didn't see any of the

14   interaction between Officer Bissonnette and Mr. Belin.

15             It's only Officer Bissonnette that will tell you his

16   version of what supposedly took place, and you'll hear the

17   version that was just given to you by the prosecutor won't

18   match up in a number of ways with the report that was drafted

19   in this case, and the report wasn't drafted by

20   Officer Bissonnette, it was drafted by Officer Finn.

21             You'll hear that that didn't comply with the Boston

22   Police Department procedures.  Boston PD officers are given

23   rules and procedures.  You'll hear that they weren't complied

24   with in a number of respects in this case.

25             You'll also hear that the officers did not get or try

1    to get access to videotape.  There's a photograph you'll see

2    during the course of this trial of Norfolk Park.  Norfolk Park

3    has the playground next to it.  There's a couple of basketball

4    courts.  Next to that, there's a tennis court.  In between the

5    two basketball courts within a short distance of where

6    Mr. Belin was arrested, there's a video camera.  You'll see it

7    in the photographs.  The police did not attempt in any way to

8    get video footage from that camera, so the only person you're

9    going to be able to rely upon, if at all, is

10   Officer Bissonnette.

11         You'll also hear that the Boston PD did not try to

12   obtain DNA evidence off of the gun.  They say that there's

13   fingerprints.  Well, they didn't try to get DNA off of it.

14   You'll hear that the Super Gluing makes it easier to obtain

15   DNA.  They didn't make attempts to do that.

16         Again, you're going to hear that they didn't comply

17   with their own procedures, and the fingerprints, I would

18   suggest to you, is somewhat odd and overly convenient.  It's

19   odd in the fact that of all the fingerprints, they get two left

20   thumbprints off of two items, the cartridge and the plastic bag

21   that I submit you'll hear during the course of the trial don't

22   ordinarily leave fingerprints.

23         So you're going to hear some I would submit to you

24   somewhat odd and very convenient evidence for the government

25   with respect to the fingerprints, and you'll hear other

1    evidence with respect to the fingerprints that will suggest to

2    you should cause you to doubt the government's case, so

3    sometimes things don't appear as they may seem on initial view.

4         In other words, pretty easy case for the government to

5    argue to you:  Mr. Belin's arrested, supposedly a gun and

6    ammunition in his pocket, been previously convicted, piece of

7    cake, convict him.

8         I would argue to you if you look behind the surface,

9    look at what the police didn't do in this case, look at what

10   they didn't obtain, what they won't present to you.  I would

11   submit to you that you're going to see that there's reasonable

12   doubt in this case and that the government will not be able to

13   keep their promise to you that they can prove to you beyond a

14   reasonable doubt that Mr. Belin knowingly possessed the firearm

15   and ammunition, and as a result at the end of this case, I'm

16   going to ask that you find Mr. Belin not guilty.  Thank you.

17        THE COURT:  Thank you, Mr. Garrity.  All right.

18   Mr. Wortmann.

19        MR. WORTMANN:  Your Honor, may we move the podium out

20   of the way?

21        THE COURT:  Yes.

22        MR. WORTMANN:  Thank you.  Your Honor, before calling

23   the first witness, I'd simply like to move a number of business

24   records into evidence.  The first such record is a certified

25   copy of Superior Court Conviction 2009-10693, which has been

1    marked for identification as Exhibit 3, and I would offer that

2    as Exhibit 3.

3              THE COURT:  Exhibit 3.  All right.  Mr. Garrity.

4              MR. GARRITY:  Can I have one second, your Honor?

5              THE COURT:  Yes.

6              MR. GARRITY:  No objection, your Honor.

7              THE COURT:  All right.  Exhibit 3 may be admitted.

8              (Exhibit No. 3 was admitted into evidence.)

9              MR. WORTMANN:  Secondly, your Honor, are three booking

10   sheets generated by the Boston Police Department.  Exhibit 4.1

11   is a booking sheet dated April 29th, 2009 in the name of

12   King Belin, and I would offer that as Exhibit 4.1.

13             MR. GARRITY:  No objection.

14             THE COURT:  All right.  It may be admitted,

15   Exhibit 4.1.

16             (Exhibit No. 4.1 was admitted into evidence.)

17             MR. WORTMANN:  Second is a booking sheet dated

18   September 17th, 2012, which has been marked for identification

19   as Exhibit 4.2.

20             MR. GARRITY:  No objection.

21             THE COURT:  All right.  It may be admitted 4.2.

22             (Exhibit No. 4.2 was admitted into evidence.)

23             MR. WORTMANN:  Third is a booking sheet dated

24   September 10th, 2007, which has been marked for identification

25   as Exhibit 8.1.

1          THE COURT:  Mr. Garrity.

2          MR. GARRITY:  No objection, your Honor.

3          THE COURT:  All right.  It may be admitted 8.1.

4          (Exhibit No. 8.1 was admitted into evidence.)

5          MR. WORTMANN:  Lastly, your Honor, a fingerprint card

6   of King Belin, Jr. dated September 10th, 2007, which has been

7   marked for identification as Exhibit 8.2.

8          THE COURT:  Mr. Garrity.

9          MR. GARRITY:  One second, your Honor.

10         THE COURT:  Yes.

11         MR. GARRITY:  Judge, just my prior objection.

12         THE COURT:  The objection is overruled.  It may be

13   admitted 8.2.

14         MR. WORTMANN:  Thank you, your Honor.  May I approach

15   the clerk, please?

16         THE COURT:  Yes.

17         (Exhibit No. 8.2 was admitted into evidence.)

18         MR. WORTMANN:  Your Honor, the government calls

19   Officer Phillip Bissonnette to the stand.

20         THE COURT:  While he's doing that, let me give the

21   jury an instruction on the purposes for which you may use this

22   evidence.  Again, the fact that the defendant may have been

23   arrested or convicted of a crime on an earlier occasion may be

24   relevant.  It may be considered by you as evidence but only in

25   a narrow way.  When people are arrested, it's customary for

1    them to be booked.  The booking process normally includes the

2    arrestee giving identifying information:  name, date of birth.

3    Normally they're photographed, normally they're fingerprinted.

4         The government is, as I understand it, introducing

5    evidence of booking sheets and fingerprint cards for the

6    purpose of establishing identifying information about the

7    defendant.  In other words, the government seeks to show that

8    the fingerprints found on the gun or the ammunition are the

9    defendant's fingerprints.

10        You can accept or reject that evidence as you see fit,

11   but you may consider it again only for the purpose of

12   identifying the defendant or connecting him to those

13   fingerprints.  Again, you may not consider that information as

14   proof that the defendant is a bad person, has a bad character

15   or the fact that he has been arrested in the past makes it more

16   likely or more certain that he committed this crime.

17        The government has also introduced evidence of a prior

18   conviction.  That's part of the offense here.  Again, I'll give

19   you instructions on this, but the gist of the offense is that

20   if you have a previous conviction for a felony, for a crime

21   that's punishable by more than one year in prison, you're not

22   thereafter permitted to possess a firearm or ammunition.

23   That's a crime, so the government is introducing evidence of

24   the prior conviction in order to establish that the crime

25   occurred.

1          Again, there's a danger here that you might conclude

2     that because he was convicted in the past, he must be a bad

3     person, must have a bad character, must be more likely to have

4     committed this offense, and, again, you cannot do that.  You

5     may consider it only for the limited purpose of establishing

6     that the defendant, in fact, did have a prior conviction before

7     he possessed the firearm or ammunition as the government

8     alleges.

9          All right.  With that, you may take the stand, sir.

10          OFFICER BISSONNETTE:  Good morning, your Honor.

11          MR. WORTMANN:  Your Honor, may I recover the exhibits,

12     please?

13          THE COURT:  Yes.

14          PHILLIP BISSONNETTE, having been duly sworn by the

15     Clerk, testified as follows:

16                        DIRECT EXAMINATION

17     BY MR. WORTMANN:

18     Q.   Good morning, sir.  Could you tell us your name, please.

19     A.   Good morning.  My name is Officer Phillip Bissonnette.

20     Q.   Where do you work, sir?

21     A.   I work for the Boston Police Department.

22     Q.   For how long?

23     A.   Approximately seven and a half years.

24     Q.   And approximately when did you get out of the academy?

25     A.   Approximately December, 2007.

1    Q.    And could you describe in a summary fashion the postings

2    that you had since going out on the street as a sworn officer?

3    A.    Sure.  Upon graduating police academy, I worked for a

4    couple months down at District 4 as a walking beat for the

5    holidays.  After that, I was transferred to District 3 which

6    covers Dorchester, Mattapan.

7    Q.    How long were you assigned to District B-3?

8    A.    I was assigned there for five years.

9    Q.    Where are you assigned now?

10   A.    I'm currently assigned to Youth Violence Strike Force.

11   Q.    How long have you been with Youth Violence Strike Force?

12   A.    Just over two years.

13   Q.    And focusing your attention on September 17th of 2012,

14   where were you assigned?

15   A.    At that time I was assigned to District 3.

16   Q.    So that's before your transfer to the Youth Violence

17   Strike Force?

18   A.    Yes.

19   Q.    And is that a transfer that you applied for?

20   A.    It is.

21   Q.    When you first got to District B-3, what were your duties?

22   A.    When I first got to District 3, I was assigned to a

23   uniform patrol, which is a more reactive patrol.  By reactive

24   patrol, I mean responding to 9-1-1 calls primarily.

25   Q.    And over time, did your responsibilities change?

1    A.   They did.

2    Q.   How?

3    A.   Eventually I was assigned to the anti-crime car, which is

4    uniform patrol.  It's more of a proactive patrol.

5    Q.   And commonly referred to as the K car?

6    A.   Yes.

7    Q.   And that's an assignment that involves plain clothes?

8    A.   Yes.

9    Q.   Now, even when you're in plain clothes, do you wear

10   anything indicating you're a police officer?

11   A.   I do, I always have my badge around my neck.  I also wear

12   gun and other equipment around my belt.

13   Q.   It's also an assignment that you do not use blue and white

14   marked cruisers?

15   A.   Correct.

16   Q.   What kind of cars do you use?

17   A.   We use, it's a Crown Victoria, but it's subdued.  It still

18   has lights and antennas and things like that.

19   Q.   And how many shifts have you driven that kind of car

20   around the streets of Boston?

21   A.   For about the last five years.

22   Q.   And fair to say that they are easily recognizable as

23   police vehicles on the street?

24   A.   Yes.

25   Q.   Officer Bissonnette, if I can, I'd focus to you in on

1     September 17th of 2012, and let me ask first whether you were

2     working that day?

3     A.    I was working.

4     Q.    And do you recall what your assignment was?  Was that

5     during the uniform portion of your time at B-3 or while you

6     were in a K car?

7     A.    I was plain clothes, anti-crime car.

8     Q.    Did you have a partner that day?

9     A.    I did, Officer Thomas Finn.

10    Q.    What shift were you working?

11    A.    We were working the first half shift, which runs from

12    4 p.m. to 11:45.

13    Q.    So you start at four in the afternoon, and it runs to

14    almost midnight?

15    A.    Correct.

16    Q.    Do you recall what the weather was like that day?

17    A.    It was a typical warm September afternoon.

18    Q.    And do you recall, do you have a specific recollection as

19    to how you were dressed that day?

20    A.    I do.  That evening I was wearing a white T-shirt, it had

21    a peace sign on it as well as khaki shorts.

22    Q.    And then your badge on a chain?

23    A.    Yes, around my neck.

24    Q.    And let me focus you on the time right around 6:45 p.m.

25    Do you recall where you were?

1    A.    I do.  We were on Norfolk Street in Mattapan.

2    Q.    And I'm going to put a chalk on the document camera and

3    ask you, sir, first, do you recognize the area depicted by this

4    aerial map?

5    A.    I do, this is the area of Norfolk Street around

6    Norfolk Park.

7    Q.    Okay.  I wonder if you could just outline for us the area

8    that is Norfolk Park?

9    A.    Sure, right in here.  (Witness drawing on diagram)

10   Q.    What kind of facilities are at Norfolk Park?

11   A.    They have a tot lot, they also have a couple basketball

12   courts, a tennis court and they have a large field.

13   Q.    And the tot lot, could you just put a Number 1 on?

14   A.    Sure, right there.  (Witness drawing on diagram)

15   Q.    Okay.  That works.  How about the two basketball courts?

16   A.    Right here.  (Witness drawing on diagram)

17   Q.    And the tennis court?

18   A.    (Witness drawing on diagram)

19   Q.    The field is obviously the area below?

20   A.    Yes, right here.

21   Q.    And this large building that's just below the circle, do

22   you know what that is?

23   A.    That's the Mildred Ave. School.

24   Q.    It's a middle school?

25   A.    Yes.

1    Q.   Okay.  And fair to say that are you familiar with this

2    area?

3    A.   I am.

4    Q.   From prior calls?

5    A.   Yes.

6    Q.   And as a general matter, especially during the summer

7    months, is this facility used by a large number of people?

8    A.   It is used by a large number of people, especially at that

9    time of year, people from all ages.

10   Q.   Now --

11        MR. WORTMANN:  Your Honor, may I approach the witness

12   just for a second, please?

13        THE COURT:  Yes.

14        (Exhibit A was admitted into evidence.)

15   Q.   I'm just going to ask you to look at these photos and ask

16   you whether you recognize them to be fair and accurate

17   depictions of the area around Norfolk Park as it appeared on

18   September 17th, 2012?

19   A.   Yes.

20   Q.   Okay.

21   A.   They are.

22        MR. WORTMANN:  Your Honor, at this time I'd offer

23   Exhibits 5.2 to 5.7 into evidence.

24        MR. GARRITY:  No objection.

25        THE COURT:  All right.  Exhibits 5.2, 5.3, 5.4, 5.5,

1  5.6, 5.7 are admitted.

2        (Exhibit Nos. 5.2, 5.3, 5.4, 5.5, 5.6, 5.7 was

3  admitted into evidence.)

4        MR. WORTMANN:  Thank you.

5  Q.    Do you know when these pictures were taken?

6  A.    That night.

7  Q.    Do you know who took them?

8  A.    Detective Magoon.

9  Q.    So Exhibit 5.2 is just a sign a street sign located at

10  that corner?

11  A.    Yes.

12  Q.    And could you explain, just put an X exactly what we are

13  looking at?

14  A.    Sure, it's actually right here where it's marked A, it

15  would be that intersection there.

16  Q.    Now, the road coming down there, what's the name of that

17  street?

18  A.    This here is Fessenden Street.

19  Q.    And then immediately on the other side of Norfolk Street,

20  does it change names?

21  A.    Yes, that's Mildred Ave.

22  Q.    Okay.  And showing you what's been marked or introduced as

23  Exhibit 5.3, do you recognize that picture?

24  A.    That's a picture of Norfolk Street in a north direction.

25  Q.    So we're looking -- we'd be looking into the city?

1    A.    Yes.

2    Q.    And can you just point out the areas of the park?

3    A.    Sure, so back here you can see the basketball hoops, to

4    the direct right would be where the tot lot is, and then

5    further right would be the open field.

6    Q.    And Exhibit 5.4, what do we see here?

7    A.    This is Norfolk Street as well in the opposite direction.

8    On the left here, you can see where the police cruisers are,

9    that's Mildred Ave. and to the far left would be the tot lot.

10   Q.    And where would the Mildred Ave. School be?

11   A.    It would be like the left is going in here.

12   Q.    And Exhibit 5.5?

13   A.    That's a picture of the tot lot and Norfolk Park.

14   Q.    And that's right at the corner of Mildred and Norfolk?

15   A.    Yes.

16   Q.    And, finally, for the moment photograph 5.6?

17   A.    Here you can see inside the tot lot, you can see the

18   slides, and there's like a little gazebo in the back, and on

19   the left, you can see the basketball courts.  To the right

20   would be Mildred Ave. and the Mildred Ave. School.

21   Q.    And the little road we see right at the bottom left-hand

22   corner, that would be Norfolk Street?

23   A.    Yes.

24   Q.    Putting Exhibit A back on, so 6:45 you're on patrol with

25   Officer Finn, and do you remember what you were doing, where

1   you were headed?

2   A.    At that time we were headed to a radio call on Walk Hill

3   Street.

4   Q.    And what was the nature of that call, if you remember?

5   A.    The nature of that call, it was a call to remove a guest

6   from a group home, an unruly guest.  We were on our way to that

7   call.

8   Q.    And did you make it to that call?

9   A.    We did not.

10  Q.    Why not?

11  A.    We heard another call broadcast over the radio.

12  Q.    And what's your recollection of that call?

13  A.    It was a broadcast for a group fighting in the

14  Norfolk Park area.

15  Q.    Now, since the incident took place on September 17th, have

16  you had an opportunity to go back and listen to the radio

17  calls?

18  A.    I have.

19  Q.    And did you hear additional information that you don't

20  recall picking up as you were out on the street that night?

21  A.    Yes, after the initial call for the group fighting, it was

22  updated as possible females fighting.

23  Q.    And let me ask you, had you realized that it was a group

24  of girls potentially fighting, would that have changed your

25  actions in any way?

1    A.    No.

2    Q.    Why not?

3    A.    No matter when there's a fight, there's a potential for

4    injury, and it's a call that we take seriously.

5    Q.    Particularly in this area?

6    A.    Yes, particularly in that area.

7    Q.    So, after hearing this call for a potential fight, what

8    did you do?

9    A.    At that time we decided that that was a more important

10   call, and we headed in that direction.

11   Q.    And could you indicate on the map how you got into the

12   area, please?

13   A.    Sure.  We were on Norfolk Street just out of view of this

14   map, and we headed in this direction.  Oops, sorry, I don't

15   know what I did.  We were headed down Norfolk Street

16   southbound.  Sorry.

17              MR. WORTMANN:  Can we clear that again?

18              THE COURT:  That happens when you touch the screen.

19   A.    We were on Norfolk Street which is a street next to the

20   park, and we were headed in a southbound direction.

21   Q.    And where did you stop your car?

22   A.    We stopped our car on Mildred Ave.

23   Q.    Okay.  And showing you what's been marked as Exhibit 5.7,

24   do you recognize that picture?

