<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3


 4     UNITED STATES OF AMERICA,          )
                                          )
 5                        Plaintiff,      )  Criminal Action
                                          )
 6                                        )  No. 13-10048-FDS
       vs.                                )
 7                                        )
       KING BELIN,                        )
 8                        Defendant.      )


 9


10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV


11


12                          JURY TRIAL DAY 3


13


14


15          John Joseph Moakley United States Courthouse
                         Courtroom No. 2
16                      One Courthouse Way
                        Boston, MA 02210
17


18                       January 6, 2015
                           8:32 a.m.
19


20


21


22


23                      Valerie A. O'Hara
                       Official Court Reporter
24          John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3204
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com
</pre>

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by JOHN A. WORTMANN, JR.,
     ESQ., 1 Courthouse Way, Suite 9200, Boston, Massachusetts
4    02110;

5    For the Defendant:

6        PAUL J. GARRITY, ESQ., 14 Londonderry Road,
     Londonderry, New Hampshire 03053.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2     Testimony of:              Direct  Cross  Redirect  Recross

3     MARYELLEN SHEA

4       by Mr. Wortmann          3-14                3-29
        by Mr. Garrity                   3-23
5
      DEBORAH DOBRYDNEY
6
        by Mr. Wortmann          3-30                3-59
7       by Mr. Garrity                   3-53

8
      CLOSING ARGUMENT BY MR. WORTMANN:          3-62
9     CLOSING ARGUMENT BY MR. GARRITY:           3-72
      REBUTTAL                                   3-80
10    VERDICT                                    3-104

11

12            E X H I B I T S

13    No.        Description                    In Evd.

14    Nos. 9.1 and 9.2                          3-20

15    Nos. 10.1 and 10.2                        3-21

16    No. 9.3                                   3-47

17    No. 10.3                                  3-51

18

19

20    No.        Description              For Identification

21    B          Chart                          3-40

22    C          Stipulation for identification   3-9

23    D          Note from jury                 3-104

24

25

PROCEEDINGS

1

2        THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is now in session in the matter of United States vs.

4    King Belin, Criminal Matter Number 13-10048.

5        THE COURT:  The defendant is on his way up.  I had my

6    clerk distribute to you a rework of the description of the

7    prior conviction instruction and a conforming change to page

8    21.  We can talk about that as soon as he is present.

9        All right.  The defendant is present.  I had a couple

08:32AM 10   moments ago distributed a revised version of page 22 of the

11   instructions, the draft instructions which address the first

12   element, the fact that the defendant has a prior conviction and

13   a copy of page 21, which has a couple minor conforming changes.

14       I'm trying to make this simpler and clearer, which is

15   not as easy as it looks.  Have you had an opportunity to look

16   at it, Mr. Wortmann?

17       MR. WORTMANN:  I have, your Honor, and I concur that I

18   think it's correct.

19       THE COURT:  Mr. Garrity.

08:33AM 20       MR. GARRITY:  Judge, are we talking about the

21   possession of a firearm elements instruction?

22       THE COURT:  Possession by a previously convicted

23   person, in other words.  The first element, you should have

24   gotten a redrafted instruction.

25       MR. GARRITY:  I did, Judge.  I guess the issue I have

1     with it is in the second paragraph.

2          THE COURT:  Yes.

3          MR. GARRITY:  Where the instruction says that is

4     sufficient proof to establish that at some point that the

5     defendant had been convicted.  I think that's almost directing

6     the jury to find for the government on that element.  I think

7     it's permissive rather than instructing them to make that

8     finding.

9          THE COURT:  Well, that's exactly what I was trying to

08:34AM 10    avoid.  What I'm trying to say, and I think I said is that if

11    they find A and B that the conviction occurred and that the

12    defendant is the person that was convicted, that's enough.

13    They can stop.  They don't have to go on and figure whether or

14    not it was a crime punishable by imprisonment for a term

15    exceeding one year, which is why I phrased it as that is

16    sufficient proof to establish as opposed to saying you must

17    find, so, therefore, you must find, that's what I'm exactly

18    trying to avoid doing.  Do you have a different suggestion?

19         MR. GARRITY:  Yes, your Honor, because I think the

08:34AM 20    typical juror would read this as a directive from the Court to

21    make that finding on that element.  I think if it's worded,

22    "You may find," that that is sufficient proof or you are

23    permitted to determine that is sufficient proof.

24         THE COURT:  Mr. Wortmann.

25         MR. WORTMANN:  Your Honor, this is, you know, I don't

think that Mr. Garrity can have it both ways.  He was adamant that he didn't want the sentence in there, he was adamant he didn't want the crime, and I understand all that, but this is a legal question.  If they find A and B, then C follows as a matter of law, which is exactly the way you've written it and exactly the way it should be written in my view, your Honor.

MR. GARRITY:  Judge, I don't have an objection to the initial part of that paragraph.  It's the last portion of the paragraph that in my view is basically a directive for them to find on a particular element, and I think that's --

MR. WORTMANN:  But it's a directive subject to the condition, and the condition is that we've proven paragraphs 1 and 2 beyond a reasonable doubt, and that's exactly as it should be.

MR. GARRITY:  Judge, I think the difference between what I'm arguing and Mr. Wortmann is arguing dovetails into beyond a reasonable doubt instruction that they must acquit, should convict.  Even if the jury makes those two determinations, they're still not required to make that finding on that element if they so choose.

MR. WORTMANN:  But, your Honor, at the same time, and with respect to you're obligated to instruct them as to what the law is, and on this point the law is that these crimes are punishable by more than a year.  You can take judicial notice of that, and you should instruct them.

1          MR. GARRITY:  And that I don't have an issue with,

2     it's the last section that's directing them to make a finding

3     on an element.

4          MR. WORTMANN:  I don't want to sound like a broken

5     record even if I'm going to, but it's only if they conclude

6     that A, the conviction occurred as alleged, and, B, that the

7     defendant was the person convicted.  That's all we have to

8     prove, and the balance of that --

9          THE COURT:  What if I said instead of "That is

08:37AM 10    sufficient proof to establish..." what if I change that to

11    "that is sufficient proof for you to find that..."?

12         MR. WORTMANN:  I think it changes the -- you know, you

13    change it in exactly the way Mr. Garrity is asking you to, and

14    that's as a matter of law and you instruct them that they have

15    to take the law as you give it to them and they can't disagree

16    with you and this is a pure question of law.

17         THE COURT:  While I'm thinking about this, we have

18    copies of the jury instructions in its entirety reflecting the

19    changes which we discussed yesterday which are relatively

08:38AM 20    minor, and I'll have that circulated as well.  Again, this will

21    remain a draft.

22         Mr. Garrity, does it at least mitigate it in your mind

23    if I've changed it from sufficient proof to establish to

24    sufficient proof for you to find?

25         MR. GARRITY:  Judge, I guess the wording I'm asking

1    for is asking to have my cake and eat it, too, but that is

2    sufficient proof if you find, if you so choose.

3            THE COURT:  All right.  I'm going to change it for you

4    to find, and I'll leave it at that.  I don't think it certainly

5    directs or even applies to the jury that they must make any

6    kind of finding.  As Mr. Wortmann points out, it's a statement

7    that if 1 and 2 are approved beyond a reasonable doubt, that's

8    enough.  I'm going to leave in the reference to sufficient

9    proof, and I'll give them I guess the wiggle room.  I'm not

08:39AM 10   sure I need to, but I'll do it anyway, "sufficient proof for

11   you to find," but at some point the defendant having been

12   convicted.  I think that's a fair statement, and I'll leave at

13   that.

14           MR. GARRITY:  Judge, please note my objection.

15           THE COURT:  Yes.

16           MR. GARRITY:  Thank you.

17           THE COURT:  Anything else that has occurred to you

18   overnight?

19           MR. WORTMANN:  Your Honor, I was intending to read the

08:40AM 20   stipulation at the outset.

21           THE COURT:  Oh, yes.

22           MR. WORTMANN:  Do you want me to mark that as an

23   exhibit or just mark it for identification?

24           THE COURT:  I think you can probably just mark it for

25   identification.  Mr. Garrity, do you have a view?

1          MR. GARRITY:  That's fine, Judge.

2          MR. WORTMANN:  I'd ask that it be marked Exhibit C for

3     identification.

4          THE COURT:  All right.

5          (Stipulation was marked as Exhibit C for

6     identification.)

7          MR. GARRITY:  Your Honor, now that I think of it, I

8     have one final issue with respect to the instruction, a

9     *Henderson* issue that we discussed briefly yesterday.

08:40AM 10         THE COURT:  This is the case about the missing

11     witness?

12          MR. GARRITY:  Yes, your Honor.

13          THE COURT:  Yes.

14          MR. GARRITY:  I had a chance to look at Henderson.  I

15     think Henderson, if I read it correctly, went up on plain error

16     review.  It appears, although the opinion doesn't say so, it

17     appears there was no objection to that argument.  I would

18     object to any such argument.  I submit it's shifting the burden

19     onto Mr. Belin.  That's not permissible under the Constitution.

08:41AM 20     We're entitled to argue that there are gaps in the

21     prosecution's case and to shift the burden onto us I would

22     submit violates Mr. Belin's right to a fair trial and

23     Sixth Amendment rights and any other constitutional rights.

24          THE COURT:  Mr. Wortmann.

25          MR. WORTMANN:  Your Honor, when this issue has come up

1    in the past, I've always said as I talk about it in the

2    rebuttal, assuming that the argument is made during

3    Mr. Garrity's closing, look, ladies and gentlemen, the burden

4    never shifts, it's always on us, but, nevertheless, these

5    witnesses were equally available to both sides and had the

6    defendant thought it was so important, they could have called

7    him.  They don't have to, but they could have.  That's what I

8    anticipate saying, and that's what I've done in other cases,

9    and that's what's been approved, and I think that's the clear

08:42AM 10    tenor of the *Henderson* case, and there's one other case, and I

11    probably should have looked it up, that supports for the same

12    proposition in the First Circuit.

13            THE COURT:  Mr. Garrity.

14            MR. GARRITY:  Your Honor, if you look at *Henderson*, I

15    mean, I think the prosecutor's argument in that case was I

16    guess in my view kind of tepid.  It didn't so much suggest that

17    the defendant could have called witnesses, and one brief

18    reference to defense counsel perhaps interviewing witnesses, it

19    wasn't objected to.

08:42AM 20            We're objecting, and Mr. Wortmann suggesting that we

21    should call people as witnesses to testify when it's their

22    burden to prove their case, their burden to present all proofs

23    to the jury.  We would object to any such argument.

24            THE COURT:  Let me just reread *Henderson* quickly here

25    or the relevant part.

1          Well it, does go up on plain error, but it also

2     doesn't caution that the remarks were inappropriate.  Here's

3     how I'm going to handle it.  Assuming that defense counsel, I'm

4     not going to permit it in the government's argument in chief,

5     so to speak, but if defense counsel says, in effect, the

6     government didn't call Witnesses A or B, I will permit a

7     response to the effect that A and B were equally available to

8     the defense.

9          As a matter of prudence, I think Mr. Wortmann would be

08:44AM 10   wise to state clearly and forthrightly that he is not shifting

11    the burden of proof and that the defendant has no burden to put

12    on any evidence at all, and that if you fail to do so, I may

13    interrupt at that point and instruct the jury myself to that

14    effect.

15         Again, it's a little bit hypothetical because I

16    haven't heard his argument, and I don't know what you're going

17    to say, but I think if it's phrased carefully and it's made

18    explicitly clear, not inferentially clear, that the defendant

19    has no burden whatsoever to put on any evidence under any

08:44AM 20   circumstances and the burden never shifts to the prosecution, I

21    think as *Henderson* indicates, I think you can respond, so to

22    speak.

23         MR. WORTMANN:  And, your Honor, the last thing I want

24    you to do is to interrupt me during my rebuttal.

25         THE COURT:  I expect it as much.

1      MR. WORTMANN:  I will be very careful.

2      THE COURT:  So, again, it's context-specific.  We'll

3  see what Mr. Garrity says and we'll see what your response is.

4      MR. GARRITY:  Just for the record, I would object to

5  any such argument.

6      THE COURT:  All right.  Anything else that --

7      MR. WORTMANN:  Not from the government, thank you.

8      MR. GARRITY:  No, your Honor.

9      THE COURT:  All right.  Why don't you use these

08:45AM 10  moments to look through the rest of the instructions as I've

11  changed them.  I'll make that change to page 22 and give it a

12  final scrubbing.  One other detail.  In terms of the

13  alternates, according to my notes, the jurors in Seats 1 and 13

14  were the last two seated, that's Ms. Fagan and Mr. Duggan, so

15  those would be the alternates removed.  Let me know if you have

16  a different view of that, and we will stand for a brief recess.

17      THE CLERK:  All rise.

18      (A recess was taken.)

19      THE CLERK:  All rise for the jury.

08:58AM 20      (JURORS ENTERED THE COURTROOM.)

21      THE CLERK:  Thank you.  You may be seated.  The United

22  States District Court is now in session, the Honorable

23  F. Dennis Saylor presiding.  This is in the matter of

24  United States vs. King Belin, Criminal matter 13-10048.

25      Counsel, would you please identify yourself for the

1    record.

2         MR. WORTMANN:  Your Honor, good morning, John Wortmann

3    for the United States.

4         THE COURT:  Good morning.

5         MR. GARRITY:  Good morning, your Honor, Paul Garrity

6    for King Belin.

7         THE COURT:  Good morning.  Welcome back, ladies and

8    gentlemen.  Thank you for your cooperation.  I know it's a pain

9    to get here and to park if you're driving or to take public

10   transportation if you live north of the city.  Thank you, I

11   appreciate your cooperation.

12        All right.  I think Mr. Wortmann, you want to begin by

13   reading a stipulation.

14        MR. WORTMANN:  I do, your Honor, thank you.

15        THE COURT:  Let me explain what a stipulation is.

16   It's kind of a fancy word for an agreed upon fact.  Sometimes

17   both sides agree that a particular fact is true.  It's a way of

18   saving time and making things easier, and in this case, the

19   parties have agreed to whatever the stipulation is and you

20   should accept it as a true fact.

21        MR. WORTMANN:  Thank you, your Honor.  Ladies and

22   gentlemen, the stipulation reads as follows:

23        "On January 5th, 2015, ATF Special Agent Matthew

24   Kelsch inadvertently testified that the Remington ammunition

25   included in Exhibit 6.2 and 6.3 was manufactured in Anoka,

1    Minnesota.  In fact, those rounds were manufactured in Lonoke,

2    Arkansas.  The parties, therefore, stipulate that Special Agent

3    Kelsch's testimony may be changed to state that this ammunition

4    was manufactured in Lonoke, Arkansas, which change does not

5    affect Special Agent Kelsch's opinion that all of the seized

6    rounds of ammunition included in Exhibit 6.2 and 6.3 traveled

7    in interstate commerce prior to being seized in Mattapan on

8    September 17th, 2012," and that stipulation is signed by

9    counsel for both parties.  Thank you.

09:00AM 10          THE COURT:  All right.  Mr. Wortmann.

11          I use the witness stand over here, ladies and

12   gentlemen.  I began asking jurors which witness stand they

13   preferred, I experimented, and 100 percent of them preferred

14   this one, so it was a pretty easy call.

15          MR. WORTMANN:  The government calls Maryellen Shea to

16   the stand, please.

17          MARYELLEN SHEA, having been duly sworn by the Clerk,

18   testified as follows:

19                       DIRECT EXAMINATION

09:01AM 20   BY MR. WORTMANN:

21   Q.   Good morning.  Would you tell us your name, please.

22   A.   My name is Maryellen Shea.

23   Q.   And would you spell it for the jury.

24   A.   My first name is M-a-r-y-e-l-l-e-n S-h-e-a.

25   Q.   Ms. Shea, what do you do for a living?

1    A.    I work as a Criminalist II in the Boston Police latent

2    print unit.