25   A.    That's a picture of the car that we were in that evening,

1    and that's exactly where we stopped.

2    Q.   Was there a reason that you took a left onto Mildred than

3    rather took a right onto Fessenden?

4    A.   Yes.

5    Q.   Why?

6    A.   While we were en route to the call, we observed a group of

7    about five males that were walking towards us on the sidewalk.

8    Q.   Did you recognize any of those men when you first saw

9    them?

10   A.   No.

11   Q.   Did you have any reason to think that they had been

12   engaged in any illegal conduct?

13   A.   No.

14   Q.   So what was the significance of them being there?

15   A.   At that point we didn't really know what the significance

16   was.  We stopped the car to get out and speak with them, just

17   to determine whether or not they were witnesses, whether they

18   were participants in the fight or if they were involved in any

19   way.

20   Q.   The kind of thing you do every day?

21   A.   Yes.

22   Q.   Who was the first person out of the car?

23   A.   Officer Finn exited the passenger side.

24   Q.   And where did he go?

25   A.   He went up Norfolk Street to the sidewalk where the group

1    was walking towards us.

2    Q.   And did you get out of the car?

3    A.   I did.

4    Q.   And did you join Officer Finn in speaking to the group of

5    males?

6    A.   No.

7    Q.   Why not?

8    A.   As I exited the driver's side and began making my way to

9    the sidewalk, I observed that one of the males had broken away

10   from the group and began walking down Mildred Ave.

11   Q.   Now, when you say broken away from the group, what caused

12   you to think that they were part of the group?

13   A.   We observed them just walking in a line down Norfolk

14   Street.  It was quite obvious to us that they weren't just a

15   group walking.

16   Q.   So the fact that this individual -- did he break away from

17   the group after Officer Finn approached?

18   A.   It was almost simultaneously.  As we stopped, pulled up

19   the cruiser, four of the males stopped on the sidewalk, and

20   this particular male just continued to walk.

21   Q.   Was that out of concern to you?

22   A.   It was.

23   Q.   Why?

24   A.   This was something we've seen in the past.  It just

25   appeared to us at that point maybe the reason he broke from the

1    group is he didn't want to speak with the police, and he was

2    trying to avoid us.

3    Q.   Now, as this individual got closer to you, did you notice

4    anything else that you considered to be significant?

5    A.   I observed that he was walking quickly with his head down.

6    I also noticed that he was wearing a dark hoodie, a very heavy

7    and baggy hoodie.

8    Q.   All right.  Let me ask you about the first one.  So you

9    had just pulled into the intersection of Norfolk and Mildred,

10   and this individual walked right by you without making eye

11   contact?

12   A.   Yes.

13   Q.   Without looking at you?

14   A.   Yes.

15   Q.   Did he maintain a stare straight down?

16        MR. GARRITY:  Judge, I'd object, leading.

17        THE COURT:  Sustained.

18   Q.   How were his eyes directed?

19   A.   As he was walking, he had his head down, he was staring at

20   the street, just looking down, not making eye contact or

21   looking in my direction.

22   Q.   And how would you describe the pace of his walking?

23   A.   He was walking a very quick pace.

24   Q.   Now, you also mentioned that he was wearing a black

25   hoodie.  Could you describe that in a little more detail,

1    please?

2    A.    Sure.  It was a very baggy hooded sweatshirt, had a hood

3    on it.

4    Q.    Was that of concern to you?

5    A.    It was.

6    Q.    Tell us why.

7    A.    Sure.  First and foremost, it was unsuitable for the

8    weather.  That told me that maybe he was wearing it trying to

9    conceal something underneath.  Typically we see on the street

10   that, you know, if it's a summer night and someone is wearing a

11   hoodie, there's a reason for that, and oftentimes it's because

12   they're hiding something underneath.

13   Q.    Could be other reasons as well?

14   A.    Yes.

15   Q.    But it was something that you were interested in?

16   A.    It was.

17   Q.    As this individual got closer, did you recognize him?

18   A.    I did.

19   Q.    Who was he?

20   A.    I recognized him as King Belin.

21   Q.    And do you see the individual who you recognized as

22   King Belin and who was walking in front of you on Mildred Ave.

23   on September 12th, 2014, is he in the courtroom?

24   A.    Yes, he is.

25   Q.    Would you point him out for the record and indicate what

1    he's wearing?

2    A.    Sure.  He's seated over there wearing a white button-down

3    shirt and a tie.

4          MR. WORTMANN:  Your Honor, could the record reflect

5    that Officer Bissonnette has indicated the defendant,

6    King Belin?

7          THE COURT:  Yes.

8    Q.    Now, you said you knew Mr. Belin?

9    A.    Yes.

10   Q.    And in what way?

11   A.    I've seen him in the past, I've spoken with him in the

12   past as well as I've arrested him in the past.

13   Q.    Okay.  And after making these observations, after

14   recognizing and realizing who it was, what, if anything, did

15   you do with respect to Mr. Belin?

16   A.    At that point I called out to him.

17   Q.    And what, if anything, did you say to him?

18   A.    I said, "Yo, King, what's going on?"

19   Q.    And how far away from you was he when you said that?

20   A.    I would estimate about 10 feet.

21   Q.    And what was your tone of voice?

22   A.    Just a regular conversational tone of voice.

23   Q.    Question mark or exclamation mark at the end of the

24   sentence?

25   A.    Question mark.

1    Q.    Did you believe you had said it loud enough for him to

2    hear you?

3    A.    Yes, because actually when I said it, he did look at me

4    and give me kind of a slight smile and continued to walk.

5    Q.    Did he slow down at all?

6    A.    No.

7    Q.    So, at that point, given the fact that he's continuing to

8    walk, what, if anything, did you decide to do?

9    A.    At that point I decided to attempt to speak with him, I

10   sped up a little bit, and as I neared him, he stopped and

11   turned in my direction.

12   Q.    And looking at this Exhibit 5.7 that's on the document

13   camera, can you tell us kind of where it was you two met?

14   A.    Sure.  He was walking on the sidewalk towards the front of

15   my cruiser, almost towards the entrance to the park.  We ended

16   up stopping and meeting just in the middle of the street almost

17   where you can see this patch of different cement on the

18   sidewalk there, on the street, rather, maybe 10 or 15 feet in

19   front of my cruiser.

20   Q.    Okay.  And when he turned around to speak to you, had you

21   said anything to him other than, "Yo, King, how are you doing,

22   what's up?"

23   A.    No.

24   Q.    Had you placed your hands on him in any way?

25   A.    No.

1    Q.    When he turned to you and approached you, how far were you

2    from him?

3    A.    About an arm's length, and then we stopped.

4    Q.    And did you say something further to him at that point?

5    A.    Yes.

6    Q.    What did you say?

7    A.    At that point I asked him if he had anything on him.

8    Q.    Is that a phrase you use regularly on the street?

9    A.    It is.

10   Q.    And when you ask somebody whether they have anything on

11   them, why are you asking that question, Officer Bissonnette?

12   A.    It's actually for several reasons:  First of all, I want

13   to know if he has something on him, a weapon or drugs.

14   Secondly, I want to see what his reaction is to the question.

15   Q.    What do you mean by that?

16   A.    Typically somebody that does have something will have a

17   different reaction than somebody who is just say walking down

18   the street.  A lot of times that question will get a nervous

19   response.

20   Q.    Okay.  And can you tell us what Mr. Belin's reaction was

21   when you asked him in the middle of that street if he had

22   anything on him?

23   A.    Sure.  After I asked him that question, his whole demeanor

24   immediately changed.  I saw his face almost drop.  He took one

25   deep breath, and then he began breathing nervously, almost like

1    quick.

2    Q.    Tell us more about the change in the facial expression.

3    A.    Sure.  As soon as I asked him the question, it was almost

4    like his face just dropped.  You could tell, it was almost like

5    I would say a deer in the headlights.  At that point I knew

6    something was up.  Normally because his facial expressions and

7    because he took that real quick deep breath.  It was obvious to

8    me that he was nervous.

9    Q.    Did he take any -- did he make any movements that were of

10   concern to you?

11   A.    He did.

12   Q.    Tell us.

13   A.    Almost immediately he looked over his shoulder, and he

14   took one step back.

15   Q.    Okay.  Now when you say over his shoulder, show us how.

16   A.    Sure.  So we were standing, I was in front of him, and he

17   almost went like this.  (Indicating)

18   Q.    And was that of concern to you?

19   A.    It was concerning to me.  At that point, I believe that

20   maybe he was making a decision to run away.

21   Q.    And when did he take the step back?

22   A.    At the same time he looked back and took one step.

23   Q.    And at that point did you make an investigative decision

24   as to what you were going to do?

25   A.    Yes.

1    Q.   And what was that?

2    A.   At that point I was concerned that he did indeed have

3    something on him, and I made a decision that I was going to

4    frisk him.

5    Q.   Could you explain to the jury what a pat frisk is, please.

6    A.   Sure.  A pat frisk is it's a pat-down of the outer most

7    clothing in search for a weapon.

8    Q.   And can you tell the jury how it was that you put your

9    decision, that is, to do a pat frisk into effect?

10   A.   Sure.  I actually reached out and grabbed Mr. Belin with

11   one hand while reaching for his waistband.

12   Q.   And when you did that, when you moved your hand towards

13   his waistband, what happened?

14   A.   As soon as I moved my hand towards the waistband, his hand

15   dropped to his waistband.

16   Q.   Was that motion, was that of concern to you?

17   A.   At that point I was very concerned for my safety, yes.

18   Q.   Why?

19   A.   I believed he had a weapon.

20   Q.   And what would make you think that he had a weapon in his

21   waistband?

22   A.   More specifically, his reaction to me trying to frisk that

23   area was him dropping his hand to that area.

24   Q.   And the guns you recovered on the street, are they

25   generally people wearing holsters?

1    A.   No.

2    Q.   Where are guns usually found?

3    A.   Usually they are found unsecured nonholstered in a

4    waistband.

5    Q.   Pockets, too?

6    A.   Pockets, too.

7    Q.   So he goes down to the waist, and what do you do in

8    response?

9    A.   In response to that, I grabbed both of his hands, and I

10    brought them up to our chest, and at that point I told him to

11    relax, and I kept telling him to relax.  I said, "King, you

12    know me, if you don't have anything, there's nothing to worry

13    about."

14    Q.   And did he relax?

15    A.   No.

16    Q.   What did he do?

17    A.   At that point, we were almost kind of like in a standoff

18    with our hands up against our chest, and I was talking to him

19    the whole time, and it was just a struggle.  He was just trying

20    to reach down.  I just kept his hands up here.  At that point

21    another officer came over to assist me.

22    Q.   Ultimately how many officers came over to assist you?

23    A.   Three additional.

24    Q.   And tell us where you ended up once the other officers

25    came?

1    A.    Sure.  If you could see in this picture here, to the left,

2    it's a box, it's an electrical box.  We ended up pushing him up

3    against that, the whole time still wrestling for his hands as

4    he was trying to go to his waistband, even at one point bending

5    over at his waist, you know, just clutching that area.

6    Q.    Did you continue to talk to him?

7    A.    We did.  The whole time I was just telling him to relax

8    and to stop resisting.

9    Q.    And did that have any impact on his behavior at all?

10   A.    No.  He was determined to get to his waistband at that

11   point.

12   Q.    Okay.  So when you get over to the electrical box, what

13   happens then?

14   A.    So, again, we go into a tug-of-war with his arms.

15   Eventually we were able to take him to the ground right in

16   front of our cruiser and place him into handcuffs.

17   Q.    And who were the other officers who came over to assist?

18   A.    Officer Dave Bridges, Officer Jeff Driscoll and

19   Officer Tom Finn.

20   Q.    Your partner?

21   A.    Yes.

22   Q.    And when you were able to get Mr. Belin down to the

23   ground, did that stop him from resisting?

24   A.    No, he was still resisting.

25   Q.    And could you describe how you got control of his arms and

1    what you did with them?

2    A.   Again, it was a wrestling match for his arms.  We were

3    able to gain control of his arms, place them behind his back

4    and then put him into handcuffs.

5    Q.   And once you had him handcuffed to the rear, what did you

6    do next?

7    A.   At that point he was laying stomach down, so I rolled him

8    over because I still wanted to frisk that area.  As I rolled

9    him over, his hooded sweatshirt lifted up, and I saw a firearm

10   in his waistband.

11        MR. WORTMANN:  Your Honor, may I approach the witness,

12   please?

13        THE COURT:  Yes.

14   Q.   Sir, showing you what has been marked for identification

15   as Exhibit 6.1, I ask you whether you recognize that?

16   A.   Yes.

17   Q.   And what is it?

18   A.   This is the firearm that we recovered that night from

19   Mr. Belin.

20   Q.   And how do you know it's the same one?

21   A.   First of all, I recognize it from that night, also it's

22   marked with a CC number.

23   Q.   And what is a CC number?

24   A.   It's a number that every call gets, and it's a way we

25   track our calls, it's a report number.

1    Q.   So every report gets an independent number applicable only

2    to it?

3    A.   Yes.

4    Q.   And that number is listed on the exhibit?

5    A.   It's listed on the firearm, yes.

6    Q.   And obviously when you saw it, the magazine was not

7    visible, correct?

8    A.   Correct.

9         MR. WORTMANN:  Your Honor, I offer Exhibit 6.1 into

10   evidence.

11        MR. GARRITY:  The prior objection.

12        THE COURT:  It's overruled.  It may be admitted 6.1.

13        (Exhibit No. 6.1 was admitted into evidence.)

14        MR. WORTMANN:  Your Honor, may I just simply pass this

15   in front of the jury by walking it by rather than handing it to

16   them?

17        THE COURT:  Yes.

18   Q.   Now, once you removed the gun from Mr. Belin's waistband,

19   what did you do with it?

20   A.   At that point I put it in my pocket, and I requested for

21   detectives to respond as well as our patrol supervisor.

22   Q.   And did you learn that there were some additional --

23   additional ammunition had been seized from him as well?

24   A.   Yes.

25   Q.   And what were they stored in?

```
1    A.   I later learned  that--

2              MR. GARRITY:  I object, basis of knowledge.

3              THE COURT:  Sustained.

4    Q.   While you were on scene, did you see any additional

5    ammunition?

6    A.   Yes, I did.

7    Q.   And where did that come from?

8              MR. GARRITY:  Objection.

9              THE COURT:  Sustained.

10   Q.   Are you aware, did you personally see any additional

11   ammunition recovered from Mr. Belin?

12             MR. GARRITY:  Objection.  Leading.

13             THE COURT:  Sustained.

14   Q.   Were there any other items seized from Mr. Belin?

15             MR. GARRITY:  Objection.

16             THE COURT:  Sustained.

17             MR. WORTMANN:  May I approach, your Honor?

18             THE COURT:  Yes.

19   Q.   Showing you what's been marked as Exhibit 6.3, do you

20   recognize those, sir?

21   A.   Yes, I do.

22   Q.   And do you know where they came from?

23   A.   These came from Mr. Belin that night.

24   Q.   And how were they packaged when they were recovered?

25             MR. GARRITY:  Objection, Judge, basis of knowledge.
```

```
1              THE COURT:  Let me see counsel at sidebar.

2              MR. WORTMANN:  Your Honor, let me ask one more

3      question, if I can.

4              THE COURT:  All right.

5      Q.   Did you see these items recovered from Mr. Belin?

6              MR. GARRITY:  Objection.  Leading.

7              THE COURT:  I'll allow it.  Overruled.

8      A.   No.

9      Q.   Okay.

10             THE COURT:  Let me see counsel at sidebar.

11             (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12             THE COURT:  I don't see how this witness without more

13     can say, you know, based on his hearsay understanding that

14     these items were recovered from King Belin.

15             MR. WORTMANN:  I'll move on, your Honor.

16             THE COURT:  Okay.

17             (SIDEBAR CONFERENCE WAS CONCLUDED)

18     Q.   Now, once the detectives arrived, how long did you remain

19     on scene?

20     A.   I would submit that we were there for 45 minutes.

21     Q.   And when you went back to District B-3 -- who were the

22     detectives -- who did you give the gun to?

23     A.   Detective Magoon.

24     Q.   And did you see Detective Magoon back at the station?

25     A.   Yes, I did.
```

1   Q.   And were you present when he made the gun safe?

2   A.   Yes.

3   Q.   And did you learn whether or not the gun had been loaded?

4   A.   I learned that it was loaded, yes.

5   Q.   Did you see that it had been loaded?

6   A.   Yes.

7   Q.   Do you recall how many rounds of ammunition were in the

8   gun?

9   A.   There were 11 total, there were 10 in the magazine, and

10  there was one in the chamber.

11          MR. WORTMANN:  May I approach the witness, your Honor,

12  please?

13          THE COURT:  Yes.

14  Q.   Showing you what was marked as Exhibit 6.2, do you

15  recognize those bullets?

16  A.   Yes, these are the 11 rounds that were recovered.

17  Q.   How do you know those are the exact same bullets that came

18  out of the gun that day?

19  A.   Again, it's marked with the CC number from that night.

20  Q.   And there's also other markings on the envelope, on the

21  actual manila envelope?

22  A.   Yes, it says there's 11 cartridges from the firearm, 10 in

23  the magazine, 1 in the chamber.

24          MR. WORTMANN:  Your Honor, I offer Exhibit 6.2 in

25  addition.

1       MR. GARRITY:  Prior objection, judge.

2       THE COURT:  It's overruled, it's admitted.

3       (Exhibit No. 6.2 was admitted into evidence.)

4  Q.   Earlier, Officer Bissonnette, you indicated to us that you

5  were familiar with Mr. Belin prior to September 17th, 2012?

6  A.   Correct.

7  Q.   And you indicated, in fact, one of the ways you were

8  familiar, you had arrested him before?

9  A.   Yes.

10 Q.   And do you recall the date of that arrest?

11 A.   April 29th, 2009.

12 Q.   Okay.

13       MR. WORTMANN:  Your Honor, I want to put on the screen

14 a document that's already been admitted into evidence.