3    Q.    And how long have you been employed at the latent print

4    unit at the Boston Police Department?

5    A.    I've been there since October of 2010.

6    Q.    And could you describe for the jury what your job is as a

7    Criminalist II in the latent print unit?

8    A.    As a Criminalist II in the latent print unit, I'm

9    responsible for processing evidence for the presence or the

09:02AM 10   absence of latent print impressions.  I make notes, write

11   reports and photograph any information that I found.  I testify

12   in courts of law on the cases that I have processed, and I

13   respond to crime scenes as requested, and I also assist in the

14   training of interns and Criminalist Is.

15   Q.    So it's clear, your job at current does not include the

16   identification of people from fingerprints but rather simply

17   the processing?

18   A.    That's correct.  I am not fully trained in comparisons

19   yet.

09:03AM 20   Q.    And the processing, how is it documented?

21   A.    Can you explain?

22   Q.    Sure.  How is the processing of a particular item for

23   fingerprints documented in the files of the Boston Police

24   Department latent print unit?

25   A.    So we have a set policies and procedures that we all must

1   follow when we are going to process an item, so that includes

2   taking -- one of the processes, taking notes of the item and

3   taking notes each step of the way that we process, and after

4   that, we will write a report on those findings.

5   Q.   And is it also the practice and procedures of the unit to

6   photograph items as they are processed?

7   A.   Yes, we will photograph an item, so when we do get a case,

8   what we'll do is we'll take the item from the evidence room,

9   and as we begin the case, we'll then open the item and

09:03AM 10   photograph.  When we open the item, we'll begin our photography

11   of the item, of the packaging, and the item as it comes out of

12   the packaging, and we'll also begin our notes at that point.

13   Q.   Over the course of the processing, are items photographed

14   for other purposes as well?

15   A.   Yes, it is.

16   Q.   And what purposes?

17   A.   So the purpose of photographing it for other purposes is

18   if we recover any latent prints or any rigid detail that we see

19   on the item, we'll photograph that, so what happens exactly

09:04AM 20   when we open a case, we'll do a visual examination of the item,

21   and from that point, we'll determine if we see any latent

22   prints on the item or not.  If we do, we'll photograph those

23   latent prints.  If we don't, we'll go to the next phase where

24   we have to determine whether it's a porous item or a nonporous

25   item.  If it's a nonporous item, that just means that it's an

1      item that doesn't absorb water, so it's an item such as a piece

2      of glass where the water won't be absorbed into it, and if it's

3      a nonporous item, we'll do a process called Super Glue fuming

4      where that is basically we take the item, we put it into our

5      chamber and the chamber, it will heat up a couple drops of

6      Super Glue that we added to it.

7          That Super Glue will become a vapor, and that will

8      adhere to any latent print residue that's potentially on the

9      item, and that will cause the latent print to become a whitish

09:05AM 10  color, which will make it more visible, and it will also make

11     it a little more durable so it won't be wiped away more easily.

12         After that stage, we'll determine if I see any latent

13     prints of value on the item, we'll take a photograph of it, and

14     then we'll go onto the chemical dye stain phase, where we'll

15     spray the item with the chemical, then we'll rinse the chemical

16     off of it.

17         What the chemical is going to do is it adheres to the

18     Super Glue, which is already adhering to the residue that was

19     left behind, and once it's all dry, we can look at it

09:05AM 20  underneath an alternate light source.  Once the alternate light

21     source will be put at a certain wave length that will

22     correspond with that chemical, and it will excite the chemical

23     causing it to fluoresce giving it a little more contrast

24     between the latent print and the actual background material,

25     and if I see any latent prints at that point, we'll photograph

1    them and then package the item up.

2    Q.   And the photographs that are taken in the course of

3    processing, how are they maintained in the files of the latent

4    print unit?

5    A.   We have a database that we use.  It's just our storage

6    area on our personal server where whoever is taking the

7    photographs, they'll upload them to the server, and when they

8    do the upload, they'll also fill in the metadata, which is

9    basically all the metadata will say is the Boston case number,

09:06AM 10   the latent print unit's specific case number, what the item is,

11   the examiner's initials and also that it's from the Boston

12   Police latent print unit.

13   Q.   And does every case that comes in the latent print unit

14   get assigned a separate file number?

15   A.   Yes, they are.  Every case when it comes in, at first it

16   automatically has a Boston Police CC number, which is just the

17   case number, but when it comes into our unit, we give it a

18   specific latent number, so every latent number has its own

19   specific CC number.

09:07AM 20   Q.   Now, I put before you on the witness stand an item that's

21   been marked as Exhibit 6.1.  Do you recognize that item?

22   A.   Yes, I do.

23   Q.   And did you participate in the processing and the

24   preparation of the processing report for item 6.1?

25   A.   Yes, I did.

1    Q.   And could you tell the jury the role that you took in the

2    processing of this firearm?

3    A.   I was the reviewer in this case, so what I basically did,

4    the process that I told you guys earlier about Super Glue,

5    another trained criminalist had previously Super Glue fumed and

6    did the dye stain.

7         When they completed their photography, their notes and

8    sat down to write their report, they requested to have me

9    review their report and their notes and their photography, so

09:08AM 10   by the time I got it, I received the entire case file, and I

11   reviewed the report to make sure they had the right -- the

12   correct information in it and that whatever was in their notes

13   was also in their report to make sure in their notes they

14   followed our policies and procedures, and I checked to make

15   sure that their metadata and their photographs depicted what

16   was actually said that it was supposed to depict.

17        MR. WORTMANN:  Your Honor, may I approach, please?

18        THE COURT:  Yes.

19   Q.   Ma'am, I'm showing you two photographs that are marked for

09:09AM 20   identification as Exhibit 6.1 and 6.2 and I'd ask you to take a

21   look at those.  Do you recognize those?

22   A.   Yes, I do.

23   Q.   And what are they photographs of?

24   A.   These are photographs of a latent print that was found on

25   the magazine corresponding with this case.

1    Q.   Of 6.1.  How do you know that that picture is, in fact, of

2    the magazine that's included as part of 6.1?

3    A.   Because, like I said before, there's the metadata inside

4    we had that corresponds with each photograph, so when I

5    reviewed the metadata that was -- when I did the review, the

6    metadata for each of these was what it said on there, sorry.

7    Q.   Did it match the markings that were placed on the magazine

8    in the latent print unit?

9    A.   Yes, it did.

09:10AM 10        MR. WORTMANN:  Your Honor, I offer these as Exhibits

11    9.1 and 9.2.

12        THE COURT:  I think you misspoke when you handed them

13    to, they're 9.1 and 9.2?

14        MR. WORTMANN:  Yes.

15        MR. GARRITY:  No objection.

16        THE COURT:  They may be admitted, 9.1 and 9.2.

17        (Exhibit Nos. 9.1 and 9.2 were admitted into

18    evidence.)

19    Q.   Could you take a look at the package that's marked in

09:10AM 20    front of you, that has been marked Exhibit 6.3.  Do you

21    recognize that?

22    A.   Yes, I do.

23    Q.   And did you participate in the processing of those items

24    for fingerprint in the manner that you've described?

25    A.   Yes, I did.  I again was the reviewer for these items.

1          MR. WORTMANN:  Your Honor, if I could approach,

2    please?

3          THE COURT:  Yes.

4    Q.   Showing you what's been marked Exhibit 10.1 and 10.2, do

5    you recognize those photographs?

6    A.   Yes, I do.

7    Q.   And what are they?

8    A.   These are photographs of a latent print that was found on

9    the plastic bag that was in Exhibit 6.3.

09:11AM 10   Q.   Okay.  How do you know that they are what they purport to

11   be?

12   A.   Well, I said previously the metadata and the photographs

13   would depict this and also the markings on the plastic bag

14   correspond with the item.

15   Q.   So they match one another?

16   A.   Yes.

17   Q.   All right.

18          MR. WORTMANN:  Your Honor, I'd offer these as Exhibits

19   10.1 and 10.2.

09:11AM 20          MR. GARRITY:  No objection.

21          THE COURT:  They may be admitted, 10.1 and 10.2.

22          (Exhibit Nos. 10.1 and 10.2 were admitted into

23   evidence.)

24          MR. WORTMANN:  Your Honor, if I could just briefly put

25   Exhibit --

1          THE COURT:  Are all the screens working?  We

2     supposedly had them fixed.  Okay, good.

3     Q.    Now, can you tell us what photograph 9.1 is, Ms. Shea?

4     A.    This photograph, it's a photograph, it's an overall

5     photograph of the latent print that was found on the magazine.

6     Q.    The name of the magazine as part of Exhibit 6.1?

7     A.    The magazine part of Exhibit 6.1.

8     Q.    And Exhibit 9.2?

9     A.    Exhibit 9.2 is a close-up photograph of that same latent

09:12AM 10     print.

11     Q.    And showing the ridge detail that was on there in greater

12     detail?

13     A.    Yes, it is.

14     Q.    And Exhibit 10.1?

15     A.    Exhibit 10.1, it's an overall photograph of the latent

16     print that was found on the plastic bag, which is part of

17     Exhibit 6.3.

18     Q.    And the mark on the lower left-hand corner of the bag that

19     says A, what does that refer to?

09:13AM 20     A.    That's just how we depict our latents.  We give each of

21     our latents a letter, so A would just mean it's the first

22     latent that was found.

23     Q.    And was a close-up photograph taken of the ridge detail

24     that was seen on the plastic bag?

25     A.    Yes, it was.

1   Q.   And that's what is depicted on 10.2?

2   A.   Yes, it is.

3            MR. WORTMANN:  That's all I have, your Honor, thank

4   you.

5                          CROSS-EXAMINATION

6   BY MR. GARRITY:

7   Q.   Good morning, Ms. Shea.

8   A.   Good morning.

9   Q.   You've been trained in obviously how to locate

09:13AM 10   fingerprints?

11            MR. WORTMANN:  Excuse me, Mr. Garrity, I apologize.

12   A.   What was that, sorry?

13   Q.   You've been trained on how to locate fingerprints?

14   A.   I've been in trained processing fingerprints.

15   Q.   You have not yet been trained in making comparison prints?

16   A.   I'm going through that training right now.

17   Q.   But you've attended a number of seminars and training, I

18   guess, events to get to your position at this point, right?

19   A.   Yes, I have.

09:14AM 20   Q.   And that training has all been on how to look at

21   fingerprints and what fingerprints are all about, right?

22   A.   So the training I've been to, it's a mix of how to process

23   for fingerprints, some on how to do comparisons and some on

24   crime scene processing.

25   Q.   And fingerprints can be affected by the type of material

1    they may be left on; is that right?

2    A.    How do you mean, sorry?

3    Q.    I guess let me rephrase it.  The type of surface or

4    material you're looking at can affect whether or not you can

5    obtain a latent print; is that right?

6    A.    I think it's a fair statement to say that some surfaces

7    are better for recovering latent prints than other surfaces

8    are.

9    Q.    Nonporous surfaces, are they better or worse than porous

09:15AM 10   surfaces?

11   A.    I wouldn't be able to answer that because I've received

12   very good results from both types of surfaces.  The only reason

13   I said nonporous and porous is because we have two different

14   processing techniques for each type of surface.

15   Q.    Nonporous would be a metal type of surface?

16   A.    Yes, nonporous is something like a metal, glass, a piece

17   of finished wood.

18   Q.    And, obviously, a gun magazine is nonporous, right?

19   A.    That is correct.

09:15AM 20   Q.    If a surface is pitted, however, that can affect in a

21   negative way whether or not you can obtain a latent print; is

22   that right?

23   A.    Do you mean textured?

24   Q.    Right.

25   A.    Textured surfaces are a little more difficult to recover

1    latent prints from smooth surfaces, but it's not impossible.

2    Q.   With guns, how often do you find latent prints on guns?

3    A.   Approximately per our unit's stats, we recover latent

4    prints from firearms approximately 42 percent of the time.

5    Q.   Usable prints are obtained off of guns 42 percent of the

6    time?

7    A.   That's just basically ridge detail that's recovered from

8    firearms, so any latents that we recover, but that's not just

9    because that 42 percent isn't not all of them are a value to go

09:16AM 10    onto comparisons.

11    Q.   How many of the 42 percent are you able to utilize at your

12    lab in making a valid comparison?

13    A.   So I don't have it of the 42 percent, so of all the gun

14    cases that have come through our lab, about 16 percent of those

15    cases have latent prints that are valued to go onto

16    comparisons.

17    Q.   So would it be fair to say 84 percent of the time you

18    can't make a valid comparison?

19    A.   That's a fair statement.

09:17AM 20    Q.   It would be fair to say, would it not, it's somewhat rare

21    to find a usable comparable latent print on a firearm?

22         MR. WORTMANN:  Objection, your Honor.

23         THE COURT:  I'll let her answer it.  Go ahead.

24    A.   I wouldn't say it was rare, I'd say it can sometimes be

25    more difficult, but there are some factors that go into it that

1    make it a little difficult to recover prints from firearms.

2    Q.    I guess let me rephrase it.  On a percentage basis, it's

3    somewhat unusual to find a latent print; is that fair to say?

4    A.    That is a fair statement.

5    Q.    On plastic bags, that's nonporous as well?

6    A.    That's correct, yes.

7    Q.    Does your lab keep statistics on how often usable latent

8    prints are found on plastic bags?

9    A.    We do not keep statistics on that.

09:17AM 10    Q.    How often have you found usable latent prints on plastic

11    bags?

12    A.    I do not know an exact number, so I wouldn't be able to

13    give a clear answer on that.

14    Q.    But you've been at the lab for how long, four years?

15    A.    Yes.

16    Q.    Do you have an approximation how many times you may have

17    found a latent usable print on a plastic bag?

18    A.    Like I said, I don't know the exact answer to that, but I

19    know that I processed many plastic bags, and I do recover

09:18AM 20    prints a fairly good amount of times.

21    Q.    Usable prints?

22    A.    I cannot say if they are usable or not.

23    Q.    And with latent prints, there's a number of factors that

24    can affect whether or not they're usable; is that right?

25    A.    What do you mean?  Sorry.

1    Q.    Can temperature affect prints?

2    A.    So I think what you are getting at is there are a couple

3    of different things that can affect whether or not we're able

4    to recover prints, and, yes, temperature is a potential factor

5    in that.

6    Q.    And if substances rub against each other, can that affect

7    whether or not you can obtain a usable latent print?

8    A.    Yes, if substances rub against each other before we get a

9    chance to process it, there's a chance that that print could be

09:19AM 10   wiped away.

11   Q.    And the latent print that you found on the magazine, what

12   side of the magazine was it on?

13   A.    Do you mind if I take a look?  Sorry.

14   Q.    Sure.

15   A.    It was located right on this side, on the back side of it.

16   Q.    And you didn't detect any sort of -- in your examination

17   of the print any sort of rubbing of that print?

18   A.    I didn't examine the print.  That would have gone onto --

19   once the photograph was taken, it would have gone onto the

09:19AM 20   comparison person to do their examination.

21   Q.    But from your view of the print, did you see any sort of

22   smudging or rubbing on it?

23   A.    I do not recall, I'm sorry.

24   Q.    In the photograph that's been shown to you of the print,

25   that's a fair depiction of the print?

1    A.    Yes, it is.  That was a photograph that was taken as the

2    examiner saw it.

3    Q.    Does that appear to have a number of ridges and detail to

4    it?

5    A.    Yes, it does.

6    Q.    Without any sort of distortion or smudging or rubbing on

7    it?

8    A.    I don't have the photo in front of me, but there is

9    potential that there was some distortion to it.

09:20AM 10           MR. WORTMANN:  Your Honor, if there's going to be a

11    question regarding the photograph, could the witness be shown

12    the photograph?

13           MR. GARRITY:  Sure.

14    Q.    I show you Exhibit 9.2.  That's the fingerprint photo, the

15    photo of the fingerprint found on the magazine; is that right?