15       THE COURT:  What number is it?

16       MR. WORTMANN:  Exhibit 4.1, your Honor.

17       THE COURT:  Again, remember my earlier caution.

18       MR. WORTMANN:  Yes.

19 Q.   And do you recognize this booking sheet?

20 A.   I do.

21 Q.   And is that the booking sheet that related to the arrest

22 on April 29th, 2009?

23 A.   Yes, it is.

24 Q.   And who is the person depicted in the booking photograph?

25 A.   King Belin.

1    Q.    And is that the person you arrested on that date?

2    A.    Yes, it is.

3    Q.    The same person who's in the courtroom today?

4    A.    Yes.

5    Q.    And did you have continuing involvement in the case?

6    A.    I did.

7    Q.    And, first, was he charged with two crimes that under

8    Massachusetts law are punishable by imprisonment for a period

9    in excess of one year, and please answer yes or no.

10   A.    Yes.

11   Q.    And are you familiar with what happened in the case?

12   A.    Yes.

13   Q.    And are you aware of whether Mr. Belin was convicted of

14   those two offenses, that is, two offenses punishable for a

15   period in excess of one year?

16   A.    He was.

17             MR. WORTMANN:  Your Honor, rather than trying to use

18   the document camera, which doesn't seem to be helping, may I

19   approach the witness, please?

20             THE COURT:  Yes.

21   Q.    First showing you Exhibit Number 3, do you recognize that,

22   sir?

23   A.    Yes.

24   Q.    What is that?

25   A.    That is the certified conviction from the April, 2009

1    case.

2    Q.   Can you tell us what the date of the offense was as

3    demonstrated by the copies of the indictment?

4    A.   Sure, April 29th, 2009.

5    Q.   The same day as your booking?

6    A.   Yes.

7    Q.   And if I could just direct you to the entry dated

8    October 19th, 2010, could you read the two entries into the

9    record as of that date.

10   A.   "Offense Number 1, guilty plea as agreed upon; Offense

11   Number 2, guilty plea as agreed upon."

12   Q.   And then the last two entries for October 19th on that

13   same sheet?

14   A.   "Defendant sentenced as to so much as to Offense Number 1,

15   defendant sentenced as to Offense Number 2."

16           MR. WORTMANN:  Your Honor, may I ask that these be

17   passed to the jury?

18           THE COURT:  All right.

19           MR. WORTMANN:  May I, your Honor?

20           THE COURT:  Yes, I'm sorry go ahead.

21           MR. WORTMANN:  If I might just have a moment, your

22   Honor.

23           THE COURT:  Yes.

24           MR. WORTMANN:  That's all I have.

25           THE COURT:  Ladies and gentlemen, we normally break at

1    10:30, we started late, and it's a few minutes before 10:30,

2    but rather than interrupt the cross-examination, I think it

3    probably makes sense to take a break now.  This is intended as

4    a stretch-your-legs and use the facilities break.  The faster

5    we get this done, the quicker the trial will move.  Let's try

6    to make it as close to five minutes as we can, and we will

7    stand in brief recess.

8              THE CLERK:  All rise.

9              (A recess was taken.)

10             THE CLERK:  All rise.  Thank you.  You may be seated.

11             THE COURT:  Cross-examination.

12                         CROSS-EXAMINATION

13   BY MR. GARRITY:

14   Q.   Good morning, Officer.

15   A.   Good morning, counselor.

16   Q.   You went to the academy in 2007; is that right?

17   A.   That's right.

18   Q.   And at the academy you were trained on the importance of

19   report writing; is that correct?

20   A.   That's correct.

21   Q.   And police reports are important because other people may

22   be relaying on them?

23   A.   Correct.

24   Q.   And that could involve attorneys or it could involve other

25   police officers, right?

1   A.   Yes.

2   Q.   So you want the report that's written to be complete and

3   accurate, right?

4   A.   Yes.

5   Q.   And in this case you did not write the report; is that

6   right?

7   A.   That's right, I did not.

8   Q.   It was written by Officer Finn?

9   A.   Yes.

10   Q.   But the report that was written by Officer Finn in your

11   opinion was thorough, right?

12   A.   Yes.

13   Q.   And you had reviewed the report?

14   A.   Yes.

15   Q.   And the report was written about an hour after the

16   interaction with Mr. Belin?

17   A.   Correct.

18   Q.   Written around 7:40 that night?

19   A.   Yes.

20   Q.   And you had reviewed it right as it was written?

21   A.   Correct.

22   Q.   And after the academy, you went to work for the Boston

23   Police Department; is that right?

24   A.   That's right.

25   Q.   And you initially were walking a beat in the Back Bay?

1    A.    Correct.

2    Q.    And then went onto Area or District B-3, right?

3    A.    That's correct.

4    Q.    And as of September 17th, 2012, you had worked for the

5    Boston Police Department for around five years?

6    A.    Yes.

7    Q.    And when you work at the Boston Police Department, there

8    are rules and procedures you're supposed to follow, right?

9    A.    Yes.

10   Q.    You're obligated to be aware of those rules and follow

11   them, right?

12   A.    Correct.

13   Q.    And you make sure that you review them periodically, I

14   take it?

15   A.    Yes, I do.

16   Q.    Because there are amendments to those rules once in a

17   while, right?

18   A.    Correct.

19   Q.    And one of the rules has to do with report writing; is

20   that right?

21   A.    That's correct.

22   Q.    And there are specific rules with respect to handling gun

23   cases, are there not?

24   A.    Yes, there is.

25   Q.    There's a distinct section of the rules and procedures of

1    the Boston Police Department on how to handle gun cases, right?

2    A.   Correct.

3    Q.   And in gun cases, when an officer takes possession of a

4    gun, he's supposed to write the report, right?

5    A.   Do you have a copy of the rules?

6    Q.   I do.

7    A.   Can I take a look at them?

8    Q.   And you're required to keep a copy of those rules so your

9    supervisor can review them to make sure that you have those

10   rules, right?

11   A.   Correct.

12        MR. GARRITY:  May I approach, your Honor?

13        THE COURT:  Yes.

14   Q.   Officer --

15   A.   Sir, if you could just show me the part you're referring

16   to?

17   Q.   Yes.  So we know what we're looking at, these are the

18   rules and procedures from the Boston PD?

19   A.   They are.

20   Q.   Rule 3.11 talks about procedures for handling firearms

21   evidence; is that right?

22   A.   That's right.

23   Q.   And Section 3 of that rule has requirements for officers

24   who take possession of firearms, right?

25   A.   Correct.

1    Q.   And that rule requires that officers that come into

2    possession of firearms, that they write the incident report,

3    right?

4    A.   Yes.

5    Q.   And in this case, you did not write the incident report?

6    A.   My partner wrote it.

7    Q.   My question, Officer, you did not write the report?

8    A.   I did not personally.

9    Q.   The rule also requires that you complete a firearms

10   submission form, BPD Form 2419, right?

11   A.   Correct.

12   Q.   Did you complete one of those forms?

13   A.   I did not personally, no.

14   Q.   And did you complete or sign the firearms analyst examiner

15   unit control log?

16   A.   Personally, I did not, no.

17   Q.   And the rule from the Boston Police Department requires

18   that you do that, right?

19   A.   Yes.

20   Q.   And there's also a rule with respect to when you come into

21   possession of physical evidence, what you're supposed to do

22   with it, right?

23   A.   Yes.

24   Q.   You're supposed to diagram it on an incident report form,

25   right?

1     A.    I think you're referring to what detectives do.

2           MR. GARRITY:  May I approach, your Honor?

3           THE COURT:  Yes.

4     Q.    I show you Rule 309 from the Boston Police Department

5     Rules and Procedures that deals with handling physical evidence

6     and other property coming into police custody.  Do you see

7     that?

8     A.    Yes.

9     Q.    And there's a Section 4 that talks about, "Whenever any

10    item of evidence is found, seized, recovered or otherwise

11    collected, it shall be noted as to position and location by

12    diagramming on an appropriate Form 1.1 or 1.11 by the officer

13    who collects such evidence."  Do you see that?

14    A.    I do.

15    Q.    Did you do that?

16    A.    Again, that's referring to who collected the evidence.

17    Q.    My question is did you do that?

18    A.    I did not personally, no.

19    Q.    And Form 1.1 is an incident report form, right?

20    A.    1.1, yes.

21    Q.    And that's the incident report form you did not write

22    yourself?

23    A.    Correct.

24    Q.    And you applied for the criminal complaint in this case,

25    right?

1    A.   Either I or my partner did.

2    Q.   Well, you're required -- you were the arresting officer,

3    right?

4    A.   My unit was the arresting unit, so me and my partner, it

5    was a collaborative effort.

6    Q.   Well, you signed the application for the complaint, did

7    you not?

8    A.   I'm not sure.

9         MR. GARRITY:  May I approach, your Honor?

10        THE COURT:  Yes.

11   Q.   I show you the --

12   A.   Yes, I did sign it.

13   Q.   And that's an application for a criminal complaint that

14   was filed against Mr. Belin, right?

15   A.   Correct.

16   Q.   And the rules of the Boston PD are that the arresting

17   officer files or signs the application for the criminal

18   complaint, right?

19   A.   Yes.

20   Q.   So you were the arresting officer?

21   A.   Me and my partner were the arresting officers.

22   Q.   Well, the rule says the arresting officer files it.  You

23   signed it, right?

24   A.   Correct, but if you look at it, it also has Officer Finn's

25   name on it.

1    Q.    He didn't sign it though, right?

2    A.    No.

3    Q.    The rules of the Boston PD require that the arresting

4    officer file a criminal complaint, right?

5    A.    Correct.

6    Q.    And you're also supposed to submit an incident report form

7    with that application that you fill out, right?

8    A.    Correct.

9    Q.    And you didn't do that in this case?

10   A.    Again, my partner did.

11   Q.    Well, you didn't do it?

12   A.    No, not personally.

13   Q.    The rules require it, right?

14   A.    The rules require that the arresting officer.  In this

15   case, me and my partner were both the arresting officer.

16   Q.    Well, this is a gun case, right?

17   A.    Correct.

18   Q.    And the rules require, does it not, that you're supposed

19   to in gun cases be extra scrupulous in following the rules,

20   right?

21         MR. WORTMANN:  Objection, your Honor.

22         THE COURT:  Sustained in that form.

23   Q.    Do you recall what the rule from the Boston Police

24   Department on gun cases indicates in terms of how scrupulous

25   you're supposed to be and whether or not to follow it?

1    A.    Yes.

2    Q.    And that rule as you recall says you're supposed to be

3    extra scrupulous in following them, right?

4    A.    If you let me answer the question, I'll gladly do it.  Me

5    and my partner ride together.  When we make an arrest, it

6    doesn't matter who finds the gun, we're both the arresting

7    officers.  In this case, you're right, I did find the firearm,

8    my partner wrote the report, and that follows the rule to a T.

9    Q.    The rule, as you understand it, allows someone else other

10   than the officer who obtains the gun to write the report?

11   A.    Correct, as I just said, the arresting officer is not only

12   just me, but it's also my partner.  We ride together.  Any

13   arrest that we make is made by the both of us, so under the

14   rule he could write the report or I could.

15   Q.    Did I read the rule wrong in terms of what an officer who

16   obtains a gun is supposed to do?

17   A.    Not at all, but like I just explained in this case, just

18   because I am the one that found the firearm, my partner was

19   just -- me and my partner both work collaboratively, so it's a

20   dual arrest.  We both arrested.  We both are just responsible

21   for this arrest.

22   Q.    Will I find a section in that rule that says your partner

23   can write the report?

24   A.    Like I just said, my partner is also the arresting officer

25   in the case.

1    Q.    Not my question, sir.  Will I find a section in that rule

2    that allows your partner to write the report?

3    A.    Like I just said, you're saying the arresting officer.  My

4    partner is the arresting officer as well.

5    Q.    I'm putting aside the issue of the arresting officer, I'm

6    dealing with someone, an officer coming into possession of a

7    gun.  Does that rule allow someone other than that officer to

8    write the report?

9    A.    I guess.  My partner came in possession of the gun just as

10   well as I did.

11   Q.    Will I find a section in that rule that says that your

12   partner can write it?

13   A.    Yes, the arresting officer.

14          MR. GARRITY:  May I approach, your Honor?

15          THE COURT:  Yes.

16   Q.    I show you the rule --

17   A.    Sure.

18   Q.    -- on handling gun cases.  Can you show me where it says

19   someone other than the officer coming into possession of the

20   gun can write the report?

21   A.    Again, the officer who came into possession of the gun can

22   write the report, and like I said, my partner is just as

23   responsible coming into possession of that gun.  We work

24   together as a team, so our team came into possession of it.

25   Just because I pulled it out of his waistband doesn't mean I'm

1    the only one that can write the report.

2    Q.   But your officer, Officer Finn, didn't see the interaction

3    between you and Mr. Belin, right?

4    A.   But he's still the arresting officer.

5    Q.   He didn't see the interaction, right?

6    A.   No.

7    Q.   His back was to you?

8    A.   That's correct.

9    Q.   And the rule says you're supposed to write the report?

10   A.   Again, I just explained it.

11   Q.   And this report was written about an hour after the event,

12   right?

13   A.   Correct.

14        MR. WORTMANN:  Your Honor, asked and answered.

15        THE COURT:  Overruled.

16   Q.   You said to this jury here that when Mr. Belin walked by,

17   his head was down?

18   A.   Yes.

19   Q.   The report that you reviewed, there's no indication of

20   Mr. Belin having his head down, is there?

21   A.   Again, can I see the report?

22   Q.   Sure.

23   A.   It doesn't say that in there, no.

24   Q.   You told this jury that he turned around and smiled at

25   you?

1    A.   Yes.

2    Q.   We won't find that in the report either, will we?

3    A.   No.

4    Q.   In fact, the report talks only about one term by

5    Mr. Belin, and that's as you approached him and were right next

6    to him when he turned around, right?

7    A.   Yes.

8    Q.   So there's no mention in this accurate, complete, thorough

9    report that you reviewed of him turning and making a half

10   smile, right?

11         MR. WORTMANN:  Your Honor, argumentative.

12         THE COURT:  Sustained.

13   Q.   There's no mention of that term, the half smile in the

14   report, right?

15   A.   No.

16   Q.   In this report that you reviewed, there's no mention of

17   Mr. Belin taking a step back from you, is there?

18   A.   No.

19   Q.   And the report that Officer Finn wrote, you're telling him

20   about an hour after the event what you had observed, right?

21   A.   Yes.

22   Q.   And you left those factors out of what you tell

23   Officer Finn, right?

24   A.   They weren't in the police report.

25   Q.   And this report, I take it, was written when your memory

1    of the event was fresher in your mind, right?

2    A.    Correct.

3    Q.    And when the memory was fresh, you forget to mention these

4    factors?

5    A.    It's a police report.  I've never seen a perfect police

6    report, I could just tell you what happened that day, and I

7    did.

8    Q.    You said Mr. Belin, just getting back to when you first

9    get to the scene, you get a report of a radio call, right?

10   A.    Yes.

11   Q.    Of a fight, right?

12   A.    Correct.

13   Q.    The fight that the report is of, is that a fight at

14   Norfolk and Fessenden Street, right?

15   A.    That's correct.

16   Q.    And you and Officer Finn drive down Norfolk, and you see

17   five individuals walking in a line, you said?

18   A.    Together in a group, yes.

19   Q.    Are they in a line or right next to each other?

20   A.    Right next to each other, a line across the sidewalk.

21   Q.    On that sidewalk, there's five individuals?

22   A.    Yes.

23   Q.    And you have the briefest view of them before you pull

24   into Mildred Ave., right?

25   A.    Correct.

1    Q.   So brief that you couldn't even see what the other

2    individuals were wearing, right?

3    A.   That's correct.

4    Q.   You learned after the fact, however, that those

5    individuals were wearing hoodies as well, right?

6    A.   Yes, I did.

7    Q.   And you found that out because those individuals were FIOD

8    carded down Norfolk; is that right?

9    A.   That's correct.

10   Q.   They were FIOD carded down by Mildred Avenue or

11   Evelyn Avenue, I'm sorry?

12   A.   Evelyn, yes.

13   Q.   And Evelyn Avenue is at the end of the tennis courts,

14   right?

15   A.   Yes.

16   Q.   So the four other individuals walking down Norfolk are

17   wearing hoodies as well, right?

18   A.   I never saw them.

19   Q.   But you find out after the fact they're wearing hoodies?

20   A.   Yes.

21   Q.   And other individuals that night were wearing either a

22   coat or a sweatshirt, the people in the park I'm talking about?

23   A.   Yes.

24   Q.   So it wasn't overly warm?

25   A.   I can't remember actually what the weather was.  Again, I

1    was wearing a T-shirt and shorts.

2    Q.   I know what you said you were wearing, other individuals

3    didn't think it was as warm because they're wearing sweatshirts

4    or coats?

5    A.   Correct.

6    Q.   You get this report of a fight at Norfolk and Fessenden,

7    you turn into Mildred?

8    A.   Correct.

9    Q.   You're driving, right?

10   A.   Yes.

11   Q.   Officer Finn is in the passenger's seat?

12   A.   That's correct.

13   Q.   You pull in front of these five individuals?

14   A.   Yes.

15   Q.   Because you only get the briefest of looks at them, you

16   couldn't tell whether they were talking to each other as they

17   went down the street, right?

18   A.   No.

19   Q.   You got the briefest of looks, so you couldn't even tell

20   whether they were walking together?

21   A.   I mean, there was nobody else on the sidewalk.  It's

22   obvious that they were walking together to us.

23   Q.   Well, how long a view of them did you have of them before

24   you pulled in front of them?

25   A.   Just a few seconds.

1    Q.   And is it uncommon for nonassociated groups to be arriving

2    at an intersection at the same time?

3              MR. WORTMANN:  Objection, your Honor.

4              THE COURT:  I'll allow it.

5    A.   In this case, it was obvious to me these individuals were

6    walking together.  It's not uncommon to see what you're talking

7    about, but this was obvious, there was nobody else on the

8    sidewalk, these were the five people there, and there's no

9    question that they were together.