16    A.    That is correct, yes.

17    Q.    That appears to have quite a bit detail to it?

18    A.    Yes, there is a lot of detail to that.

19    Q.    Without any sort of smudging or distortion to it?

09:21AM 20    A.    There appears to be.  There could be some distortion, but,

21    like I said, that would mostly be looked at in the comparison

22    stage.

23    Q.    Let me show you the Exhibit 10.2.  That's the photograph

24    of the fingerprint on the plastic bag?

25    A.    Yes, it is.

1    Q.   Does that appear to have quite a bit detail to it as well?

2    A.   Yes, it does.

3    Q.   And do you see or observe any sort of smudging or

4    distortion to that fingerprint?

5    A.   There could be some distortion in there, but, like I said,

6    that would be the comparison person to make that determination.

7         MR. GARRITY:   Thank you.  I have no further questions.

8         MR. WORTMANN:   May I approach, your Honor?

9         THE COURT:   Yes.

09:22AM 10                    REDIRECT EXAMINATION

11   BY MR. WORTMANN:

12   Q.   Ms. Shea, I just wanted to ask you to take a look at the

13   magazine that's from 6.1.  Do you consider that to be a pitted

14   surface?

15   A.   There are some textured surfaces to it, a couple areas

16   where it curves, but for the most part, it's a smooth surface.

17   Q.   Is that more susceptible to recovering latent

18   fingerprints?

19   A.   Yes, smooth flat surfaces are mostly ideal for recovering

09:23AM 20   latent prints.

21   Q.   Could you tell us, if you can, the number of firearms and

22   found latent fingerprints what percentage are the fingerprints

23   located on the magazine as opposed to to the rest of the gun?

24   A.   I don't know that exact detail.

25   Q.   Well, let me ask you, is it unusual to find prints on the

1    magazine as opposed to the rest of the gun?

2    A.    No, that is not unusual at all.

3              MR. WORTMANN:  I have no further questions.

4              MR. GARRITY:  No further questions.

5              THE COURT:  Thank you, you may step down.

6              MR. WORTMANN:  I call Deborah Dobrydney to the stand,

7    please.  Your Honor, with your permission, may I set up the

8    easel?

9              THE COURT:  Yes.

09:23AM 10              MR. WORTMANN:  Thank you.

11              DEBORAH DOBRYDNEY, having been duly sworn by the

12    Clerk, testified as follows:

13                        DIRECT EXAMINATION

14    BY MR. WORTMANN:

15    Q.    Could you tell us your name, please.

16    A.    Sure, Deborah Dobrydney.

17    Q.    And could I ask you to spell your first and last name for

18    the record, please.

19    A.    Yes, first, D-e-b-o-r-a-h, last name, D-o-b-r-y-d-n-e-y.

09:24AM 20    Q.    Where do you work, Ms. Dobrydney?

21    A.    I work for the Boston Police Department in the latent

22    print unit.

23    Q.    And when did you first join the latent print unit?

24    A.    I was employed there October of 2007.

25    Q.    And when you adjoined the latent print unit, what were

1   your responsibilities?

2   A.   I was hired as a criminalist to examine items of evidence

3   and crime scenes for the presence or absence of evidentiary

4   fingerprint impressions.

5   Q.   And at some point did your responsibilities within the

6   latent print unit change?

7   A.   They did.

8   Q.   And can you tell the jury what your responsibilities were

9   as of September, 2012?

09:25AM 10   A.   At that time I had completed the in-house training program

11   for the comparison portion of latent print examination where

12   any fingerprints that are recovered from surfaces are then

13   analyzed for suitability and compared with persons of interest

14   in the case.

15   Q.   Could you describe for the ladies and gentlemen of the

16   jury, please, the training program that you went through in

17   order to be allowed to actual identifications and comparisons

18   as opposed to processing?

19   A.   Yes.   After completion of the processing training program

09:25AM 20   and performing casework for a number of years, I then embarked

21   on the comparison training program, which took about two years

22   to complete.   It consists of answering research-type questions,

23   the science behind fingerprint identification, then performing

24   a series of practical examinations and practical exercises that

25   help to train the eye to perform these types of comparisons.  I

1    also attended numerous hours of external training at various

2    other law enforcement agencies in the fingerprint discipline,

3    and then the program culminates with three competency

4    examinations before I'm able to embark on cosigned casework,

5    and I embark on that cosigned casework until a period of time

6    that I'm deemed suitable to embark on independent casework.

7    Q.   And when were you allowed to begin independent casework?

8    A.   In the summer of 2010.

9    Q.   And since 2010, have your responsibilities at the latent

09:26AM 10    print unit been predominantly fingerprint identification

11    comparison?

12    A.   Yes.

13    Q.   And since being qualified and being allowed to do this

14    work, do you continue to be required to undergo a proficiency

15    testing?

16    A.   Yes, once a year.

17    Q.   Could you describe for the jury what the proficiency

18    testing is, please.

19    A.   Yes, once a year we receive what we call a mock case where

09:27AM 20    the ground truth or the answer to the examinations is known

21    ahead of time.  I do not know those answers.  I complete the

22    mock case, and then my own conclusions are compared against the

23    correct answers, and determinations are made if I am proficient

24    in the discipline.

25    Q.   And on each occasion that you've had proficiency testing,

1    have you been determined to be proficient?

2    A.    I have.

3    Q.    Now, have you also been certified by a professional

4    certification body to be a latent print examiner?

5    A.    I have.

6    Q.    And what organization is that?

7    A.    I'm certified by the International Association for

8    Identification.

9    Q.    And could you describe for the jury what you had to do in

09:27AM 10    order to be certified by that group?

11    A.    Yes.  In order to be certified, you need to complete two

12    years of independent casework.  At that time you can apply to

13    be certified, and the certification process consists of

14    undergoing an examination that consists of a practical as well

15    as a written component in the field of latent print comparisons

16    and identification.

17          At the completion of the test, if you are successful

18    and you pass the test, you then have to undergo a moot court or

19    testimony aspect of the examination where you have a transcript

09:28AM 20    of yours reviewed by the certifying body to determine that you

21    testify in an appropriate manner.  At the completion of all of

22    that, if that is deemed satisfactory, you are then certified.

23    Q.    When were you certified?

24    A.    In 2013.

25    Q.    Now, in the course of your work as a fingerprint examiner,

1    have you also been qualified to testify as an expert in

2    fingerprint comparison and identification?

3    A.    I have.

4    Q.    And approximately how many times?

5    A.    I've testified total about 63 times, and in the field of

6    comparisons and identifications, approximately 20 to 25 times.

7    Q.    Okay.  And that includes courts, various courts around the

8    Commonwealth of Massachusetts?

9    A.    Yes.

09:28AM 10    Q.    Now, could you tell us, ma'am, what the theory of

11    fingerprint identification is?

12    A.    Yes, the theory of fingerprint identification can actually

13    be broken down into two components, the first being based on

14    uniqueness.  And when I say uniqueness, what I mean is that all

15    of the ridge detail that we have on the palmar surface of our

16    hand and the bottoms of our feet is unique to one individual

17    only.

18    Q.    And could you describe or define when you say ridge detail

19    exactly what is it that you're talking about?

09:29AM 20    A.    I'm talking about the raised ridges of skin that we have

21    on those surfaces of our hands and feet.

22    Q.    And if I understand you, those are unique to an

23    individual?

24    A.    They are.

25    Q.    And you said there were two things behind the theory of

1    fingerprint examination.  What's the second?

2    A.    The second is what we call persistence or permanence.

3    Over the course of a person's lifetime, from before birth until

4    after death, the configuration of those ridges on your skin do

5    not change, you have the same configuration of features on your

6    hands and feet for your entire life unless a scar occurs on

7    that surface, in which case that scar then also becomes unique

8    to you.

9    Q.   And could you tell us sort of the real basics, how are

09:30AM 10   fingerprints formed?

11   A.   Do you mean fingerprints on surfaces?

12   Q.   Yes.

13   A.    Well, as you go about your daily life, you have pores

14   along the ridges of your skin that exude moisture, regular

15   sweat, just like you would exude from any other surface of your

16   body as well as picking up different materials such as oils

17   from your face and other parts of your skin and foreign

18   materials like lotions or cosmetics.

19         All of those materials can be transferred from the

09:30AM 20   ridges of your friction ridge skin onto a surface as you touch

21   that surface, and in doing so, much as a stamp leaves behind an

22   impression, you will behind the impression of your friction

23   ridges onto that surface.

24   Q.   So does that mean that every time that I touch a surface,

25   I'm creating a fingerprint?

1    A.    It has the potential, although it's not guaranteed that a

2    fingerprint will be left behind.

3    Q.    Why is that?

4    A.    There are many reasons why you may not leave a fingerprint

5    behind when you touch a surface.  First, if your hands are

6    extremely dry, if you don't have any of that material on the

7    friction ridges themselves to transfer, you won't leave behind

8    an impression.

9          Also, if there's any barrier between your skin and the

09:31AM 10   surface such as the glove or dirt or any foreign material, once

11   again, you would not leave an impression behind.  Finally, the

12   texture of the surface itself, if it's highly textured or if

13   it's rippled in some way or wet or dirty, again, causing a

14   barrier between the skin and the surface, you won't leave an

15   impression behind.

16   Q.    Are there also differences in the ridge detail between

17   people, meaning that some have more deeper ridge detail than

18   others?

19   A.    That's exactly right, yes.

09:31AM 20   Q.    And when a fingerprint is formed, what is it made of?

21   A.    Fingerprints are comprised 98 to 99 percent of water with

22   the remaining two percent being oils and some proteins and

23   chemicals that we exude from our bodies, and like I said

24   before, foreign matters such as lotions and cosmetics.

25   Q.    Now, we've already talked about some terms of

1    fingerprints.  I wonder if you could just define some for us.

2    First, can you tell us what a patent fingerprint is?

3    A.    Yes, a patent print is one that is readily visible without

4    enhancements, so if you have a foreign material on your hand

5    such as blood or ink and you place your finger down onto a

6    clean surface, you're going to leave behind a fingerprint

7    that's visible without needing any further enhancements.

8    Q.    The best example is when we were kids and we'd breathe on

9    the glass and then put our fingers on it?

09:32AM 10   A.    That would be a patent print.

11   Q.    Okay.  Would you contrast that to what has been referred

12   to as a latent fingerprint?

13   A.    Yes.  A latent fingerprint is typically left behind in

14   those residues, the water and the oil components.  It's not

15   readily visible to the naked eye unless you enhance it in some

16   way either using lights or using some sort of chemical process

17   ing or physical processing.

18   Q.    Are you also familiar with the term "partial fingerprint"?

19   A.    Yes, I am.

09:33AM 20   Q.    What is that?

21   A.    Well, any fingerprint that we deal with in the course of

22   processing items is a partial print because it is impossible to

23   record every single surface of friction rigid detail on your

24   hand at the same time.  So even a fully rolled print is

25   considered a partial print because it does not capture all of

1 the rigid detail that is available.

2 Q. And you said rolled fingerprint.  What is that?

3 A. A rolled fingerprint is one that will appear on a

4 fingerprint card when someone has their fingerprints collected

5 in a meaningful light or on purpose.

6 Q. Okay.  Now, will every fingerprint permit you to make an

7 identification of the person who made the fingerprint?

8 A. No.

9 Q. And why not?

09:33AM 10 A. In some cases when we go to analyze fingerprints that are

11 recovered from a surface, they do not contain enough detail in

12 order to be unique enough to attribute to an individual, so

13 sometimes we'll have just a few ridges that I can tell have

14 originated from the friction ridge skin, but there's not enough

15 detail in that impression to attribute it to a source.

16   In that case, we call those fingerprints no value

17 because they do not have any identifying characteristics.

18 Q. In a sense, they're too partial?

19 A. Correct.

09:34AM 20 Q. And are you also familiar with the term "sufficient ridge

21 detail"?

22 A. Yes, I am.

23 Q. And what does that mean?

24 A. When a latent print is deemed to be sufficient or

25 suitable, it does contain enough detail within the impression

1    to attribute it to a source.  In other words, if I had the

2    subject, the known fingerprint card of the subject who left the

3    print, I would be able to attribute that print to that source.

4    Q.   Can you tell us how long fingerprints have been used as a

5    means of identification?

6    A.   In the law enforcement arena, they've been used for well

7    over 100 years.

8    Q.   And more recently has there been a specific process

9    developed for doing the evaluation comparison and

09:35AM 10    identification of the fingerprint?

11    A.   There has.

12    Q.   And what's that process called?

13    A.   The methodology that we use to perform this task is called

14    ACEV, which is actually an acronym with each letter standing

15    for a different component.

16    Q.   Could you tell us just what each letter stands for?

17    A.   Yes.  The A in ACEV is for analysis, the C is for

18    comparison, E stands for evaluation, and V is verification.

19    Q.   And how long has the ACEV method been in use?

09:35AM 20    A.   Since about the 1950s.

21    Q.   Is it generally accepted by fingerprint examiners in the

22    field?

23    A.   It is.

24    Q.   Is that the method that you have used since you've become

25    a fingerprint examiner in the Boston Police Department?

1    A.   Yes, it is.

2    Q.   Now, all right.  I wonder if we can start with talking

3    about the A, the analysis phase, and let me ask you --

4         MR. WORTMANN:  Your Honor, if I might approach,

5    please?

6         THE COURT:  Yes.

7    Q.   I'm going to show you a blow-up, which is entitled,

8    "Levels of Detail in Friction Print Impressions," and are you

9    familiar with that?

09:36AM 10   A.   I am.

11   Q.   And, in fact, you prepared it?

12   A.   I did.

13   Q.   Would this be helpful in explaining your testimony to the

14   jury?

15   A.   Yes, it is.

16        MR. WORTMANN:  Your Honor, I'd ask that the witness

17   refer to it and come off the stand if that would be helpful.

18        THE COURT:  Can everyone on the jury see that?

19        MR. WORTMANN:  What I can do, your Honor, is I can

09:36AM 20   also put the smaller version on the document camera, if that

21   would be helpful.

22        THE COURT:  That would be helpful.  Mr. Garrity, if

23   need be, you can move as well.

24        MR. GARRITY:  Thank you, your Honor.

25        ( Chart was marked Exhibit B for identification.)

1    Q.    Okay.  Ms. Dobrydney, I wonder if you could explain to us

2    what the analysis phase of the ACEV process involves?

3    A.    Yes.  The analysis phase involves looking at the three

4    levels of detail of friction ridge skin which are depicted here

5    on this chart, and I'll go through each one.  On the left-hand

6    side of this blue line, you will see what we refer to as

7    Level I detail.

8         The top three boxes, whorl, loop and arch depict the

9    three pattern types that each of us have on our fingertips.

09:37AM 10   Each of us in this room has some combination of those three

11   pattern types of the tips of our fingers.  That's predictable,

12   and that places you into certain categories.

13        Also predictable with Level 1 detail is the flow of

14   the ridges in various parts of our hands.  If I have an

15   impression that looks like this, I know it originates from the

16   palm of the hand on the area underneath the pinky finger.

17   That's just a predictable flow of that area of the hand, the

18   ridge detail.

19        This originates from the joints of the finger, the tip

09:38AM 20   of the finger is depicted here, and as well these triradius

21   regions or delta regions occur in predictable locations along

22   your fingers and hands as well, so based on Level I detail, I

23   can figure out what the anatomical region of that fingerprint

24   is as well as placement to certain categories based on just

25   ridge flow.

1    Q.   And is Level I detail often useful in excluding a

2    fingerprint as being from a known source?

3    A.   It is.  If I have a subject whose fingerprints are all

4    whorl patterns, and my evidentiary fingerprint is an arch

5    pattern, I can effectively exclude him from having left that

6    print.

7    Q.   And can you tell us what Level II ridge detail is and how

8    you use that in the analysis process?