10   Q.   They weren't interacting with each other, right?

11   A.   They very well could have been.  Again, like you said --

12   Q.   I'm not asking what could have been.

13             MR. WORTMANN:  Objection, your Honor, I'm asking that

14   he be allowed to answer the question.

15             THE COURT:  All right.  Let's put the question to the

16   witness again and we'll hear the answer.

17   Q.   Did you see them interacting with each other?

18   A.   Again, like you said, we saw them for a few seconds.  Did

19   I have enough time to see if they were having a full-out

20   conversation, no, but just the fact they were walking so close

21   together, here's five guys walking down the street together.

22   Q.   And at the academy besides being trained on writing

23   reports, you were also trained on encounters with individuals

24   in the street, right?

25   A.   Yes.

```
 1    Q.   When you can stop someone, when you can't?

 2    A.   Correct.

 3    Q.   Right, and this encounter that you and Officer Finn wanted

 4    to engage in with these five individuals was a consensual

 5    encounter, right?

 6    A.   Correct.

 7    Q.   Meaning that the individuals don't have to talk to you?

 8    A.   That's correct.

 9    Q.   They can ignore you and keep going, right?

10    A.   Yes.

11    Q.   And the law allows that, right?

12    A.   Correct.

13    Q.   And when you get out of the cruiser, you see Mr. Belin

14    walking by, right?

15    A.   Yes.

16    Q.   That's when you recognize him?

17    A.   That's correct.

18    Q.   And you begin to follow him?

19    A.   Yes.

20    Q.   He doesn't have to talk to you, right?

21    A.   No.

22    Q.   He can keep going?

23    A.   That's correct.

24    Q.   But you didn't want that to happen because you began to

25    pursue him, right?
```

1    A.    I walked after him, yes.

2    Q.    And you walked up to him close enough so that he had to

3    turn around, right?

4          MR. WORTMANN:  Objection, your Honor.  How does he

5    know what Mr. Belin did, why Mr. Belin did what he did?

6    Q.    Well, have you testified --

7          THE COURT:  Are you going to put another question to

8    him?

9          MR. GARRITY:  Yes, your Honor.

10         THE COURT:  All right.

11   Q.    Have you testified previously that you got so close to him

12   that he had no choice but to turn around?

13   A.    No.

14   Q.    Well, let me ask you this way.  Have you testified

15   previously that you got so close to him that he would know that

16   he wouldn't be able to walk away from you?

17   A.    Can you ask that question again?

18   Q.    Sure.  Have you testified previously that you got so close

19   to him that he knew he would have no choice but to talk to you?

20   A.     I got within an arm's reach.  He made the decision on his

21   own to turn around and speak with me.  I never asked him to

22   stop.  He stopped on his own.  I never got in front of him.  He

23   actually turned around.

24   Q.    You've testified on this event on two other occasions; is

25   that right?

1    A.    Correct.

2    Q.    Once in February of last year and once in December of last

3    year?

4    A.    Yes.

5    Q.    Do you recall testifying February of last year on page 20:

6    "So I sped up my pace, I closed distance with him, when I got

7    into about an arm's reach."  Question:  "And it became clear

8    that he wasn't going to be able to walk away from you?"  "Yeah,

9    at that point he stopped and turned in my direction."

10   A.    Sure, so in his mind he maybe thought he wasn't going to

11   be able to walk away.  I never blocked him, I never stopped

12   him.  I think that's referring to what I thought he was

13   thinking, that it was clear that I was going to follow him

14   until he did stop.  Now, again, he stopped on his own accord.

15   Q.    Well, I just want to make sure I get this straight.  He

16   can walk away, right?

17   A.    Yes.

18   Q.    You didn't want that to happen?

19   A.    Correct.

20   Q.    You began to follow him?

21   A.    Yes.

22   Q.    You got close enough so that he would get the message that

23   he had no choice but to engage with you, right?

24   A.    Again, he made that decision.  It played out the way it

25   played out, he stopped, and he turned in my direction.

1    Q.    And this is within feet of your cruiser, right?

2    A.    About 15, 10 to 15 feet.

3    Q.    And within seconds of seeing these individuals walking on

4    Norfolk Street?

5    A.    Yes.

6    Q.    And after he turned, you said you asked him this question

7    about what he had on him, right?

8    A.    Yes.

9    Q.    You say he steps back, right?

10   A.    Yes.

11   Q.    But your report says otherwise, right?

12   A.    My report doesn't reflect that, but that's what I

13   testified to.

14   Q.    You say this half smile that your report doesn't refer to

15   that it drops?

16   A.    Correct.

17   Q.    And then you reach out and grab him, right?

18   A.    Yes.

19   Q.    And you grab him with your right hand or left hand?

20   A.    I can't recall, I just reached out and grabbed him, and at

21   the same time I went for his waistband, so I used both hands.

22   Q.    And eventually he's pushed up against that brown box?

23   A.    Yes.

24   Q.    Is that right?  And Officer Bridges helps you as well?

25   A.    Correct.

1    Q.    And does Officer Driscoll come over?

2    A.    Yes.

3    Q.    And Officer Finn, is he still back with the other

4    individuals?

5    A.    Yes, but eventually he does come over and assist us.

6    Q.    Does Officer Bridges to your knowledge write a report?

7    A.    No.

8    Q.    Does Officer Driscoll to your knowledge write a report?

9    A.    No.

10   Q.    Are the four individuals who were talking to Officer Finn

11   who are within feet of this, are they asked to give a

12   statement?

13   A.    No.

14   Q.    Are they interviewed for what they potentially observed?

15   A.    I'm not sure.

16   Q.    The Mildred Avenue School is right there on the corner,

17   right?

18   A.    Yes.

19   Q.    Did you make any attempts to see whether or not there are

20   video cameras in that school location?

21   A.    You're going to have to check with the detective on that

22   one.

23   Q.    To your knowledge, did any detective or officer make that

24   attempt?

25   A.    I have no knowledge either way.

1    Q.   And you're familiar with this area, right?

2    A.   Yes.

3    Q.   Very familiar with it?

4    A.   Yes.

5    Q.   Do you know that in between those two basketball courts,

6    there's a video camera, right?

7    A.   I'm not sure.

8    Q.   Well, how often have you been to that Norfolk Park?

9    A.   Plenty of times.

10   Q.   I show you Exhibit 5.3.  Do you see that there?

11   A.   Yes.

12   Q.   And this is a view looking down Norfolk towards the

13   basketball courts?

14   A.   Yes, it is.

15   Q.   And there's some police cruisers at the far end of that

16   photograph.  Do you see those?

17   A.   I do.

18   Q.   Is that right near Evelyn Avenue?

19   A.   Yes, Evelyn would be on the left-hand side.

20   Q.   On the other side.  Is that where the four individuals

21   were being FIOD carded?

22   A.   I believe so, yes.

23   Q.   Can you tell the jury what FIOD is?

24   A.   FIO, it's a field interrogation observation form, so it's

25   a form we fill out pretty much on any encounter that we have

1    with people who have -- who are believed to be committing a

2    crime or who we've had past experiences with.

3    Q.   But no interviews were done to your knowledge?

4    A.   Again, I wasn't there.  I don't know what the officers

5    talked to these individuals about.

6    Q.   And I'm just going to circle or point.  Do you see the

7    arrow there?

8    A.   I do.

9    Q.   That's a security video camera, is it not?

10   A.   I can't tell from this picture.

11   Q.   Well, you were down there a bunch of times, right?

12   A.   Correct.

13   Q.   This photograph was taken that day, right?

14   A.   Yes.

15   Q.   Within minutes of the encounter?

16   A.   Yes.

17   Q.   You can't tell us whether that's a video camera or not?

18   A.   I just can't see it on this.  If I could see the actual

19   picture, maybe I could see it.

20           MR. GARRITY:  May I approach, your Honor?

21           THE COURT:  Yes.

22   A.   I can't be sure.

23   Q.   Is it fair to say you didn't make any attempts to get

24   video footage from the scene, right?

25   A.   No.

1  Q.   To your knowledge, no other officer made attempts to get

2  video footage from the scene?

3  A.   I'm not sure.

4  Q.   And the only person that viewed the initial encounter

5  between you and Mr. Belin was yourself, right?

6  A.   That's correct.

7  Q.   We don't have a report from Officer Bridges, right?

8        MR. WORTMANN:  Objection, your Honor.

9        THE COURT:  Overruled.

10  Q.   We don't have a report from Officer Bridges?

11  A.   No.

12  Q.   To your knowledge, Officer Bridges is not testifying here,

13  right?

14        MR. WORTMANN:  Objection, your Honor.

15        THE COURT:  Sustained.

16  Q.   There were other individuals in the park, right?

17  A.   Yes.

18  Q.   A number of adults, right?

19  A.   Yes.

20  Q.   Did you interview them?

21  A.   Personally, no.

22  Q.   To your knowledge, did any officer interview them?

23  A.   I'm not sure.

24  Q.   Did you photograph the gun on Mr. Belin?

25  A.   Personally, no, I did not.

1    Q.   Doesn't the Boston Police Department rules require

2    physical evidence be photographed where it's located?

3    A.   Again, at that point if there's a gun on his waistband,

4    for my own safety, I need to take that gun out of his

5    waistband.  Under no circumstance would a gun be -- a firearm

6    be photographed in somebody's waistband, it's just not safe.

7    It's not safe to myself, it's not safe to anybody around.

8    Q.   My question, Officer, doesn't the rule require it be

9    photographed where it's located?

10   A.   Again, for my own safety, that would never happen.  I

11   remove that firearm just as instinctual way to protect myself.

12   Q.   Were photographs taken of Mr. Belin after the gun was

13   taken away?

14   A.   Just booking photos.

15   Q.   So no photos at the scene?

16   A.   I don't believe so, no.

17   Q.   Were any photos taken of any cigarette pack to your

18   knowledge at the scene?

19   A.   I don't believe so, no.

20   Q.   And just getting back to when you first see Mr. Belin and

21   before you grab him, you've been trained by the Bureau of

22   Alcohol, Tobacco and Firearms in the characteristics of an

23   armed gunman, right?

24   A.   Correct.

25   Q.   And there are a number of characteristics that an armed

1    gunman might have, right?

2    A.    Yes.

3    Q.    And we're talking about someone who is carrying a

4    concealed gun, right?

5    A.    Correct.

6    Q.    And some of those characteristics involve walking in a

7    funny way?

8    A.    Yes.

9    Q.    Patting the gun to make sure it's still there?

10   A.    Correct.

11   Q.    Blading away from you?

12   A.    Yes.

13   Q.    Can you tell us some of the other characteristics?

14   A.    Sure, just walking with an unusual gait, again, clothes

15   unsuitable for the weather, looking for an escape route,

16   holding a gun if they're running, things like that.

17   Q.    Sagging clothes?

18   A.    Yes.

19   Q.    Bulges?

20   A.    A bulge.

21   Q.    Other than the black hoodie, you didn't see any

22   characteristics of Mr. Belin that matched up with the

23   characteristics of an armed gunman you've been trained in,

24   right?

25   A.    No, this was a very short encounter.

1    Q.   But you didn't see any of the other characteristics,

2    right?

3    A.   No.

4    Q.   And the gun, after you took possession of it, you put it

5    in your pocket?

6    A.   Yes.

7    Q.   Did you tag it?

8    A.   No.

9    Q.   You're required by your rules to tag it, right?

10   A.   Again, that wasn't my first concern, my first concern was

11   the safety of myself, the citizens in the area and everybody

12   else.  We're talking about a loaded firearm.

13   Q.   I understand, Officer, but your rule requires that you tag

14   it, right?

15   A.   And it was tagging.

16   Q.   Did you tag it?

17   A.   No.

18   Q.   Was it tagged there at the scene?

19   A.   No.

20   Q.   You say you gave it over to Detective Magoon?

21   A.   Correct.

22   Q.   You didn't give it to Detective Josey?

23   A.   I don't believe so, no.

24   Q.   Detective Josey and Detective Magoon arrived together?

25   A.   Yes.

1    Q.   Detective Magoon took the photographs?

2    A.   To the best of my knowledge, yes.

3    Q.   And it's clear in your memory you gave the firearm to

4    Detective Magoon?

5    A.   I believe so.  I mean, there was a few detectives on

6    scene, and I gave it to one of them.

7    Q.   Well, you told us on direct you gave it to

8    Detective Magoon?

9    A.   To the best of my knowledge, yes.

10   Q.   Do you have a lack of memory who you gave it to?

11   A.   No.

12          MR. GARRITY:  May I have one second, your Honor?

13          THE COURT:  Yes.

14   Q.   And you say he struggled with you, put his hands down by

15   his waist, right?

16   A.   Yes.

17   Q.   And did so even after you supposedly saw the gun in his

18   waistband, right?

19   A.   I didn't see the gun in his waistband until after he was

20   handcuffed.

21   Q.   But you were still struggling after that, right?

22   A.   Yes.

23   Q.   If what you say actually happened actually happened, you

24   had probable cause to arrest him for resisting arrest, right?

25   A.   Yes.

1    Q.    You did not?

2    A.    No.

3    Q.    You had probable cause to arrest him for assault on a

4    police officer, right?

5    A.    Yes.

6    Q.    You did not?

7    A.    No.

8            MR. GARRITY:  Your Honor, may I have one second?

9            THE COURT:  Yes.

10           MR. GARRITY:  Thank you, your Honor, no further

11   questions.

12           THE COURT:  Redirect.

13           MR. WORTMANN:  Thank you, your Honor.

14                   REDIRECT EXAMINATION

15   BY MR. WORTMANN:

16   Q.    Officer Bissonnette, why didn't you charge him with

17   resisting arrest?

18   A.    This is not something I commonly charge, it's just a

19   personal opinion.

20   Q.    Why didn't you charge him with assault and battery on a

21   police officer?

22   A.    Again, that's not something I commonly charge.  I wasn't

23   injured.

24   Q.    Was anybody injured?

25   A.    No.

1    Q.    Now, let me ask you something.  How many times have you

2    left a gun in the possession of a suspect so that somebody

3    could get a camera and photograph it?

4    A.    Never.

5    Q.    Never?

6    A.    Never.

7    Q.    How many times have you been disciplined because your

8    partner wrote the report and you reviewed it rather than the

9    other way around?

10   A.    Never.

11   Q.    And you were asked about what was said and what wasn't

12   said in the report regarding your initial approach to

13   Mr. Belin.  Do you recall that?

14   A.    Yes.

15   Q.    And I'm going to first show you a copy of the police

16   report.  Do you recognize that, sir, as the police report that

17   was prepared by you and Officer Finn on that evening?

18   A.    Correct.

19   Q.    And could you read for the jury, please, the part I've

20   highlighted regarding the initial interaction?

21   A.    Sure.  It says, "As Officer Finn engaged this group in

22   consensual conversation, Officer Bissonnette observed one

23   individual break away from the group in a hurried manner

24   walking in the direction of Norfolk Park on Mildred Ave.

25   Officer Bissonnette observed that this individual broke from

1   the group.  He appeared to avoid eye contact with the police."

2   Q.   When you said he was avoiding eye contact, how did he

3   avoid eye contact?

4   A.   He was looking straight down to the ground.

5   Q.   Okay.  With respect to when you approached him and had the

6   interaction, could you read that portion of what was said in

7   the report?

8   A.   "Officer Bissonnette observed Belin, turned towards the

9   officer, and at that point Officer Bissonnette asked, "Do you

10  got anything on you?"  Officer Bissonnette saw Belin's demeanor

11  immediately change where Belin began to exhibit several nervous

12  mannerisms.  Officer Bissonnette saw Belin take a deep breath

13  and start to breathe at a quick and shallow rate.  The officer

14  also observed Belin turn and appear to look for an escape

15  route."

16  Q.   Where was the gun found?

17  A.   In his waistband.

18  Q.   Where did you see the gun?

19  A.   In his waistband.

20  Q.   Where did you take the gun out of?

21  A.   His waistband.

22         MR. WORTMANN:  That's all I have, your Honor, thank

23  you.

24         THE COURT:  Recross.

25

RECROSS-EXAMINATION

BY MR. GARRITY:

Q.   You say you haven't been disciplined when someone else
writes a report, right?

A.   Correct.

Q.   The rule, did I read it wrong, that you are supposed to
write it?

A.   I think you're looking at it wrong, yes.  Again, me and my
partner work collaboratively, so we're both the arresting
officers, and it doesn't necessarily mean just because I remove
the gun out of his waistband that I'm the arresting officer.
He's my partner, so we make arrests together.

Q.   Well, the rule that I read to you doesn't talk about
arresting officer, right?

A.   Correct.

Q.   It talks about an officer who comes into possession of a
gun and what they're supposed to do?

A.   Correct, and as I just stated, just because I was the one
that removed it from his waistband doesn't necessarily mean
that I was the one in possession of it.  Again, it was me and
him as a team, as a Charlie K-1.

Q.   Does the rule give you the exceptions that you've just
talked about?

A.   I just think you're misinterpreting the rule.

Q.   What part am I misinterpreting when it says you're

1    supposed to do certain stuff?

2    A.   Again, I just explained just because I took the gun out of

3    his waistband, my partner is just as involved in that arrest,

4    and as a team, we're in possession of the firearm, so as a

5    team, we make the arrest together, we write the necessary

6    reports together.

7    Q.   The officer who didn't even see what happened?

8    A.   My partner, the officer that I was running with that

9    night.

10   Q.   That didn't see it?

11   A.   Correct.

12   Q.   The rule allows him to write the report of an incident he

13   doesn't see?

14   A.   Well, obviously I collaborated with him on the report, and

15   I reviewed the report.

16        MR. GARRITY:  I have no further questions.

17        THE COURT:  Thank you.  You may step down.

18        MR. WORTMANN:  I call Officer Tom Finn to the stand.

19        THOMAS FINN, having been duly sworn by the Clerk,

20   testified as follows:

21        THE WITNESS:  Good morning, your Honor.

22                      DIRECT EXAMINATION

23   BY MR. WORTMANN:

24   Q.   Sir, could you tell us your name spelling your last name,

25   first and last name for the record, please.