9    A.   Yes.  So as you can see, in these ridges, the images are

09:39AM 10   black against a white background, and as you can see, these

11   ridges don't just flow in straight lines like corduroy, as

12   these ridges flow along, they have ridge events or things that

13   happen along the ridge flow.

14        Sometimes the ridge is flowing along and it breaks

15   into two separate ridges.  We refer to that as a bifurcation.

16   At other times, ridge flow comes from end point in space, known

17   as an ending ridge, and at other times, it will be very small.

18   We refer to those as dots or short ridges.  It is the size,

19   shape, location of those Level II features flowing within the

09:39AM 20   ridge path that make your fingerprints unique to anyone else's,

21   and we can go and analyze those Level II features and determine

22   whether there are enough of them to make the determination of

23   identification, and then if there is a subject who matches,

24   actually making an identification.

25   Q.   And when you say enough of them, does that mean that

1   there's a specific number of comparison, of similarities that

2   you have to find in order to make an identification?

3   A.   No, there is no minimum number needed.

4   Q.   And so is it both a quantitative and a qualitative

5   analysis?

6   A.   Yes, if I have a very high quality latent print, I will

7   need fewer Level II features, and if the quality of the latent

8   print isn't that great, I would need more Level II features in

9   order to determine its suitability.

09:40AM 10   Q.   Okay.  And could you tell us what role Level III detail

11   plays in the analysis portion of your examination?

12   A.   Yes.  Level III detail is not always present, although it

13   can be used in the comparison phase as well.  If we have an

14   impression that is high enough quality where we can actually

15   see the pores along the ridges as well as the shape of the

16   edges of the ridges, that information can also be used in the

17   comparison phase to determine if a print originates from the

18   same source.

19   Q.   And so it's clear, do you get Level III or even Level II

09:41AM 20   detail in every latent print that you're provided with?

21   A.   No, we do not.

22   Q.   And is it required that you have Level III print detail,

23   for example, in order to make an identification?

24   A.   No, it's not required.

25   Q.   Is it required that you have Level II detail in order to

1    make an identification?

2    A.    You do need sufficient number of Level II features.

3    Q.    And, obviously, if you have Level II, you also have Level

4    I?

5    A.    That's correct.

6    Q.    Now, once you've completed the analysis phase, and in a

7    sense is that assessing the latent print and determining its

8    quality?

9    A.    Yes, the quality and quantity of features that are

09:41AM 10    present.

11    Q.    Could you then describe how you do a comparison?

12    A.    Yes.  I will take a constellation of those Level II

13    features typically that looks unique to me and search through

14    known fingerprint cards coming from known suspects or subjects,

15    persons of interest in the case, that I can see if I can find

16    any configuration that appears similar to the one that I have

17    in my evidentiary print.

18          If I do find a finger or an area of ridged detail that

19    has a similar configuration, I will then perform a side-by-side

09:42AM 20    comparison between the latent or evidentiary fingerprint and

21    the known impression in question.

22    Q.    Okay.  And you do that side-by-side comparison in order to

23    determine similarities and dissimilarities?

24    A.    That's correct.

25    Q.    And ultimately to reach your conclusion?

1    A.    That's right.

2    Q.    And, finally, could you talk to us about evaluation and

3    verification?

4    A.    Yes.  During the E stage or the evaluation stage is when

5    I'm actually forming my conclusion as to whether this is an

6    identification, meaning the evidentiary print originated from

7    the same source as the known print.

8          I can come to the conclusion of exclusion, meaning the

9    person I'm looking at did not donate the print in question, and

09:42AM 10   I can come to an inconclusive result as well, where there's

11   just not enough information to make a determination, so that's

12   the E stage, and the V stage stands for verification where a

13   second trained and competent latent examiner repeats

14   independently A, C and E and comes to a conclusion before any

15   conclusion can be released.

16   Q.    And was there, in fact, two examiners that both performed

17   work in this case?

18   A.    Yes.

19   Q.    Approximately how many fingerprint evaluations and

09:43AM 20   comparisons have you done while you've been a fingerprint

21   examiner at the Boston Police Department?

22   A.    I don't have a specific number, but it's in the tens of

23   thousands.

24   Q.    Okay.  And were you requested to do fingerprint evaluation

25   in this case?

A.    I was.

Q.    And how many latent prints did you analyze?

A.    Three.

Q.    And how many were found to have sufficient ridge detail to enable you to do a comparison?

A.    Two.

Q.    Was the first latent print you analyzed denominated as latent 2A1?

A.    Latent 2A.

09:44AM Q.    2A, I'm sorry.  Where was that taken from?

A.    That was recovered from a magazine in this case.

        MR. WORTMANN:  And, excuse me, your Honor, may I approach, please?  Thank you.

Q.    Showing you what's been marked as Exhibit 9.1, and 9.2, do you recognize these as the first latent prints that you analyzed?

A.    Yes, I do.

Q.    And when you began your analysis and comparison, you mentioned earlier that you do a side-by-side comparison?

09:45AM A.    During the C stage, yes.

Q.    And did you prepare a side-by-side comparison of the latent print and the known print in this case?

A.    I did.

        MR. WORTMANN:  And, your Honor, if I could approach again?

1           THE COURT:  Yes.

2    Q.    Showing you what's been marked as Exhibit 9.3, could you

3    tell us if you recognize that?

4    A.    I do.

5    Q.    And what is it?

6    A.    That is a visual aid depicting the comparison stage and

7    evaluation of latent 2A.

8    Q.    And the picture on the left side, is that another copy of

9    Exhibit 9.2?

09:45AM 10   A.    Yes, it's a processed image of that latent print.

11   Q.    Black and white?

12   A.    Yes, black and white image.

13   Q.    And the print on the right, which is marked as the left

14   thumbprint of King Belin, where did that come from?

15   A.    That came from the fingerprint card bearing the name of

16   King Belin.

17          MR. WORTMANN:  Your Honor, I'd offer this into

18   evidence as Exhibit 9.3.

19          MR. GARRITY:  No objection.

09:46AM 20          THE COURT:  It may be admitted, Exhibit 9.3.

21          (Exhibit No. 9.3 was admitted into evidence.)

22   Q.    And showing you what's been admitted into evidence,

23   Deborah Dobrydney --

24          MR. WORTMANN:  As I'm afraid because it's two-sided,

25   it's not going to take, so if I can approach, please, your

1    Honor?

2            THE COURT:  Yes.

3    Q.   Showing you what has been introduced into evidence as

4    Exhibit 8.2, do you recognize that?

5    A.   I do.

6    Q.   Is that the original fingerprint card from which the

7    fingerprint on the right was taken in doing your analysis?

8    A.   Yes.

9    Q.   And that was done in connection with the booking process?

09:47AM 10   A.   It is.

11   Q.   And when there's a booking process, the fingerprint cards

12   would be corroborated by a booking sheet?

13   A.   Yes, they are.

14   Q.   And what was the date on which this fingerprint was taken?

15   A.   9-10 of '07.

16   Q.   And showing you what's been marked as Exhibit 8.1, what

17   was the date of that booking?

18   A.   9-10 of '07.

19   Q.   What are the names on both the fingerprint card and the

09:47AM 20   booking sheet?

21   A.   King T. Belin.

22   Q.   Thank you.  Now, having set up the comparison side by

23   side, did you go through the ACEV analysis process that you've

24   described?

25   A.   I did.

1    Q.   And based on the analysis that you did, have you formed an

2    opinion to a reasonable degree of professional certainty as the

3    source of the latent fingerprint that's marked on the left side

4    as fingerprint 2A?

5    A.   I have.

6    Q.   And what is that opinion, ma'am?

7    A.   Latent 2A originated from the same source as the

8    fingerprint on the right, which is from the fingerprint card

9    bearing the name of King Belin, the left thumb impression.

09:48AM 10   Q.   Now, I wonder if you would be good enough to explain the

11   basis for the opinion, and if it would be helpful for you to

12   stand up.

13          MR. WORTMANN:  And, your Honor, I request that she be

14   granted permission to do that?

15          THE COURT:  Yes.

16   A.   Looking at Latent 2A independently of the fingerprint

17   card, I noted that it was a left-facing loop pattern, which is

18   one of the Level I details we spoke about earlier.  As well, I

19   noted that there were numerous Level II features that occurred

09:49AM 20   along the ridges as well.

21          What's depicted here are some of the Level II features

22   that are in common, although not the totality of them.  There

23   are more in common that are not marked.  Well, if you take a

24   look at these colored markings where the green markings is all

25   the way to the right, it corresponds to the green marking on a

1    Level II feature occurring in this impression over here.  To

2    the one ridge to the left, there's an ending ridge marked in

3    red, and you will see that corresponding here, and if you

4    follow along counting the ridges in between each of these

5    Level II features, you will find that they occur at places

6    within tolerance and that the configuration of the Level II

7    features between both print is consistent.

8         Considering the totality of the information contained

9    within the latent and the known impression, I made the

09:49AM 10   determination that they originated from the same source.

11   Q.   Did you also look for dissimilarities that would tend to

12   show that the fingerprint was not from the same person?

13   A.   Yes, I did.

14   Q.   And did you find any that excluded Mr. Belin or caused you

15   to question your opinion?

16   A.   No, I did not.

17   Q.   And, again, was your conclusion also subject to

18   verification within the Boston Police Department latent print

19   unit?

09:50AM 20   A.   There were two trained examiners that came to the same

21   conclusion.

22   Q.   Now, did you examine a third print for the purposes of

23   making a comparison and identification?

24   A.   Yes, I did.

25   Q.   And where was that print taken from?

1    A.   There was a print from a plastic bag that I examined.

2    Q.   And was that a latent print identified as 3-1A?

3    A.   Yes.

4         MR. WORTMANN:  And if I could approach, please, your

5    Honor?

6         THE COURT:  Yes.

7    Q.   Did you also set up a side-by-side comparison using the

8    same known print and performing an ACEV analysis on that?

9    A.   Yes.

09:51AM 10   Q.   Showing you, ma'am, what's been marked as Exhibit 10.3,

11   can you tell us what that is?

12   A.   This is a visual aid that I prepared depicting the

13   similarities between Latent 3-1A and this impression to the

14   right.

15   Q.   Is this comparable to what you used in making your actual

16   examination?

17   A.   Yes, it is.

18        MR. WORTMANN:  Your Honor, I offer Exhibit 10.3 into

19   evidence.

09:51AM 20        MR. GARRITY:  No objection.

21        THE COURT:  It may be admitted, Exhibit 10.3.

22        (Exhibit No. 10.3 was admitted into evidence.)

23   Q.   I wonder, Ms. Deborah Dobrydney, can you tell us, having

24   performed the ACEV analysis on latent 3-1A, have you formed an

25   opinion to a reasonable degree of professional certainty as to

1    the source of the fingerprint recovered from the plastic bag

2    that was included in Exhibit 6.2?

3    A.    I have.

4    Q.    And what conclusion did you reach?

5    A.    Latent 3-1A originated from the same source as the left

6    thumb impression bearing the name King Belin.

7    Q.    So both of these prints came from the left thumb of

8    Mr. Belin in your opinion?

9    A.    Yes.

09:52AM 10   Q.    And could you describe for the ladies and gentlemen of the

11   jury how it is that you reached that conclusion?

12   A.    Sure.

13         Again, going to the A phase or the analysis phase for

14   this impression, I noted that this had the semicircular curve

15   that is typical of fingertips or above the pattern area in a

16   finger impression, and so I then went in to look at Level II

17   features to see if there were suitable number and quality of

18   those features, which I determined that there were, and then

19   comparing with the known card bearing the name of King Belin, I

09:53AM 20   found a similar configuration of ridge detail in that same tip

21   region of the left thumb and working side to side determined

22   that there was suitable agreement to determine that they shared

23   a source.

24   Q.    Did you also, as with the prior example, look for any

25   dissimilarities that would exclude Mr. Belin from being the

1    person who left that fingerprint?

2    A.    I did.

3    Q.    Did you find any?

4    A.    No.

5    Q.    Was this also subject to verification, yes or no?

6    A.    Yes.

7         MR. WORTMANN:  That's all I have, your Honor, thank

8    you.

9         THE COURT:  All right.  Cross-examination.

10                    CROSS-EXAMINATION

11   BY MR. GARRITY:

12   Q.    Good morning.

13   A.    Good morning.

14   Q.    The fingerprints that you looked at, they had been Super

15   Glued or fumed?

16   A.    They had.

17   Q.    And when you Super Glue or fumed a latent print, you

18   preserve I guess the material of the print; is that right?

19   A.    Yes.

09:53AM 20   Q.    And the material of a print is made up 96 to 97 percent

21   water?

22   A.    Yes, or a little higher, 98 percent, yeah.

23   Q.    And the rest of it is oil and some other bodily fluids; is

24   that right?

25   A.    Yes.

1    Q.   And Super Gluing, fair to say, preserves the DNA that may

2    be available in that bodily fluid?

3    A.   I'm unaware of that statement.

4    Q.   Have you had any training?

5    A.   I'm sorry.

6    Q.   Have you had any training on that?

7    A.   On DNA, no, I have not.

8    Q.   But in terms of whether or not Super Gluing preserves DNA,

9    have you had any training on that?

09:54AM 10    A.   Not specific to that topic.

11    Q.   Would it be a fair statement that Super Gluing where it

12    preserves a fingerprint preserves bodily fluid?

13            MR. WORTMANN:  Objection.

14            THE COURT:  Overruled.

15    A.   That's a fair statement.

16    Q.   To your knowledge, were these prints sent out to be

17    analyzed for DNA?

18    A.   To my knowledge, no.

19    Q.   Could you tell when you looked at the print how long that

09:54AM 20    print may have been on the particular surface?

21    A.   No.

22    Q.   And in your training on fingerprinting, is it fair to say

23    that smudging or rubbing can affect whether or not a print will

24    be I guess usable?

25    A.   Yes, that's true.

1    Q.    Did you observe any sort of evidence of rubbing or

2    distortion on the prints that you looked at?

3    A.    They certainly weren't clean impressions as they're taken

4    in controlled situations.  There's always going to be some

5    distortion just because of the malleability of skin and the

6    fact that when you handle items, you're not purposefully

7    placing them down gently, so, yes, there was some distortion

8    within the impressions.

9    Q.    Let me ask it the other way.  I mean, the prints that they

09:55AM 10   looked at, did they appear to have quite a bit of detail to

11   them?

12   A.    They did.

13   Q.    And did you make a comparison between the two latent

14   prints side by side with each other?

15   A.    I did not.

16   Q.    You can't tell us whether or not they came from the same

17   part of the thumb?

18   A.    Since they were both individualized to that same finger, I

19   can determine based on that that they originated from the same

09:56AM 20   finger.

21   Q.    But I guess my question is you didn't compare them side by

22   side to see whether or not they came from the same part of the

23   left thumb?

24   A.    I did not.

25   Q.    And these prints did both come from the left thumb, right?

1    A.    They did.

2    Q.    Has the Boston Police Department lab conducted any sort of

3    studies or kept statistics in terms of how often you get the

4    same print from the same digit on two separate items?

5    A.    No, we have not.

6    Q.    Is it common to get latent prints or usable prints off of

7    a firearm?

8    A.    I wouldn't say it's common.  It does happen a certain

9    percentage of time, and we do keep statistics on recovery of

09:57AM 10   fingerprints from firearms.

11   Q.    Is the percentage around 16 percent?

12   A.    Yes, that's correct.

13   Q.    And that's within the Boston Police Department lab?

14   A.    That's right.

15   Q.    Have you reviewed statistics from other labs?

16   A.    I have not.

17   Q.    You've had training on lifting prints from guns; is that

18   right?

19   A.    I have.

09:57AM 20   Q.    Within that training, have you been taught on the

21   percentages of obtaining usable prints from firearms?