1    A.    My name is Thomas Finn, F-i-n-n.

2    Q.    And you're a Boston police officer?

3    A.    Yes, I am.

4    Q.    For how long?

5    A.    Since November of 2006 was the academy start date, and

6    May of 2007 I was sworn.

7    Q.    Where are you presently assigned, and what do you do

8    there?

9    A.    I'm assigned to Area B-3, which is North Dorchester and

10   Mattapan, and I'm a police officer.

11   Q.    I direct your attention, sir, to September 17th, 2012.

12   Were you working that day?

13   A.    Yes, I was.

14   Q.    What shift?

15   A.    The first half shift, which was four to midnight.

16   Q.    And what was your assignment on that particular evening?

17   A.    We were assigned to the Charlie K-1 unit, which is a plain

18   clothes unit in an unmarked vehicle.

19   Q.    Who was your partner?

20   A.    Philip Bissonnette.

21   Q.    What shift were you working?

22   A.    The four to midnight, first half.

23   Q.    The plain clothes?

24   A.    Yes.

25   Q.    Would you wear your badge on the exterior of your

1    clothing?

2    A.    Yes.

3    Q.    What kind of car were you driving?

4    A.    It was a Crown Victoria, unmarked police vehicle.

5    Q.    Readily recognizable on the street as a police vehicle?

6    A.    Yes.

7    Q.    Let me focus you on the time period around 6:45 p.m.  Do

8    you recall where you were?

9    A.    Yes.

10   Q.    Where?

11   A.    On Norfolk Street.

12   Q.    And are you familiar with that area?

13   A.    I am.

14   Q.    And what were you doing?

15   A.    We were responding to a -- we were dispatched to a radio

16   call for a removal at a group home.

17   Q.    Did you make it to that group home?

18   A.    No.

19   Q.    What happened?

20   A.    Another broadcast was made by a department radio for a

21   report of girls fighting on Norfolk and Fessenden.

22   Q.    And based on hearing that call, did you and your

23   partner -- your partner was Officer Bissonnette that evening?

24   A.    Yes, it was.

25   Q.    And did you and your partner make any decisions as to what

1    you were going to do?

2    A.    Yes.

3    Q.    What did you decide to do?

4    A.    That radio call for that alleged fight was en route to our

5    call on Walk Hill Street, so we preempted from that call and

6    responded to Norfolk and Fessenden to address that fight.

7    Q.    And are you familiar with the area of Norfolk and

8    Fessenden?

9    A.    Yes, I am.

10         MR. WORTMANN:  Excuse me, may I approach the exhibits,

11   your Honor?

12         THE COURT:  Yes.

13         MR. WORTMANN:  Thank you.

14   Q.    What's there?

15   A.    There's a large park, playground, athletic field, middle

16   school.

17   Q.    And could you tell the ladies and gentlemen of the jury

18   how you drove into that, how you got into the area?

19   A.    It was outbound on Norfolk Street approaching Blue Hill

20   Avenue.

21   Q.    So let me -- you were coming down this direction?

22   A.    Yes.

23   Q.    Okay.  And then once you got to the area of Norfolk Park,

24   where did you go?

25   A.    Officer Bissonnette was driving, and he turned left on

1    Norfolk onto Mildred Ave.

2    Q.   And it's Mildred Ave. on one side of Norfolk and Fessenden

3    on the other side?

4    A.   That's correct.

5    Q.   Now, as you approached the intersection of Fessenden and

6    Mildred, did you see something that caught your attention?

7    A.   Yes.

8    Q.   What did you see?

9    A.   There was a group of five males walking on Norfolk Street

10   towards Mildred Ave.

11   Q.   Could you describe the manner in which they were walking?

12   A.   A casual, normal pace.

13   Q.   Did it appear to you that they were together?

14         MR. GARRITY:  Objection.  Leading.

15   A.   Yes.

16         THE COURT:  Sustained.

17   Q.   How did it appear to you with respect to whether they were

18   in a group?

19   A.   There were five males that were together it appeared.

20   Q.   When you say together, what do you mean?

21   A.   Not walking at great distances, they were grouped close.

22   Q.   Okay.  And when Officer Bissonnette turned the car into

23   Mildred, who was closest to that group of individuals?

24   A.   I was.

25   Q.   And did you make a decision as to what you were going to

1    do?

2    A.   Yes.

3    Q.   Tell us.

4    A.   I exited the vehicle and I made a brief interaction with

5    the group.

6    Q.   And do you recall why it was that you wanted to speak to

7    them?

8    A.   Just to inquire whether or not, as they were the first

9    people that we encountered, if they saw the fight to which we

10   were responding.

11   Q.   Okay.  And did you get any information from them?

12   A.   One person I believe answered in the negative that they

13   didn't see a fight.

14   Q.   And as you were talking to these individuals, did

15   something else catch your eye?

16   A.   Yes.

17   Q.   Tell us.

18   A.   There was two additional officers that responded.

19   Q.   Who was that, do you remember?

20   A.   It was Officer Jeffrey Driscoll and David Bridges.

21   Q.   And where did you see them go?

22   A.   Jeffrey Driscoll was to my right, and I saw him run behind

23   my back.

24   Q.   And when you saw him run, in which direction did he run

25   in?

1    A.   Down Mildred Ave. away from Norfolk Street.

2    Q.   So, putting Exhibit 5.7 on the board, could you put an X

3    in the approximate position that you were if you could see it

4    on this map.

5    A.   It would almost be off screen, but it was approximately

6    where the crosswalk is.

7    Q.   Okay.  And which way did Officer Bridges run?

8    A.   It was Officer Driscoll that ran.

9    Q.   Oh, Officer Driscoll, I'm sorry.

10   A.   Yes.

11   Q.   Which way did he run?

12   A.   It would have been behind the car down towards Mildred

13   Ave.  Should I draw it on the screen, sir?

14   Q.   Sure.

15   A.   Down Mildred Ave. away from Norfolk Street, but it would

16   have been around that vehicle.

17   Q.   Did you see anybody else in that area when you turned

18   around and saw him run?

19   A.   Yes.

20   Q.   Who?

21   A.   Officer Bissonnette, Officer Bridges at that point and an

22   individual who was unknown to me at the time.

23   Q.   What was happening?

24   A.   On the junction box that I can see here is a brown, what I

25   believe to be an electrical junction box, I saw

1    Officer Bissonnette holding the individual, his arms kind of

2    pinned to his chest in looked like a struggle.

3    Q.    And so based on that, what did you do?

4    A.    I then ran to assist.

5    Q.    Okay.  And when you got there, where were

6    Officer Bissonnette and the individual who he was struggling

7    with?

8    A.    Still against that brown junction box.

9    Q.    And the other two officers were in the area as well?

10   A.    They were there as well.

11   Q.    Everybody standing up?

12   A.    Yes.

13   Q.    By the way, do you see the individual that

14   Officer Bissonnette was struggling with in the courtroom today?

15   A.    I do.

16   Q.    Could you point him out, please, and describe what he's

17   wearing.

18   A.    He's the gentleman in the white shirt seated at the table

19   with braids.

20          MR. WORTMANN:  Your Honor, if the record could reflect

21   that Officer Finn has identified the defendant, King Belin.

22          THE COURT:  Yes.

23   Q.    Now, once you got over to the junction box, there are now

24   five of you.  What happens next?

25   A.    The individual who was unknown to me was hunched over with

1    his hands no longer at his chest area but at his waist, he was

2    hunched over, and Officer Bridges and Officer Bissonnette were

3    trying to pull his hands from behind him.

4    Q.    Do you recall anybody saying anything to Mr. Belin?

5    A.    Yes, I do.

6    Q.    What do you recall them saying?

7    A.    Officer Bissonnette was repeatedly saying, "King, relax,

8    King, relax."

9    Q.    Did that appear to have any effect on Mr. Belin?

10   A.    No, it did not.

11   Q.    What was he doing?

12   A.    Still maintaining that posture where his hands were firm

13   against his waist and hunched over.

14   Q.    How does all this get resolved?

15   A.    Eventually Mr. Belin and three officers went to the

16   ground, and his hands were removed from underneath him and

17   placed in handcuffs.

18   Q.    Now, when Mr. Belin went to the ground, where were you

19   standing?

20   A.    Sort of straddling his back legs -- his legs from on top

21   of him.

22   Q.    So you were directly on top of him?

23   A.    Yes.

24   Q.    And did you see him get cuffed up?

25   A.    Yes.

1    Q.   And did you see Officer Bissonnette begin to turn

2    Mr. Belin over?

3    A.   Yes.

4    Q.   And what's the next thing that you heard?

5    A.   "Gun, gun."

6    Q.   What's the next thing you saw?

7    A.   A firearm in Officer Bissonnette's hand.

8    Q.   And how long after you heard "gun" did you see the gun in

9    Officer Bissonnette's hand?

10   A.   Within seconds.

11   Q.   Were you ever actually able to see him pull it out from

12   the waistband?

13            MR. GARRITY:  Objection, leading.

14            THE COURT:  This one I'll allow.  Overruled.

15   A.   I'm sorry.

16   Q.   Did you actually see him pull it out from the waistband?

17   A.   No.

18   Q.   Now, once the firearm was recovered, what was done with

19   Mr. Belin?

20   A.   He was transported -- oh, a search of Mr. Belin was

21   conducted.

22   Q.   And did you assist in that search?

23   A.   Yes, I did.

24   Q.   Who was helping you?

25   A.   Officer Martin Velez.

1   Q.   Did you see Officer Velez pull something from one of

2   Mr. Belin's pockets?

3           MR. GARRITY:  Objection, leading.

4           MR. WORTMANN:  Strike that, I'll rephrase.

5   Q.   Did you see anything recovered?

6   A.   Yes.

7   Q.   What?

8   A.   It was a Newport cigarette pack.

9   Q.   And where was it recovered from?

10  A.   His right pants pocket, front pants pocket.

11  Q.   When Officer Velez pulled out that cigarette pack, what

12  did he do with it?

13  A.   He handed it to me.

14  Q.   Did you notice anything unusual about it?

15  A.   Yes, I did.

16  Q.   What?

17  A.   Its weight was inconsistent with a pack of cigarettes, and

18  it also had a plastic bag that was protruding from the top.

19  Q.   So what did you do?

20  A.   I inspected the bag and the cigarette pack.

21  Q.   What did you find inside the bag?

22  A.   Five rounds of ammunition.

23  Q.   And, Officer Finn, what did you do with the cigarette

24  pack, the plastic bag and the ammunition?

25  A.   I provided that to detectives who arrived on scene,

1    Detective Magoon.

2           MR. WORTMANN:  That's all I have, your Honor, thank

3    you.

4                         CROSS-EXAMINATION

5    BY MR. GARRITY:

6    Q.   Good morning, Officer Flynn.  I'm sorry, I think I called

7    you Flynn.  You're familiar with Norfolk Park, is that right?

8    A.   Yes, I am.

9    Q.   You've been there a bunch of times?

10   A.   Yes.

11   Q.   Mildred Avenue from the corner where you and

12   Officer Bissonnette pulled over, there's an entrance right

13   there to the park?

14   A.   At which point?

15   Q.   It's right there.  Is that the entrance to the park?

16   A.   I believe there's actually two entrances.  I could be

17   mistaken, but I think there's one directly behind that junction

18   box as well.

19   Q.   Where this woman with the coat is?

20   A.   Just in front of her, towards -- away from Norfolk Street,

21   I believe there's two entrances there.

22   Q.   There's one on the right-hand side of the junction box; is

23   that right?

24   A.   Yes, sir.

25   Q.   And one right here?

1    A.    Yes.

2    Q.    And just getting back to what brought you and

3    Officer Bissonnette there, you heard dispatch call in about a

4    fight among girls at Norfolk and Fessenden Street?

5    A.    Yes.

6    Q.    And you and Officer Bissonnette are on your way to Walk

7    Hill Street?

8    A.    That's correct.

9    Q.    And you decide to assist in this one; is that right?

10   A.    That's correct.

11   Q.    And Fessenden Street is across the street but a little

12   kind of like diagonally across?

13   A.    Yes.

14   Q.    And when you get to that area, rather than go on Fessenden

15   Street, Officer Bissonnette turns the cruiser or the car onto

16   Mildred Avenue, right?

17   A.    That's correct.

18   Q.    And before Officer Bissonnette pulled over, you saw these

19   five individuals coming down Norfolk Street?

20   A.    Yes.

21   Q.    And you had a brief view of them before

22   Officer Bissonnette pulled over?

23   A.    View?

24   Q.    Right.

25   A.    Yes.

1    Q.    Really brief view, is that fair to say?

2    A.    Yes, sir.

3    Q.    And the sidewalk as you come down Norfolk Street there is

4    it fair to say pretty narrow?

5    A.    It's an average width, I'd say.

6    Q.    Average width of a regular sidewalk?

7    A.    Yes.

8    Q.    Not wide enough to have five individuals walking side by

9    side, right?

10   A.    I don't know, it depends on the individual.

11   Q.    Well, you eventually spoke to four of these individuals,

12   right?

13   A.    Yes.

14   Q.    And fair to say most of them were around 6 feet tall?

15   A.    I don't recall.

16   Q.    Well, they weren't small, right?

17   A.    I don't recall those four.

18   Q.    Do you recall what they were wearing?

19   A.    I don't.

20   Q.    Did they have on to your memory different clothing than

21   what Mr. Belin had on?

22   A.    I don't remember.

23   Q.    Have you seen any FIOD cards that were done on these

24   individuals?

25   A.    I think the night the report was processed.

1    Q.    You saw those cards?

2    A.    I believe so, yes.

3    Q.    And those cards were on the four individuals you were

4    speaking with?

5    A.    I had an interaction with one male.  The group that were

6    approaching Norfolk Street and Mildred Ave. were the same four

7    that were FIO'd.

8    Q.    And those FIO cards indicate they were all wearing

9    sweatshirts, right, or hoodies?

10   A.    I don't know.  I don't remember the FIO cards.

11   Q.    If I showed those cards to you, would that refresh your

12   recollection?

13   A.    Yes.

14          MR. GARRITY:  May I approach, your Honor?

15          THE COURT:  Yes.

16   Q.    I show you those documents.  Are those the FIO cards we're

17   talking about?

18   A.    No.  These are FIO cards from a database, but they're not

19   the FIO forms that were filled out by the officer who would

20   have stopped them that night.

21   Q.    There's a different form than that?

22   A.    There's a physical paper form that is a notepad type of

23   form.

24   Q.    Is that an accurate reflection of what was on those cards?

25   A.    It should be as it's entered, yes.

1  Q.   Why don't you take a look at that and see if it helps

2  refresh your recollection as to what they might have been

3  wearing?

4  A.   There's only three here.

5  Q.   Of the three that are there?

6  A.   It indicates gray hooded sweat, a blue hoodie and a black

7  hoodie as it's recorded here.

8  Q.   And the photograph that's in front of you shows a woman

9  right by that brown electrical box, right?

10 A.   It's hard to see.  I can't tell if it's a woman or not.

11 Q.   If I showed you the actual photo, would that help?

12 A.   Sure, if I can make it out.

13      MR. GARRITY:  May I approach, your Honor?

14      THE COURT:  Yes.

15 Q.   It's Exhibit 5.7.  Does that look like a woman right to

16 the left of that box wearing a coat?

17 A.   Yes.  Well, there's another woman it appears on the top

18 corner as well, but, yes, it does appear to be a woman by that

19 box.

20 Q.   Wearing a coat?

21 A.   Yes.

22 Q.   And you said you spoke to one of the individuals of the

23 five you initially saw walking down Norfolk, right?

24 A.   Yes.

25 Q.   And you didn't spend a whole lot of time with them before

1    you ran over towards the brown electrical box?

2    A.    That's correct.

3    Q.    Would it be fair to say seconds?

4    A.    Yes.

5    Q.    And you didn't see -- the first time you see the gun is

6    when it's in Officer Bissonnette's hand, right?

7    A.    That's correct.

8    Q.    And it was Officer Felez that searches Mr. Belin?

9    A.    Velez.

10   Q.    Velez, I'm sorry, he's the one that searches Mr. Belin,

11   right?

12   A.    Yes.

13   Q.    He's the one that reaches into his pockets?

14   A.    That's correct.

15   Q.    And where were you when Officer Velez was doing that?

16   A.    Standing to his right.

17   Q.    And how long did you stay at the scene before you leave?

18   A.    Approximately 15 minutes, 10 to 15 minutes.

19   Q.    And do detectives arrive on the scene before you leave?

20   A.    Yes.

21   Q.    And is it Detectives Magoon and Josey that show up?

22   A.    That's correct.

23   Q.    Detective Magoon takes photographs?

24   A.    I don't know if it was Detective Magoon or Detective Josey

25   who took photographs.

1    Q.    The cigarette pack, do you hand that over to

2    Detective Josey or Detective Magoon?

3    A.    Magoon.

4    Q.    There were other individuals in a park; is that fair to

5    say?

6    A.    Yes.

7    Q.    Did you make any attempts to interview those individuals?

8    A.    I did not.

9    Q.    There's a school right around the corner.  Put 5.7 up

10   again.  The corner right at the bottom; do you see that?

11   A.    Yes.

12   Q.    Right around the corner is the Mildred Avenue School?

13   A.    Yes.

14   Q.    Did you make any attempts to get any kind of security or

15   video footage from that school?

16   A.    I did not.

17   Q.    Are you aware as to whether or not there's a video camera

18   on Norfolk Street near the park?

19   A.    I am aware of that, yes.

20   Q.    It's right in between the two basketball courts, right?

21   A.    Correct.

22   Q.    Did you make any attempts to get video footage from that

23   surveillance camera?

24   A.    No.

25   Q.    To your knowledge, did any officer from the Boston Police

1  Department make attempts to get video footage from that camera?

2  A.    I don't know.

3  Q.    Have you seen any video footage of this incident that was

4  taken from that camera?