22   A.    No, not that I can recall.

23   Q.    Does the Boston Police Department lab keep statistics on

24   how often usable latent prints are taken off of magazines?

25   A.    Not separate from firearms.  We lump all of those

1    categories together.

2    Q.   So, in total, it's about 16 percent of the time?

3    A.   Sixteen percent of the time there's a latent print of

4    value that can be identified.

5    Q.   And with respect to plastic bags, does the lab keep

6    statistics on how often latents prints are taken off of plastic

7    bags?

8    A.   No, we don't.

9    Q.   In your experience, can you tell us how often you have

09:58AM 10   found usable latent prints on plastic bags?

11   A.   It is the surface that is conducive to the recovery of

12   latent prints being that it's smooth and flat and nonporous, so

13   we can apply those Super Glue fumes and dye stains in order to

14   raise ridge detail.  It's not uncommon to get a print on a

15   plastic bag.

16   Q.   Let me ask you this.  To your knowledge, are plastic bags

17   typically used in say drug sales?

18   A.   The cases that I've processed containing plastic bags come

19   from a variety of types of cases, and I have had experience

09:59AM 20   where they've been involved in drug cases.

21   Q.   Would it be a fair statement that it's somewhat -- I guess

22   is it less than 50 percent of the time you may find a usable

23   latent print on a plastic bag?

24   A.   I can't put a number to that scenario.

25   Q.   The lab keeps no stats on that?

1    A.    No, sir.

2    Q.    From looking at the prints that you were asked to look at,

3    were you able to tell or can you tell us whether or not they

4    were put there by an actual person or whether they were left

5    there by some other means?  If that question is not clear, tell

6    me, and I'll try to rephrase it.

7    A.    If you could, I'm not sure exactly.

8    Q.    Can one take a print off of say a print card if it's inked

9    or done in a certain way and put that onto a surface and then

10:00AM 10   that be evaluated by yourself as a usable latent print?

11   A.    I've never had experience with that scenario.  I've never

12   heard of that happening.  I assume anything is possible, but if

13   you were to place a print from one surface onto another, it

14   would be a mirror image, and in this case, they were not mirror

15   images.

16   Q.    You didn't look at each one side by side, right?

17   A.    The latent prints side by side?

18   Q.    Right.

19   A.    I did not.

10:00AM 20   Q.    So you can't tell us or tell the jury whether they are

21   mirror images of each other?

22   A.    Well, I can because they both appeared in that

23   configuration that directly corresponded to the known

24   impression, and the known impression I know is not a mirror

25   image, so they are also not mirror images.

1    Q.   The known impression being the left thumbprint?

2    A.   That's right.

3             MR. GARRITY:  I have no further questions.

4             THE COURT:  Redirect.

5                      REDIRECT EXAMINATION

6    BY MR. WORTMANN:

7    Q.   Just one question.  If I were to take Exhibit 8.2 --

8             MR. WORTMANN:  And if I can approach, your Honor,

9    please?

10:01AM 10        THE COURT:  Yes.

11   Q.   -- you'd agree with me that that's dry?

12   A.   It is.

13   Q.   And if I were to put it down on the table, is it likely

14   that that fingerprint would be transferred to that substance?

15   A.   No, that's actually printed instead of inked onto a card,

16   it's printed from a computer printer so there's no residue

17   there.

18            MR. WORTMANN:  No further questions.

19            THE COURT:  Thank you.  You may step down.

10:02AM 20       MR. WORTMANN:  Your Honor, could I clean up my mess?

21            THE COURT:  Yes.

22            MR. WORTMANN:  Thank you.

23            MR. WORTMANN:  Your Honor, the government rests.

24            THE COURT:  All right.  Let me see counsel at sidebar.

25            (THE FOLLOWING OCCURRED AT SIDEBAR:)

         1            MR. GARRITY:  I will make a Rule 29 motion for

         2    judgment of acquittal.

         3            THE COURT:  That motion is denied.  Will there be a

         4    defense case?

         5            MR. GARRITY:  No, there will not be.  Can I have one

         6    second to speak to Mr. Belin?

         7            THE COURT:  Yes.

         8            MR. GARRITY:  We will not present a case, Judge, we

         9    rest.

10:04AM 10            THE COURT:  All right.  What I propose to do then is

        11    to tell the jury that the evidence is closed, call a recess and

        12    set up for closing arguments, finalize the jury instructions

        13    and proceed from there.

        14            MR. WORTMANN:  Thank you, your Honor.

        15            (SIDEBAR CONFERENCE WAS CONCLUDED)

        16            THE COURT:  All right.  Ladies and gentlemen, the

        17    evidence is now closed.  What we have left to do is the closing

        18    arguments of lawyers, my instructions to you, and at that

        19    point, we will take care of some housekeeping details, and

10:04AM 20    you'll retire to deliberate.  We will take up and we need to

        21    and I need to finalize the jury instructions so if you will

        22    bear with us, we'll get you back in court as soon as we can,

        23    but for now we'll take a break.

        24            THE CLERK:  All rise for the jury.

        25            (JURORS EXITED THE COURTROOM.)

1          THE COURT:  How long do you expect your argument to

2    be, Mr. Wortmann?

3          MR. WORTMANN:  15, 20 minutes.

4          THE COURT:  Mr. Garrity.

5          MR. GARRITY:  Judge, 10 minutes.

6          THE COURT:  And, again, you'll be given an opportunity

7    for true rebuttal.

8          MR. WORTMANN:  I understand, your Honor.

9          THE COURT:  Is there anything further on the jury

10:05AM 10   instructions?  I did catch a couple of typos.

11         MR. WORTMANN:  Nothing, your Honor.

12         MR. GARRITY:  No, your Honor.

13         THE COURT:  Again, my practice is to give each juror a

14   copy of the written instructions, to tell them they can read

15   along as I give them to them, they can write on them and take

16   them with them into the jury room.

17         With that, why don't we take a break.  Let me see

18   where the jury instructions are in terms of mechanically

19   getting that ready, and you can set up for closing.  We'll be

10:06AM 20   back or I'll check in another 10 minutes or so.

21         MR. WORTMANN:  I'm sorry, how long, your Honor?

22         THE COURT:  Ten minutes.

23         MR. WORTMANN:  Thank you.

24         THE CLERK:  All rise.

25         (A recess was taken.)

1    THE CLERK:  All rise.  Thank you.  You may be seated.

2    THE COURT:  All right.  I'm having my clerk distribute

3    copies of the charge and the verdict form to each of you.  Are

4    we ready to go?

5    MR. WORTMANN:  Yes, sir.

6    MR. GARRITY:  We are, your Honor.

7    THE COURT:  All right.  Ms. Pezzarossi, can you bring

8    in the jury as soon as they're ready.

9    THE CLERK:  All rise for the jury.

10:24AM 10    (JURORS ENTERED THE COURTROOM.)

11    THE CLERK:  Thank you.  You may be seated.

12    THE COURT:  All right.  Mr. Wortmann, whenever you're

13    ready.

14                        CLOSING ARGUMENT

15    MR. WORTMANN:  Thank you, your Honor.  Ladies and

16    gentlemen, at the beginning of the case, I told you it's a

17    privilege to represent the United States of America, and it is,

18    but it's also a responsibility, and that responsibility is to

19    prove the case beyond a reasonable doubt, not beyond all

10:25AM 20    possible doubt, not to some mathematical or metaphysical

21    certainty but proof beyond a reasonable doubt, and Judge Saylor

22    will explain what that term means to you, and just so it's

23    clear, and I think it already is, that when it comes to the

24    law, he's the boss, so if there's anything I say in the course

25    of this closing that is inconsistent what you hear him say, you

1    know who to go with, him.

2         And I suggest to you, ladies and gentlemen, that

3    that's exactly what the government has done in this case, prove

4    its case beyond a reasonable doubt, prove that on

5    September 17th, 2012, King Belin right there had this gun and

6    this ammunition on his person stuck in his waistband and stuck

7    in his pocket.

8         That's what the evidence shows, and everything that

9    you need to know about this case, you heard from Phil

10:25AM 10   Bissonnette, Tom Finn and Deborah Dobrydney, and so it's clear,

11   your job is to assess their credibility, nobody else's job,

12   it's your job.

13        Did they get up on the stand and make it up after

14   swearing to tell the truth, or is their testimony worthy of

15   your belief?  That's your call, that's why you're here, and

16   that's why we have juries to exercise their practical

17   experience and their common sense in making that decision.

18   Each and every day of your lives, you come into contact with

19   people, and whether it's in a business context, whether it's a

10:26AM 20   neighbor, whether it's your kids, you figure out whether or not

21   they're giving it to you straight.

22        Use that same ability that you've developed over the

23   course of your life and make a decision as to whether or not

24   you think they made it all up or they were telling the truth.

25   That's what your job is in determining whether this gun and

1    this ammunition was in his possession.

2            Now, as you know by now, possession is not the only

3    thing that the government has to prove and prove beyond a

4    reasonable doubt, so I'd like to start off with taking a few

5    minutes to talk about some of those other things before we get

6    back to possession, knowing possession.

7            First, is this a firearm?  Exhibit 6.1 with the

8    magazine, and what that means is, you know, according to what

9    Congress has said, is it a weapon that's capable of expelling a

10:27AM 10   projectile by reason of an explosive force?  How anyone came up

11   with that definition, I don't know, but that is the definition.

12           What does it mean, that if you pull the trigger, a

13   bullet comes out, and is that what that is?  I submit to you,

14   of course, it is.  How do you know that?  Well, Firearm

15   Examiner Nina Jefferson certainly told you that it was, and she

16   told you based on the best evidence possible, the fact that she

17   had taken this very gun, a round of ammunition, in fact, two

18   rounds of ammunition into it and fired it into a water tank,

19   and when she pulled that trigger, those bullets went into the

10:27AM 20   tank.  It's a firearm, I submit to you.

21           Is it ammunition?  She also told you about her

22   experience, about the examination that she does in order to

23   determine whether or not something is, in fact, ammunition or a

24   bullet, and I think her testimony was straightforward, but,

25   again, use your common sense.  Look at these things.  You know,

1    you can tell the difference between a firearm and a lighter or

2    a toy, and these are neither.  The firearm and the ammunition

3    are exactly what the government said they are, so think about

4    these things in the context of your common sense, the most

5    important think you brought with you when you came to court.

6         Second, did this gun and did the ammunition included

7    in 6.2 and 6.3, did they travel in interstate commerce?  Now,

8    Judge Saylor again is going to tell you what the law is with

9    respect to that, and listen to him, make sure you follow his

10:29AM 10    instruction, but what I think he'll tell you is that the only

11    thing that the government has to prove is that at some point

12    subsequent to the manufacture of the item, it had to cross a

13    state line or a national boundary.

14         He's not the one that had to cross it, Mr. Belin

15    didn't have to know that it crossed state lines, the only thing

16    that the government has to prove is that basically all these

17    things were manufactured outside of Massachusetts because to

18    get into Massachusetts where they were seized, they would have

19    necessarily had to cross a state line, and here, of course, you

10:29AM 20    have the testimony of Special Agent Kelsch from the ATF.

21         He's an experienced interstate nexus examiner.  He's

22    done dozens and dozens of these, and while he unfortunately got

23    his Anoka mixed up with his Lonoke, his testimony was clear

24    that both the gun and all 16 rounds of ammunition, the 11

25    rounds were in it at the time that it was seized and the five

rounds that were in the pocket in the plastic bag were

manufactured outside of Massachusetts, meaning that they had to

have crossed a state line before they were seized from

Mr. Belin's waistband and his pocket on September 17th, 2008.

And, you know, when you assess the credibility of

Special Agent Kelsch, keep in mind that when he realized he had

confused the Anoka and Lonoke, he immediately reported it and

fixed it even though it had absolutely no impact on his

opinion, and that you should consider in your consideration of

credibility.

Third, we have to prove that Mr. Belin had been

convicted of a felony, that is a crime punishable for a period

in excess of one year, and that's what I mean when I say felon,

prior to being found in possession of this gun and this

ammunition on September 17th, 2012.

Now, keep in mind something, please.  This testimony

is in front of you for one reason and one reasonable only, that

Congress said that's an element of the offense, the fact that

you may conclude that he was convicted of an earlier crime

doesn't make it more likely or less likely, and it would be

completely improper for you to use it for any purpose, so,

please, understand why it's in front of you and use it for the

purpose for which it's intended.

Has the government proven Mr. Belin was a convicted

felon as of September 17th, 2012?  Again, I submit to you that

1      it has.

2              You have before you, ladies and gentlemen, Exhibit 3,

3      the certified copy of the conviction, and you recall when

4      Officer Bissonnette read from the entry that he pled guilty to

5      two offenses and was sentenced to two offenses.  Any question

6      about whether or not it was actually King Belin who was the

7      King Belin in this conviction?  You saw the booking sheet named

8      the same date as the date of the charge, April 29th, 2009, and

9      there's a picture of King Belin with all the same biological

10:31AM 10    information.

11             You also heard the testimony of Brandon McLellan, who

12     was Mr. Belin's probation officer in Suffolk Superior beginning

13     in about, according to Exhibit 2, the supervision sheet again

14     with his picture on it beginning on November 22nd, 2010.

15             Both Bissonnette and McLellan told you that those --

16     that the crimes, what they are doesn't matter, don't think

17     about it, don't worry about it, the only thing that does matter

18     is that they were punishable for a period in excess of one

19     year, and the Judge will give instruction, and you also heard

10:32AM 20    testimony about that.

21             So let's go back to where we started.  Was this gun in

22     King Belin's waistband, and was he knowingly in possession of

23     it?  All right.  First, with respect to the knowing part, how

24     do you not know that something is in your waistband?

25             What's the best evidence that he knew that that gun

1    was in his waistband?  The way he reacted to the police,

2    walking away from Officer Finn, trying to walk away from

3    Officer Bissonnette and then struggling more and more so that

4    ultimately it took four officers to get him to the ground and

5    get his arms safe behind his back so he could be searched

6    safely, and you don't do that unless you got something to hide,

7    ladies and gentlemen, and Officer Bissonnette found out very

8    quickly what it was he was trying to hide and what it was he

9    was trying to get away from and what it was he was trying to

10   reach for, this firearm and all these rounds of ammunition.

11        Again, it really comes back, did Bissonnette, Finn and

12   Dobrydney, are they worthy of your belief?  Did they provide

13   credible testimony?  Do you think they went up there -- and

14   think about how they testified, how they reacted, the answers

15   they gave, how they conducted themselves, whether or not it

16   makes sense, all those things.

17        That's what credibility determination is made up of,

18   and that's what we're asking you to do in this case, but when

19   you consider the issue, ask yourself some questions:

20        Why did King Belin split off from the group the way

21   that he did?

22        Why did he try to avoid Bissonnette the way that he

23   did?

24        Why did he resist so vigorously, and if not from his

25   waistband?  Where did this gun magically appear from given the

1    setting, given what happened?

2         You know, people just don't walk around carrying extra

3    guns, and how, ladies and gentlemen, on top of all that did

4    fingerprint, his fingerprint, end up being recovered both from

5    the magazine and from the plastic bag that the five rounds of

6    ammunition that were in his pocket in that cigarette box come

7    from?

8         Corroboration, ladies and gentlemen, of the scientific

9    kind, and you heard Ms. Dobrydney talk, you heard her

10:34AM 10    experience, you heard the basis for her opinion, you saw the

11    worksheets that she did and remember that all of this happened

12    in the space of a matter of minutes.  Nobody had time to do

13    anything, it just happened, and the minute that

14    Phil Bissonnette rolled him over, that thing pulled up, and

15    what's the first thing that he saw and what did he do?  Do you

16    remember him, Finn, do you remember him, gun, and it was this

17    gun in that waistband.