5  A.    No.

6  Q.    And you wrote the report in this case, right?

7  A.    I did.

8  Q.    The incident report?

9  A.    Yes.

10  Q.    Do you recall when you wrote it?

11  A.    I don't have that committed to memory, the same night, but

12  I don't know how long after the incident.

13  Q.    Where did you write it, if you recall?

14  A.    At the district station.

15  Q.    Did you write it by yourself?

16  A.    There were other officers in the room.

17  Q.    But did you draft it yourself?

18  A.    Yes.

19  Q.    And the other officers in the room, do you recall who they

20  were?

21  A.    No.

22  Q.    Did you write any notes at the scene?

23  A.    No.

24  Q.    Did you see whether or not Officer Bissonnette or any

25  other officer wrote notes?

1    A.   No.

2    Q.   And when you wrote the report, were you sitting down at a

3    computer or did you handwrite it?

4    A.   No, I had a computer, sir.

5    Q.   You had a computer?

6    A.   Yes.

7    Q.   And you wrote it up?

8    A.   Yes.

9    Q.   And did you submit that to your supervisor?

10   A.   Yes.

11   Q.   And who was your supervisor, if you recall?

12   A.   I don't recall.

13        MR. GARRITY:  Can I have one second, your Honor?

14        THE COURT:  Yes.

15        MR. GARRITY:  No further questions, your Honor.

16        THE COURT:  Redirect.

17                  REDIRECT EXAMINATION

18   BY MR. WORTMANN:

19   Q.   Did you consult with Officer Bissonnette when you wrote

20   the report?

21   A.   Yes.

22        MR. GARRITY:  Objection.  Leading.

23        THE COURT:  Sustained, the answer will be struck.

24   Q.   Who did you consult when you were writing the report?

25   A.   Officers Bissonnette, Bridges and Driscoll.

1    Q.   And do you know what Officer Bissonnette was doing while

2    you were writing the report?

3    A.   I can't say with certainty, but I believe he was booking

4    the prisoner.

5            MR. WORTMANN:  And if I could approach, your Honor?

6            THE COURT:  Yes.

7    Q.   Just showing you what was marked as Exhibit 5.6, do you

8    see a female dressed in it looks like pink?

9    A.   Yes.

10   Q.   What does she appear to be wearing?

11   A.   Blue jeans and a short sleeve pink T-shirt.

12           MR. WORTMANN:  That's all I have, your Honor, thank

13   you.

14           THE COURT:  Recross.

15                    RECROSS-EXAMINATION

16   BY MR. GARRITY:

17   Q.   So Officer Bissonnette was booking a prisoner or was he

18   booking Mr. Belin?

19   A.   As far as my memory serves me, it was Mr. Belin, not a

20   separate prisoner.  I can't remember if it was Mr. Bissonnette

21   that was booked.

22   Q.   Was he in a separate room?

23   A.   There's a booking area of the station, yes, separate room

24   from the report writing room.

25   Q.   And you weren't talking to him over the phone, I take it?

1    A.   No.

2    Q.   Did you and he drive back to the station together?

3    A.   As far as I recall, yes.

4    Q.   You handed your report to your supervisor, right?

5    A.   We submit it electronically, yes.

6    Q.   You didn't hand it to Officer Bissonnette before you

7    handed it to or e-mailed it to your supervisor, right?

8    A.   No.

9    Q.   Did you talk about the events on the way to the station?

10   A.   I don't remember.

11   Q.   And he wasn't next to you when you were writing the

12   report?

13   A.   I don't know if he was in the room while I was writing the

14   report or not, I don't remember.

15   Q.   Just in terms of what people may have been wearing that

16   night, I show you Exhibit 5.5.  Do you see that in front of

17   you?

18   A.   Yes, sir.

19   Q.   This individual here, do you see what -- can you see what

20   they're wearing?

21   A.   I can't, the lighting on the screen is difficult to see.

22   Q.   If I showed you the actual photograph, would that help?

23   A.   Yes, sir.

24           MR. GARRITY:  May I approach, your Honor?

25           THE COURT:  Yes.

1    Q.    Again, that's Exhibit 5.5.  Does that individual appear to

2    be wearing a red hoodie?

3    A.    It does appear that way, yes.

4    Q.    And would it be fair to say that September 17th was a

5    fairly typical September late afternoon in terms of

6    temperature?

7              MR. WORTMANN:  Objection.

8              THE COURT:  I'll let him answer.  I assume you're not

9    asking for a weather statistic --

10             MR. GARRITY:  Right.

11             THE COURT:  -- just impression.  Overruled.

12   A.    September weather can vary, so I don't know what you mean

13   by typical September weather.

14   Q.    Well, people have varying types of clothes on that day,

15   right?

16   A.    Yes, sir.

17   Q.    People with hoodies, people with coats, people with

18   T-shirts?

19   A.    I can't say with certainty coats, but certainly the other

20   items that you described, yes.

21   Q.    And we did see that one photograph of the individual

22   wearing what appears to be a white long coat, right?

23   A.    It appears to be a coat, yes.

24             MR. GARRITY:  I have no further questions.

25             MR. WORTMANN:  Your Honor, can I have one.

1          THE COURT:  All right.

2                    REDIRECT EXAMINATION

3    BY MR. WORTMANN:

4    Q.   Was Officer Bissonnette given an opportunity to read the

5    report before it was submitted?

6    A.   Yes.

7          MR. GARRITY:  Objection.  Leading.

8          THE COURT:  Overruled.

9          MR. WORTMANN:  That's all I have, your Honor.

10         THE COURT:  Anything further, Mr. Garrity?

11         MR. GARRITY:  No, your Honor.

12         THE COURT:  All right, you may step down.

13         THE WITNESS:  Thank you, your Honor.

14         MR. WORTMANN:  Detective Magoon to the stand, please.

15         KEVIN MAGOON, having been duly sworn by the Clerk,

16   testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. WORTMANN:

19   Q.   Sir, could you tell us your name, please, spelling your

20   first and last name for the record.

21   A.   Kevin, K-e-v-i-n M-a-g-o-o-n.

22   Q.   Where do you work, sir?

23   A.   Boston Police Department, Area B-3 in Mattapan.

24   Q.   For how long?

25   A.   I've been there ten years.

1    Q.    And what's your current rank?

2    A.    Detective.

3    Q.    How long have you held the rank of detective?

4    A.    Ten years.

5    Q.    Have you been assigned to District B-3 for that entire

6    period?

7    A.    Yes.

8    Q.    Generally, sir, could you describe for the ladies and

9    gentlemen of the jury your responsibilities as a detective

10   assigned to a district?

11   A.    I respond to general investigations for assaults,

12   shootings, home breaks, larcenies.

13   Q.    And do you have any specific defined responsibilities

14   whenever a gun is recovered in any case on the street?

15   A.    We do, yes.

16   Q.    And what are they?

17   A.    We'll go to the scene, photograph it and recover it.

18   Q.    And what else?

19   A.    We'll process it and send it to ballistics.

20   Q.    Okay.  And whose responsibility is it to take control of

21   the evidence, specifically a gun and any ammunition?

22   A.    We, as the detectives, when we respond, we will take

23   custody of it.

24   Q.    Now, let me ask you a question, Detective Magoon.  Have

25   you ever allowed a gun to stay in the possession of a suspect

1   so it could be photographed with that person in custody of the

2   gun?

3   A.   No.

4   Q.   Why wouldn't you do that?

5   A.   Leave a loaded gun on a suspect to take a photograph?

6   Q.   Yes.

7   A.   It's dangerous.

8   Q.   Let's talk September 17th, 2012.  Were you working that

9   night?

10  A.   Yes, I was.

11  Q.   What shift, sir?

12  A.   I was working the first half, 4 p.m. to 11:45.

13  Q.   Some time after 6:45, did you receive a call regarding a

14  recovered gun?

15  A.   Yes.

16  Q.   And where was that call?  Where did you respond to?

17  A.   Norfolk Street at Norfolk Park.

18  Q.   And who did you meet up with when you got there?

19  A.   When myself and Detective Windell Josey responded there,

20  we met with other Boston Police Area B-3 units.

21  Q.   Okay.  What, if anything, did you recover while you were

22  on scene?

23  A.   We recovered a firearm.

24  Q.   Yes.  What else?

25  A.   Magazine, there was an additional five round cartridges of

1    ammunition.

2    Q.   And where were those additional five rounds of ammunition,

3    how were they stored?

4    A.   They were stored inside a plastic bag which was placed

5    inside a Newport cigarette box.

6    Q.   All right.  And who collected the firearm and the extra

7    bag of ammunition?

8    A.   From the defendant?

9    Q.   From the police officers?

10   A.   Detective Josey did.

11   Q.   Okay.  And when did you come in contact with the firearm

12   and the ammunition?

13   A.   When we returned to Area B-3 with the firearm, I took

14   custody of it, and I fumed the weapon.

15   Q.   All right.  Can you tell the ladies and gentlemen of the

16   jury what fuming means?

17   A.   Fuming is a process where we have a chamber at the

18   station, it's like a fish tank, and inside this chamber there

19   are two heating elements.  We place a glue on the heating

20   element, a Krazy Glue, we place whatever the item is that we're

21   fuming inside this tank.  The heating element heats the glue,

22   which creates a vapor, and that vapor will attach to any

23   fingerprints that may be on whatever the item is that you're

24   fuming.

25   Q.   And what did you fume in this case?

1   A.   I fumed the firearm, the magazine, and I believe that was

2   it, yeah, the firearm and the magazine.

3   Q.   And once the fuming had been done of the firearm and the

4   magazine, what did you do with the evidence?

5   A.   It was photographed, placed in a gun box, and it was

6   forwarded to the ballistics and latents unit.

7           MR. WORTMANN:  May I approach, your Honor?

8           THE COURT:  Yes.

9   Q.   First, I'm showing you what's been admitted as

10  Exhibit 6.1.  Do you recognize that?

11  A.   Yes.

12  Q.   And can you tell us what it is?

13  A.   This is the recovered firearm that I fumed at Area B-3.

14  Q.   On September 17th, 2012?

15  A.   Yes.

16  Q.   And how do you know it's the same gun?

17  A.   This is my markings, this is my bar code, this is -- I

18  placed this on the firearm.

19  Q.   And the bar code contains an individualized number?

20  A.   Yes, it does.

21  Q.   And what's that number called in the document?

22  A.   It is referred to as a CC number.  It identifies the

23  incident.

24  Q.   And each incident report is assigned a separate number?

25  A.   Yes.

1    Q.    So you know by looking at that number that that's the gun

2    that you recovered?

3    A.    Yes.

4    Q.    And showing you what's been marked for identification as

5    Exhibit 6.2, do you recognize that, sir?

6    A.    Yes.

7    Q.    And what is that?

8    A.    That is my handwriting, and this is the cartridges that I

9    removed from the magazine and from the chamber of the firearm.

10   Q.    And when did you make the gun safe?

11   A.    I'm not sure if Windell, Detective Josey, made the gun

12   safe on scene or back at the station.

13   Q.    But that's your handwriting?

14   A.    That's my handwriting, yes.

15   Q.    And those are the cartridges you took that were collected

16   along with this gun?

17   A.    Yes.

18   Q.    And third, sir, I ask you to take a look at Exhibit 6.3.

19   Do you recognize that?

20   A.    Yes.

21   Q.    What is that?

22   A.    This is also my handwriting.  This was the plastic bag

23   that the additional five cartridges were located in.

24   Q.    And how do you know that these are the same bullets that

25   came out of the plastic bag that was in the Newport box?

1    A.   I'm the one that removed those from the plastic bag.

2    Q.   And do we also see the same CC number?

3    A.   Yes.

4    Q.   And is that in your writing?

5    A.   The CC number and that's my writing.

6         MR. WORTMANN:  Your Honor, I'd offer Exhibit 6.3 into

7    evidence.

8         MR. GARRITY:  Just the prior objection, Judge.

9         THE COURT:  All right.  That objection is overruled.

10   It may be admitted, Exhibit 6.3.

11        (Exhibit No. 6.3 was admitted into evidence.)

12   Q.   Now, you also indicated that before you closed up the

13   evidence, that you took pictures of the firearm and the

14   ammunition?

15   A.   Yes.

16   Q.   I'm showing you what's been marked as Exhibits 7.1 to 7.7.

17   I'm going to ask if you take a look at that and if you

18   recognize those pictures?

19   A.   Yes.

20   Q.   And --

21   A.   That's my writing on the cover for the photographs, the

22   location date, respond to Detectives Magoon and Josey.  This is

23   the firearm and the box, firearm make, make, obliterated serial

24   numbers, photographs of the recovered cartridges.

25   Q.   And that includes both the eleven that were taken from the

1    gun and the five in the bag?

2    A.   Yes, and here's photographs of the five that were in the

3    back.

4         MR. WORTMANN:  Your Honor, I offer 7.1 to 7.7 into

5    evidence.

6         MR. GARRITY:  No objection.

7         THE COURT:  They may be admitted, Exhibits 7.1 through

8    7.7.

9         (Exhibit Nos. 7.1 through 7.7 was admitted into

10   evidence.)

11   Q.   If I could just briefly, what's this called?

12   A.   When you take photographs, before you take the first

13   photograph, you fill out a placard, which you have the date on

14   the top, the location, Norfolk at Mildred Ave., the CC number,

15   which is the unique number for the incident.

16   Q.   That's that number right there?

17   A.   Yeah, the 120584284, and then myself, Magoon and

18   Detective Josey's names.

19   Q.   And Exhibit 2, 7.2, that includes what?

20   A.   That's the firearm, magazine, recovered cartridges and a

21   Newport cigarette box.

22   Q.   Do you know what happened to the Newport cigarette box?

23   A.   I do not.  I did not enter into evidence because it was

24   handled by several officers prior to coming into my custody, so

25   it wasn't entered into any type of testing.

1   Q.   7.3 is?

2   A.   That's a photograph of the make and model of the firearm.

3   Q.   7.4?

4   A.   Place of manufacture.

5   Q.   7.5?

6   A.   Obliterated serial number.

7   Q.   And, again, if we look at the handle of the gun, you can

8   see the same thing on the actual firearm, 6.1?

9   A.   Yes.

10   Q.   7.6?

11   A.   Cartridges that were recovered.

12   Q.   Okay.  Finally Exhibit 7.7?

13   A.   Those are the five individual cartridges that were located

14   on that Newport box.

15   Q.   Did you leave those in the plastic bag, sir?

16   A.   Yes, they stayed in the bag.

17   Q.   All right.  Now --

18         MR. WORTMANN:  May I approach again, your Honor?

19         THE COURT:  Yes.

20   Q.   Once you finished photographing and processing items 6.1,

21   6.2 and 6.3, that's the firearm and the 16 rounds of

22   ammunition, what did you do with it?

23   A.   They were fumed, they were placed in this box, the box was

24   sealed, I initiated it, dated it and I forwarded it to the

25   ballistics and latent unit.

1  Q.   And how do you know this is the same box?

2  A.   This is all my writing.  I'm the one that sealed it.

3  Q.   And does it indicate the CC number that is the CC number

4  assigned to this case?

5  A.   Yes.

6          MR. WORTMANN:  Your Honor, I offer the box as

7  Exhibit 6.4.

8          MR. GARRITY:  No objection.

9          THE COURT:  It may be admitted 6.4.

10          (Exhibit No. 6.4 was admitted into evidence.)

11          MR. WORTMANN:  I have nothing else for this witness at

12  this time.  Thank you, your Honor.

13          THE COURT:  All right.  We might as well take our

14  12:00 break early.  We'll take a very quick recess.

15          THE CLERK:  All rise for the jury.

16          (A recess was taken.)

17          THE CLERK:  All rise for the jury.

18          (JURORS ENTERED THE COURTROOM.)

19          THE CLERK:  Thank you.  You may be seated.

20          THE COURT:  Mr. Garrity, cross-examination.

21                    CROSS-EXAMINATION

22  BY MR. GARRITY:

23  Q.   Good afternoon, Detective.

24  A.   Good afternoon.

25  Q.   You and Detective Josey went to the scene; is that right?

1    A.   Yes.

2    Q.   And you photographed the scene; is that right?

3    A.   Yes.

4    Q.   And Detective Josey, he took possession of the gun and the

5    ammunition; is that right?

6    A.   Yes.

7    Q.   So Officer Bissonnette did not hand you a gun?

8    A.   No.

9    Q.   And are you familiar with that area, Norfolk Park?

10   A.   Yes.

11   Q.   How long have you been a detective in B-3?

12   A.   Ten years.

13   Q.   And were you a patrol officer before that?

14   A.   No, I did my patrol in Roxbury in District 4 and the south

15   end.

16   Q.   But ten years in District B-3?

17   A.   Ten years in District 3 and 14 years in Roxbury and the

18   south end.

19   Q.   So you are very familiar with Norfolk Park?

20   A.   Yeah.

21   Q.   And there's a video camera there by the basketball courts?

22   A.   There may be, I'm not sure.  We do have cameras and short

23   spotters in the area.  I'm not sure of all the locations.

24   Q.   And short spotters, are they sound or sound-activated?

25   A.   Yes.

1    Q.   But there are other cameras there as well that record?

2    A.   I'm not sure of that.

3    Q.   Were you asked to obtain any video surveillance from

4    Norfolk Park at all with respect to this event?

5    A.   No.

6    Q.   And are you familiar with the Mildred Avenue School?

7    A.   Yes.

8    Q.   Were you asked to obtain any video surveillance footage

9    from that school?

10   A.   No.

11   Q.   And that's right on the corner as you come down Mildred

12   Avenue?

13   A.   When you go down Mildred, you take the right, it's right

14   there on the left-hand side.

15   Q.   And you've been a member of the Boston Police Department

16   for over 20 years; is that right?

17   A.   Twenty-four years.

18   Q.   And there are rules and procedures you're supposed to

19   follow; is that right?

20   A.   Yes.

21   Q.   They're laid out in written directives and written rules?

22   A.   Yes.

23   Q.   And there's a specific rule, isn't there, about how to

24   handle handgun evidence or firearm evidence?