18         So think about Finn, think about Bissonnette, think

19    about Dobrydney and the way they testified.  Did they appear to

10:35AM 20    you to be credible?  Did their story make sense?  Look at their

21    demeanor.  You know when people feel uncomfortable, you know,

22    when people -- all that is your common sense.  Use that common

23    sense, evaluate it based on what you saw, and if you do, I

24    submit to you, ladies and gentlemen, you're only going to reach

25    one conclusion, that that gun was in his waistband and he's

1     guilty of the single crime charged in the indictment.

2              So let's think a little bit also about some of the

3     points that were made during cross-examination.  Let me make

4     real clear, it's the government's burden to prove the case

5     beyond a reasonable doubt.  That never changes.  It's always

6     our burden.  The defendant doesn't have to do anything, he can

7     sit and do nothing, but when questions are asked and when

8     inquiries are made, it's fair for you to take a look at them

9     and for us to think about them a little bit.

10:36AM 10          First, do you really expect the arresting officers to

11     have left the gun in Mr. Belin's waist until the detectives

12     arrived there to photograph it?  Does that really make sense?

13     Does that cast doubt on what happened?

14              Was there really something Finn wrote the report while

15     Bissonnette was off doing other things, having read it, having

16     reviewed it, particularly in view of Detective Magoon, who's

17     been on the force for 24 years, told you is done on a

18     day-to-day basis and how the officers interpret that

19     regulation?  Is there something wrong with that?  Think about

10:37AM 20     it.

21              Was there really important differences between

22     Bissonnette's testimony and the report that he helped write?

23     Did the report fail to make clear that Mr. Belin was trying to

24     avoid Officer Bissonnette when it stated, and you remember he

25     read this from the stand, "As Officer Finn engaged the group in

1    consensual conversation, Bissonnette observed one individual

2    break away from the group in a hurried manner walking in the

3    direction of Norfolk Park on Mildred Ave.  Officer Bissonnette

4    observed that as this male broke from the group, he appeared to

5    avoid eye contact with the police."

6         You recall, I said, well, how come you didn't say that

7    he was looking down?  Well, you know, how many ways do you have

8    to say it?

9         Did the report fail to make clear that Belin was

10   trying to avoid Officer Bissonnette when it stated, and again

11   Officer Bissonnette read this to you, Officer Bissonnette

12   observed Belin turn towards the officer, and at that point

13   Officer Bissonnette asked, "Got anything on you?"

14        Officer Bissonnette saw Belin's demeanor immediately

15   change where Belin began to exhibit several nervous mannerisms.

16   Officer Bissonnette saw Belin take a deep breath and start to

17   breathe at a quick and shallow rate.  The officer observed

18   Belin turn and appear to look for an escape route.

19        And the question was:  Well, you didn't say in there

10:38AM 20  that he took a couple steps?  Again, you know, the English

21   language is used to communicate.  That's what was communicated,

22   and that got the point across.

23        Is it really surprising that, you know, Bissonnette

24   and Magoon had different memories as to who initially got the

25   guns.  You know, these occurrences, they happen quickly, they

1    happen in high stakes, you know, it's stress, and if it was any

2    other way, then people would say, oh, it fits like a glove, you

3    must have made it up.  Everybody sees things differently,

4    nobody's memory is perfect, but if that's the best that there

5    is, the answer to all these questions is none of them are a

6    substance, I submit, and none of them submit the credibility of

7    Bissonnette or Finn or Dobrydney into serious question, your

8    call, not mine, remember that for concluding that they made

9    this whole thing up, and it just happened, somebody just

10:39AM 10   happened -- there just happened to be a gun and ammunition

11   lying round and a cigarette pack with five more rounds of

12   ammunition so they could charge King Belin with it.

13        Think about all the testimony, think about the

14   evidence you heard, apply your common sense, and if you do

15   that, ladies and gentlemen, I respectfully submit, ladies and

16   gentlemen, that it should take you one place and one place

17   only, that King Belin is guilty of the crime charged in the

18   indictment, and I ask you to return that verdict.  Thank you.

19        THE COURT:  All right.  Thank you.  Mr. Garrity.

20                        CLOSING ARGUMENT

21        MR. GARRITY:  Thank you, your Honor.  Good morning.

22   You are probably wondering why are we even here.  According to

23   the government and the evidence you've heard, this case should

24   be a piece of cake, guns in Mr. Belin's waistband supposedly,

25   ammunition is in his pocket, you heard from the agent that the

1    gun was manufactured elsewhere, the bullets were manufactured

2    elsewhere.  According to Ms. Jefferson, the gun fires

3    ammunition.  It's a firearm, why are we here?  Why are we

4    wasting everyone's time?  Why are we dragging you in from all

5    over the parts of Massachusetts to sit here and listen to this

6    case?  This case is easy, according to the government.

7         It's not so easy.  As I said to you in the opening,

8    things don't always appear what they seem to be on the surface.

9    You've got to look behind the surface to see what's really

10:40AM 10   going on here.

11         And in this case, why didn't the government present to

12   you certain witnesses?  If Officer Bissonnette is telling you

13   the truth, why didn't they call in Officer Bridges?  Why didn't

14   they call in Officer Driscoll?

15         Certainly I could have, but do you think they could

16   have come to Mr. Belin's assistance?  Do you think they were

17   going to come in here and say anything other than what

18   Officer Bissonnette would like them to present to you or what

19   the government would like to present to you?  It's their

10:41AM 20   burden.  It never shifts to us.  It's their burden to prove to

21   you beyond a reasonable doubt that Mr. Belin's guilty, that

22   what Officer Bissonnette is telling you is the truth.

23         And, remember, Officer Finn really didn't see what was

24   going on between Mr. Belin and Officer Bissonnette.  His back

25   is to Officer Bissonnette and Mr. Belin.  The only people who

1  potentially could tell you what actually was going on was

2  Officer Bridges and Officer Driscoll, and they weren't called

3  before you.

4  I think it's fair to ask the government why not, why

5  didn't you bring them in? They didn't bring in Officer Velez,

6  who supposedly finds the cigarette pack in Mr. Belin's pocket.

7  Why didn't they bring him? Again, certainly I could have

8  brought him in, but it's not our burden, it's their burden to

9  prove to you beyond a reasonable doubt that what they're saying

10:42AM 10  actually happened, and they didn't do it.

11  Why didn't they get the video footage from that

12  surveillance camera? You heard from Officer Finn that there is

13  a video camera right there between the two basketball courts.

14  Why didn't they get that? Why didn't they get the video

15  footage from the Mildred Avenue school, which is right there on

16  the corner which could have given us a fair representation of

17  what happened?

18  There are adults in the park. Why didn't they

19  interview them? They could have brought them in, they could

10:42AM 20  have found out what they had to say about what actually

21  happened. There's four individuals supposedly with Mr. Belin,

22  and that's open to question, I'd submit, but there's four

23  individuals on the corner right there talking to Officer Finn.

24  Finn's back is to Officer Bissonnette. It's fair to

25  assume the other four are looking right at Belin and

1    Bissonnette.  They're not interviewed.  The most the police do

2    is FIOD card them way down by Evelyn Avenue.  They don't take

3    any time or effort to interview them.  From the police

4    perspective, this case is a piece of cake, easy, don't put any

5    effort into investigating it further.  What Officer Bissonnette

6    says happened, that's what happened, but it's simply not the

7    case.

8         What Officer Bissonnette told you what happened

9    doesn't match up with his police report.  Mr. Wortmann tries to

10:43AM 10  minimize the discrepancies, but, remember, this report drafted

11   by Officer Finn was written within minutes of this event

12   happening, when the event is fresh in Officer Bissonnette's

13   mind, Officer Bissonnette supposedly consulting with

14   Officer Finn when the report is written.  He leaves out certain

15   facts like Mr. Belin's head looking down to the ground.

16        I'd submit that didn't really happen, otherwise he

17   would have told that to Officer Finn.  He says that Mr. Belin

18   tried to back away from him.  Again, I'd submit that didn't

19   happen, otherwise he would have put that in there.  He says

10:44AM 20  Mr. Belin, as he's walking that short distance, it's from the

21   corner to where he's arrested, his feet, Officer Bissonnette,

22   Mr. Wortmann tried to portray it as a long distance, that he's

23   supposedly hurrying along.  It's within feet of the cruiser

24   that he's stopped and accosted by Officer Bissonnette, and he

25   doesn't put into the report, Officer Finn doesn't put in the

report because he wasn't told by Officer Bissonnette that

Mr. Belin supposedly looks back and gives a half smile.

I'd submit to you that didn't really happen.  I'd

submit to you that was made up after the fact.  This whole case

for the most part rises and falls on the credibility of

Officer Bissonnette because he's the only one that really is

engaging with Mr. Belin.  He is the only one that the

government puts forward to you to tell you what supposedly

happened because they failed to bring in these other people.

And he's really not a reliable reporter, is he?  Not

only because of the discrepancies between his testimony and the

report, but he tells you from the witness stand flat out, "I

gave the gun to Detective Magoon."  Well, we know that's not

true because he gave, according to Detective Magoon, he didn't

get the gun from Officer Bissonnette, it's Detective Jossey

that gets the gun.  He tells you that Mr. Belin was struggling

with him, resisting, resisting arrest, potentially assaulting

Officer Bissonnette.

He tells you, yeah, I could have charged him with

that, but he doesn't charge him with that.  You think he was

out there to do favors for Mr. Belin.  I think on redirect

Mr. Wortmann asked him:  "Do you typically charge that?"  And

he shrugs, "No, I don't ordinarily do that."  Do you think he

was out there to do favors for him?  If that struggle actually

happened, if that assault on him actually happened, he

1    certainly would have charged Mr. Belin, and he did not.

2        I'd submit to you that goes to whether or not what he

3    told you is truthful, and then we've got the fingerprints.  If

4    you remember from Ms. Jefferson, she says the magazine slides

5    in and out of the gun, it rubs up against the inside.  You

6    heard from the two fingerprint people, and I'm not questioning

7    their credibility one bit.  What they told you was I'd submit

8    to you flat out the truth, but you'll have a chance to look at

9    those fingerprints up close.

10:47AM 10       Look to see if there's any smudging on them, look to

11   see if there's any marks on them consistent with the magazine

12   going in and out because if Mr. Belin -- if his fingerprint was

13   actually on that magazine when it went in, it rubs up against

14   the inside when it's put in, and when it's taken out, it rubs

15   up against the inside of the gun again when it's taken out.

16       I'd submit to you that that doesn't match up with the

17   physical evidence if that scenario actually happened.  I'd

18   submit what really happened here is that Officer Bissonnette

19   and Officer Finn, they get a report of a fight taking place

10:47AM 20   between girls at Norfolk and Fessenden.

21       Officer Bissonnette is driving the car down Norfolk.

22   He decides rather than go Fessenden, which is diagonally across

23   the street where the fight supposedly is taking place among

24   girls, he tells you he didn't hear it.  Officer Finn apparently

25   has better ears than Officer Bissonnette.  He hears the fight

1   is among girls.

2        Officer Bissonnette sees for a brief instance these

3   five people walking down the street.  The government and

4   Officer Bissonnette try to portray it as they're together.

5   There's no evidence they're together.  He pulls into Mildred

6   Avenue.

7        I'd submit to you what's really going on here, he saw

8   Mr. Belin.  He's not a friend of Mr. Belin's.  He's arrested

9   Mr. Belin before.  He's had interaction with him before.  I'd

10:48AM 10   submit to you those weren't friendly encounters.  He sees

11   Mr. Belin walking down the street, he decides to pull into

12   Mildred Avenue.

13        He decides to pursue Mr. Belin, and you've heard from

14   officers that people don't have to engage with the police.

15   Mr. Wortmann tries to portray it as he had the audacity to walk

16   away from the officer, that you're obligated to engage with

17   police.  You're not.  If an officer walks up to you and wants

18   to talk to you, they can do that, but you can walk away.  You

19   don't have to talk to them, and that's what Mr. Belin did.

10:49AM 20   He's under no obligation to speak to Officer Bissonnette.

21        Officer Bissonnette wasn't happy with that.  He

22   pursued him, he grabbed him, he pushes him up against that

23   brown box.  That's what really happened here.  He saw him,

24   wanted to get him, wasn't happy that Mr. Belin wasn't stopping

25   for him.  That's what really happened.

1          I'm not going to stand before you and say that

2     Officer Bissonnette is required to follow each and every Boston

3     Police Department rule.  I think that would minimize the human

4     part of any sort of organization.  There are rules of

5     organizations, but people can't be automatons in following

6     rules.  Police are the same as anyone else.  They're not

7     automatons.  They're given rules to follow, like how to write

8     reports, what to do with gun cases.  The rule says one thing.

9     You can't always follow it in practice such as photographing a

10:50AM 10    gun.

11          I agree it's probably a stupid question for me to ask.

12    It's not practical for the police to keep a gun on someone's

13    person, but the rules are in place for a reason, and they

14    didn't follow them in this case, but, again, I understand the

15    police are human, and they can't follow every rule to the T,

16    but the human element, I'd submit, is what's really going on in

17    this case.

18          Officer Bissonnette has a relationship with Mr. Belin,

19    it's a negative one, it's not a positive one.  It's been

10:51AM 20    negative for quite awhile, so much that he arrested Mr. Belin

21    five years ago, and I'd submit that's what really played into

22    this case.  That's what happened in this case.

23          So on the surface, this case is a piece of cake, gun

24    in the waistband, bullets in the pocket, but I'd submit to you

25    if you take some time looking at all the evidence in this case,

1    really analyze it, you'll see that there's a reasonable doubt

2    as to whether or not Mr. Belin knowingly possessed the firearm

3    on September 17th, 2012.

4         I'd ask you to really look at the evidence, go through

5    it thoroughly, and I'm sure you will, you've taken an oath to

6    do that, and I'm sure you'll follow that oath, and at the end,

7    I'll ask you to come to the conclusion that Mr. Belin is not

8    guilty of what the government has charged him with.  Thank you.

9         THE COURT:  Thank you.

10:52AM 10    MR. WORTMANN:  Thank you, your Honor.

11                           REBUTTAL

12        MR. WORTMANN:  Ladies and gentlemen, there's not a

13   shred of evidence, not one thing that suggests that Belin and

14   Bissonnette had any problems between them, not one bit, making

15   it up.  All right.  There's nothing into this record that

16   suggests that getting a video from 200 feet when there are four

17   officers crowded around and struggling that that would have

18   shown anything.

19        You know, what kind of police officers do you want?

10:52AM 20   Do you want police officers that do appropriate investigations

21   and then get up and tell you what happened, and I submit to

22   you, ladies and gentlemen, the credibility issue is up to you,

23   that that's exactly what happened here.

24        Now, look, what the government does is puts together a

25   case, and it tries to do it efficiently and reasonably and gets

1    you plenty of evidence to look at a case, and, you know,

2    Mr. Garrity is right.  We could have paraded five or six more

3    witnesses in.  To do what?  Dealing with a gun in the

4    waistband.  Look, some cases are what they are, and this case

5    is a gun in the waistband, and you didn't hear anything in that

6    closing that talks about, well, where did the gun come from?

7    How did it get there?  How did the fingerprint get on?

8         Those are the things to focus on.  Those are the

9    things to look at.  Make those credibility assessments.  You're

10:53AM 10   the ones who do them, and when you do, you tell Mr. Belin that

11   you know what he did, you tell him that you know that he had

12   that gun, and you tell him in the only way that you know makes

13   sense, the only way that's appropriate, and the real way that's

14   supported by the evidence in this case, and that's by returning

15   a verdict of guilty.  Thank you very much.

16        THE COURT:  All right.  Thank you.  Ladies and

17   gentlemen, it's now time for me to deliver the instructions of

18   law that you are to follow in this case.  I'm going to have

19   Ms. Pezzarossi distribute a copy for each of you.  If you want

20   to take a moment to stand up and stretch, you can do that while

21   we are getting organized here.