25   A.   Yes.

1    Q.   Do you recall what that rule contains?

2    A.   No.

3    Q.   If I were to show it to you, would it help refresh your

4    recollection?

5    A.   I could read it for you.  I'm sure it's a lengthy rule.

6              MR. GARRITY:  May I approach, your Honor?

7              THE COURT:  Yes.

8    Q.   I'm not going to ask you to read the whole thing.

9    A.   Okay.  Yeah.

10   Q.   Just I guess the first page there.  Just read it to

11   yourself, see if it refreshes your recollection.

12   A.   Okay, sure.

13   Q.   Have you had a chance to look at it?

14   A.   Yeah.

15   Q.   The rule starts out, doesn't it, with a section that says,

16   "With handguns, you're supposed to be especially vigilant in

17   following the rules," do you see that there, the top section?

18   A.   Yeah.

19   Q.   And the bottom section talks about an officer who comes

20   into possession of a handgun, right?

21   A.   Yes.

22   Q.   Or takes possession of a handgun?

23   A.   Yes.

24   Q.   What they're supposed to do?

25   A.   Yes.

1    Q.   And an officer who comes into possession of a gun is

2    supposed to write an incident report, right?

3    A.   Yes.

4    Q.   And I'm not talking about you, you wrote an investigation

5    report, right?

6    A.   Yes.

7    Q.   And that's separate from an incident report?

8    A.   Yes.

9    Q.   And an officer who comes into possession of a gun is

10   supposed to fill out another form, are they not?

11   A.   No, that was my responsibility.  I'm the officer that came

12   in possession of it and processed it, that's what I did.  The

13   evidence submission form, is that what you're getting at?

14   Q.   Right, that form after the incident.

15   A.   Evidence submission form, I filled that out.

16   Q.   Is that BPD with a number on it, the form there do you

17   see?

18   A.   Final submission form BPD, Form 2419?

19   Q.   Right.  Did you fill that out?

20   A.   Yes.

21   Q.   But the incident report is supposed to be filled out by

22   the officer who takes possession of it, right?

23   A.   No, the responding officers that made the arrest, either

24   the driver or the observer.  One drives, the observer usually

25   writes the report, so one of those two officers would have

1    wrote the report.

2    Q.    An observer writes the report?

3    A.    Normally in a two-car situation, the operator of the

4    vehicle drives the car, and the observer, the passenger, would

5    write all the reports for the course of the tour of duty.

6    Q.    But the rule says the officer who comes into possession is

7    supposed to write the report, right?

8    A.    It says, "Firearms come into possession of police

9    officers, whenever a firearm comes into the possession of a

10   police officer, the officer shall complete an incident report,

11   a firearm submission form and the firearms analysis examining

12   unit log form."

13   Q.    And if the observer doesn't observe the event, it should

14   be the officer who takes possession of the gun, right?

15            MR. WORTMANN:  Objection, your Honor.

16            THE COURT:  You're saying what do the rules call for?

17            MR. GARRITY:  Right.

18            THE COURT:  I'll allow it, go ahead.

19   A.    Knowledge of one is knowledge of all.  Either one of them

20   could have wrote the report, either one of the two officers.

21   Q.    Does the rule allow for that?

22   A.    Yeah, it's common.

23   Q.    It's in there?

24   A.    Firearms come into the possession of police officers, it

25   doesn't specify who.  Are you asking who is supposed to write

1    the report out of the two?

2    Q.    Right.

3    A.    Either one of them could have written the report.

4    Q.    Does it say who?

5    A.    It says police officers, plural.

6    Q.    Does it say the officer who took possession of it?

7    A.    That would be me, I took possession of it.

8          MR. GARRITY:  May I approach, your Honor?

9          THE COURT:  Yes.

10   Q.    It starts out, "Section 3, firearms coming into possession

11   of police officers:"  Right?

12   A.    Uh-hum.

13   Q.    "Whenever a firearm comes into the possession of a police

14   officer," singular, "the officer shall complete an incident

15   report," right?

16   A.    Yeah.

17   Q.    That's what the rule says?

18   A.    That's what they did, yeah.

19   Q.    That's what the rule says?

20   A.    Yes.

21   Q.    And the officer coming into possession of the gun in this

22   case was Officer Bissonnette, right?

23   A.    Yes.

24         MR. GARRITY:  I have no further questions.

25         THE COURT:  Redirect.

1        MR. WORTMANN:  If I could have just a moment, your

2   Honor?

3        THE COURT:  Yes.

4                     REDIRECT EXAMINATION

5   BY MR. WORTMANN:

6   Q.   How many police reports have you read regarding recovery

7   of firearms?

8   A.   I have no -- I couldn't even guess.

9   Q.   Well, let me ask you, is it the practice that only the

10  officer who seizes the gun writes the report?

11  A.   No.

12       MR. WORTMANN:  I have nothing else.  Thank you, your

13  Honor.

14       THE COURT:  Mr. Garrity.

15                    RECROSS-EXAMINATION

16  BY MR. GARRITY:

17  Q.   Do the Boston Police Department rules and procedures start

18  out with a requirement that every officer is supposed to follow

19  the rules?

20  A.   Yes.

21       MR. GARRITY:  I have no further questions.

22       THE COURT:  Thank you.  You may step down.

23       MR. WORTMANN:  The government calls Brandon McClellan

24  to the stand.

25       BRANDON McCLELLAN, having been duly sworn by the

1    Clerk, testified as follows:

2                        <u>DIRECT EXAMINATION</u>

3    BY MR. WORTMANN:

4    Q.   Sir, would you identify yourself, please.

5    A.   Yes, my name is Brandon McClellan.

6    Q.   Spell the last and first name, please.

7    A.   B-r-a-n-d-o-n, McClellan, M-c-C-l-e-l-l-a-n.

8    Q.   What do you do for a living?

9    A.   I'm a probation officer.

10   Q.   And how long have you been a probation officer?

11   A.   Approximately 14, 14 years.

12   Q.   And where are you presently assigned, sir?

13   A.   I'm presently assigned to the Plymouth Superior Court out

14   of Brockton, Massachusetts.

15   Q.   And how long have you been in Brockton?

16   A.   A little over a year.

17   Q.   Prior to that, where were you?

18   A.   I was employed by Suffolk Superior Court in Boston,

19   Massachusetts.

20   Q.   For how long?

21   A.   For about 13 years.

22   Q.   And can you describe generally what your responsibilities

23   were as a probation officer in the Suffolk Superior Court?

24   A.   Sure.  Our main function is to enforce all orders handed

25   down by the Court on individuals placed on probation.

1    Q.   Are you given a particular caseload that becomes your

2    responsibility?

3    A.   That's correct.

4    Q.   Now, in connection with your work at Suffolk Superior, did

5    you become familiar with someone named King Belin?

6    A.   Yes, I did.

7    Q.   Who is Mr. Belin?

8    A.   He was someone I supervised on probation.

9    Q.   And did he come under your supervision following a

10   conviction that he had for two crimes punishable for a period

11   in excess of one year?

12   A.   That is correct, sir, yes.

13   Q.   And do you see the person who you know to be King Belin

14   who was on probation before you beginning in 2010?

15   A.   I do.

16   Q.   Could you point him out, please?

17   A.   Yes.  He's sitting to my left.  He's the gentleman with

18   the braided hair wearing a white shirt at defense counsel

19   table.

20        MR. WORTMANN:  Your Honor, if the record could reflect

21   that Mr. McClellan has indicated the defendant, King Belin.

22        THE COURT:  Yes.

23   Q.   Now, during your time at Suffolk Superior Court, are you

24   familiar with a document entitled supervision sheet?

25   A.   I am.

1          MR. WORTMANN:  Your Honor, may I approach, please?

2          THE COURT:  Yes.

3    Q.   Showing you what's been marked for identification as

4    Exhibit 2, do you recognize that document?

5    A.   I do.

6    Q.   And what is it?

7    A.   It is a supervision sheet, what we also call a face sheet.

8    It lists an individual's particulars, including their name,

9    date of birth, their residence and what their conditions are.

10   Q.   And would you come into contact with that when you first

11   undertook the responsibility of supervising a particular

12   defendant?

13   A.   Yes.

14   Q.   Who does this supervision sheet relate to?

15   A.   Mr. King Belin.

16   Q.   Is that the sheet you received when you began supervising

17   Mr. Belin?

18   A.   Yes.

19   Q.   And is that your signature on the bottom?

20   A.   Yes, on the bottom that is my signature.

21          MR. WORTMANN:  Your Honor, I offer the supervision

22   sheet as Exhibit Number 2.

23          MR. GARRITY:  No objection.

24          THE COURT:  It may be admitted Exhibit Number 2.

25          (Exhibit No. 2 was admitted into evidence.)

1    Q.   Now, does the supervision sheet indicate the number of the

2    case on which you were supervising him on?

3    A.   It does, yes.

4    Q.   And could you just tell the grand jury -- sorry, tell the

5    ladies and gentlemen of the jury what that number is.

6    A.   It's Suffolk County Docket Number 2009, 10693.

7    Q.   I'm going to ask you to look at Exhibit Number 3 which has

8    been introduced, which is a certified copy of a conviction, and

9    could you let the ladies and gentlemen of the jury know what

10   the number of that conviction is?

11   A.   Yes, it is Suffolk Superior Court Criminal Docket 2009,

12   10693.

13   Q.   So the supervision sheet and the case to which the

14   supervision sheet refers is, in fact, Exhibit 3?

15   A.   Correct.

16        MR. WORTMANN:  Nothing else, thank you, your Honor.

17        MR. GARRITY:  No questions.

18        THE COURT:  Thank you.  You may step down.

19        THE WITNESS:  Thank you, your Honor.

20        MR. WORTMANN:  The government calls Nina Jefferson to

21   the stand.

22        NINA JEFFERSON, having been duly sworn by the Clerk,

23   testified as follows:

24                        DIRECT EXAMINATION

25   BY MR. WORTMANN:

1   Q.   Tell us your name, please, ma'am.

2   A.   Nina Jefferson.

3   Q.   And spell it for us, just for the record.

4   A.   N-i-n-a J-e-f-f-e-r-s-o-n.

5   Q.   Ms. Jefferson, where do you work?

6   A.   I am currently employed with the Boston Police Department.

7   Q.   And where are you assigned and what do you do?

8   A.   I work in the firearms analysis unit, and I am a firearms

9   examiner.

10   Q.   How long have you worked as a firearms examiner?

11   A.   Approximately four years.

12   Q.   And prior to that, were you a sworn officer?

13   A.   Yes.

14   Q.   For how long?

15   A.   For about five years.

16   Q.   So, in total, you've been with the Boston Police

17   Department for approximately nine years?

18   A.   Yes.

19   Q.   And I take it throughout that time you've carried a gun on

20   a regular basis?

21   A.   Yes.

22   Q.   Familiar with firearms?

23   A.   Yes.

24   Q.   Now, when you transferred to the firearms analysis

25   section, what, if anything, did you have to do in order to

1   become a firearms examiner?

2   A.    When I got to the unit, I was put in training.  I first

3   did on-the-job training with some of the experienced firearms

4   examiners that were already there, then the department hired

5   some outside contractors that came in and did some training

6   with us as well, and then I got into a year-long intensive

7   program with the ATF, the Alcohol, Tobacco and Firearms, and I

8   did an examiner's academy with them for one year.

9   Q.    And have you been subject to periodic testing as well?

10  A.    Yes.

11  Q.    And exactly what is it that you do as a firearms examiner?

12  A.    So the firearms analysis unit takes in all of the firearms

13  that are taken off the streets in Boston, and in addition to

14  the firearms, they take in any firearms-related evidence, which

15  would mean magazine or a cartridge or a piece of ammunition,

16  and then after we receive them in our office, we analyze them,

17  and we draw conclusions based on the evidence that we have.

18  Q.    Okay.  And at some point were you certified to be a

19  firearms examiner with respect to both identification and

20  operational -- operation of firearms and ammunition?

21  A.    Yes.

22  Q.    How long ago was that?

23  A.    For operability, I was signed off in June of 2012, and for

24  identification, I was signed off in 2014.

25  Q.    And can you tell, have you been qualified as an expert in

1    firearms handling issues?

2    A.    Yes, I have.

3    Q.    How many times have you so testified as an expert?

4    A.    I've testified about five times now.

5         MR. WORTMANN:   Okay.   Now, if I can approach, your

6    Honor, please?

7         THE COURT:   Yes.

8    Q.    I put in front of you Exhibit 6.1, 6.2 and 6.3, and I

9    would ask that you take a look at those, please.

10   A.    Yes.

11   Q.    First, with respect to Exhibit 6.1, do you recognize that

12   firearm?

13   A.    Yes, I do.

14   Q.    And were you asked to perform some work on it in

15   connection with this case?

16   A.    Yes, I was.

17   Q.    And can you tell the ladies and gentlemen of the jury what

18   you did with respect to the firearm that's Exhibit 6.1?

19   A.    With this firearm, I did an initial process, which we just

20   look at the evidence, mark anything that doesn't look right,

21   scratches, deformities.   We check it to make sure that it's

22   actually safe to even attempt to fire.   We record the just

23   general characteristics, the color, the length, the calibre,

24   and after that I test fired the firearm.

25   Q.    And based on the work that you did and your inspection of

1    it, do you have an opinion to a reasonable degree of

2    professional certainty as to whether article 6.1, namely the

3    firearm that's in front of you, is a weapon that's capable of

4    expelling a projectile by reason of an explosive force?

5    A.    Yes, I do.

6    Q.    What is that opinion, ma'am?

7    A.    My opinion is that it is a firearm.

8    Q.    And could you explain to the ladies and gentlemen of the

9    jury what the basis of your opinion is?

10   A.    The basis of my opinion is that it has to dispel

11   a -- based off of an explosion, it has to be able to dispel a

12   bullet, and I did test firing, and I have two test fires that I

13   used on this firearm.

14   Q.    And could you explain to the ladies and gentlemen of the

15   jury how you test fired this gun?

16   A.    We test fired them by getting two rounds of ammunition

17   that go with this gun, the same calibre, and we have a shooting

18   room where we shoot the firearms into a water tank so that both

19   the cartridge case and the bullet can be recovered.

20   Q.    And when you loaded a round of ammunition into Article

21   6.1, pointed it into the water tank and pulled the trigger,

22   what happened?

23   A.    When I pulled the trigger, the gun went off.

24   Q.    On both occasions?

25   A.    Yes.

1    Q.   Did you also have the opportunity to inspect or do you

2    recognize Exhibit 6.2 and 6.3?

3    A.   6.2 is the -- I'm not sure which.

4         MR. WORTMANN:  If I could approach, your Honor, again?

5         THE COURT:  Yes.

6    Q.   You got it now?

7    A.   Yes.

8    Q.   Okay.  Did you have an opportunity to inspect the contents

9    of Exhibit 6.2 and 6.3?

10   A.   Yes, I did.

11   Q.   And based on that inspection, do you have an opinion as to

12   whether the 11 items in 6.2 and the five items in 6.3 are

13   ammunition or cartridge cases, primers, propellants, powder

14   designed for use to shoot in a firearm?

15   A.   Yes.

16   Q.   And what is that opinion?

17   A.   My opinion is that both 6.2 and 6.3 are both ammunition.

18   Q.   And what's the basis for that opinion, ma'am?

19   A.   A visual examination where you can tell that these are

20   cartridge cases and bullets and primers that you can see

21   visually.

22        MR. WORTMANN:  Thank you.  I have nothing else, your

23   Honor.

24        THE COURT:  Cross-examination.

25

1                        CROSS-EXAMINATION

2    BY MR. GARRITY:

3    Q.   Good afternoon.

4    A.   Good afternoon.

5    Q.   Just a couple questions.  The gun we're talking about,

6    there's a cartridge that goes into it; is that right?

7    A.   Yes.

8    Q.   The ammunition is inside the cartridge?

9    A.   Yes, so when I say cartridge, it's a full round of

10   ammunition.

11   Q.   Right.  I guess I'm talking about the casing for the

12   ammunition.

13   A.   Yes, so the cartridge would be put into the magazine, and

14   then the magazine would be inserted into the firearm.

15   Q.   Maybe I'm using the wrong lingo.

16   A.   Okay, sorry.

17   Q.   The magazine contains the bullets?

18   A.   Yes.

19   Q.   And the magazine goes into the gun?

20   A.   Yes.

21   Q.   And when it goes in, it slides in?

22   A.   Yes.

23   Q.   And it rubs up against the inside of the gun; is that

24   right?

25   A.   Yes.

1    Q.   And when it's taken out, it's rubs up against the inside

2    of the gun as well?

3    A.   Yes, when you're pulling the magazine out?

4    Q.   Right.

5    A.   Yes.

6    Q.   So it's fair to say there's not a big gap of separation

7    between the inside of the gun and the side of the magazine, if

8    I'm saying it right?

9    A.   More likely than not, no, they're pretty much in contact

10    with each other.

11    Q.   They're rubbing against each other as it goes in?

12    A.   There's probably some amount of connection between the

13    outside of the magazine and the inside of the magazine well.

14    That's what it's called.

15    Q.   And rubbing again as it comes back out?

16    A.   Yes.

17         MR. GARRITY:  I have no further questions.

18         MR. WORTMANN:  May I approach, your Honor?

19         THE COURT:  Yes.

20               REDIRECT EXAMINATION

21    BY MR. WORTMANN:

22    Q.   Taking a look at the magazine that was included in 6.1,

23    from the visual eye, can you see a large number of scratches up

24    and down the sides of that magazine?

25    A.   Large number, probably, yes, not anything that's uncommon

1 though.

2        MR. WORTMANN:  Okay.  Thank you.  I have nothing else,

3 thank you, your Honor.

4        THE COURT:  Anything further?

5        MR. GARRITY:  Just very brief.

6                    RECROSS-EXAMINATION

7 BY MR. GARRITY:

8 Q.   It's common to get scratches as the magazine goes in and

9 out?