22        You'll recall at the beginning of the case, I gave you

23   some preliminary instructions.  I don't think anything I say

24   here is different or inconsistent with that, but if it is,

25   these are the instructions that control.  Each of you will have

1    your own copy of this.  You should feel free to write on it, if

2    you want, and you'll be able to take it with you into the jury

3    room along with the evidence.

4         If everyone has their copy -- not quite yet.  If you

5    can turn to page 2, please follow along with me as I read.

6         It is your duty to find the facts from the evidence

7    submitted in this case.  To those facts, you must apply the law

8    as I give it to you.  The determination of the law is my duty

9    as the Judge.  It is your duty to apply the law exactly as I

10   give it to you, whether you agree with it or not.

11        In following my instructions, you must follow all of

12   them and not single out some and ignore others.  They're all

13   important.

14        You must not interpret these instructions or anything

15   I may have said or done as a suggestion by me as to what

16   verdict you should return.  That is a matter entirely for you

17   to decide.

18        Every person accused of a crime is presumed to be

19   innocent unless and until his guilt is proved beyond a

20   reasonable doubt.  The presumption is not a mere formality, it

21   is a fundamental principle of our system of justice.

22        The presumption of innocence means that the burden of

23   proof is always on the government to prove that the defendant

24   is guilty of the crimes with which he is charged beyond a

25   reasonable doubt.

1          This burden never shifts to the defendant.  It is

2     always the government's burden to prove each of the elements of

3     the crimes charged beyond a reasonable doubt.  The defendant

4     does not have to prove that he is innocent or even present any

5     evidence.

6          The presumption of innocence alone may be sufficient

7     to raise a reasonable doubt and to require the acquittal of the

8     defendant.  You may not convict the defendant of any crime

9     charged against him if the government fails, or is unable, to

10:56AM 10    prove every element of that crime beyond a reasonable doubt.

11         You may not convict the defendant based on speculation

12    or conjecture.

13         You may not convict the defendant if you decide that

14    it is equally likely that he is guilty or not guilty.  If you

15    decide that the evidence would reasonably permit either of two

16    conclusions, either that he is guilty as charged, or that he is

17    not guilty, you must find the defendant not guilty.

18         You may not convict the defendant if you decide that

19    it is only probable or even strongly probable that he is

10:56AM 20    guilty.  A mere probability of guilt is not guilt beyond a

21    reasonable doubt.

22         The law does not require that the government prove

23    guilt beyond all possible doubt; proof beyond a reasonable

24    doubt is sufficient to convict.  There are very things in this

25    world that we know with absolute certainty, and in criminal

1    cases, the law does not require proof that overcomes every

2    possible doubt.

3          Again, the defendant is presumed to be innocent, and

4    the government bears the burden of proving him guilty beyond a

5    reasonable doubt.  If, after fair and impartial consideration

6    of all the evidence, you have a reasonable doubt as to the

7    defendant's guilt, it is your duty to acquit him.  On the other

8    hand, if after fair and impartial consideration of all the

9    evidence, you are satisfied beyond a reasonable doubt as to his

10   guilt, you should vote to convict him.

11         Like all defendants, the defendant in this case has a

12   constitutional right not to testify.  No inference of guilt or

13   of anything else may be drawn from the fact that the defendant

14   did not testify.  For any of you to draw such an inference

15   would be wrong.  Indeed, it would be a violation of your oath

16   as a juror.

17         Your verdict must be based solely upon the evidence.

18   It would be improper for you to base your verdict on anything

19   that is not evidence.

20         You may not base your verdict on any personal

21   feelings, prejudices or sympathies you may have about the

22   defendant or about the nature of the crime with which he is

23   charged.

24         You may not consider or be influenced by any possible

25   punishment that may be imposed on the defendant.

1          Again, your verdict must be based solely on the

2     evidence and according to the law.

3          The evidence in this case consists of the sworn

4     testimony of witnesses, both on direct and cross-examination,

5     the exhibits that have been received into evidence and any

6     facts to which the parties have agreed or stipulated.  You

7     should consider all of the evidence, no matter what form it

8     takes, and no matter which party introduced it.

9          Whether the government has sustained its burden of

10:58AM 10   proof does not depend upon the number of witnesses it has

11    called, or upon the number of exhibits it has offered, but

12    instead upon the nature nature and quality of the evidence

13    presented.

14         Certain things are not evidence:

15         Arguments and statements by lawyers are not evidence.

16    The lawyers are not witnesses.  What they say in their opening

17    statements, closing arguments and at other times is intended to

18    help you interpret the evidence, but it is not evidence.  If

19    the facts as you remember them from the evidence differ from

10:58AM 20   the way the lawyers have stated them, your memory of the facts

21    should control.

22         Questions by lawyers, standing alone, are not

23    evidence.  Again, the lawyers are not witnesses.  The question

24    and the answer taken together are the evidence.

25         Objections by lawyers are not evidence.  Lawyers have

1    a duty to their clients to object when they believe a question

2    is improper under the rules of evidence.  You should not be

3    influenced by any objection or by my ruling on it, and you

4    should not speculate or guess about what the answer might have

5    been or what an exhibit might have said.

6          Anything that I have struck or instructed you to

7    disregard is not evidence.

8          The indictment is not evidence.

9          Anything you may have seen or heard when the Court was

10:59AM 10   not in session is not evidence.  You must decide the case

11   solely on evidence received at trial.

12         Evidence may take the form of either "direct evidence"

13   or "circumstantial evidence."  "Direct evidence" is direct

14   proof of a fact, such as testimony from an eyewitness that the

15   witness saw something.  "Circumstantial evidence" is indirect

16   evidence; that is, proof of a fact or facts from which you

17   could draw a reasonable inference that another fact exists even

18   though it has not been proved directly.

19         You are entitled to consider both direct and

11:00AM 20   circumstantial evidence.  The law permits you to give equal

21   weight to both.  It is for you to decide how much weight to

22   give to any particular piece of evidence, whether direct or

23   circumstantial.

24         Although you may consider only the evidence presented

25   in the case, you are not limited to the plain statements made

1    by witnesses or contained in the documents.  In other words,

2    you are not limited solely to what you saw and heard as the

3    witnesses testify.

4         You are also permitted to draw reasonable inferences

5    from the facts if you believe those reasonable inferences are

6    justified in light of common sense and personal experience.  An

7    inference is simply a deduction or a conclusion that may be

8    drawn from the facts that have been established.

9         Any inferences you draw must be reasonable and based

11:00AM 10    on the facts as you find them.  Inferences may not be based on

11    speculation or conjecture.

12         A particular item of evidence is sometimes received

13    for a limited purpose only.  That is, it can be used by you

14    only for one particular purpose and not for any other purpose.

15    I have told you when that occurred and instructed you on the

16    purposes for which the item can and cannot be used.

17         You do not have to accept the credibility of any

18    witness if you find that the witness is not credible.  You must

19    decide which witnesses to believe, considering all of the

11:01AM 20    evidence and drawing upon your common sense and personal

21    experience.  You may believe all of the testimony of a witness

22    or some of it or none of it.  You alone are the judges of the

23    witnesses' credibility.

24         In deciding whether to believe the testimony of the

25    witnesses, you may want to take into consideration such factors

1    as their conduct and demeanor while testifying; any apparent

2    fairness or unfairness they may have displayed; any interest

3    they may have in the outcome of the case; any prejudice or bias

4    they may have shown; their opportunities for seeing or knowing

5    the things about which they have testified; the reasonableness

6    or unreasonableness of the events that they have related to you

7    in their testimony; and any other evidence that tends to

8    support or contradict their version of the events.

9         The testimony of a witness may be discredited or

11:02AM 10   impeached by showing that he or she previously made statements

11   that are inconsistent with his or her present testimony.  If a

12   witness made inconsistent statements about any significant

13   matter, you have a right to distrust the testimony of that

14   witness in other respects.  You may reject all of the testimony

15   of that witness or give it such credibility as you may think it

16   deserves.

17        Sometimes, of course, people make innocent mistakes,

18   particularly as to unimportant details; not every contradiction

19   or inconsistency is necessarily important.  Again, you alone

11:02AM 20   are the judges of the witnesses' credibility.

21        You've heard the testimony of law enforcement

22   officers.  You may accept or reject that testimony.  The fact

23   that a witness may be employed as a law enforcement officer

24   does not mean that his or her testimony is necessarily

25   deserving of more or less consideration or greater or less

weight than that of any other witness.

Again, it is for you to decide whether to accept the testimony of any witness and what weight, if any, to give to that testimony.

You have heard testimony from persons who are permitted to explain certain technical issues or to express certain opinions about certain subjects.  A witness who has special knowledge, skill, experience, training, or education on a particular topic may testify and provide an explanation or state an opinion concerning such matters.

You may accept or reject that testimony, in whole or in part.  In weighing the testimony, you should consider the witness's education and experience and the soundness of the reasons given for the opinion.  You should also consider the credibility of the testimony, as you would with any witness.

The Court has received in evidence certain items that the government contends are firearms, that is, a firearm, singular, it should be.  Those items are in evidence, just like all the other exhibits.  In accordance with the standard procedures of the Court, some of those items will not be with you in the jury room when you deliberate.  In particular, we will not send 6.1, what the government contends is the firearm, at the same time as Exhibit 6.2 and 6.3, what the government contends is the ammunition.  You may, nonetheless, treat all of those items as you would any other items of evidence and

1    consider them in the course of your deliberations.  Should you

2    desire to examine any or all of that evidence, please give a

3    note to that effect to the court officer, and we will make

4    appropriate arrangements for you to do so.

5         Again, let me get off script here.  We're just not

6    going to send in the firearm and ammunition at the same time.

7    We can send in one without the other and then switch.  You're

8    entitled to both, but we don't want you to have both with you

9    in the jury room.

11:04AM 10      Back to page 17.  As I indicated at the beginning of

11   the trial, you've been permitted to take notes but some

12   cautions apply.  You should bear in mind not everything that is

13   written down is necessarily what was said.  When you return to

14   the jury room to discuss the case, do not assume simply because

15   something appears in somebody's notes that it necessarily took

16   place in court.  Notes are an aid to recollection, nothing

17   more.  The fact that something is written down does not mean

18   that it is necessarily accurate.

19        The numbers assigned to the exhibits are for

11:05AM 20   convenience and in order to ensure an orderly procedure.  You

21   should draw no inference from the fact that a particular

22   exhibit was assigned a particular number or that there may be

23   gaps in the number sequence.

24        This case, like most criminal cases, began with an

25   indictment.  You will have that indictment with you while you

1    deliberate in the jury room.  The indictment is not evidence or

2    proof of guilt.  The indictment is simply an accusation.  It is

3    the means by which the defendant is charged with crimes and

4    brought before this Court.

5         I'm now going to give you some instructions on the

6    nature of the crime charged in the indictment and the elements

7    of the offense that the government must prove beyond a

8    reasonable doubt.

9         The indictment contains one count that charges the

11:06AM 10    defendant with one crime, allegedly committed on or about

11    September 17th, 2012.

12         Count 1 charges the defendant with possession of a

13    firearm and ammunition after a previous conviction for a crime

14    punishable by imprisonment for a term exceeding one year.

15         The indictment charges the defendant with the crime of

16    possession of a firearm and ammunition by a person who was

17    previously convicted of a crime punishable by imprisonment for

18    a term exceeding one year.  It is against federal law for any

19    person who has been convicted in any court of a crime

11:06AM 20    punishable by imprisonment for a term exceeding one year to

21    possess a firearm or ammunition in or affecting interstate or

22    foreign commerce.

23         In order to find the defendant guilty of that crime,

24    the government must prove the following four elements beyond a

25    reasonable doubt:

1           First, that at some point before September 17th, 2012,

2      the defendant had been convicted of a crime punishable by

3      imprisonment for a term exceeding one year;

4           Second, that on or about September 17th, 2012, the

5      defendant possessed the firearm or ammunition specified in the

6      indictment;

7           Third, that the defendant acted knowingly;

8           And, fourth, that the firearm or ammunition were in or

9      affected interstate or foreign commerce.

11:07AM 10           The first element that the government must prove is

11      that at some point before September 17th, 2012 the defendant

12      had been convicted of a crime punishable by imprisonment for a

13      term exceeding one year.

14           The government has alleged that the defendant was

15      convicted of a state law crime in the Superior Court for the

16      Commonwealth of Massachusetts on October 19th, 2010.  As a

17      matter of law, that type of state law crime is a crime that is

18      punishable by imprisonment for a term exceeding one year.

19      Therefore, if you find beyond a reasonable doubt:  (1), that

11:08AM 20      the conviction occurred as alleged; and, (2) that the defendant

21      was the person who was convicted, that is sufficient proof for

22      you to find that at some point before September 17th, 2012, the

23      defendant had been convicted of a crime punishable by

24      imprisonment for a term exceeding one year.

25           The exact nature of the state law crime was redacted,

1    that is, blacked out, in the government's exhibits in order to

2    avoid any potential unfairness.  The government is not required

3    to prove the specific nature of the crime to satisfy its burden

4    as to this element of the offense.  You may not speculate or

5    guess about what crime the defendant may have committed or the

6    nature of the punishment.

7            If you find that the government has proved that the

8    defendant had such a prior conviction, you may not use that

9    evidence to infer that the defendant has a bad character or is

11:08AM 10   a bad person, and for that reason committed the crime charged

11   in this case, or was more likely to have committed the crime.

12   You may consider evidence of that conviction only for the

13   purpose of deciding whether this element has been proved and

14   not for any other purpose.

15           The second element that the government must prove is

16   that on or about September 17th, 2012, the defendant knowingly

17   possessed the firearm or ammunition specified in the

18   indictment.

19           I will now define the terms "possession," "firearm"

11:09AM 20   and "ammunition."

21           "Possession."

22           To "possess" something means to exercise authority,

23   dominion or control over that object.  Possession includes both

24   "actual" and "constructive" possession.  A person who has

25   direct physical control of something on or around his person is

1    in "actual" possession of it.  A person who is not in actual

2    possession, that is, who does not physically control the item

3    but who has both the power and the intent to exercise control

4    over it is in "constructive" possession of that item.  In

5    either case, the person is in possession of that item.

6         Whenever I use the term "possession" in these

7    instructions, I mean constructive as well as actual possession.

8         The government does not have to prove that the

9    defendant possessed the item for any specific period of time.

11:10AM 10         "Firearm."

11         A "firearm" is any weapon that will, or is designed

12    to, or may readily be converted to expel a projectile by the

13    action of an explosive, or the frame of any such weapon.

14         "Ammunition."

15         "Ammunition" is ammunition or cartridge cases,

16    primers, bullets or propellant powder designed for use in any

17    firearm.

18         The indictment alleges that the defendant possessed a

19    Ruger Model P95DC 9 millimeter semi-automatic handgun having an

11:10AM 20    obliterated serial number and 16 rounds of 9 millimeter

21    ammunition.  The government must prove either that the first

22    item is a "firearm" or that the second items are "ammunition"

23    as I have defined those terms for you.

24         It is not necessary that the government prove that the

25    defendant knowingly possessed both of the alleged items.  In

1    other words, to satisfy this element, you may convict the

2    defendant if the government proves beyond a reasonable doubt

3    that the defendant possessed the first item only, (the handgun)

4    the second item only, (ammunition) or both items, (handgun and

5    ammunition.)

6         You must, however, agree unanimously as to at least

7    one of those items before you may find the defendant guilty.

8    In other words, you must unanimously agree that the government

9    has proved that the defendant possessed the first item only,

11:11AM 10   (handgun), the second item only, (ammunition), or both items,

11   (handgun and ammunition.)

12        You may not convict the defendant if only some of you

13   agree as to the item or items the defendant possessed.  Thus,

14   for example, if only eight of you agree as to any one item, you

15   may not convict the defendant even if all 12 of you agree that

16   he knowingly possessed some item, but if you are unanimous as

17   to one item and not unanimous as to another, you may convict

18   provided that all the other elements of the offense have been

19   proved beyond a reasonable doubt.