10 A.   Well, for the magazine to get seeded into the firearm, it

11 has to go up and reach a certain point so that there's -- so

12 that it can stay in contact with the gun and not fall out with

13 test firing the gun or shooting the gun.

14 Q.   As the magazine goes in and out, it gets some scratches

15 because it's rubbing against the inside of the gun; is that

16 right?

17 A.   No, it wouldn't get scratched any crazy way just by

18 putting it into the magazine well.

19 Q.   But you get some rubbing of friction as it goes --

20 A.   Rubbing and friction, yes.

21        MR. GARRITY:  I have no further questions.

22        THE COURT:  Okay.  You may step down.

23        MR. WORTMANN:  I call Special Agent Mattheu Kelsch to

24 the stand, your Honor.

25        MATTHEU KELSCH, having been duly sworn by the Clerk,

1    testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. WORTMANN:

4    Q.   Sir, could you tell us your name, please.

5    A.   Sure.  Good afternoon.  My name is Mattheu Kelsch.

6    Q.   Could you spell both sides of that, please, for us.

7    A.   Sure.  It's spelled a little differently, it's Mattheu,

8    M-a-t-t-h-e-u, and the last name is Kelsch, K-e-l-s-c-h.

9    Q.   What do you do for a living, Mr. Kelsch?

10   A.   I'm employed as a special agent with the Bureau of

11   Alcohol, Tobacco, Firearms and Explosives or more commonly

12   known as ATF.

13   Q.   For how long have you worked at ATF?

14   A.   I've been with ATF for approximately 14 years now.

15   Q.   And could you tell us where you're assigned and what your

16   responsibilities are?

17   A.   I'm currently assigned to our Boston, Massachusetts group,

18   and that group is primarily tasked with firearm investigations

19   as well as arson and explosive investigations within the City

20   of Boston itself.

21   Q.   Now, in addition to your primary duties as an arson and

22   firearms investigator, do you have any other distinct

23   responsibilities within the Boston group of the ATF?

24   A.   I do.  I have a number of collateral duties that I hold

25   within ATF.  I am part of our SWAT team and special response

1   team, I do analysis of computers and cell phones for forensic

2   analysis, and I also do something which we call interstate

3   nexus determination for firearms and ammunition.

4   Q.   Could you describe for the Court what interstate nexus

5   examinations are?

6   A.   So interstate examination, to kind of put it in easy

7   terms, would be where a certain Special Agent who's received

8   training would look primarily at firearms and ammunition and

9   through their training, experience and knowledge of that be

10  able to look at the markings and understand what are on those

11  particular items to determine where, in fact, they were

12  manufactured.

13  Q.   Have you received training in order to do interstate nexus

14  examinations?

15  A.   Yes, I have.

16  Q.   Could you describe that, please.

17  A.   Every agent when they get on in our regular academy,

18  six-month academy, takes firearms-related courses and whatnot,

19  firearms handling and some basic stuff.

20       Later on in our ATF academy, you receive some more

21  in-depth training regarding firearms, their markings and

22  whatnot.  After you've been on the job for a certain amount of

23  time, you can apply to go to our nexus determination school.

24  When you do that, you're given study material to look at ahead

25  of time and memorize.  You're also asked to put together a

1    packet explaining why you'd like to go ahead and do these types

2    of examinations.  If you're chosen to do so, you're brought

3    down to our national firearms technology branch, which is

4    located in West Virginia.  When you arrive at that particular

5    course, you're given --

6    Q.   Let me interrupt you.  Were you so chosen to go to that?

7    A.   Yes, I was.

8    Q.   Thank you.

9    A.   So once you attend that course, you're given a test on the

10   study materials you were given.  If you pass that test, you're

11   allowed to go on and take the week-long course.  That

12   particular course specifically goes into the manufacture of

13   firearms, how they're manufactured, the different types of

14   firearms out there.

15        It specifically looks at the markings that are placed

16   on firearms.  There's mandatory markings that are required to

17   be put on each firearm.  On a separate segment, you're also

18   taught in the manufacturing techniques of ammunition, what the

19   components of ammunition are, and there are certain markings

20   that are placed on ammunition.

21        There's a testing phase where you're given firearms

22   and ammunition during the course of the study to make sure that

23   you're proficient in doing so.  There's also a massive firearms

24   library that we have.  It's kind of like a regular library, but

25   instead of books, we have firearms, and there's over 10,000

1    firearms catalogued within ATF.  They like to have a copy of

2    one of everything, if they can.  We're allowed to spend days in

3    there just familiarizing with the types of firearms and looking

4    at them.

5         At the conclusion of the course, you're actually given

6    a second test where you're given a written test and then

7    firearms to examine and ammunition, and if you pass that test,

8    then you're allowed go ahead and do these interstate nexus

9    determinations for ATF.

10   Q.   And was there any further class work or training that you

11   were given in connection with your work as an interstate

12   commerce expert?

13   A.   Yes.  Approximately a year later, I was able to attend our

14   advanced nexus course.  It goes over a lot of the same

15   information, but this one rather than being in the classroom is

16   out in the field, and it's run throughout New England, and

17   during the course of it, we're allowed to tour approximately 10

18   firearms manufacturers.

19        New England is very heavy for firearms manufacturers,

20   and we go to the facilities, and we see the different types of

21   production, how firearms are made, there's different ways.

22   They specifically go over how these particular markings are

23   placed on firearms, and we're able to go more in-depth into

24   that type of knowledge.

25   Q.   Do you also maintain a library in Boston of

1    firearm-related literature?

2    A.    Yes, I do.  I have my own personal library which contains

3    a lot of the commonly referenced firearms books, especially for

4    the more popular manufacturers, and ATF also maintains aside

5    from their own firearms library an online catalogue of

6    information for both the ammunition and firearms.

7    Q.    Could you explain to the jury how it is that you proceed

8    on an interstate nexus examination on a firearm?

9    A.    Sure, so usually I'm contacted by an investigator that's

10   working a case, when I'm contacted I'll go and either look at

11   that firearm or the firearm will be within ATF's custody.

12   Either way, when I look at that particular firearm, I look at

13   it for particular markings.

14        As I mentioned before, since 1968, there's been

15   certain markings that have to be placed on a firearm

16   specifically.  Before that they didn't exist, so it's tougher

17   to look at a firearm prior to 1968, but since then the

18   manufacturer has to have their name placed on the firearm

19   itself.

20        There has to be the calibre ammunition that that

21   firearm uses, there has to be a city and state either where

22   that firearms manufacturer is based or where the firearm was

23   actually manufactured.  There has to be a model designation,

24   and that's only if the company has a model name.  If they do,

25   that's supposed to be placed on there, and there has to be a

1    unique serial number for that firearm, and that unique serial

2    number has to be placed on the frame of the firearm, which is

3    kind of the body of the firearm.  The rest of that information

4    can be placed anywhere else on the firearm.

5    Q.   Let me ask you, Special Agent Kelsch, whether you were

6    asked to do an interstate -- well, strike that for a second.

7    Can you tell us how many interstate nexus examinations you have

8    actually performed?

9    A.   Yes, I've done well over 140 examinations, and many of

10   those examinations would include multiple firearms and hundreds

11   or thousands of rounds of ammunition, depending.

12   Q.   Can you tell us whether any of those examinations involve

13   firearms manufactured by Sturm, Ruger?

14   A.   Yes, I've looked at least 25 to 30 firearms that were

15   produced by Ruger.

16   Q.   Have you been qualified as an expert to give testimony in

17   federal court regarding interstate nexus examinations?

18   A.   Yes, I have.

19   Q.   Approximately how many occasions?

20   A.   Approximately 10 times now.

21   Q.   Were you asked to do work in this case?

22   A.   Yes, I was.

23   Q.   And specifically were you asked to perform an examination

24   with respect to the firearm that's in front of you that's

25   marked as Exhibit 6.1?

1   A.   Sure.  Give me one second.  Yes, I was specifically asked

2   to look at this firearm here that's marked as an exhibit.

3   Q.   What kind of firearm is it?

4   A.   This is a firearm that was made by the Sturm, Ruger &

5   Company.  It's a Model Number P95DC.

6   Q.   And can you tell us, sir, based on your training and

7   experience where that particular gun was manufactured?

8   A.   Yes, I can.  I mentioned before when I was talking about

9   markings that you have to have on a firearm, so either the

10  manufacturer's actual place of manufacturer has to be on there

11  or their headquartered area.

12       A lot of these older firearms manufacturers like

13  Sturm & Ruger or Colt or some of the names that have been

14  around for a long time are known to be from a certain area, so

15  Sturm & Ruger, their main plant was always located in

16  Southport, Connecticut.  They also have manufacturing

17  facilities in Newport, New Hampshire and in Prescott, Arizona.

18       All of their firearms of this type, so any

19  semiautomatic center-fire calibre pistol that they produced was

20  made in Prescott, Arizona, so this particular firearm would

21  have been manufactured in Prescott, Arizona, but it is marked

22  for Southport, Connecticut, and they would have received what

23  we call a variance from ATF to put that marking on there, but

24  we have that on file.

25  Q.   Let me ask you, has Sturm & Ruger ever had any

1    manufacturing facilities in Massachusetts?

2    A.    They have not, no.

3    Q.    Therefore, do you have an opinion to a reasonable degree

4    of special certainty as to whether that gun crossed an

5    interstate line or an international boundary prior to being

6    seized in Mattapan, Massachusetts on September 17th, 2012?

7    A.    Yes, being that it was manufactured originally in

8    Prescott, Arizona, if it was possessed anywhere in the

9    Commonwealth of Massachusetts, it would have traveled in

10   interstate commerce.

11   Q.    Okay.  Were you also asked to examine the items that are

12   contained in 6.2, 11 rounds of ammunition and 6.3, 5 rounds of

13   ammunition?

14   A.    Yes.  Just give me one moment, please.

15   Q.    Sure.

16   A.    Okay.

17   Q.    Were you asked to examine these as well?

18   A.    Yes, I was.

19   Q.    And can you describe how you do an interstate nexus

20   examination with respect to ammunition?

21   A.    Yes.  So when I look at ammunition, and ammunition is

22   always the kind of same components, you have a little shell

23   casing at the back side, you have a primer in the bottom of

24   that shell casing that actuates it, there's gun powder on the

25   inside, and there's a bullet or a projectile on the front of

1    it, so when I'm looking at ammunition, on the bottom side of

2    the particular casing, there's usually markings from a

3    manufacturer, and the reason they put that there is obviously

4    they want to know what they made, and obviously they want to

5    mark it with the type of calibre it is.

6         It makes it easier for both the manufacturer and the

7    user to know what type of calibre it is, make sure you're using

8    the correct ammunition for the correct type of firearm, so that

9    little writing on there is called a head stamp, that's what we

10   refer to it, and that head stamp is made with something called

11   a bunter that the manufacturers have.

12        These bunters are very tough to make.  They are made

13   out of a very, very, very hard metal because they're constantly

14   pressing into the brass here, so that bunter leaves a very

15   specific type of head stamp as we call it on the ammunition.

16   Q.   Now, in examining the 16 rounds of ammunition that are 6.2

17   and 6.3, how many different head stamps did you find?

18   A.   There were three different head stamps within this

19   ammunition here.

20   Q.   And what head stamp was most prevalent and how many rounds

21   of ammunition did it include?

22   A.   The head stamp that was most prevalent would be in capital

23   letters W-I-N and then 9mm, mm stands for millimeter, and then

24   and Luger, L-u-g-e-r, and Luger is just kind of a trade name

25   for 9 millimeter.  They call it Luger.

1    Q.   Based on your training and experience, sir, can you tell

2    us where those nine rounds of ammunition were manufactured?

3    A.   Yes.  Winchester has always manufactured their ammunition

4    in East Alton, Illinois.

5    Q.   Has Winchester ever had a facility, a manufacturing

6    facility, for ammunition in Massachusetts?

7    A.   No, they have not.

8    Q.   So do you have -- well, strike that.  What was the next

9    most prevalent head stamp that you found in the 16 rounds

10   contained in Exhibit 6.2 and 6.3?

11   A.   Sure.  Give me one second here.  So the next most

12   prevalent would have been five rounds, and that particular head

13   stamp says PMC, but the M actually looks like an upside down W,

14   it's written a little funny, and then that is followed by once

15   again 9 millimeter Luger, which I described before.

16   Q.   Based on your training and experience, can you tell us

17   where that five rounds were manufactured?

18   A.   Yes.  That head stamp is commonly used by a company called

19   Poongsan Metal Corporation, which is a firearms manufacturer

20   based out of Seoul, South Korea.

21   Q.   And have they ever had any manufacturing facilities in

22   Massachusetts?

23   A.   They have not, no.

24   Q.   And what about the remaining cartridges, what head stamp

25   did they contain?

1    A.    So the final head stamp would have been an R with a small

2    dash followed by a P, and then once again 9 millimeter Luger on

3    the bottom, which I described before.

4    Q.    And can you tell us based on that head stamp where they

5    would have been manufactured?

6    A.    Yes, that designation R-P is a very common designation

7    used by the Remington Peterson Company, and they've had two

8    manufacturing facilities, one that has since closed, but their

9    main facility now is in Anoka, Minnesota, and then they also

10   did have a facility that closed in the late '80s in

11   Connecticut.

12   Q.    Has Remington ever maintained a manufacturing facility for

13   ammunition in Massachusetts?

14   A.    No, they have not.

15   Q.    So, based on the examination you did and your training and

16   experience, can you tell us whether you have an opinion to a

17   reasonable degree of professional certainty as to whether or

18   not all 16 rounds of ammunition traveled in interstate

19   commerce, that is, crossed an interstate line or international

20   boundary between the date of manufacturer and being seized in

21   Massachusetts on September 17th, 2012?

22   A.    Yes, knowing the three different manufacturing locations

23   for this ammunition, if they were possessed in the Commonwealth

24   of Massachusetts, they would have traveled in domestic or

25   foreign commerce.

1          MR. WORTMANN:  Thank you, sir, I have no further

2     questions.

3          THE COURT:  Mr. Garrity, any questions?

4          MR. GARRITY:  I have no questions.

5          THE COURT:  Thank you, you may step down.

6          MR. WORTMANN:  Your Honor, that concludes all the

7     witnesses I had scheduled to go for today.

8          THE COURT:  Let me see counsel at sidebar.

9          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

10          THE COURT:  How many more witnesses do you have?

11          MR. WORTMANN:  I've got two more witnesses, your

12     Honor, the first, the people involved in processing of the

13     fingerprints and the actual person who do the comparison work,

14     total, I suspect maybe an hour of testimony.

15          THE COURT:  Direct testimony, you're talking?

16          MR. WORTMANN:  Direct, yes.

17          THE COURT:  Is there going to be a defense case?

18          MR. GARRITY:  No, I don't think so, Judge.

19          THE COURT:  So it looks like we ought to probably tell

20     the jury they are probably going to get the case tomorrow --

21          MR. GARRITY:  Right.

22          THE COURT:  -- in all likelihood, so I'll alert them

23     to that, and then I'll send them home and we'll talk about what

24     the case is going to look like.

25          MR. WORTMANN:  Thank you, your Honor.

1          (SIDEBAR CONFERENCE WAS CONCLUDED)

2          THE COURT:  Ladies and gentlemen of the jury, this

3    comes under the heading of good news in the sense that we're

4    quite a bit ahead of where we expected to be.  I'm going to let

5    you go for the day.  The lawyers expect that you will get the

6    case tomorrow, not on Wednesday, so that, again, you'll get it

7    a little earlier than perhaps we had anticipated.

8          You should expect tomorrow to be prepared to be here

9    all day.  You may not need that amount of time, but once you

10   get the case, it's entirely up to you how much or how little

11   time you want to take to make your decision, but you should at

12   least anticipate in terms of making your arrangements that you

13   might be here all day.

14         I don't know when you'd get the case, but my guess is

15   probably late morning, 12:00, somewhere in that time frame.

16   You don't have to worry about lunch.  We'll provide that for

17   you.  I do ask that, again, I know some of you are coming very

18   long distances, and it's somewhat chaotic in this building

19   because of the other case, but I ask that you make every effort

20   to be here early so we can start on time and get you the case

21   and get you out of here once you're ready to make your

22   decision, so thank you for your patience today.

23         Please remember my caution not to discuss the case

24   among yourselves or with anyone else, and I will see you

25   tomorrow morning, and hopefully we'll start at 9:00 a.m. sharp.

1          THE CLERK:  All rise for the jury.

2          (JURORS EXITED THE COURTROOM.)

3          THE COURT:  All right.  I think we need to have at

4    least our preliminary charge conference this afternoon.  I have

5    a 2:00 and then a 3:15 revocation hearing, which I don't think

6    will be terribly long.  I propose that we reconvene at 4:00,

7    and that way I can have a draft to you of the proposed jury

8    instructions, and, obviously, the final decisions will be made

9    after the close of the evidence, but we can at least make

10   headway on that.

11         MR. GARRITY:  Judge, the only scheduling issue we

12   have, and I don't think it's really going to be a problem, but

13   I have a 3:00 in front of Judge Young.  We're going to

14   stipulate the violation and argue sentencing.

15         THE COURT:  If you're delayed, we'll wait for you, I

16   guess, we'll just have to handle it that way.

17         MR. WORTMANN:  Your Honor, I have a 3:15 with you, so

18   you know where I'll be.

19         THE COURT:  Let's try it that way, and, again, I don't

20   know that there's that much to discuss, but I think it's useful

21   to do it today rather than tomorrow.  Thank you.

22         (Whereupon, the hearing was adjourned at

23   12:48 p.m.)

24

25

1                C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7

8              I do hereby certify that the foregoing transcript,

9    Pages 1 through 159 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Criminal

11   Action No. 13-10048-FDS, UNITED STATES OF AMERICA vs.

12   KING BELIN and thereafter by me reduced to typewriting and is a

13   true and accurate record of the proceedings.

14             Dated this 6th day of January, 2015.

15

16                      s/s Valerie A. O'Hara

17             _____

18                      VALERIE A. O'HARA

19                      OFFICIAL COURT REPORTER

20

21

22

23

24

25