11:11AM 20        The third element the government must prove is that

21   the defendant acted knowingly.  To act knowingly means to act

22   voluntarily and intentionally and not because of ignorance,

23   mistake or accident.  A person's knowledge cannot ordinarily be

24   proved directly for the obvious reason that there is no way of

25   being able to look inside a person 's mind.  Rather, a person's

1    "knowledge" must be determined by his statements and actions --

2    that is, what he says or does or does not say or do -- and by

3    the surrounding facts and circumstances.

4         To satisfy this element, you must find that the

5    defendant knowingly possessed the firearm or ammunition.  This

6    means that he possessed the firearm or ammunition voluntarily

7    and intentionally and not by accident or mistake.  It also

8    means that he knew the item in question was a firearm or

9    ammunition.  However, the government is not required to prove

10   that the defendant knew he was breaking the law.

11        The fourth element that the government must prove is

12   that the firearm or ammunition were "in or affected interstate

13   or foreign commerce."

14        This element is satisfied if it is established beyond

15   a reasonable doubt that at some time after the manufacture of

16   the firearm or ammunition and before the defendant possessed

17   them they moved across the international boundary of the

18   United States or across a state line.  Thus, proof that the

19   firearm or ammunition were manufactured outside Massachusetts

20   and then were later possessed by the defendant in Massachusetts

21   is sufficient to satisfy this element.

22        The government does not have to prove that the

23   defendant purchased or obtained the firearm or ammunition in

24   some other country or other state and carried it into

25   Massachusetts.  It does not have to prove that the defendant

1    knew that the firearm or ammunition had crossed a state line or

2    international boundary.  It does not have to prove who

3    purchased the firearm or ammunition or how they arrived in

4    Massachusetts.  It does not have to prove that any shipment or

5    transportation of the firearm or ammunition across the boundary

6    was in furtherance of any unlawful activity or had any

7    connection to the defendant.

8         Again, the government must prove that the firearm or

9    ammunition had traveled in interstate or foreign commerce by

11:13AM 10  moving across the international boundary or a state line at any

11   time before the defendant possessed it.

12        The indictment charges that the offense was committed

13   in or about or on or about certain dates.  Although it is

14   necessary for the government to prove beyond a reasonable doubt

15   that the offense you are considering was committed on or

16   reasonably near the dates alleged in the indictment, it is not

17   necessary for the government to prove that the offense was

18   committed precisely on the dates charged.

19        I come now to the last part of the instructions, the

11:14AM 20  rules for your deliberations.  When you retire, you will

21   discuss the case with the other jurors to reach agreement if

22   you can do so.  You shall permit your foreperson to preside

23   over your deliberations, and your foreperson will speak for you

24   here in court.  Your verdict as to each count must be

25   unanimous.  That is, all of us must agree on the verdict.

1          Each of you must decide the case for yourself, but you

2     should do so only after considering all the evidence,

3     discussing it fully with the other jurors and listening to the

4     views of the other jurors.

5          Do not be afraid to change your opinion if you think

6     you are wrong, but do not come to a decision simply because

7     other jurors think it is right.

8          It is important that you reach a verdict if you can do

9     so conscientiously.  You should not hesitate to reconsider your

11:15AM 10    views from time to time and to change them if you are persuaded

11    that this is appropriate attempt.

12          It is important that you attempt to return a verdict,

13    but, of course, only if each of you can do so after having made

14    your own conscientious determination.  Do not surrender an

15    honest conviction as to the weight and effect of the evidence

16    simply to reach a verdict.

17          I want to explain to you now what is called the

18    verdict form.  This is simply the written notice of the

19    decision you will reach in this case.  It's a single piece of

11:15AM 20    paper.  It has the caption on the case, United States of

21    America vs. King Belin.  It says, "Verdict Form," and it says,

22    We, the jury, find the defendant as to Count 1, and there's a

23    place to mark guilty or not guilty.  That's the choice you're

24    going to make, and then there's a place for the foreperson to

25    sign it and date it.

1          After you've reached a unanimous agreement on a

2     verdict, your foreperson will fill in the form that has been

3     given to you, sign and date it and advise the jury officer

4     outside your door that you're ready to return to the courtroom.

5          After you return to the courtroom, your foreperson

6     will deliver the completed verdict form as directed in open

7     court.  If it becomes necessary during your deliberations to

8     communicate with me, you may send through the jury officer a

9     note signed by your foreperson or by one or more members of the

11:16AM 10    jury.

11         No member of the jury should ever attempt to

12    communicate with me on anything concerning the case except by a

13    signed writing, and I will communicate with any member of the

14    jury on anything concerning the case only in writing or orally

15    here in open court.

16         If you send out a question, I will consult with the

17    parties as promptly as possible before answering, which may

18    take some time.  You may continue with your deliberations while

19    waiting for the answer to any question.

11:16AM 20         When you are communicating with me, please do not tell

21    me or anyone else how the jury stands numerically or towards

22    which decision the jury is leaning.

23         All right.  Let me see counsel at sidebar.

24         (THE FOLLOWING OCCURRED AT SIDEBAR:)

25         THE COURT:  Anything further on the jury instructions,

1    Mr. Wortmann?

2           MR. WORTMANN:  Your Honor, the only thing I might

3    think about and ask you to consider is just reminding them that

4    they do not have any transcripts, that the transcripts won't be

5    available for them in this case.  That's up to you.

6           MR. GARRITY:  No objection to that.

7           THE COURT:  Anything further?

8           MR. GARRITY:  No, your Honor.  Again, note my

9    objection to the instructions with respect to the conviction.

11:22AM 10          THE COURT:  That objection is again overruled.

11          (SIDEBAR CONFERENCE WAS CONCLUDED)

12          THE COURT:  All right.  Ladies and gentlemen, a few

13   housekeeping matters.  Before I get to that, first let me

14   remind you again, as I said, at the beginning of the case, you

15   will not have a transcript of the proceeding with you in the

16   jury room.  You will have copies of exhibits, but you won't

17   have a transcript during your deliberations.

18          Your schedule is your own.  It's just after 11:15.

19   You can take as long as you want to make this decision or as

11:22AM 20   short as you want.  It is entirely up to you.  We have ordered

21   lunch for you.  It should be arriving at some point.

22          THE CLERK:  About 11:30.

23          THE COURT:  At or about 11:30, as we say in the legal

24   profession.  If I haven't heard from you otherwise, I will want

25   to check in with you at 5:00 about whether you want to come

1    back tomorrow.  Again, you are the masters of your schedule at

2    this point.  You can take as long as you think as necessary or

3    you can return a verdict as quickly as you think is

4    appropriate.

5         I have another matter, which I don't enjoy, and that

6    is I need to remove two alternates.  Even though the trial only

7    lasted two days, before the trial started I thought it was

8    necessary to impanel two extra people.  That means I have to

9    remove two people, which means the two people I remove will not

11:22AM 10    be allowed to deliberate or vote, and to make matters worse, we

11    won't let you two leave.  You have to stay until the jury

12    returns the verdict, but the law requires me to remove you, and

13    I'm going to do it, the last two jurors seated when we

14    impaneled, and that's Mr. Duggan in seat 1 and Ms. Fagan in

15    seat 13.  I apologize to both of you under the circumstances.

16         Finally, I need to appoint a foreperson of the jury.

17    The rule of the foreperson is to simply ensure and to make sure

18    the form is filled out correctly and to sign it and date it in

19    open court.  The foreperson's views are not entitled to extra

11:22AM 20    weight.  They don't get an extra vote.  There's nothing special

21    about the position other than making sure the discussion is

22    orderly and that the form is filled out correctly and returned

23    here in open court.

24         I'm going to appoint Ms. Garneau in seat 10 as the

25    foreperson of the jury, and I ask that you permit her to

1    preside over your deliberations.

2         With that, I instruct you to retire to the jury room

3    to begin your deliberations.  It will take us a moment or two

4    to gather the exhibits together and to deliver them to you.  I

5    think, again, what we're going to do, deliver what the

6    government says is the firearm without what the government says

7    is the ammunition, and we can switch those out at your

8    convenience or at your instruction, and I should add, if you

9    have a question or issue concerning your personal comfortable,

11:22AM 10   if the room is too hot or too cold, we don't need it, but

11   anything not having to do with your personal comfort does

12   require we come back here in open court with the lawyers

13   present.

14        With that, I instruct you to retire and begin your

15   deliberations.

16             THE CLERK:  All rise for the jury.

17             (JURORS ENTERED THE COURTROOM.)

18             THE COURT:  Please be seated.  Will the lawyers get

19   together and make sure that the jury exhibits are all there,

11:22AM 20   again, holding back 6.1.

21             MR. WORTMANN:  6.1 is the --

22             THE COURT:  We'll hold back 6.2 and 6.3 unless the

23   jury requests them.

24             MR. WORTMANN:  Do you want me to maintain them?

25             THE COURT:  Yes, the party that introduces the

1    exhibits will always maintain possession of them until they're

2    in control of the jury.  Let me know if there's an issue, if

3    there's some disagreement.  I ask that you remain in some

4    hailing distance of the courtroom.  I will permit you to have

5    your cell phones with you and turned on at any place in the

6    building.  Make sure that Ms. Pezzarossi has your cell number

7    so we can contact you if there's a question or a verdict.  Is

8    there anything else?

9             MR. WORTMANN:  No, thank you, your Honor.

11:23AM 10             MR. GARRITY:  No, your Honor.

11             THE CLERK:  Counsel, do you all agree that we're

12    bringing the exhibits upstairs to the jury?

13             MR. GARRITY:  I do.

14             MR. WORTMANN:  I do, and we've suggested and agreed

15    that at the conclusion of the case, the 8 and a half by 11 of

16    Exhibits 9.3 and 10.3 be included in the record.

17             MR. GARRITY:  I agree with that as well.

18                          VERDICT

19             THE CLERK:  All rise.  You may be seated.

12:20PM 20             THE COURT:  All right.  I have a note from the jury

21    that says we are ready, we have a verdict.  Shall we order the

22    jury brought in?

23             MR. GARRITY:  Yes, your Honor.

24             MR. WORTMANN:  Thank you, your Honor.

25             THE COURT:  We'll mark this note as Exhibit D, as in

1    dog.

2           (Note from jury was marked Exhibit D for

3    identification.)

4           THE COURT:  Ms. Pezzarossi, will you bring the jury

5    in.

6           THE CLERK:  All rise for the jury.

7           (JURORS ENTERED THE COURTROOM.)

8           THE CLERK:  Thank you.  You may be seated.

9           THE COURT:  We need to retrieve the alternates.

12:27PM 10                          VERDICT

11           THE CLERK:  All rise.  Thank you.  Be seated.  Madam

12    foreperson, has the jury reached a unanimous verdict?

13           FOREPERSON OF THE JURY:  Yes, your Honor.

14           THE COURT:  Will you please hand the verdict form to

15    the clerk.  The form appears to be in order.

16           Ms. Pezzarossi, will you please publish the verdict.

17    Would the defendant please stand.

18           THE CLERK:  In the matter of the United States vs.

19    King Belin, Criminal Matter Number 13-10048, we, the jury, find

12:28PM 20    the defendant as to Count 1, possession of firearm and

21    ammunition guilty.  So, say you madam forelady?

22           FOREPERSON OF THE JURY:  Yes.

23           THE CLERK:  So say you all members of the jury?

24           ALL JURORS:  Yes.

25           THE COURT:  Is there a request to poll the jury?

1                MR. GARRITY:  There is, your Honor.

2                THE COURT:  All right.  Would you please be seated.

3        Would you please poll the jury.

4                THE CLERK:  Juror Number 2, so say you, is that your

5        verdict?

6                JUROR NUMBER 2:  Yes.

7                THE CLERK:  Juror Number 3, is that your verdict?

8                JUROR NUMBER 3:  Yes.

9                THE CLERK:  Juror Number 4, is that your verdict?

10               JUROR NUMBER 4:  Yes.

11               THE CLERK:  Juror Number 5, is that your verdict?

12               JUROR NUMBER 5:  Yes.

13               THE CLERK:  Juror Number 6, is that your verdict?

14               JUROR NUMBER 6:  Yes.

15               THE CLERK:  Juror Number 7, is that your verdict?

16               JUROR NUMBER 7:  Yes.

17               THE CLERK:  Juror Number 8, is that your verdict?

18               JUROR NUMBER 8:  Yes.

19               THE CLERK:  Juror Number 9, is that your verdict?

20               JUROR NUMBER 9:  Yes.

21               THE CLERK:  Juror Number 10, is that your verdict?

22               JUROR NUMBER 10:  Yes.

23               THE CLERK:  Juror Number 11, is that your verdict?

24               JUROR NUMBER 11:  Yes.

25               THE CLERK:  Juror Number 12, is that your verdict?

1          JURY NUMBER 12:  Yes.

2          THE CLERK:  Juror Number 14, is that your verdict?

3          JURY NUMBER 14:  Yes.

4          THE COURT:  Thank you, ladies and gentlemen of the

5     jury.  Thank you for your jury service and for your patience

6     throughout this process.  I have to attend to a couple of

7     matters with the attorneys.  It will take me a few moments, but

8     if you're willing, if you can stick around for a few minutes,

9     I'd like to come back to the jury room and thank you personally

12:29PM 10   in the jury room, but, again, thank you, and I will be up in a

11    few moments.

12          THE CLERK:  All rise for the jury.

13          (JURORS EXITED THE COURTROOM.)

14          THE COURT:  I neglected to formally discharge them,

15    which I now do.  Please be seated.  Mr. Belin, a written

16    pre-sentence report will be prepared by probation to assist me

17    in determining your sentence.  You'll be asked to give

18    information for that report.  Your lawyer may be present, if

19    you wish.

12:30PM 20          It's important that the report be accurate.  It will

21    not only affect what sentence you receive but what happens to

22    you after you are sentenced.  For example, if you're sent to

23    prison, it will affect where you are sent and what happens to

24    you when you get there.  Even minor mistakes in the report

25    should be corrected.

1        You'll have a chance to read the report, as your will

2   your lawyer, and to file objections to it before the time of

3   sentencing, and both your lawyer and you personally will have

4   the opportunity to speak on your behalf at the time of

5   sentencing.

6        I'm, therefore, going to refer you to the probation

7   office for the pre-sentence investigation and preparation of

8   the report.  That process usually takes about 12 weeks to

9   complete, so March 31st at 2:30 p.m.  Does that work?

12:31PM 10        MR. WORTMANN:  It does, thank you, your Honor.

11        MR. GARRITY:  It does, your Honor.

12        THE COURT:  March 31st 2:30 p.m.  I'll order that the

13   defendant remain detained pending imposition of the sentence.

14   Is there anything further, Mr. Wortmann?

15        MR. WORTMANN:  Nothing, thank you, your Honor.

16        MR. GARRITY:  No, your Honor.

17        THE COURT:  Thank you, all, we'll stand in recess.

18        THE CLERK:  All rise.

19        (Whereupon, the hearing was adjourned at

20   12:30 p.m.)

21

22

23

24

25

1                        C E R T I F I C A T E

2

3      UNITED STATES DISTRICT COURT )

4      DISTRICT OF MASSACHUSETTS ) ss.

5      CITY OF BOSTON )

6

7               I do hereby certify that the foregoing transcript,

8      Pages 1 through 108 inclusive, was recorded by me

9      stenographically at the time and place aforesaid in Criminal

10     Action No. 13-10048-FDS, UNITED STATES OF AMERICA vs.

11     KING BELIN and thereafter by me reduced to typewriting and is a

12     true and accurate record of the proceedings.

13               Dated this 29th day of November, 2015.

14

15                          s/s Valerie A. O'Hara

16               _____

17                          VALERIE A. O'HARA

18                          OFFICIAL COURT REPORTER

19

20

21

22

23

24

25